## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
                                             :
In re                                        :       Chapter 11
                                             :
PHOENIX SERVICES TOPCO, LLC, et al.,         :       Case No. 22–10906 (      )
                                             :
                Debtors.¹                     :       (Joint Administration Requested)
                                             :
------------------------------------------------------------- x
```

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), AND 503(B) AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF UNDISPUTED AND OUTSTANDING PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF

Phoenix Services Topco, LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable). The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, Pennsylvania 19087.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.      Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert Richard in Support of Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on the date hereof (the "**Richard Declaration**"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

6.      By this Motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request (i) authority, but not direction, to pay prepetition amounts, in the exercise of their reasonable business judgment

subject to the terms of the Proposed Orders owed to (a) vendors whose goods and services are essential to the Debtors' operations (such vendors, collectively, the "**Critical Vendors**" and their prepetition claims, the "**Critical Vendor Claims**") in an aggregate amount not to exceed $13.2 million on an interim basis and $14.1 million on a final basis (inclusive of the interim amount) (the "**Critical Vendor Cap**"), of which approximately $1.2 million is for certain goods received within the twenty (20) days prior to the Petition Date (such claims, the "**503(b)(9) Claims**," and such claimants, the "**503(b)(9) Claimants**") and approximately $800,000 is for vendors that may be entitled to assert liens against the Debtors' or their customers' assets (such claims, the "**Lien Claims**," and such claimants, the "**Lien Claimants**"), and (b) certain suppliers, service providers, and other entities outside of the United States (such parties, collectively, the "**Foreign Vendors**" and their prepetition claims, the "**Foreign Vendor Claims**") in an aggregate amount not to exceed $1.4 million (the "**Foreign Vendor Cap**"); (ii) authority to confirm the administrative expense priority status of Outstanding Prepetition Orders (as defined below) and pay prepetition amounts related to the Outstanding Prepetition Orders; and (iii) related relief.  The Debtors also seek authority, but not direction, to condition the payment of the Critical Vendor Claims and the Foreign Vendor Claims (such claims, collectively, the "**Vendor Claims**" and their claimholders, the "**Vendor Claimants**"), whether in whole or in part, upon the respective Vendor Claimants' commitment through a Trade Agreement (as defined herein) or as otherwise described herein to maintain or reinstate contract terms during the pendency of these chapter 11 cases that are at least as favorable as the most favorable trade terms existing in the 180 days before the Petition Date, or such other trade terms acceptable to the Debtors and the Ad Hoc Group.[2]

---

[2] "Ad Hoc Group" shall have the meaning ascribed to such term in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protections,*

3

7.     The following table summarizes the relief requested in the Motion with respect to the Vendors Claims:

| Type of Vendor | Interim Amount (24 days after the Petition Date) | Final Amount[3] |
|---|---|---|
| **Critical Vendors** | | |
| *Lien Claimants* | $800,000 | $800,000 |
| *503(b)(9) Claimants* | $1,000,000 | $1,200,000 |
| *Other Critical Vendors* | $11,400,000 | $12,100,000 |
| *Total* | **$13,200,000** | **$14,100,000** |
| **Foreign Vendors** | $1,400,000 | $1,400,000 |
| **Total** | **$14,600,000** | **$15,500,000** |

8.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**"), and a proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**").  The relief requested herein is subject to any consent required or any restrictions under any interim and final order(s) of this Court granting the DIP Motion (such interim or final order, as applicable, the "**DIP Order**"), the DIP Credit Agreement (as defined in the DIP Order), or the Approved DIP Budget (as defined in the DIP Order).

## Preliminary Statement

9.     The relief requested herein is critical to the success of the Debtors' ability to achieve their objectives in chapter 11.  The Debtors rely on the Vendors Claimants to supply

---

*(IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Motion**") filed contemporaneously herewith.

[3]     The Final Amount is equal to the estimated total amount accrued as of the Petition Date and inclusive of the Interim Amount.

critical goods and services to facilitate the Debtors' steel mill services.  The uninterrupted continuation of the Debtors' business depends upon the continued support of their Vendor Claimants.  Failure to pay the Vendor Claimants on the terms and conditions set forth herein would likely create a crisis in confidence among such vendors and, consequently, customers, that would significantly harm the Debtors' business — to the detriment of its stakeholders.  Without the ability to pay or otherwise honor, whether in whole or in part, their prepetition obligations to their Vendor Claimants in the ordinary course of business on the terms and conditions set forth herein, the Debtors risk (i) a decline in their operating revenues and (ii) losing the hard-earned trust, loyalty, and goodwill of their Vendor Claimants, both of which would irreparably damage the value of their business.

10.     Indeed, due to the nature of the Debtors' business, their operations are susceptible to significant disruptions—and would come to near halt—if certain Vendor Claimants fail to perform.  The Debtors commenced these chapter 11 cases to maximize the value of their business for the benefit of all stakeholders.  Accordingly, it is more important than ever that the Debtors continue to honor payments to their Vendor Claimants, as set forth in this Motion, in order to keep the business stabilized and avoid any significant disruptions to the business that would be value destructive for all parties in interest.

## Critical Vendor Assessment Process

11.     The Debtors and their advisors, including AlixPartners, LLP, the Debtors' proposed financial advisor, and Weil, Gotshal & Manges LLP, the Debtors' proposed counsel, engaged in a comprehensive process to (i) identify those vendors, suppliers, and/or service-providers that may be "critical" to the Debtors' businesses and (ii) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors at the outset of these chapter 11 cases.  In

5

this process, the Debtors, with the assistance of their restructuring professionals, assessed a variety of factors, including:

- the goods or services provided by a vendor or supplier;

- whether goods or services are provided pursuant to a contract or on a purchase-order or sales-order basis;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or provide critical services on a postpetition basis;

- whether failure to pay a particular vendor could result in contraction of trade terms;

- whether the vendor is a sole- or limited-source or high-volume supplier of traffic to the Debtors' platforms or of particular goods or services;

- whether alternative vendors are available that could provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto; and

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor.

12.    As a result of this analysis, the Debtors identified the universe and types of vendors whose support remains essential to the Debtors' own ability to preserve and enhance value through the seamless transition of their operations into chapter 11.  Depending on the Critical Vendor, the Debtor may elect to: (i) pay a portion of the Critical Vendors' prepetition claim; and/or (ii) pay the claim over time in installments.

## Critical Vendors

### A.    Overview

13.    The Debtors provide mission-critical services to leading, global steel-producing companies in the U.S.  The Debtors' suite of customer services primarily includes the removal and handling of molten slag that has been separated from steel at customer sites.  In

6

addition to handling slag, the Debtors also process the slag in order to (i) recover entrained metal which is typically sold back to the steel mills and (ii) separate the non-metallic slag content for sale as a construction aggregate to buyers in other manufacturing industries.  The Debtors also prepare and handle metal scraps, as well as provide related ancillary services included raw material preparation, in-plant materials transportation, and transporting steel products.

14.    In order to provide the aforementioned services safely and reliably, the Debtors require various specialized materials, tools, equipment, and services.  For example, the Debtors' operations involve specialized industry- and site-specific equipment, such as cranes, crushers, conveyers, screens, and magnetic separators (among other related equipment). Moreover, the Debtors operate a customized fleet of trucks and other vehicles that allow for the transport of slag and other steel manufacturing-related products in large trailers, pots, and other types of containers.  Many of the Debtors' services and operations require significant amounts of long-distance transport, which entails substantial fuel consumption by, and vehicle wear and tear on, the Debtors' vehicles.  Accordingly, the Debtors must maintain a steady reserve of fuel, tires, spare equipment parts, and protective equipment on an ongoing basis, as well as purchase repair parts and services for the vehicles and containers used in such operations.

15.    The Debtors rely on a network of Critical Vendors to provide the goods and services necessary to facilitate their operations.  Importantly, the Debtors' business is highly sensitive and could easily be disrupted by a Critical Vendor refusing to provide the Debtors with essential goods and services for even a short time.  Any such disruption could jeopardize the Debtors' ability to deliver goods to their customers, preserve the value of their business, and ensure stability during these chapter 11 cases.

7

16.     In the ordinary course of the Debtors' business, the Debtors receive communications from vendors regarding upcoming payments.  A failure to pay certain Critical Vendors in a timely manner following receipt of such communications could lead to a hindering of the Debtors' relationships with such vendors and a disruption in the provision of services.  In the weeks leading up to the Petition Date, the Debtors have received increased pressure from vendors.  Due to their diminishing liquidity, the Debtors have had to stretch vendor payables in an unprecedented fashion.

17.     Importantly, the vast majority of the Critical Vendors do not have contracts with the Debtors.  Consequently, if the Debtors were to refuse or delay payment of their Critical Vendor Claims, the Critical Vendors would have no obligation to continue providing services on a go-forward basis.  Based on the communications with certain of the Debtors' Critical Vendors in the months leading up to the Petition Date, the Debtors have reason to believe that certain Critical Vendors may seek or threaten to discontinue service absent payment of their prepetition claims, and the Debtors' enforcement of contracts alone would be insufficient to guarantee uninterrupted services.  The ability to leverage the Debtors' Critical Vendors is integral to the Debtors' operations, and any interruption could cause material, immediate, and irreparable harm to the Debtors' business and going-concern viability.

18.     Not only would failure to pay likely be detrimental to many of the Debtors' vendor relationships, but it would also send a message to the greater industry that the Debtors fail to honor their obligations.  Similarly, termination of the Critical Vendor relationships will likely cause interruptions and harm customer relationships as the Debtors will be unable to provide consistency and certainty.  The Debtors further believe that their failure to pay outstanding invoices

in a timely manner has already had a negative impact on the quality of services they have been providing to their customers.

19.     Accordingly, the Debtors believe that it is in the best interests of the Debtors' estates to pay the prepetition claims of Critical Vendors, whether in whole or in part, as applicable, that, in the Debtors' business judgment, on the terms and conditions set forth herein, if the Debtors failed to pay, would diminish the value of the Debtors' business.

**B.    503(b)(9) Claimants**

20.     As described above, the Debtors' business relies on certain industry supplies and goods, which are supplied by certain Critical Vendors, to allow the Debtors to conduct their day-to-day operations.  Certain of the Debtors' Critical Vendors are afforded specific rights pursuant to section 503(b)(9) of the Bankruptcy Code.  These 503(b)(9) Claimants are vendors from whom the Debtors have received goods within 20 days prior to the Petition Date.  Because of the Debtors' business model, many of the 503(b)(9) Claimants provide unique goods and services that would be difficult, if not impossible, to replace without incurring significant switching costs or significant disruption to the Debtors' business.  Other 503(b)(9) Claimants, which (i) manufacture, or provide parts or goods necessary to operate, the Debtors' equipment, or (ii) provide fuel, tires and other necessary goods or equipment for transportation operations would likewise be difficult and/or costly to replace.  Perhaps most significantly, and as discussed further herein, the Debtors have entered into a variety of favorable and/or fixed pricing terms with its fuel vendors given the volatility in such market.  In the event that the fuel vendors were to stop delivering fuel to the Debtors, the Debtors do not believe that they would be able to re-source fuel at a comparable price, resulting in significantly increased costs.

21.     A migration of the Debtors' business to substitute manufacturers and goods providers would be prohibitively expensive and cause serious disruptions to the Debtors' business.

9

Moreover, such migration would be time-consuming – in some cases, such a migration could take several months, and in other cases, even longer.  For instance, replacing the 503(b)(9) Claimants which provide customized equipment designed for the Debtors' site-specific purposes could take several months to a year or more to replace.

22.    Absent authority to pay 503(b)(9) Claims at the outset of these chapter 11 cases, the Debtors could be denied access to the goods, including fuel, necessary to maintain the Debtors' business operations, and certain 503(b)(9) claimants may withhold support for the Debtors during the chapter 11 process or eliminate favorable trade terms.  Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

23.    Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay prepetition 503(b)(9) Claims in an aggregate amount not to exceed $1.0 million on an interim basis and $1.2 million on a final basis (inclusive of the interim amount), that, in the exercise of the Debtors' business judgment and in consultation with the Ad Hoc Group, if and when applicable, the Debtors believe are essential to avoiding costly disruptions to the Debtors' operations.

## C.    Lien Claimants

24.    To service their customers, the Debtors engage various Lien Claimants, which may hold or have the right to assert liens against the assets of the Debtors or the Debtors' customers, to supply many of the essential materials, supplies, equipment, and services that the Debtors rely on to service their customers.  Across their customer sites, the Debtors require such goods and services to effectively complete the services for their customers.  For example, the Debtors utilize service providers to, among other things, service cranes and other equipment at

10

customer sites, deliver various materials and supplies to customer sites, and store tires and other materials at offsite facilities on behalf of the Debtors.

25.    Accordingly, to continue operating and serving their customers, the Debtors must continue purchasing essential goods and services from certain Lien Claimants.  Any delay or disruption in the provision of the essential goods and services by the Lien Claimants to the Debtors would materially impact the Debtors' ability to operate their business, to the detriment of their customers, creditors, and all parties in interest.

26.    In certain instances, if the Debtors fail to pay the Lien Claimants, the Lien Claimants may be entitled to assert liens on their customers' property under various state laws to secure payment for the materials, supplies, equipment, labor or services provided to the Debtors. In such instances, the customers may withhold payment to the Debtors, essentially trapping unpaid funds which may be in excess of the amounts owed to the Lien Claimants.  Accordingly, the failure to pay these Lien Claimants on a timely basis, on account of materials, supplies, equipment, labor, or services provided to the Debtors could result in a significant disruption to the Debtors' business.

27.    In addition to the liens, these Lien Claimants may be entitled to assert against certain of the Debtors' or their customers' property under various state laws, pursuant to section 363(e) of the Bankruptcy Code, Lien Claimants with valid liens may also be entitled to adequate protection of their liens, which may impose additional costs on the Debtors' estates.  The Debtors expect that, as of the Petition Date, certain Lien Claimants will have outstanding invoices or accrued unbilled charges for materials and/or supplies that were delivered to or sent by the Debtors prior to the Petition Date.  As a result, certain Lien Claimants may argue that they are entitled to possessory liens for the transportation and storage of, or work performed on, the materials, supplies, or equipment in their possession, and may refuse to deliver or release such

11

materials, supplies, or equipment before their Lien Claims have been satisfied and their liens redeemed.  The assertion of such liens would materially disrupt the Debtors' operations.  Further, to the extent any Lien Claimants do not have valid liens, their possession and retention of any of the Debtors' materials, supplies, or equipment would impact the Debtors' ability to efficiently and effectively operate their business in the ordinary course, as promised to their customers who depend on such output.

28.     Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay prepetition Lien Claims in an aggregate amount not to exceed $800,000 on an interim basis and $800,000 on a final basis (inclusive of the interim amount), that, in the exercise of the Debtors' business judgment, and in consultation with the Ad Hoc Group, if and when applicable, the Debtors believe are essential to avoiding costly disruptions to the Debtors' operations.

**D.     Other Critical Vendors**

29.     The Debtors also rely on certain other Critical Vendors to provide essential services and equipment.  In particular, these Critical Vendors provide services that relate to the repair of the Debtors' equipment and facilities, as well as the health and safety of the Debtors' operations and their employees.   Under applicable governmental regulation and customer requirements, the Debtors are required to maintain certain standards of health and safety at steel mill sites that require, among other things, the use of specific gloves, fire and chemical resistant uniforms, helmets, steel toe boots, and other various forms of personal protective equipment.  In addition, the Debtors retain the services of various health and safety experts for, among other things, safety compliance work, which includes, among other things, explosives and various forms of testing and removal of hazardous waste.  In order to comply with such requirements in the ordinary course of business, the Debtors rely on certain Critical Vendors to provide the necessary equipment.  If the Debtors were unable to pay prepetition amounts due such Critical Vendors, the

Debtors risk not only a disruption, but a complete halt in their day-to-day operations given that the lack of such equipment and services would create an unsafe and dangerous environment for the Debtors' employees, and would likely be in violation of applicable governmental regulations.

30.    As discussed, the Debtors operate a customized fleet of trucks and other vehicles that allow for the transport of slag and other steel manufacturing-related products in large trailers, pots, and other types of containers.  Therefore, many of the Debtors' services and operations require significant amounts of long-distance transport, which relies on substantial fuel consumption.  To mitigate fuel costs, the Debtors also have entered into a variety of favorable, fixed pricing terms with their fuel vendors given the volatility in such market.  In the event that the fuel vendors were to stop delivering fuel to the Debtors, the Debtors do not believe that they would be able to re-source fuel at a comparable price, which would result in significantly increased costs, and serious disruptions to the Debtors' business.  Without the fuel provided by these fuel vendors, the Debtors' business will face serious disruptions due to the inability to transport the equipment and other goods necessary for their operations to different sites.

31.    The Debtors' operations also involve specialized industry- and site-specific equipment, such as cranes, crushers, conveyers, screens, and magnetic separators (among other related equipment), which are serviced by the vendors specializing in such equipment necessary for the Debtors' business (the "**Equipment Vendors**").  The Equipment Vendors are critical as they provide equipment and equipment parts that are unique and customized in nature and, therefore, difficult to replace.  Furthermore, the Debtors believe that refusal to pay one Equipment Vendor for equipment at a particular site is likely to have ripple effects across all applicable sites.

32.    Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay prepetition Critical Vendor Claims (inclusive of the 503(b)(9) Claims and the Lien Claims)

in an aggregate amount not to exceed $13.2 million on an interim basis and $14.1 million on a final basis (inclusive of the interim amount), that, in the exercise of the Debtors' business judgment, and in consultation with the Ad Hoc Group, if and when applicable, the Debtors believe are essential to avoiding costly disruptions to the Debtors' operations.

### Foreign Vendors

33.     In the ordinary course of conducting their business, the Debtors incur various obligations to and rely on certain key Foreign Vendors, which are located in, among other places, Poland.  The Foreign Vendors supply various goods or services that are crucial to the Debtors' ongoing operations, including capital installments and equipment that are critical to the Debtors' provision of their day-to-day services to their own customers.  Each of the Foreign Vendors would be difficult to replace and would result in high switching costs or significant disruption to the Debtors' business.

34.     Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtors may not be able to enforce the stay in foreign jurisdictions if the creditor against whom enforcement is sought has minimal or no presence in the United States.  As a result, despite the commencement of these cases and the imposition of the automatic stay, if the Foreign Vendor Claims are not timely paid, the Foreign Vendors may be able to immediately pursue remedies and seek to collect prepetition amounts owed to them.  Indeed, there is a real risk that nonpayment of even a single invoice could cause a Foreign Vendor to stop providing necessary services to the Debtors on a timely basis or sever its business relationship with the Debtors.  The Debtors are making every effort to avoid interruptions to their business and the adverse effects that even a temporary disruption could have on their businesses.  Any short-term

disruption of services provided by the Foreign Vendors could generate instability and jeopardize the Debtors' ability to preserve value to the detriment of the Debtors' estates.

35.     Accordingly, by this Motion, the Debtors seek authority, but not direction, to pay prepetition Foreign Vendor Claims in an aggregate amount not to exceed $1.4 million that, in the exercise of the Debtors' business judgment, and in consultation with the Ad Hoc Group, if and when applicable, the Debtors believe are essential to avoiding costly disruptions to the Debtors' operations.

**Customary Trade Terms**

36.     In exchange for payment of the Vendor Claims, the Debtors propose to use appropriate efforts to require each Vendor Claimant to provide as favorable trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, product mix, availability, and other programs) as those trade terms, practices, and programs in place in the 180 days prior to the Petition Date (collectively, the "**Customary Trade Terms**").

37.     Accordingly, by this Motion, the Debtors seek authority, but not direction, to, in consultation with the Ad Hoc Group, if and when applicable, require as a condition to payment of all or a portion of a Vendor Claim that the applicable Vendor Claimant's (including a Vendor Claimant whose Vendor Claim may be entitled to priority under section 503(b)(9) of the Bankruptcy Code) enter into trade agreements, substantially in the form attached hereto as **Exhibit C** (each, a "**Trade Agreement**").  A Trade Agreement, once agreed to and accepted by a Vendor Claimant, will be a legally binding contractual relationship between the parties governing the commercial trade relationship as provided therein.   The Debtors and their advisors, in consultation with the Ad Hoc Group, if and when applicable, will evaluate whether a requesting

vendor is eligible for Critical Vendor or Foreign Vendor status based on the analysis and factors detailed above and will oversee the Trade Agreement execution process.

38.    The Debtors also seek limited authority to pay Vendor Claims in the event no Trade Agreement has been executed and if the Debtors determine, in their business judgment, and after consultation with the Ad Hoc Group, if and when applicable, that a formal Trade Agreement is prohibitive or unnecessary; provided that, unless otherwise agreed by the Debtors, if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms (regardless of whether a Trade Agreement has been executed), and subject to any Trade Agreement that may be executed, then the Debtors' and the Ad Hoc Groups' respective rights are reserved to treat any payment made pursuant to the relief granted by this Motion as an unauthorized postpetition transfer and to exercise any and all appropriate remedies.

### Payment of Outstanding Prepetition Orders

39.    Prior to the Petition Date, and in the ordinary course of business, the Debtors have certain orders outstanding with various suppliers and vendors for goods or services ordered by the Debtors that will not be delivered until on or after the Petition Date (the "**Outstanding Prepetition Orders**").  These suppliers and vendors may be concerned that because the Debtors' obligations under the Outstanding Prepetition Orders arose prior to the Petition Date, such obligations will be treated as general unsecured claims in these chapter 11 cases.  Accordingly, certain vendors may refuse to provide such goods or services to the Debtors (or may recall shipments thereof) purchased pursuant to the Outstanding Prepetition Orders, unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services

16

subject to Outstanding Prepetition Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code.

40.     To prevent any disruption to the Debtors' operations, and given that claims arising from goods or services delivered on and after the Petition Date may be afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors request entry of the Proposed Orders (i) confirming administrative expense priority under section 503(b) of the Bankruptcy Code for all undisputed obligations of the Debtors arising from the acceptance of any goods or services included in the Outstanding Prepetition Orders, and (ii) authorizing, but not directing, the Debtors to satisfy such obligations in the ordinary course of business.

## **Relief Requested Should be Granted**

A.      **Payment of Critical Vendor Claims is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code**

41.     The Court may grant the relief requested herein pursuant to sections 363 and 105(a) of the Bankruptcy Code.

42.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also 7*

17

*Trustee of Tower Air, Inc. v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

43.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105; *see In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").  Courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See*, *e.g.*, *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the

18

continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus").

44.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business. *See*, *e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

45.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 105(a) of the Bankruptcy Code.  As described above, the Debtors and their advisors have reviewed each of the Debtors' vendors in careful detail with an eye toward each vendor's importance to the Debtors' operational viability.  The list of Critical Vendors resulted from the Debtors whittling the vendor universe down to only those which, left unpaid, would result in a significant disruption to the Debtors' operations.  As described above, due to the unique nature of the Debtors' business and their relationships with their often highly customized providers of equipment and operational goods and services, the Debtors have limited to no options for replacement suppliers.  A loss of any one of the Critical Vendors could

19

hinder the Debtors' ability to safely and reliably operate customer sites.  Importantly, the Debtors rely on fuel-powered equipment and machinery and many of the Critical Vendors are fuel suppliers with whom the Debtors have favorable pricing.  Maintaining its relationships with the Critical Vendors is therefore essential to the continued operation of the Debtors' business.  Accordingly, authorizing the Debtors to pay prepetition amounts related to Critical Vendor Claims is in the best interests of the Debtors, their estates, and all stakeholders.

46.    The relief requested in this Motion will also allow the Debtors to require that the Critical Vendors continue providing goods and services to the Debtors on Customary Trade Terms.  Absent such relief, Critical Vendors may have no incentive to continue providing the Debtors with trade credit.  In contrast, the preservation of working capital through the retention or reinstatement of trade credit in sufficient amounts and on favorable terms will conserve liquidity, stabilize the Debtors' business operations, and facilitate their ability to maximize value. The retention and reinstatement of Customary Trade Terms will enable the Debtors to restore the confidence of their Critical Vendors, customers, and stakeholders and mitigate the uncertainty caused by the commencement of these chapter 11 cases.

47.    Given (i) the nature of the goods and services provided by the Critical Vendors, (ii) the consequences if the Critical Vendors cease providing such goods and services to the Debtors, and (iii) the resulting loss of value to the Debtors' estates, the relief requested herein is necessary and appropriate.  The Debtors' authority to address their Critical Vendor Claims in the initial days of these cases will send a clear signal to their suppliers that the Debtors are both willing and able to conduct business as usual after the Petition Date.  Failure to authorize the Debtors to pay Critical Vendor Claims as provided herein would jeopardize the Debtors' chapter 11 restructuring strategy, and, ultimately, the success of these chapter 11 cases.

20

B.    **The Debtors Should Be Authorized to (i) Pay Claims Entitled to Administrative Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code and (ii) Satisfy Prepetition Lien Claims**

48.    Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the Debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). These claims must be paid in full for the Debtors to confirm a plan. *See id.* § 1129(a)(9)(A). Paying these claims now only provides such creditors what they would otherwise be entitled to receive under a chapter 11 plan. Thus, payment of 503(b)(9) Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code will effect only a change in the timing of such payments, not the amounts or priority thereof. Instead of paying such claims on the effective date of a chapter 11 plan, the Debtors seek authority to pay the 503(b)(9) Claims in the ordinary course of business and to condition payment of 503(b)(9) Claims on claimants' agreement to continue supplying goods and services to the Debtors on Customary Trade Terms.

49.    Absent authority to pay section 503(b)(9) Claims at the outset of these chapter 11 cases, the Debtors could be denied access to the goods necessary to maintain the Debtors' business operations, and certain 503(b)(9) Claimants may withhold support for the Debtors during the chapter 11 process or eliminate favorable trade terms. Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders. Furthermore, authorizing the Debtors to pay the 503(b)(9) Claims entitled to priority pursuant to the terms set forth herein will eliminate the burden on this Court and the Debtors of individual motions requesting payment on account of such 503(b)(9) Claims.

21

50.     Additionally, if the Debtors were to cease payments to the Lien Claimants, the Lien Claimants may assert liens on the Debtors' or the Debtors' customers' property under various state laws to secure payment for the materials, supplies, equipment, labor, or services provided.  As such, the Debtors' customers may withhold payment to the Debtors, essentially trapping unpaid funds, or worse, discontinuing their relationship with the Debtors altogether.  In turn, this could potentially destabilize and irreparably harm the Debtors' steady stream of receivables generated by their customers.  Indeed, any costs associated with honoring such amounts will be significantly offset by the revenue earned by keeping such vendors, and their provision of critical goods and/or services in place.

51.     For the foregoing reasons, payment of the Critical Vendor Claims in an amount not to exceed the Critical Vendor Cap, absent further order of the Court, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize, but not direct, the Debtors to continue honoring, paying, incurring, or otherwise satisfying any obligations with respect to the Critical Vendors Claims, including the 503(b)(9) Claims and the Lien Claims, without interruption, in the ordinary course of business, and to pay and/or honor, as applicable, any prepetition obligations that may be outstanding with respect thereto in the amounts and manner set forth in the Proposed Orders.

## C.     Payment of Prepetition Claims of Foreign Vendors Is Necessary to Ensure the Debtors' Continued Operations

52.     Payment of the prepetition claims of the Debtors' Foreign Vendors is essential to the Debtors' restructuring.  As stated, the limitations of the enforceability of the automatic stay, the critical nature of goods and services provided by certain of the Foreign Vendors, and the lack of qualified alternative suppliers justify the relief requested in this Motion.

Absent a continued, uninterrupted supply of goods and services from Foreign Vendors, the Debtors' overall ability to operate their businesses will be jeopardized. Simply stated, payment of the Foreign Vendor Claims as proposed will assure the orderly operation of the Debtors' businesses and avoid costly disruptions and the significant loss of value and irreparable harm arising therefrom. Further, the Foreign Vendors may take actions to collect debts outside of the U.S. The Debtors have concluded that if they do not pay the Foreign Vendor Claims, the resulting negative impact on the Debtors' estates will be far greater than the amounts the Debtors seek authorization to pay.

**D.    Claims on Account of Outstanding Prepetition Orders Are Entitled to Administrative Priority**

53.    Pursuant to section 503(b) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services may be afforded administrative expense priority if, among other things, they benefit the estate postpetition. 11 U.S.C. § 503(b)(1)(A). Accordingly, granting the relief sought herein to give the Debtors flexibility with respect to the Outstanding Prepetition Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest. Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Prepetition Orders to provide certain suppliers with assurance of such administrative priority. Such a disruption to the continuous and timely flow of critical goods and materials to the Debtors could potentially force the Debtors to halt operations, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors. Accordingly, the Debtors submit that the Court should confirm the administrative

23

expense priority status of the Outstanding Prepetition Orders and should authorize the Debtors to pay the Outstanding Prepetition Orders in the ordinary course of business.

**Applicable Financial Institutions Should Be
Authorized to Receive, Process, Honor, and Pay Checks Issued
and Transfers Requested to Pay Critical Vendor Claims and Foreign Vendor Claims**

54.     The Debtors further request that this Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested by or on behalf of the Debtors relating to the Vendor Claims, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payment.  The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of the Vendor Claims.   Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.  Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of the Vendor Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**Bankruptcy Rule 6003(b) Has Been Satisfied**

55.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after

24

the Petition Date.  Fed. R. Bankr. P. 6003(b).  As explained above and in the Richard Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Request for Bankruptcy Rule 6004(a) and (h) Waivers

56.     To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Richard Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### Reservation of Rights

57.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (vi) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

25

**Notice**

58.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: Linda Casey, Esq.); (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the District of Delaware; (v) (a) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Scott Greenberg, Esq., Steven A. Domanowski, Esq., Matthew Williams, Esq., and Jason Goldstein, Esq.), and (b) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899 (Attn: Laura Davis Jones, Esq.), as co-counsel to the Ad Hoc Group; (vi) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Ira Dizengoff, Esq. and James Savin, Esq.), as counsel to Apollo Global Management, Inc.; (vii) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian Resnick, Esq. and Jonah A. Peppiatt, Esq.), as counsel to the First Lien Agent; (viii) Banks; and (ix) any other party entitled to notice pursuant to Local Rule 9013-1(m) (the parties in clauses (i) through (ix) of this section, collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013- 1(m).

59.     The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

*[Remainder of page intentionally left blank]*

26

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  September 27, 2022
         Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Jeffrey D. Saferstein (*pro hac vice* pending)
Garrett A. Fail (*pro hac vice* pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
                                        :
In re                                   :        **Chapter 11**
                                        :
**PHOENIX SERVICES TOPCO, LLC,** *et al.,*    :    **Case No. 22–10906 (      )**
                                        :
Debtors.[1]                             :        **(Jointly Administered)**
                                        :
-------------------------------------------------------- x    Re: Docket No. ____

### INTERIM ORDER PURSUANT TO
### 11 U.S.C. §§ 105(A), 363(B), AND 503(B) AND FED. R.
### BANKR. P. 6003 AND 6004 (I) AUTHORIZING PAYMENT OF CERTAIN
### PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS,
### (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF UNDISPUTED AND
### <u>OUTSTANDING PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF</u>

Upon the motion, dated September 27, 2022 (the "**Motion**")[2] of Phoenix Services

Topco, LLC and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and

debtors in possession (collectively, the "**Debtors**"), for entry of interim and final orders pursuant

to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and

6004 (i) authorizing the Debtors to pay (a) Critical Vendor Claims in an amount not to exceed the

Critical Vendor Cap absent further order of the Court and (b) Foreign Vendor Claims in an amount

not to exceed the Foreign Vendor Cap; (ii) confirming the administrative expenses priority status

of Outstanding Prepetition Orders; (iii) granting related relief, all as more fully set forth in the

Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable). The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, Pennsylvania 19087.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held an interim hearing to consider the relief requested in the Motion; and upon the Richard Declaration and the record of the hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, to pay, or cause to be paid, some or all of the Critical Vendor Claims in an amount not to exceed $13.2 million in the aggregate, upon such terms and in the manner provided in this Interim Order and the Motion.

3.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to pay, or cause to be paid, some or all of the Foreign Vendor Claims in an amount not to exceed $1.4 million in the aggregate, upon such terms and in the manner provided in this Interim Order and the Motion.

4.      The Debtors shall undertake appropriate efforts to cause the Vendor Claimants to enter into Trade Agreements with the Debtors.

5.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, to condition payment of a Vendor Claim upon the applicable Vendor Claimant's entry into a Trade Agreement substantially in the form attached to the Motion as **Exhibit C** thereto; provided that the Debtors are authorized to pay Vendor Claims in the event no Trade Agreement has been executed if the Debtors determine, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, that a formal Trade Agreement is prohibitive or unnecessary.

6.      Unless otherwise agreed by the Debtors, if any party accepts payment pursuant to the relief granted in this Interim Order and, thereafter, does not continue to provide either goods or services on Customary Trade Terms (regardless of whether a Trade Agreement has been executed), then the Debtors' and the Ad Hoc Groups' respective rights to exercise any and all appropriate remedies are expressly reserved.

7.       The Debtors are authorized, but not directed, to pay all undisputed obligations related to the Outstanding Prepetition Orders in the ordinary course of business.

3

8.      The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds and automated clearing house transfers requested, or to be requested, by the Debtors relating to such obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or electronic funds or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or electronic funds or automated clearing house transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise.

9.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Interim Order.

10.      Any payments or transactions contemplated under this Interim Order shall be subject to any consent requirements or any restrictions under the DIP Order, the DIP Credit Agreement (as defined in the DIP Order), or the Approved DIP Budget (as defined in the DIP Order).

11.      Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any lien satisfied pursuant

4

to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (vi) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Any payment made pursuant to this Interim Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

12.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

13.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

14.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Interim Order.

16.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by any party.

17.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

18.     The final hearing to consider the relief requested in the Motion shall be held on ____, **2022, at _____** (Prevailing Eastern Time) and any objections or responses to the Motion shall be filed on or prior to _____**2022 at 4:00 p.m.** (Prevailing Eastern Time).

5

**Exhibit B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------- x
                                                            :
In re                                                       :      Chapter 11
                                                            :
PHOENIX SERVICES TOPCO, LLC, et al.,                        :      Case No. 22–10906 (      )
                                                            :
            Debtors.[1]                                     :      (Jointly Administered)
                                                            :
----------------------------------------------------------- x      Re: Docket No. ____
```

### FINAL ORDER PURSUANT TO
### 11 U.S.C. §§ 105(A), 363(B), AND 503(B) AND FED. R.
### BANKR. P. 6003 AND 6004 (I) AUTHORIZING PAYMENT OF CERTAIN
### PREPETITION CLAIMS OF CRITICAL VENDORS AND SERVICE PROVIDERS,
### (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF UNDISPUTED AND
### OUTSTANDING PREPETITION ORDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated September 27, 2022 (the "**Motion**")[2] of Phoenix Services

Topco, LLC and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and

debtors in possession (collectively, the "**Debtors**"), for entry of interim and final orders pursuant

to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and

6004 (i) authorizing the Debtors to pay (a) Critical Vendor Claims in an amount not to exceed the

Critical Vendor Cap absent further order of the Court and (b) Foreign Vendor Claims in an amount

not to exceed the Foreign Vendor Cap; (ii) confirming the administrative expenses priority status

of Outstanding Prepetition Orders; (iii) granting related relief, all as more fully set forth in the

Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable). The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, Pennsylvania 19087.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held an interim hearing and a final hearing, if any, to consider the relief requested in the Motion (the "**Hearings**"); and this Court having granted interim relief on the Motion (Docket No. [●]); and upon the Richard Declaration, and the record of the Hearings; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, to pay, or cause to be paid, some or all of the Critical Vendor Claims in an amount not to exceed $14.1 million in the aggregate, upon such terms and in the manner provided in this Final Order and the Motion.

2

3.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to pay, or cause to be paid, some or all of the Foreign Vendor Claims in an amount not to exceed $1.4 million in the aggregate, upon such terms and in the manner provided in this Final Order and the Motion.

4.      The Debtors shall undertake appropriate efforts to cause the Vendor Claimants to enter into Trade Agreements with the Debtors.

5.      The Debtors, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, are authorized, but not directed, to condition payment of a Vendor Claim upon the applicable Vendor Claimant's entry into a Trade Agreement substantially in the form attached to the Motion as **Exhibit C** thereto; provided that the Debtors are authorized to pay Vendor Claims in the event no Trade Agreement has been executed if the Debtors determine, in the exercise of their reasonable business judgment and in consultation with the Ad Hoc Group, if and when applicable, that a formal Trade Agreement is prohibitive or unnecessary.

6.      Unless otherwise agreed by the Debtors, if any party accepts payment pursuant to the relief granted in this Final Order and, thereafter, does not continue to provide either goods or services on Customary Trade Terms (regardless of whether a Trade Agreement has been executed), then the Debtors' and the Ad Hoc Groups' respective rights to exercise any and all appropriate remedies are expressly reserved.

7.      The Debtors are authorized, but not directed, to pay all undisputed obligations related to the Outstanding Prepetition Orders in the ordinary course of business.

3

8.      The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds and automated clearing house transfers requested, or to be requested, by the Debtors relating to such obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or electronic funds or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or electronic funds or automated clearing house transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise.

9.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds or automated clearing house transfers, and to replace any prepetition checks or electronic fund or automated clearing house transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order.

10.     Any payments or transactions contemplated under this Final Order shall be subject to any consent requirements or any restrictions under the DIP Order, the DIP Credit Agreement (as defined in the DIP Order), or the Approved DIP Budget (as defined in the DIP Order).

11.     Nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors or any lien satisfied pursuant to this Motion, (ii) an agreement or obligation to pay any claims, (iii) a waiver of any claims or causes of

4

action that may exist against any creditor or interest holder, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, (v) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (vi) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Any payment made pursuant to this Final Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

12.    Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

13.    Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

14.    The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Final Order.

15.    Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by any party.

16.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

5

## **Exhibit C**

**Form Trade Agreement**

## TRADE AGREEMENT

[●] (the "**Company**"), on the one hand, and the supplier identified in the signature block below ("**Supplier**"), on the other hand, hereby enter into the following trade agreement (this "**Trade Agreement**") dated as of the date in the Supplier's signature block below.

### Recitals

WHEREAS on September 27, 2022 (the "**Petition Date**"), Phoenix Services Topco LLC and certain of its affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

WHEREAS on [●], 2022, the Court entered the *[Interim / Final] Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors and Foreign Vendors, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief* (collectively, with the [interim / final] order granting similar relief, the "**Critical Vendor Orders**")[1] [Docket No. [●]], authorizing the Debtors on a[n] [interim / final] basis, under certain conditions, to pay the prepetition claims of certain suppliers, including Supplier, subject to the terms and conditions set forth therein.

WHEREAS prior to the Petition Date, Supplier delivered goods to and/or performed services for the Company, and the Company paid Supplier for such goods and/or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Company and Supplier (each a "**Party**," and collectively, the "**Parties**") agree to the following terms as a condition of payment on account of certain pre-petition claims Supplier may hold against the Company.

### Agreement

1.    Recitals.  The foregoing recitals are incorporated herein by reference as if set forth at length herein.

2.    Supplier Payment.  Supplier represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to Supplier is $[●] (the "**Agreed Supplier Claim**").  Following execution of this Trade Agreement, the Company shall, in full and final satisfaction of the Agreed Supplier Claim, pay Supplier $[●] on account of its prepetition claim (the "**Supplier Payment**") (without interest, penalties, or other charges), as such amounts become due and payable in the ordinary course.

3.    Timing of Payments: The Company shall make the Supplier Payment in accordance with the following schedule: [●].

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the Critical Vendor Orders.

4.      <u>Agreement to Supply</u>.

a.      Supplier shall supply goods and/or perform services to or for the Company, and the Company shall accept and pay for goods and/or service from Supplier, for the Duration of the Cases (as defined below), on the trade terms (the "**Customary Trade Terms**") at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs) in place in the 180 days prior to the Petition Date except for any partial payments or other payments (or assurances) Company made with respect to any unfinished product.

b.      "**Duration of the Cases**" means the earlier of:  (i) the effective date of a chapter 11 plan in the Debtors' chapter 11 case; (ii) the closing of a sale of all or a material portion of the Debtors' assets pursuant to Bankruptcy Code section 363 resulting in a cessation of the Debtors' business operations; (iii) conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; or (iv) a default under any of the Debtors' debtor-in-possession financing facilities that results in the Company losing access to funds available under any such facility.

c.      The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.  For the avoidance of doubt, such Customary Trade Terms include, but are not limited to:

_____

_____

d.      Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

5.      <u>Other Matters</u>.

a.      Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Debtors' chapter 11 cases on account of any outstanding administrative claims Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.  The Supplier Payment will be made concurrently with payment of other outstanding administrative claims as provided in a confirmed plan.

b.      Supplier will not separately seek payment from the Debtors on account of any prepetition claim (including, without limitation, any reclamation claim, or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Trade Agreement or a plan confirmed in the Company's chapter 11 cases.

2

c.    Supplier will not file or otherwise assert against the Debtors, their assets, or any other affiliated person or entity, or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to Supplier by the Debtors arising from prepetition agreements or transactions.  Furthermore, if Supplier has taken steps to file or assert such a lien prior to entering into this Trade Agreement, Supplier will promptly take all necessary actions to remove such liens.

6.    <u>Breach</u>.

a.    In the event that the Company pays Supplier its Supplier Payment and Supplier is determined to have breached this Trade Agreement (a "**Supplier Breach**"), upon the Company's written notice to Supplier, Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Supplier Payment or any portion of the Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to Supplier from the Company.

b.    In the event that the Company recovers the Supplier Payment pursuant to Section 5(a) hereof or otherwise, the full Agreed Supplier Claim shall be reinstated as if the Supplier Payment had not been made.

c.    Supplier agrees and acknowledges that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to seek an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief, and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.  Notwithstanding the foregoing, in the event of a specific performance action by the Company, the Supplier retains its right to seek adequate assurance of payment and other similar relief pursuant to applicable law.

d.    In the event the Company fails to pay for goods or services delivered postpetition in accordance with this Trade Agreement, and the Company fails to cure such default within ten (10) days after receiving notice of such default, the Supplier shall have the right to terminate this Trade Agreement, in which event the Supplier (i) shall have no obligation to continue to provide goods or services to the Company, and (ii) reserves its rights to file a timely proof of claim for any alleged unpaid amounts of the Supplier Payment.

7.    <u>Notice</u>.

If to Supplier, then to the person and address identified in the signature block hereto.

If to Company:

Phoenix Services Topco LLC
[●]
[●]

Attn: [●]
E-mail: [●]

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Jeffrey D. Saferstein, Garrett A. Fail, Moshe Fink
Telephone:  (212) 310-8000
Email:  jeffrey.saferstein@weil.com
        garrett.fail@weil.com
        moshe.fink@gmail.com

– and –

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Daniel J. DeFranceschi, Zachary I. Shapiro, Matthew P. Milana
Telephone:    (302) 651-7700
Email:  defranceschi@rlf.com
        shapiro@rlf.com
        milana@rlf.com

8.    <u>Representations and Acknowledgements</u>.  The Parties agree, acknowledge and represent that:

        a.    the Parties have reviewed the terms and provisions of the Critical Vendor Orders and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Critical Vendor Orders;

        b.    any payments made on account of the Agreed Supplier Claim shall be subject to the terms and conditions of the Critical Vendor Orders;

        c.    if Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Critical Vendor Orders, the Bankruptcy Code, or applicable law; and

       d.      in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from Supplier to the Company, until a ruling of the Court is obtained.

       9.     <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between Supplier and Company, Supplier agrees to hold in confidence and not disclose to any party: (i) this Trade Agreement; (ii) any and all payments made by the Company pursuant to this Trade Agreement; (iii) the terms of payment set forth herein; and (iv) the Customary Trade Terms (collectively, the "**Confidential Information**"); <u>provided</u> <u>that</u> if any party seeks to compel Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or Supplier intends to disclose any or all of the Confidential Information, Supplier shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order, or any other available remedy to prevent such disclosure; provided, further, that, if such remedy is not obtained, Supplier shall furnish only such information as Supplier is legally required to provide.

      10.    <u>Miscellaneous</u>.

       a.      The Parties hereby represent and warrant that: (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

       b.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended, or supplemented, except in a writing signed by both Parties.

       c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

       d.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

       e.      The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

       f.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

*[Signature page follows]*

RLF1 27986984v.1

AGREED AND ACCEPTED AS OF THE DATE SET FORTH ABOVE:

[**COMPANY**]                                    [**SUPPLIER**]

_____        _____
By:                                      By:
Title:                                   Title:
                                         Address:

                                         Date:

6