## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **PHOENIX SERVICES TOPCO, LLC**, *et al.*, | : | **Case No. 22–10906 (      )** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Requested)** |
| | : | |

------------------------------------------------------------- x

## DECLARATION OF ROBERT RICHARD IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Robert Richard, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.    I am the Chief Financial Officer ("**CFO**") of Phoenix Services Topco, LLC ("**Phoenix TopCo**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**," and, together with their non-debtor affiliates, "**Phoenix Services**," or the "**Company**").  I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first day" pleadings (the "**First Day Pleadings**").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable).  The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, Pennsylvania 19087.

2.     In my capacity as CFO, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I joined the Company in my current role in February 2022. Prior to this, I was Vice President of Finance at Stelco Holdings Inc. Prior to that, I was a Division Controller at Republic Steel and, prior to that, a Controller at Nucor Steel. I have over 30 years of steel industry experience. I hold a B.S. in Metal Engineering and Metallurgy from the University of Pittsburgh and a M.B.A. in Business Economics from the University of Chicago. I am a licensed certified public accountant (CPA) with an active CPA and a certified financial analyst (CFA) with an active charter.

3.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable and familiar with the circumstances leading to the commencement of these chapter 11 cases.

4.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information learned from my review of relevant documents and information concerning the Company, as well as the Company's books and records that are maintained and utilized in the ordinary course of the Company's business; (iii) information provided to me by the Company's employees and/or external counsel for the matters described herein, including the Company's advisors, including (a) Weil, Gotshal & Manges LLP ("**Weil**") and Richards, Layton & Finger, P.A. ("**RLF**"), as legal restructuring counsel, (b) AlixPartners LLP ("**AlixPartners**") as financial advisor, and (c) PJT Partners LP ("**PJT**", and together with Weil, RLF, and AlixPartners, the "**Advisors**"), as investment banker; and/or (iv) my opinion based upon my experience, knowledge, and information I have received and reviewed in relation to the Debtors' operations. I am over the age of 18 and authorized to submit this Declaration on behalf

2

of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.     This Declaration is divided into five sections.  Section I provides an overview of the Debtors and these chapter 11 cases, including the general framework for the Debtors' restructuring.  Section II describes the Debtors' business, including its history and its current operations.  Section III describes the Debtors' organizational and capital structure. Section IV describes the circumstances that led to the commencement of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  Section V provides a summary of the First Day Pleadings and factual bases for the relief requested therein.

## I.     Overview[2]

6.     The Company provides mission-critical services to leading, global steel-producing companies.  With approximately 2600 non-unionized and unionized employees, the Company is the second largest service provider to steel mills domestically and the third largest globally, based on market position.  As set forth in more detail below, the Company provides a variety of services based on each customer's unique needs across 39 customer sites.  This suite of customer services primarily includes the removal, handling, and processing of molten slag at customer sites, as well as the preparation and transportation of metal scraps, raw materials, and finished products.  Notably, the Debtors own and operate substantial fixed and movable machinery and equipment at each of their locations.  Further, the Debtors own and operate steel mill servicing operations through non-debtor subsidiaries in Europe, South America, and Africa.[3]

---

[2]     Capitalized terms not defined in this section shall have the meanings ascribed to such terms in the body of this Declaration.

[3]     The Debtors are party to certain contracts governing sites and projects outside the United States.

7.      The Debtors' most significant revenue driver are their service contracts with steel mill operators.  Pursuant to servicing agreements, the Debtors provide services to global steel producers at nineteen (19) sites in the United States.  Recent headwinds, however, have rendered the Debtors' current customer contract portfolio unsustainable.  Among other things, inflationary pressures and rising fuel costs, coupled with suboptimal contract terms, have resulted in unprofitable contracts.  The Debtors have also faced a variety of discrete operational challenges at customer sites, such as equipment failures and management turnover.  The contracts and operational challenges, in turn, have placed a significant strain on the Debtors' liquidity, which was further weakened by capital lease payments, rising interest rates, and increased capital expenditures.

8.      Recognizing that the most significant challenges the Debtors face are the customer contracts, the Debtors and the Advisors worked diligently to develop a comprehensive strategy to be implemented before the filing and during these chapter 11 cases to repair the contract portfolio.  Following renegotiation or rejection of their unprofitable contracts, the Debtors expect to emerge from chapter 11 as a going concern with a sustainable and profitable contract portfolio.

9.      The strategy essentially consists of two phases: (i) site-by-site contract and operational analysis to determine necessary contractual modifications; followed by (ii) engagement with the customers to obtain contractual relief.  Prior to the Petition Date, the Debtors focused on the initial phase.  Specifically, in the weeks leading up to the Petition Date, the Debtors and their advisors undertook a thorough review of the Debtors' contract portfolio on a site-by-site basis, identifying individual customer contracts' impact on operating profit, EBITDA margins, and liquidity.  Using this data, the Debtors and the Advisors identified specific modifications to the Debtors' customer contracts necessary to return such contracts to profitability

in the long term. Absent making acceptable changes to the contracts, such contracts will be subject to rejection upon court approval pursuant to the rights afforded to the Debtors under the Bankruptcy Code.

10. Now that the Debtors have commenced these chapter 11 cases, the Debtors will turn their attention to the second phase. The Debtors intend to engage immediately with their customers to negotiate modifications to the applicable contracts. The Debtors have identified interim relief that may be necessary at specific sites until final modifications are agreed upon. The Debtors intend to file a motion with the Court seeking authority to enter into interim servicing agreements (such agreements, collectively, the "**Interim Servicing Agreements**" and, such motion, the "**Interim Servicing Motion**") with customers that will reflect the negotiated interim modifications.

11. Moreover, as discussed further below, the Debtors maintain capital leases for certain of the equipment and machinery for their operations at customer sites from a variety of lessors. The Debtors' lessors are extremely important partners for the Debtors, and the Debtors intend to work closely with their leasing partners during these chapter 11 cases. In connection with the contract review process, the Debtors and their advisors have similarly undertaken a review of their lease portfolio. Once the Debtors determine to maintain (or reject) a customer contract at a particular site, the Debtors will work with their leasing partners to assess and determine any attendant leasing changes should the Debtors' operations change.

12. To provide the Debtors with the liquidity and runway necessary to execute on their restructuring strategy, the Debtors have obtained fully-committed, proposed debtor-in-possession financing package (the "**DIP Financing**"), which includes a new money multiple-draw secured term loan in the aggregate principal amount of $50,000,000. The DIP Financing is being

5

provided by an ad hoc group of lenders (collectively, the "**Ad Hoc Group**") holding First Lien

Claims.  The Debtors recognize that the expeditious execution of their restructuring strategy is

crucial to preserving and maximizing the value of the Company for the benefit of all stakeholders.

Accordingly, the Company has agreed to, among others, the following chapter 11 milestones in

the DIP Financing documents (subject to the Court's calendar):

| Event | Key DIP Milestone |
| --- | --- |
| Entry of Interim DIP Order | 5 Days from Petition Date |
| Entry into Restructuring Support Agreement with Prepetition Lenders | 30 Days from Petition Date |
| Entry of Final DIP Order | 30 Days from Petition Date |
| Company to have negotiated interim relief with specified customers | 30 Days from Petition Date |
| Company to have negotiated final relief with specified customers | 75 Days from Petition Date |
| Delivery of emergence business plan | 90 Days from Petition Date |
| Filing of plan and disclosure statement | 95 Days from Petition Date |
| Entry of disclosure statement order | 125 Days from Petition Date |
| Entry of plan confirmation order | 155 Days from Petition Date |
| Emergence from chapter 11 cases | 165 Days from Petition Date |
| DIP maturity date | 6 Months after Petition Date, subject to four 1-month extensions, each with vote by required lenders under new money tranche |

13.    These milestones align the Debtors and the Ad Hoc Group in their support

of an efficient restructuring to maximize the long-term benefits to the Company's operations,

vendors, and employees.  The proposed timeline for these chapter 11 cases appropriately balances

the Debtors' need to complete their restructuring process quickly and their need to successfully re-

negotiate burdensome and uneconomical customer contracts prior to emerging from chapter 11 as

a going concern.

6

## II. Debtors' Business

### A. Overview and History

14.     As mentioned, the Company provides steel mill services to leading, global steel-producing companies. The Company currently operates at 39 sites, both in the United States and internationally, and is headquartered in Radnor, Pennsylvania. As set forth in the below timeline, the Company was founded in 2007 and, since then, has experienced significant success and growth by maintaining its focus on operational best practices to provide greater value to its customers. After securing its first domestic contract in 2006, the Company steadily grew its domestic presence before venturing into Europe in 2010, and then later to Brazil.



15.     As depicted in the graphic below, the Company maintains a global footprint — the Company services steel mills in North America, Europe, the Middle East, South Africa, and South America. In particular, the Debtors are domestic entities that provide services at 19 sites across the United States, servicing nine (9) customers. Specifically, the Debtors provide services to:

- (i) Nucor Steel at Gallatin (Kentucky), Hickman (Arkansas), Yamato (Arkansas), and Marion (Ohio);

- (ii) Cleveland Cliffs at Burns Harbor (Indiana), Indiana Harbor, East (Indiana), Indiana Harbor, West (Indiana) and Riverdale (Illinois);

- (iii) Acerinox at Ghent (Kentucky);

- (iv) AN/MS at AN/MS Calvert (Alabama);

- (v) OTK Stainless Steel at Calvert OTK (Alabama);

- (vi) Gerdau at Petersburg (Virginia), Fort Smith (Arkansas), and Wilton (Iowa);

- (vii) US Steel at Fairfield (Alabama), and Gary (Indiana);

- (viii) Steel Dynamics Inc at Roanoke (Virginia); and

- (ix) Carpenter at Latrobe (Pennsylvania).

Additionally, the Debtors have an operating site in Weirton (West Virginia).  The Company provides international services through certain of the Debtors' non-debtor affiliates (collectively, the "**Foreign Affiliates**").



**B.    Business Operations**

16.    The primary service that the Debtors provide is "slag handling," or the removal and handling of molten slag that has been separated from steel.  Slag is an inert environmentally-friendly co-product of the steel making process.  The Debtors deploy custom-designed slap pot carriers and loaders to transport molten slag to a cooling area for processing.

RLF1 27986989V.1



17.    In addition to handling slag, the Debtors also provide a variety of other related services at customer sites, including:

- <u>Metal Recovery</u>:  The Debtors process the slag using a variety of equipment, including, but not limited to, crushers, conveyers, screens and magnetic separators, to process the slag to recover entrained metal.

- <u>Aggregate Sales</u>:  After removing metallic content from the slag, the Debtors separate the non-metallic slag for sale as a construction aggregate to buyers in other manufacturing industries.  The 'sustainable' non-metallic slag can often replace natural aggregates that need to be mined, and, accordingly, is highly sought after by customers such as cement mills, asphalt plants, mineral wool producers, asphalt companies, concrete producers, city and county highway departments and large regional infrastructure firms.

- <u>Scrap Preparation</u>:  The Debtors also prepare, handle, and transport metal scraps by breaking large, thick scrap pieces with a crane & drop ball, or cutting the pieces with a hand-torch or oxygen lancing.

- <u>Scrap Handling</u>:  The Debtors receive, weigh, unload, stockpile, manage inventory and transport customer-purchased metals within the customer facility.  The Debtors also load scrap into charge boxes for delivery to the steel-making melt shop.

- <u>Ancillary Services</u>:  The Debtors provide related ancillary services including on-site equipment rental, delivery of customers' finished products using on-highway trucks, road watering and road sweeping.  The Debtors also provide additional specialized services such as raw material preparation, in-plant materials transportation, refractory services and briquetting.

18.     To provide services at customer sites, the Debtors utilize heavy equipment and machinery typically used in the steel industry.  For example, the Debtors' operations involve specialized industry- and site-specific equipment, such as cranes, crushers, conveyers, screens, and magnetic separators (among other related equipment).  The Debtors operate a customized fleet of trucks and other vehicles that allow for the transport of slag and other steel manufacturing-related products in large trailers, pots, and other types of containers.  Historically, the Debtors financed new projects with liquidity on-hand.  Over the last two (2) to three (3) years, however, the Debtors entered into a number of capital leases to finance equipment for new projects.  While there is typically only one (1) customer contract associated with a particular site, certain capital leases cover equipment that spans across multiple contracts and sites.  The Debtors are party to 104 leases with a variety of lessors, although three (3) lessors account for the majority of the lease portfolio.

19.     The revenues that the Debtors generate from providing services at customer sites is generally comprised of three (3) components.

RLF1 27986989V.1

- <u>Service Fees</u>: The most significant portion of the Debtors' revenue is generated from service fees comprised of base monthly fees for mill services, variable fees for melt shop services, and fees for ancillary services.

- <u>Metal Recovery</u>: The Debtors also generate revenues from tolling fees charged on recovered metallics returned to mills and sold on the open market.

- <u>Slag, Mill Scale and Outside Scrap Sales</u>: A small component of the Debtors' revenue is generated from sales of processed materials to a variety of end-users at market prices.

20.     The Company's multi-service revenue model, as displayed below, integrates a variety of fixed and variable components.  Variable fees are generally calculated based upon tonnage of slag processed.  The Company typically enters into long-term customer contracts that provide steady recurring revenue over many years based on steel production volumes.  Typical customer contracts last 5 to 20+ years and are often extended prior to contract expiration.  The Company's current customer contract portfolio has a weighted average remaining life of approximately 5.8 years.



21.     The Company employs approximately 2600 unionized and non-unionized employees globally.  As of the Petition Date, the Debtors collectively employ approximately 1,250

full-time employees (collectively, the "**Employees**").  1,050 Employees are paid on an hourly

basis (the "**Hourly Employees**") while approximately 200 Employees are paid on a salaried basis.

Approximately 275 of the Debtors' Hourly Employees are represented by a union and covered by

industrial agreements with the International Union of Operating Engineers Local 150, AFL-CIO.

In addition, the Debtors currently utilize the services of temporary employees (collectively,

the "**Supplemental Workforce**").  The Employees and Supplemental Workforce are critical to the

Debtors' business and are responsible for ensuring, among other things, the Debtors' steel mill

servicing operations continue to run safely and reliably.

C.    **Recent Financial Performance**

22.    The Company had Adjusted EBITDA and net sales of approximately $92

million and approximately $365 million, respectively, for the 2019 fiscal year.  However, while

the Company's net sales increased by more than 8% to approximately $395 million for the 2021

fiscal year, the Company's Adjusted EBITDA declined by nearly 30% to approximately $65

million.

### III.    Debtors' Corporate and Debt Structure

A.    **Corporate Structure**

1.    **Organizational Structure**

23.    Phoenix TopCo directly or indirectly owns or controls 100% of the equity

or membership interests, as applicable, in all of the other Debtors.  Over 99% of the Class A

membership units in Phoenix TopCo (the "**Class A Units**") are, in turn, owned by ANRP II

Phoenix Services Holdings (LP), an affiliate of Apollo Global Management, Inc.  The remaining

Class A Units are owned by individual holders, including former members of the Debtors'

management team.  Phoenix TopCo has also granted Class B membership units (the "**Class B

Units**") to current and former members of the Company's management team, approximately

12

53,473 of which are currently outstanding.  There are an additional 29,777 Class B Units available for issuance.

24.    Most of the Company's operations are conducted through Metal Services LLC (d/b/a Phoenix Services LLC) ("**Metal Services**"), which enters into most lease, vendor, customer, and other agreements on behalf of the Company.  All of the other Debtors and non-debtors perform specific functions that support the operations of Metal Services, but do not otherwise have material roles in daily operations.

25.    A simplified version of the Debtors' organizational structure, as of the Petition Date, is set forth below.  A more detailed organizational chart is annexed hereto as **Exhibit A**.



2.    **Management Team**

26.    The following table sets forth the names and positions of the Debtors' senior management team, including myself: Mark Porto, Chief Executive Officer; Robert Richard, Chief

Financial Officer; Steven Hall, Executive Vice President of Operations (North America); Clint McGinty, Senior Vice President of Procurement and Assets; and Carlos Ferreira Sarmento, Senior Vice President of Strategy & Analytics.

### 3.    Phoenix TopCo Board of Managers

27.    The following individuals are members of Phoenix TopCo's current Board of Managers (the "**TopCo Board**"): Mark Porto, Gareth Turner, Conor J. Sutherland, Joseph Romeo, Layle Kiplind Smith, Kelli Gant, Paul Aronzon, and Patrick Bartels.  Additionally, prior to the commencement of these chapter 11 cases, the TopCo Board formed an independent special committee (the "**Special Committee**") to oversee restructuring activities.  Mr. Paul Aronzon and Mr. Patrick Bartels (collectively, the "**Independent Directors**") are members of the Special Committee.

## B.    Debt Structure

28.    As of the Petition Date, the Company's capital structure includes approximately $587 million in funded debt, including approximately $77 million in capital lease liability.  The following table provides a summary of the Company's prepetition funded debt obligations, each discussed further below:

|  | Outstanding Principal |
| --- | --- |
| First Lien Revolving Credit Facility | $65.00 million[4] |
| First Lien Term Loan | $445.24 million |
| **Total First Lien Debt** | **$510.24 million** |
|  |  |
| Capital Leases | $76.80 million |
| **Total Funded Debt** | **$587.04 million** |

---

[4]    The outstanding principal under the First Lien Revolving Credit Facility includes approximately $5.7 million in letters of credit, as discussed below.

1.     **First Lien Credit Agreement**

29.     The Debtors have outstanding first lien secured debt obligations under that certain First Lien Credit Agreement, dated as of March 1, 2018 (as amended, supplemented, amended and restated or modified from time to time, the "**First Lien Credit Agreement**" and the claims thereunder or related thereto, the "**First Lien Claims**"), among Phoenix Services International LLC, as borrower, Phoenix Services Holdings Corp., as Holdings, Barclays Bank PLC, as administrative agent for the lenders and collateral agent for the secured parties (in such capacities, the "**First Lien Agent**"), and the lenders and issuing banks party thereto from time to time (the "**First Lien Lenders**").[5]

30.     As of the Petition Date, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $510 million, which amount consists of the following, each secured by the same collateral on a *pari passu* basis: (a) approximately $445 million in term loans (the "**First Lien Term Loans**") and (b) approximately $65 million in revolving commitments (the loans made thereunder, "**First Lien Revolving Loans**"; such commitments, together with the First Lien Revolving Loans, the "**First Lien Revolving Facility**"). The Debtors' obligations under the First Lien Credit Agreement (the "**First Lien Credit Agreement Obligations**") are secured by a first lien on substantially all of the Debtors' tangible and intangible property (subject to certain specified liens in Section 6.02 of the First Lien Credit Agreement and certain Excluded Property (as defined in the First Lien Credit Agreement)). The First Lien Revolving Facility is fully drawn as of the Petition Date and includes issued but undrawn

---

[5]     Phoenix TopCo is not liable on the Debtors' outstanding debt obligations under the First Lien Credit Agreement.

letters of credit in the amount of approximately $5.7 million.  The First Lien Revolving Facility matures on March 1, 2023 while the First Lien Term Loans mature on March 1, 2025.

### 2.    Capital Leases

31.    As of the Petition Date, the Debtors currently own over 1,740 fixed assets that are not financed through capital leases.  These assets include, among other things, a variety of equipment, trucks, and buildings, which comprise a net book value of approximately $102 million.  Over the last two (2) to three (3) years, the Company entered into a number of capital leases to finance new projects, particularly with respect to the purchase of heavy equipment and machinery.  As of the Petition Date, the Debtors have approximately $76.8 million in outstanding capital lease obligations with respect to 386 assets, 73% of which is owed to the Debtors' three (3) top lessors.

## IV.    Events Leading to Commencement of Chapter 11 Cases

### A.    Factors Contribution to Financial Pressure

32.    Over the past several years, the Debtors' customer contract portfolio has become unsustainable due to financial pressure from a combination of (i) cyclical industry headwinds that have bid down returns on new contracts, (ii) existing contracts that have eroded margin, and (iii) discrete operational challenges at sites.  Each factor is discussed briefly below.

33.    First, inflationary headwinds have increased operating costs while contractual service billing levels have remained fixed for a sustained period, resulting in material margin compression.  Increased customer concentration has consolidated the Company's customer base and has reduced the Company's pricing leverage.  Similarly, the Company's competitors continue to aggressively pursue new contracts alongside the Company, which bids down returns on new contracts and pushes the Company to compromise its discipline on certain contractual terms (*e.g.*, inflation price caps).

34.     Second, several of the Company's contracts contain unfavorable terms, including, among others, challenging cost structures and cost inflations caps.  While some of these terms are standard across the industry, they are not sustainable.  Third, the Company has faced a variety of discrete operational challenges at specific sites.  For example, the Company has suffered unexpected equipment failures that have required temporarily bringing in additional outside labor and equipment rentals to maintain operations at the facility while maintenance and repair work is conducted.  Additionally, the Company has encountered challenges relating to employee turnover at certain of its sites.

35.     The Company's recent financial performance has, in turn, placed a strain on the Debtors' liquidity.  The strain has been compounded by capital lease payments, rising interest rates in 2022, and substantial capital expenditures, which the Company has been unable to finance.  The Company has generated a net reduction of approximately $55 million in total liquidity year-to-date.  As of the Petition Date, the Debtors' total liquidity is approximately $6 million, which is inclusive of approximately $4 million in Phoenix TopCo cash.

## B.     Prepetition Operational and Liquidity Enhancing Initiatives

36.     In the months leading up to the Petition Date, guided by a new senior management team, the Company and the Advisors worked diligently to address both the Company's operational and liquidity challenges.  On the operational front, the Company has been working to address operational and management issues at customer sites.  Among other things, under current management, the Company has implemented (i) new systems to improve equipment maintenance practices and quality control, and (ii) new guidelines to prevent pursuing contracts with poor economics.

37.     The Company has likewise undertaken various measures to enhance liquidity.  In the months leading up to the chapter 11 filing, the Company: (i) liquidated certain in-

the-money positions (*e.g.*, unwinding certain foreign exchange swap positions); (ii) adjusted the debt service requirement pursuant to the First Lien Credit Agreement Obligations by electing quarterly, instead of monthly, interest payments; and (iii) reduced certain growth and maintenance capital expenditures.

38.     In the months leading up to the Petition Date, the Company and the Advisors also explored various financing alternatives, including: (i) capital lease financings to support capex spending; (ii) a sale-leaseback transaction with one of the Company's existing equipment lessors; and (iii) an accounts receivable securitization facility.  Unfortunately, none of these alternatives were successful, in part due to the Company's credit profile.

**C.     Prepetition Restructuring Efforts**

**1.     Formation of Special Committee and Independent Investigation**

39.     As foreshadowed earlier, on August 2, 2022, in connection with the Company's evaluation of strategic alternatives, the Independent Directors were appointed to TopCo Board.  Further, on August 3, 2022, the Special Committee comprised of the Independent Directors was formed.

40.     The Topco Board authorized the Special Committee to, among other things: (i) consider, analyze and evaluate potential restructuring transactions and other strategic alternatives for the Company with respect to the Company's existing outstanding indebtedness and contractual and other liabilities (each such strategic alternative, a "**Potential Transaction**"); (ii) recommend to the TopCo Board the Company's entry into a Potential Transaction; (iii) oversee the Company's negotiations with potential counterparties and the Company's stakeholders with respect to any Potential Transaction; and (iv) conduct investigations with respect to prior acts of the company and certain insiders.

2.        **Stakeholder Engagement & DIP Financing**

41.        As discussed above, to address the challenges presented by their contract portfolio, the Debtors and their Advisors undertook a comprehensive prepetition analysis of the contracts, identifying contractual modifications necessary to return the contract portfolio to profitability.  The Debtors and their Advisors also identified interim relief that is necessary in the short term while long-term contractual modifications are negotiated.  The Debtors will now immediately engage with customers to negotiate these modifications.

42.        To obtain the liquidity and runway needed to execute on their restructuring strategy, the Debtors, with the assistance of the Advisors and the approval of the Special Committee, engaged with the Ad Hoc Group and its advisors to discuss, among other things, the business, customer contract modifications, and potential DIP financing.  The Debtors and the Advisors provided significant diligence to the Ad Hoc Group and its advisors and held numerous meetings with the Ad Hoc Group and/or their advisors.

43.        The negotiations culminated in the members of the Ad Hoc Group agreeing to provide the DIP Financing with $50,000,000 in new money loans that will immediately solidify the Debtors' financial position.  As described herein, due to diminishing liquidity, the Debtors require immediate access to the DIP Financing.  The liquidity provided by the Ad Hoc Group through the DIP Financing will provide the Debtors the necessary liquidity and runway to implement their restructuring strategy in these chapter 11 cases to negotiate contract modifications with their customers, and eventually emerge from chapter 11 as a healthy going concern.  The DIP Financing will also provide the Debtors with, among other things, (i) sufficient working capital to operate their business and to administer their estates, and (ii) the ability to timely pay administrative expenses incurred during these chapter 11 cases.

## V.    <u>First Day Pleadings</u>

44.    The Debtors have filed, or expect to file, with the Court First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization.  The First Day Pleadings include the following:

- (i) *Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases* (the "**Joint Administration Motion**");

- (ii) *Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and § 107(c), Fed. R. Bankr. P. 1007(d), and Local Rule 1001-1(c) for Entry of an Order Authorizing Debtors to (I) Maintain and File a Consolidated List of Creditors, (II) File a Consolidated List of the Debtors' Top 30 Unsecured Creditors, (III) Redact Certain Personally Identifiable Information for Individual Creditors, and (IV) Granting Related Relief* (the "**Creditor Matrix Motion**");

- (iii) *Debtors' Application For Entry of an Order (I) Approving the Retention and Appointment of Stretto as Claims and Noticing Agent, Effective as of the Petition Date, and (II) Granting Related Relief (*the "**Stretto Retention Application**");

- (iv) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management Systems, Bank Accounts, and Business Forms, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Authorizing (A) Continuation of Intercompany Transactions and (B) Granting Superpriority*

*Administrative Expense Status for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* (the "**Cash Management Motion**");

- (v) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employee Expenses and (II) Granting Related Relief* (the "**Employee Wages Motion**");

- (vi) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors and Service Providers, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief* (the "**Critical Vendors Motion**");

- (vii) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541(d) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (the "**Taxes Motion**");

- (viii) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), and 363(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Insurance Programs and Surety Bond Program and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief* (the "**Insurance Motion**");

21

- (ix) *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "**Utilities Motion**");

- (x) *Motion of Debtors For Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in, and Claims Against, the Debtors and Claiming a Worthless Equity Deduction* (the "**NOL Motion**"); and

- (xi) *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay and (F) Schedule a Final Hearing and (II) Related Relief* (the "**DIP Motion**").

45.    The First Day Pleadings seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.  In my capacity as CFO, and based on my experience and knowledge, I believe that the relief requested in the First Day Pleadings is necessary to provide the Debtors an opportunity to work towards a successful restructuring that will inure to the benefit of each stakeholder.

46.    Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  The Debtors have narrowly tailored these requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors will defer seeking other relief to subsequent hearings before the Court.

47.    I am familiar with the content and substance of each of the First Day Pleadings and hereby reference and expressly incorporate into this Declaration the facts in each First Day Pleading with the exception of certain of the sections of the DIP Motion, which rely on the Singh Declaration (as defined in the DIP Motion).  In my capacity as CFO, and based on my experience and knowledge, I believe approval of the relief sought in each of the First Day Pleadings is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations.  Obtaining the relief sought in the First Day Pleadings will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

*[Remainder of page intentionally left blank]*

RLF1 27986989V.1

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    September 27, 2022
              Radnor, Pennsylvania

Respectfully submitted,

By:    _/s/ Robert Richard_____
          Robert Richard
          Chief Financial Officer


on behalf of Phoenix Services Topco, LLC and its Debtor Affiliates

**Exhibit A**

**Detailed Org Chart**

