**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------------- x
                                            :
In re                                       :        Chapter 11
                                            :
PHOENIX SERVICES TOPCO, LLC, et al.,        :        Case No. 22– 10906 (     )
                                            :
Debtors.¹                                   :        (Joint Administration Requested)
                                            :
--------------------------------------------------------- x
```

**MOTION OF DEBTORS FOR (I) AUTHORITY**
**TO (A) OBTAIN POSTPETITION FINANCING,**
**(B) USE CASH COLLATERAL, (C) GRANT LIENS AND**
**PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(D) GRANT ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC**
**STAY, AND (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF**

Phoenix Services Topco, LLC (the "**Phoenix Topco**") and its debtor affiliates in

the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively,

the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**[2]

1.      By this Motion, the Debtors seek authorization to obtain postpetition

financing (the "**DIP Financing**") and approval of their entry into a superpriority senior secured

debtor-in-possession credit facility in an aggregate principal amount of up to $200 million

(the "**DIP Facility**"), provided by certain of the Debtors' prepetition secured lenders (solely in

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable).  The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, PA 19087.

[2]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Singh Declaration, the Richard Declaration, the DIP Credit Agreement, and the Interim Order (each, as defined herein), as applicable.

such capacity, the "**DIP Lenders**") and agented by Wilmington Savings Fund Society, FSB (solely in such capacity, the "**DIP Agent**"), which consists of (i) a new money term loan facility in an aggregate amount not to exceed $50.0 million (the "**New Money Facility**") and (ii) a term loan facility in an aggregate principal amount not to exceed $150.0 million (the "**Roll-Up Facility**" and the loans thereunder, the "**Roll-Up Loans**"), subject to entry of the Interim Order (as defined herein).

2.        As described herein, the DIP Financing provides the Debtors with necessary liquidity on terms that are reasonable under the circumstances.  The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, execute their strategy with respect to the re-negotiation of customer contracts (the "**Customer Contracts**"), and finance these chapter 11 cases.  In support of this Motion, the Debtors have filed contemporaneously herewith:

- the *Declaration of John Singh in Support of Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay and (F) to Schedule a Final Hearing and (II) Related Relief*, sworn to the date hereof (the "**Singh Declaration**"); and

- the *Declaration of Robert Richard in Support of Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on the date hereof (the "**Richard Declaration**").

3.        As of the Petition Date, the Debtors have approximately $6 million in cash on hand and require immediate access to the DIP Financing and authority to use Cash Collateral (as defined herein) to ensure that they have sufficient liquidity to operate their business while in bankruptcy.  To finance these chapter 11 cases, the DIP Lenders have committed to provide the Debtors with the $50 million New Money Facility.

4.        Several reasons justify the relief requested herein:

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded.

2

- The Debtors are entering chapter 11 with limited cash on hand. Immediate access to DIP Financing is therefore critical to ensure (a) sufficient working capital to operate their business and to administer their estates, (b) the Debtors execute their strategy with respect to the re-negotiation of the Customer Contracts prior to exiting bankruptcy, and (c) the ability to timely pay administrative expenses incurred during these chapter 11 cases.

- The Debtors' proposed interim draw of up to $25 million under the New Money Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- Negotiations with the proposed DIP Lenders were conducted in good faith and at arms' length. As confirmed by the Debtors' prepetition process to solicit proposals for third-party debtor-in-possession financing, there is no alternative financing available to the Debtors in the market. The DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best—and in fact only—currently available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

### Background

5.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

6.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3

7.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Richard Declaration.

## Jurisdiction

8.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

10.     By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), and 9014, and Local Rule 4001-2, the Debtors request (i) entry of an interim order, substantially in the form annexed hereto as **Exhibit A** (the "**Interim Order**") and, (ii) following the Final Hearing (as defined herein), entry of a final order granting the relief requested herein (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") and the relief as provided therein, including:

(a)     authority to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit Agreement* among Phoenix Services International LLC (the "DIP Borrower"), Phoenix Services Topco, LLC, Phoenix Services Parent, LLC, Phoenix Services Holdings Corp., the DIP Lenders and the DIP Agent (the DIP Agent, together with the DIP Lenders, the "**DIP Secured Parties**") (as the

4

same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**DIP Credit Agreement**") and related documents (collectively, the "**DIP Documents**"), which provide for a DIP Facility consisting of (i) the New Money Facility, of which Initial Term Loans an amount equal to $25 million will be drawn on an interim basis (the "**Initial Draw**") and subsequent draws of Initial Term Loans in an aggregate principal amount of $25 million will be available subject to satisfaction of certain milestones and conditions precedent and (ii) the Roll-Up Facility (loans borrowed or deemed to be borrowed, as applicable, under the New Money Facility and the Roll-Up Facility, collectively, the "**DIP Loans**");

(b)　　authority to pay the following interest and fees:  (a) with respect to the Initial Term Loans under the New Money Facility: (i) interest at a rate of SOFR (subject to 2.0% floor) + 12.0% per annum, of which an amount equal to SOFR + 2.0% per annum will be paid in cash and the remainder of the interest will be paid in kind, (ii) on the Closing Date, a closing fee equal to 5.0% of the aggregate principal amount of the Initial Term Loans will be paid in kind, (iii) on the Closing Date, a backstop fee equal to 5.0% of the aggregate principal amount of the Initial Term Loans payable to the Backstop Parties under the DIP Credit Agreement will be paid in kind, (iv) an exit fee equal to 3.0% of the aggregate principal amount of the Initial Term Loans will be paid on the Maturity Date or on any other date that the Initial Term Loans are repaid, and (v) a one-month maturity extension fee equal to 1.0% of the aggregate principal amount of the DIP Loans will be payable in kind upon each one-month extension of the Maturity Date (provided, that there will be no more than four such extensions) and will be paid in kind (b) with respect to the Roll-Up Facility, interest at a rate of SOFR (subject to 2.0% floor) + 12.0% per annum, payable in kind, (c) certain agent fees as described in that certain *Agent Fee Letter* (the "**Agent Fee Letter**")[3] by and between the Debtors and the DIP Agent and (d) certain escrow agent fees as described in that certain Escrow Agent Fee Schedule (the "**Escrow Agent Fee Schedule**") by the DIP Borrower in favor of The Bank of New York Mellon, as escrow agent (such fees payable under clauses (a)(ii)-(v), (c) and (d), collectively, the "**DIP Fees**");

(c)　　granting, in each case subject to the Carve Out (as defined below) and certain other exceptions set forth in the Interim Order, a first-priority, perfected, priming security interest and liens (the "**DIP Liens**") on all prepetition and postpetition assets of each Debtors' estate and all proceeds thereof (other than avoidance actions, but including, subject to and effective upon entry of the Final Order, any proceeds of such avoidance actions), not including any Excluded Property (as defined in the Interim Order) (collectively, the "**DIP Collateral**"), and superpriority claims over all other administrative expenses;

---

[3]　The Agent Fee Letter and the Escrow Agent Fee Schedule will be provided to the Court, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), and any professionals retained by an official committee appointed in these chapter 11 cases, subject to the confidentiality provisions set forth therein.

(d)     authority to use Cash Collateral within the meaning of sections 363(a) and 363(c) of the Bankruptcy Code;

(e)     approval of the form and manner of adequate protection to be provided to the Prepetition First Lien Secured Parties, including (a) adequate protection liens and superpriority claims; (b) payment of reasonable and documented costs and expenses of the First Lien Lenders (as defined below); (c) section 506(c) and section 552(b) waivers (in each case subject to entry of the Final Order); (d) stipulations as to the liens and claims held by such parties; and (e) certain financial reporting requirements;

(f)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, subject to the Remedies Notice Period (as defined in the DIP Orders), as applicable;

(g)     waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

(h)     scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "**Final Hearing**") no later than forty (40) days after entry of the Interim Order.

## Summary of Terms of DIP Financing[4]

11.     In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the below chart summarizes the significant terms of the proposed Interim Order and the DIP Documents.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
| --- | --- | --- |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Phoenix Services International LLC (the "**Borrower**"). | DIP Credit Agreement, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Phoenix Topco<br>Phoenix Services Parent, LLC<br>Phoenix Services Holdings Corp. and each U.S. subsidiary of the Borrower. | DIP Credit Agreement, § 1.01. |

---

[4]     This summary is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this summary and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Documents and/or the Interim Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain DIP Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | CREDIT SUISSE LOAN FUNDING LLC (the "**DIP Lenders**"). | DIP Credit Agreement, Signature Pages. |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wilmington Savings Fund Society, FSB. | DIP Credit Agreement, Preamble. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B) | Initial Term Loans in an aggregate principal amount of $50.0 million under the New Money Facility.<br><br>Roll-Up Loans in an aggregate principal amount of $150.0 million under the Roll-Up Facility. | DIP Credit Agreement, §§ 2.01; 2.04 |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to limitations on borrowing under the DIP Documents, the Borrower may draw $50.0 million of Initial Term Loans upon entry of the Interim Order, of which $25.0 million will be made available to the DIP Borrower and $25.0 million will be deposited with the Escrow Agent and may be withdrawn thereafter upon satisfaction of certain conditions. | DIP Credit Agreement, §§ 2.01; 4.01; 4.02. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget will be agreed to by the Borrower and the Required DIP Lenders prior to the Closing Date. | DIP Credit Agreement, § 3.27. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>New Money Facility</u>:  SOFR + 12.0% (SOFR + 2.0% paid in cash and 10% paid in kind), subject to a SOFR floor of 2.0%.<br><br><u>Roll-Up Facility</u>:  SOFR + 12.0% paid in kind, subject to a SOFR floor of 2.0%. | DIP Credit Agreement, § 2.13. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Closing Fee</u>:  An amount equal to 5.0% of the aggregate principal amount of the Initial Term Loans to be paid in kind on the Closing Date.<br><br><u>Backstop Fee</u>:  An amount equal to 5.0% of the principal amount of the Initial Term Loans to be paid in kind to the Backstop Parties on the Closing Date.<br><br><u>Exit Fee</u>:  On the Maturity Date or on any other date that the Initial Term Loans (under the New Money Facility) are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise), a non-refundable fee equal to 3.0% of the aggregate principal amount of the Initial Term Loans repaid on such applicable date.<br><br><u>Extension Fee</u>:  A consent fee equal to 1.0% of the aggregate principal amount of the DIP Loans held by such Lender on the date of such extension (the "**Extension Fee**"). | DIP Credit Agreement, §§ 2.12; 2.24. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | The earliest of (i) the date that is 6 months after the Closing Date, as such date may be extended as described below, (ii) the date on which all Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with the DIP Credit Agreement, by operation of law or otherwise, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor, (iv) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (v) the Plan Consummation Date.<br><br>Clause (i) above is subject to four one-month extensions, subject to certain conditions, including (x) consent of the Required Lenders and (y) payment of the Extension Fee. | DIP Credit Agreement, § 1.01. |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | As security for the DIP Obligations, effective and perfected as of the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP collateral, the following security interests and liens are granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties, subject only to (x) Prior Senior Liens, (y) the Excluded Property and (z) the Carve Out:<br><br>(a) pursuant to section 364(c) of the Bankruptcy Code, first priority liens on any unencumbered property of the Debtors (now or hereafter acquired and all proceeds thereof);<br><br>(b) pursuant to section 364(d)(1) of the Bankruptcy Code, first priority priming liens on all property of the Debtors that was subject to the Prepetition Liens, including the Prepetition Collateral and Cash Collateral; and<br><br>(c) pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on all prepetition and post-petition property of the Debtors immediately junior to the Prior Senior Liens; | Interim Order ¶¶ 7; DIP Credit Agreement, § 1.01. |

8

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | "Excluded Property" means all licenses and any other property and assets (including any lease, license, permit or agreement) (i) to the extent that the Collateral Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date or (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or prohibition; provided, however, that Excluded Property shall not include any proceeds, substitutions or replacements of any Excluded Property unless such proceeds, substitutions or replacements constitute Excluded Property in accordance with clause or (ii) above. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative and Negative Covenants: Usual and customary covenants for debtor-in-possession financings of this type.<br><br>Financial Covenants:<br>  (a)  Domestic Minimum Liquidity: Commencing with the first full calendar week after the Petition Date, the Debtors shall maintain Domestic Liquidity of not less than $5,000,000 as of the last business day of each calendar week.<br><br>  (b)  Permitted Variance: The Debtors shall not permit: (i) for the rolling four-week period ending on any Testing Date, the Debtors' Actual Disbursements (in the aggregate) to be more than 115% of the projected disbursements (in the aggregate) as set forth in the Approved Budgets with respect to such period; and (ii) for the rolling four-week period ending on any Testing Date, the Debtors' Actual Receipts (in the aggregate) to be less than 80% of the projected receipts (in the aggregate) as set forth in the Approved Budgets with respect to such period. For the avoidance of doubt, for purposes of  budget variance testing, (w) the amounts set forth in the Approved Budget under "Professional Fees", (x) the amounts set forth in the Approved Budget under "Debt Services", (y) adequate protection costs and (z) the amounts set forth in the Approved Budget under "Capital Expenditures – Growth" shall be excluded. | DIP Credit Agreement, §§ 5; 6.<br><br>Interim Order ¶¶ 4. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type. | DIP Credit Agreement, § 7.01. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | By the times and dates set forth below (as any such time and date may be extended with the consent of the Administrative Agent (at the direction of the Required Lenders) cause the following to occur (each, a "**Milestone**"):<br><br>(a)    by the date that is no later than 5 days after the Petition Date, the Debtors shall obtain entry of the Interim Order;<br><br>(b)    by the date that is no later than 30 days after the Petition Date, the Debtors shall have entered into the RSA;<br><br>(c)    by the date that is no later than 30 days after the Petition Date, the Debtors shall obtain entry of the Final Order;<br><br>(d)    by the date that is no later than 30 days after the Petition Date, the Debtors shall have obtained the Interim Relief with each Specified Customer and if such Interim Relief has not been obtained, the Company shall have moved to reject the applicable contract between the Company and the Specified Customer in accordance with the Bankruptcy Code no later than 30 days after the Petition Date;<br><br>(e)    by the date that is no later than 75 days after the Petition Date, the Debtors shall have reached the Final Relief with each Specified Customer that was the subject of Interim Relief and if such Final Relief is not obtained, the Company shall have moved to reject the applicable contract between the Company and the Specified Customer in accordance with the Bankruptcy Code no later than 75 days after the Petition Date;<br><br>(f)    by the date that is no later than 90 days after the Petition Date, the Debtors shall deliver to the Required Lenders a five-year business plan detailing emergence from the Chapter 11 Cases that is in a form and substance satisfactory to the Required Lenders and that incorporates the terms of the Final Relief;<br><br>(g)    by the date that is no later than 95 days after the Petition Date, the Debtors shall have filed a Disclosure Statement and an Acceptable Plan;<br><br>(h)    by the date that is no later than 125 days after the Petition Date, the Debtors shall have obtained entry of an order approving the Disclosure Statement, and such order to be in form and substance satisfactory to the Required Lenders; and<br><br>(i)    by the date that is no later than 155 days after the Petition Date, the Debtors shall obtain entry of an order confirming an Acceptable Plan, and such order to be in form and substance satisfactory to the Required Lenders. | DIP Credit Agreement, § 5.15. |
| **Roll-Up**<br>Local Rule 4001-2(a)(i)(O) | Upon entry of the Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $200,000,000 of DIP Loans (inclusive of the Roll-Up Loans), with $175,000,000 (inclusive of | Interim Order ¶¶ 3(b-c). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | the Roll-Up Loans) being made available to the Borrower on an interim basis, subject to and in accordance with the Interim Order, without any further action by the Debtors or any other party.<br><br>Upon the entry of the Interim Order, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have effectuated the exchange of First Lien Loans for Roll-Up Loans, subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement). | |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all accrued and unpaid fees and expenses (collectively, the "**Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "**Pre-Carve Out Trigger Notice Cap**"); and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) (such date, the "**Trigger Date**"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**" and, together with the Pre-Carve Out Trigger Notice Cap, the "**Carve Out Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, the Prepetition First Lien Administrative Agent, and counsel to the Committee (to the extent one has been appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions of the Interim Order governing use of Cash Collateral that is not timely cured), stating that the Post-Carve Out Trigger Notice Cap has been invoked. | Interim Order ¶ 9(b). |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Voluntary Prepayments</u>: The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty (but subject to payment of the applicable Exit Fee and | DIP Credit Agreement, §§ 2.10; 2.11. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | break funding payments), in an aggregate principal amount that is an integral multiple of $250,000 and not less than $1,000,000 or, if less, the amount outstanding, subject to prior notice (3 U.S. Government Securities Business Days with respect to SOFR Loans and 1 Business Day with respect to ABR Loans).<br><br>Mandatory Prepayments: The Borrower shall apply all Net Proceeds from non-ordinary course asset sales and incurrences of non-permitted indebtedness promptly upon receipt thereof to prepay Loans (on a pro rata basis), together with the applicable Exit Fee. | |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type. | DIP Credit Agreement, § 4.01. |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "**DIP Superpriority Claims**") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors. | Interim Order ¶ 6. |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition First Lien Secured Parties. | Interim Order ¶¶ E(iii); F; 1; 17. |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) | As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "**First Lien Adequate Protection Liens**"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.<br><br>As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "**Adequate Protection Superpriority Claims**"), but junior to the Carve Out and the DIP Superpriority Claims.<br><br>Fees and Expenses: Payment of all reasonable and documented fees and expenses, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and the Interim Order.<br><br>Information: The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP | Interim Order, ¶¶ 5; 8(a-c). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | Agent under the DIP Documents. | |
| **Postpetition Liens on Unencumbered Assets** Local Rule 4001-2(a)(i)(G) | Subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), a 100% equity pledge of all first-tier foreign subsidiaries and all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "**Previously Unencumbered Property**"); provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to the Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing. | Interim Order, ¶ 7(a). |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' Prepetition First Lien Obligations. | Interim Order, ¶ E. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code. | Interim Order, ¶¶ E(v); 6. |
| **Effect of Debtors'** | Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled), all | Interim Order, ¶ 11. |

13

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | of the Debtors' stipulations and admissions contained in the Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition First Lien Secured Parties' claims, liens, and interests contained in the Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. The "Challenge Period" shall be seventy-five (75) calendar days after entry of the Interim Order. | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Documents, the Escrow Agent under the Escrow Agreement, and the Prepetition First Lien Administrative Agent under the Prepetition First Lien Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility. The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "**Remedies Notice Period**"):  (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and the Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out. Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. If the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in the Interim Order. | Interim Order, ¶¶ 3(e); 15; 23(a). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | Events of Default:<br><br>• the filing by any Loan Party of any chapter 11 plan of reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure, that is not an Acceptable Plan without the prior written consent of the Required Lenders;<br><br>• the bringing of a motion or taking of any action in any Chapter 11 Case by the Debtors, or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the U.S. Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence thereof or (ii) except as provided in the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the U.S. Bankruptcy Code without the prior written consent of the Required Lenders;<br><br>• the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is *pari passu* or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under the DIP Credit Agreement or the DIP Order;<br><br>• the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order or the Cash Management Order, in each case, in a manner that is adverse to the Lenders, in their capacities as such, without the prior written consent of the Required Lenders;<br><br>• the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under the DIP Credit Agreement or the other Loan Documents;<br><br>• the filing of a motion by any Debtor requesting, or the entry of any order by the Bankruptcy Court granting, any superpriority claim which is senior or *pari passu* with the Lenders' claims or with the claims of the Prepetition Lenders under the Prepetition Loan Documents; and<br><br>• the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding the Administrative Agent or the Prepetition Administrative Agent to have the right to or be permitted to "credit bid." | DIP Credit Agreement, §§ 7.01(cc); (v-aa). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date the First Lien Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral. Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Party Debtors Upon entry of the Interim Order and subject to the Carve Out, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of the Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of the Interim Order (together, the "**First Lien Adequate Protection Liens**"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions. | Interim Order, ¶¶ E(v); 3(f); 8(a). |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Except as set forth in this paragraph 15 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties under the Interim Order. Subject to the rights and limitations set forth in paragraph 11 of the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of the Interim Order, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "**Related Parties**"), and, effective upon entry of the Final Order, each of the Prepetition First Lien Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal | Interim Order, ¶¶ 15;24; 26(c). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition First Lien Obligations, the First Lien Loan Liens or the Prepetition First Lien Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition First Lien Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.<br><br>Unless and until all DIP Obligations, Prepetition First Lien Obligations, and the First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition First Lien Administrative Agent (acting at the direction of the Prepetition Required Lenders), (x) any modification, stay, vacatur, or amendment of the Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition First Lien Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the First Lien Adequate Protection Liens or the First Lien Loan Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and the Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases. | |
| **Provision Limiting the Court's Power or Discretion to Enter Future Orders**<br>Local Rule 4001-2(a)(i)(C) | Any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) (as to the Prepetition First Lien Secured Parties) and the "equities of the case" exception of section 552(b), subject to the entry of the Final Order). | Interim Order ¶ 3(f). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Joint Liability of Debtors**<br>Local Rule 4001-2(a)(i)(J) | The DIP Guarantors shall jointly, severally, and unconditionally guarantee, and upon entry of the Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.<br><br>The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations. | Interim Order ¶ 3(g); 18(b). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement. | Interim Order ¶ 18(c); DIP Credit Agreement § 9.05. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | In light of the Prepetition First Lien Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition First Lien Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code.<br><br>Upon entry of the Interim Order and subject to the Carve Out, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of the Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or the Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All payments or proceeds remitted (a) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of the Prepetition First Lien Secured Parties, in each case, pursuant to the DIP Documents, the provisions of the Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code, solely in the case of waivers of rights under sections 506(c) (as to the Prepetition First Lien Secured Parties) and the "equities of the case" exception of section 552(b), subject to the entry of the Final Order). For the avoidance of doubt, and notwithstanding anything to the contrary in any Prepetition First Lien Loan Document, DIP Document, any additional document, instrument, certificate and/or agreement related to any of the foregoing, in no event shall any property, proceeds, cash, cash equivalents, or otherwise placed or held in the escrow account established pursuant to the Escrow Agreement at any time be, or be deemed to be, property of any of the Debtors or their affiliates or subsidiaries or any of the Debtors' estates and | Interim Order, ¶¶ F(v); 3(f). |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | the parties to the Escrow Agreement have acknowledged and agreed to the foregoing. | |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | The Prepetition First Lien Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral). | Interim Order, ¶ 36. |
| **No Marshaling** Local Rule 4001-2(a)(i)(X) | The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the Interim Order, the DIP Documents and the Prepetition First Lien Loan Documents, notwithstanding any other agreement or provision to the contrary, and subject to entry of the Final Order, the Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral. | Interim Order, ¶ 34. |
| **Equitization** | Subject to entry of a Final Order, if any New Investor (as defined below) makes a direct or indirect investment in Equity Interests of the Borrower (including through an investment in Equity Interests of any parent entity or any Affiliate or Subsidiary of the Borrower) (the "**New Investment**", and such investor, the "**New Investor**"), (i) each Lender must be provided written notice (the "**Investor Notice**") of the New Investment and (ii) the Borrower will offer the right to each Lender, to be exercised in its sole discretion, to convert all or a portion of its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor on the same terms as such New Investor, including at the same equity value implied by such New Investment (taking into account all fees, discounts and other economics provided to the New Investor in connection with such New Investment) (the "**Equitization**"), but including customary shareholder protections satisfactory to Lenders holding a majority of the Loans electing this option; provided, however, that, following receipt of any Investor Notice, any Lender who provides written notice to the Lender Advisors and the Borrower that it does not wish to be offered the right to convert its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor as described in this paragraph shall not be offered such right. | DIP Credit Agreement § 9.21. |

## Prepetition Indebtedness

12.     The following table provides a summary of the Debtors' prepetition funded debt obligations (the "**Prepetition Secured Obligations**") under its prepetition credit facilities (the "**Prepetition Secured Facilities**"):

| | Outstanding Principal Amount |
|---|---|
| First Lien Revolving Credit Facility | $65.00 million |
| First Lien Term Loan | $445.24 million |

RLF1 27987007V.1

| | Outstanding Principal Amount |
|---|---|
| **Total First Lien Debt** | **$510.24 million** |
| Capital Leases | $76.80 million |
| **Total Funded Debt** | **$587.04 million** |

13.    *First Lien Credit Agreement*.  The Debtors other than Phoenix Topco and Phoenix Services Parent, LLC (the "**Prepetition Loan Parties**") have outstanding first lien secured debt obligations under that certain First Lien Credit Agreement, dated as of March 1, 2018 (as amended, supplemented, amended and restated or modified from time to time, the "**First Lien Credit Agreement**" and the claims thereunder or related thereto, the "**First Lien Claims**"), among Phoenix Services International LLC (as successor by merger to Phoenix Services Merger Sub, LLC), as borrower, Phoenix Services Holdings Corp., Barclays Bank PLC, as administrative agent for the lenders (in such capacity, the "**First Lien Agent**"), and the lenders and issuing banks party thereto from time to time (the "**First Lien Lenders**").  As of the Petition Date, the aggregate principal amount outstanding under the First Lien Credit Agreement is approximately $510 million, which amount consists of the following, each secured by the same collateral with *pari passu* lien priority:  (a) approximately $445 million in term loans (the "**First Lien Term Loans**") and (b) approximately $65 million in revolving loans (the "**First Lien Revolving Loans**" or "**First Lien Revolving Facility**").  The Prepetition Loan Parties' obligations under the First Lien Credit Agreement (the "**First Lien Credit Agreement Obligations**") are secured by a first lien on substantially all of the Prepetition Loan Parties' assets, except as set forth in the First Lien Credit Agreement (collectively, the "**Prepetition Collateral**").  The First Lien Revolving Facility is fully drawn as of the Petition Date and includes undrawn letters of credit in the amount of $6 million. The First Lien Revolving Facility matures on March 1, 2023 while the First Lien Term Loans mature on March 1, 2025.

14.     _Capital Leases_.    As of the Petition Date, the Debtors currently own approximately 1,740 fixed assets that are not financed through capital leases.  These assets include, among other things, a variety of equipment, trucks, and buildings, which comprise a net book value of approximately $102 million.  Over the last two (2) to three (3) years, the Company entered into a number of capital leases to finance new projects, particularly with respect to the purchase of heavy equipment and machinery.  As of the Petition Date, the Debtors have approximately $76.8 million in outstanding capital lease obligations with respect to 386 assets, 73% of which is owed to the Debtors' three (3) top lessors.

**Debtors' Immediate Need for DIP Financing and Access to Cash Collateral**

15.     As stated in the Singh Declaration, the Debtors require immediate access to debtor-in-possession financing and Cash Collateral (as defined below) to ensure (a) sufficient working capital to operate their business and to administer their estates, (b) the Debtors execute their strategy with respect to the re-negotiation of the Customer Contracts prior to exiting bankruptcy, and (c) the ability to timely pay administrative expenses incurred during these chapter 11 cases.  As of the Petition Date, the Debtors will have only approximately $6 million in cash on hand.  Without additional financing and the ability to use Cash Collateral, the Debtors will be in a negative cash position in the coming days.  Thus, the Debtors require immediate access to the proceeds of the DIP Financing and authority to use Cash Collateral to ensure they have sufficient liquidity to operate their business as a going concern and to avoid immediate and irreparable harm to their estates.

16.     In consultation with their advisors, the Debtors reviewed and analyzed the Debtors' projected cash flows to determine the requisite amount of debtor-in-possession financing.  Based on management's cash-flow forecast, the Debtors, in consultation with their advisors and the management team, compiled the Initial DIP Budget.  Based on the forecasted funding

21

requirements reflected in the Initial DIP Budget, the liquidity provided under the proposed DIP Financing will enable the Debtors to preserve their value as a going concern, provide the Debtors with sufficient liquidity to meet their ongoing day-to-day obligations, fund the operational and administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

### Debtors' Efforts to Obtain Postpetition Financing

17.　　The Debtors operate in a competitive industry.  Over the past several years, the Debtors' customer contract portfolio has become unsustainable due to financial pressure from a combination of (i) cyclical industry headwinds that have bid down returns on new contracts, (ii) existing contracts that have eroded margin, and (iii) discrete operational challenges at sites.  Thus, in 2022, the Debtors, with the assistance of their restructuring advisors, engaged with the Ad Hoc Group and its advisors to discuss, among other things, the business, customer contract modifications, and potential DIP financing.  The Debtors and the Advisors provided significant diligence to the Ad Hoc Group and its advisors and held numerous meetings with the Ad Hoc Group and/or their advisors.

18.　　In consultation with the Debtors and their advisors, PJT Partners LP ("**PJT**") developed a list of parties that potentially would be interested in providing the DIP Financing to create a competitive environment for raising the necessary capital on the best terms available in the market.  Since substantially all of the Debtors' assets are encumbered and subject to validly perfected first priority liens, according to PJT's understanding, PJT's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure.

19.     In advance of PJT reaching out to potential financing providers, PJT, AlixPartners, and the Debtors undertook an analysis of how much postpetition financing would be required to operate the Debtors' business, pay administrative costs during the chapter 11 process, and capitalize the restructured Company.   Based on this analysis, the Debtors ultimately determined that they would require incremental liquidity of up to $50 million to operate smoothly postpetition, satisfy all administrative costs and expenses, and remain adequately capitalized upon emergence.

20.     Given the facts and circumstances of the Debtors' situation, PJT contacted parties PJT believed, in their experience and judgment, were most likely to fund a postpetition financing facility.  PJT contacted parties that were likely to be interested in providing a DIP facility for the purposes of raising the necessary capital on the best terms available to the Debtors in the market.  PJT solicited interest from 18 financial institutions to determine the extent to which third parties would be willing to provide postpetition financing to the Debtors.  In its solicitation, PJT provided potential lenders an overview of the situation and described the financing opportunity.

21.     No party that PJT communicated with as part of the marketing process and no other party that PJT is aware of was interested in providing and willing to provide postpetition financing to the Debtors.  Thus, no alternative sources of financing are currently available to the Debtors on both better and executable terms than those being provided by the DIP Facility.

22.     Accordingly, the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best—and in fact only—currently available option.

### DIP Financing Was Negotiated in Good Faith and at Arms' Length

23.     Over the course of multiple weeks, the Debtors, the Ad Hoc Group, and their respective legal and financial advisors negotiated the terms and provisions of the DIP Facility. During that time, the parties exchanged numerous term sheets and mark-ups and participated in

23

several calls.  Over the course of these negotiations, the terms of the DIP Financing improved to the benefit of the Debtors.  Throughout the negotiation process, the Debtors' restructuring professionals held numerous calls and briefings with the Debtors' management team, Phoenix Topco's board of managers (the "**Board**"), and the special committee of the Board, each of which provided feedback and direction with respect to the terms of the DIP Financing.

24.     This process culminated in the DIP Facility, which was negotiated in good faith and at arms' length.  As stated in the Singh Declaration, given the arms'-length negotiations that took place between the Debtors and the DIP Lenders, in addition to the lack of viable alternative financing sources, the proposed DIP Facility is the best financing alternative available to the Debtors and avoids a costly and time-consuming priming fight at the outset of the Chapter 11 Cases that places the Debtors' enterprise at risk.

## Relief Requested Should be Granted

### A.     Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

25.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Facility, and use Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that

24

courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

26.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

27.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances.  *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

28.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  The DIP Financing was market tested and was the product of arms'-length negotiations.  Keeping in mind the advantages and disadvantages of the proposed DIP Financing, the Debtors ultimately decided that moving forward with the proposed DIP Financing was appropriate and in the Debtors' best interests.  Put simply, the DIP Financing represents the only financing available to the Debtors, and given the Debtors' current cash position and the lack

of alternatives, the only alternative path available to the Debtors is liquidation, which would be detrimental to all stakeholders.  In addition, the proposed DIP Facility is necessary for the Debtors to meet critical going concern funding requirements, including, but not limited to, funding the Debtors' next payroll cycle on September 28, 2022.  The DIP Facility serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with a clear source of financing during the pendency of these chapter 11 cases.  Thus, in light of the above, the Debtors and their advisors determined that entry into the DIP Facility was the best path forward under the totality of circumstances, and the Debtors believe that they have obtained the best terms currently available under the circumstances.

29.    The terms and conditions of the DIP Credit Agreement were negotiated at arm's-length by well-represented, independent parties in good faith.  Through its financing process, the Debtors were able to obtain the necessary financing on the best terms available in the market under the circumstances.  The DIP Facility gives the Debtors the funding and flexibility needed to reorganize around their core business and successfully emerge from these chapter 11 cases.

30.    The DIP Facility contemplates a proposed equitization upon entry of a Final Order, whereby each DIP Lender can elect to convert its DIP loans to equity if a third party invests in the Debtors through equity or equity–linked securities on economically-similar terms. Provisions in DIP facilities that allow for the conversion of DIP loans to equity are permissible and have been approved by other bankruptcy courts.[5]

---

[5]    *See* Bench Decision (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, and (III) Granting Related Relief, *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. September 21, 2022) (Docket No. 376); Notice of Filing of Revised DIP Credit Agreement, *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Oct. 3, 2020) (Docket No. 1017); Final Order Granting Debtors' Motion to (I) Authorize Certain Debtors In Possession to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and

31.     Here, the Equitization was a heavily negotiated term that was ultimately required by the DIP Lenders as a condition to entry into the DIP Facility.  Nothing in the DIP Documents prohibits the Debtors from sourcing third-party equity capital in connection with a plan process.

32.     Further, the DIP Facility provides for a roll-up of up to $150 million of obligations outstanding under the First Lien Credit Agreement held by DIP lenders.  The Debtors respectfully submit that the roll-up is reasonable under the circumstances of these chapter 11 cases.  The inclusion of the roll-up was required by the DIP Lenders as a condition to providing the DIP Financing and the overall benefits provided by the DIP Financing as a whole.

33.     Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates and is necessary to preserve the value of estate assets and is a reasonable exercise of their business judgment.

**B.      Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

34.     The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Documents and described above.  The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

---

364; (II) Grant Liens and Superpriority Administrative Expense Claims to DIP Lenders Pursuant to 11 U.S.C. §§ 364 And 507; (III) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507; and (IV) Grant Related Relief, Grupo Aeroméxico, S.A.B. de C.V., No. 20-11563 (SCC) (Bankr. S.D.N.Y., Oct. 13, 2020) (Docket No. 527).

28

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

35.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding

29

that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

36.     Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

37.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit due to their lack of unencumbered assets.  Thus, the Debtors determined that the DIP Facility provided the best—and, in fact, the *only*—opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

38.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent of the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition First Lien Secured Parties consent to the priming or (b) the Prepetition First Lien Secured Parties' interests in collateral are adequately protected.

39.     Most importantly, here, the priming is consensual.  Pursuant to the First Lien Credit Agreement, the Prepetition First Lien Secured Parties support, or are deemed to support, the priming of their prepetition liens in exchange for an adequate protection package.  Further, the Debtors are not aware of any available financing on equal or better terms from the DIP Lenders absent the granting of first-priority priming liens on the Prepetition Collateral.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

### C.     Interests of Prepetition First Lien Secured Parties Are Adequately Protected

40.     Parties with an interest in cash collateral are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  Adequate protection may be provided in various forms, including, among other things, payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re*

31

*Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012);

*In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr.

D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2

(Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H.

1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that

adequate protection can take many forms and "must be determined based upon equitable

considerations arising from the particular facts of each proceeding")).

41.    The adequate protection package provided to the Prepetition First Lien

Secured Parties, as described above, is consensual and appropriately safeguards the Prepetition

First Lien Secured Parties from the diminution in the value (if any) of their interests in the

Prepetition Collateral.  The Debtors submit that their provision of adequate protection to the

Prepetition First Lien Secured Parties is fair and reasonable and is sufficient to satisfy the

requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### D.    Debtors Should Be Authorized to Use Cash Collateral

42.    For the reasons set forth herein, the Debtors require use of the Cash

Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy

Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in

pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

43.     Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

44.     As noted above, the Prepetition First Lien Secured Parties have, or are deemed to have, consented to the use of Cash Collateral, and the Debtors are providing the Prepetition First Lien Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

E.      **The Carve-Out is Appropriate**

45.      The liens granted pursuant to the DIP Facility, replacement liens on account of adequate protection, and the superpriority claims of all secured lenders are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Claire's Stores, Inc.*, 18-10584 (MFW) (Bankr. D. Del. 2018); *In re Avaya,* Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (Docket No. 61); *In re Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res.  Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (Docket No. 130); *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) (Docket No. 99); *In re American Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (Docket No. 248); *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (Docket No. 54); *In re Bear Island Paper Co., LLC*, No. 10-31202 (DOT) (Bankr. E.D. Va.  Feb. 26, 2010) (Docket No. 66); *In re The Great Atl. & Pac.  Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (Docket No. 43).

46.      Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of the Prepetition First Lien Secured Parties' interests in the Prepetition Collateral.

**F.      Debtors Should Be Authorized to Pay Fees Required by DIP Documents**

47.      As described herein, the Debtors have agreed, subject to Court approval, to pay the DIP Fees in exchange for their providing and agenting the DIP Facility.  As set forth in the Singh Declaration, taken as a whole, the terms of the DIP Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and is the Debtors' best—and in fact only—currently available option to maintain their ongoing business operations and to fund their chapter 11 cases.

48.      The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**G.      DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

49.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As described in the Singh Declaration, the negotiations of the terms of the DIP Financing with the DIP Lenders were conducted at arms' length.  Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance with the Budget (subject to any Permitted Variance).  Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

**H.     Modification of Automatic Stay is Warranted**

51.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Agent and/or DIP Lenders to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.  In the Debtors' business judgment, such relief is reasonable and fair under the present circumstances.

52.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D.

36

Del. January 17, 2019) (Docket No. 222); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) (Docket No. 184); *In re The NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) (Docket No. 85); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (Docket No. 130); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (Docket No. 93).

I.    **Debtors Require Immediate Access to Cash Collateral and DIP Financing**

53.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

54.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g.*, *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. July 29, 2016) (Docket No. 46) (authorizing debtors to obtain postpetition financing on an interim basis); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr D. Del. Mar. 11, 2016) (Docket No. 65) (same); *In re Allied Nev. Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Mar. 12, 2015) (Docket No. 70) (same); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr. D. Del. Mar. 17, 2014) (Docket No. 39) (same); *In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009) (Docket No. 64) (same); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (Docket No. 88) (same).

55.    As described in the Richard Declaration, as of the Petition Date, the Debtors will only have approximately $6 million in cash on hand. Absent authority to enter into and access

37

the proceeds of the DIP Financing, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Thus, the Debtors require immediate access to the proceeds of the DIP Financing, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases.

**J.      The "Equities of the Case" Waiver is Appropriate**

56.      The Prepetition First Lien Secured Parties are consenting, subject to the terms of the Interim Order, to the priming of their liens by the DIP Facility and to the Debtors' use of Cash Collateral, thereby permitting the Debtors to obtain sufficient funds to continue to operate their business and providing a substantial benefit to the Debtors' estates. As a condition to providing such consent, the Prepetition First Lien Secured Parties required the Debtors to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon entry of the Final Order. Absent the Prepetition First Lien Secured Parties' consent, the Debtors would have been required to seek to prime the Prepetition First Lien Secured Parties' liens and to use Cash Collateral on a non-consensual basis, which would have proven costly to the Debtors were they unable to prevail in such a priming fight. In addition, the Debtors are seeking approval of the "equities of the case" waiver only upon entry of the Final Order, thereby allowing parties in interest an opportunity to be heard in connection therewith. Therefore, the Debtors submit that the proposed "equities of the case" waiver is appropriate.

**K.      Request for Final Hearing**

57.      As stated above, the Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). The Debtors request a date which is no later than forty (40) days

38

after entry of the Interim Order to hold a hearing to consider the relief requested herein on a final basis.

## Bankruptcy Rule 6003(b) Has Been Satisfied

58.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" prior to 21 days after the Petition Date.  Fed. R. Bankr. P. 6003(b).  As explained above and in the Richard Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein were not promptly granted and if the Debtors were therefore unable to access the proceeds of the DIP Financing or use Cash Collateral.  Absent immediate access to the proceeds of the DIP Financing and Cash Collateral, the Debtors would lack, among other things, (a) sufficient working capital to operate their business and to administer their estates, (b) the ability to execute their strategy with respect to the re-negotiation of the Customer Contracts, and (c) the ability to timely pay administrative expenses incurred during these chapter 11 cases.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Request for Bankruptcy Rule 6004(a) and (h) Waivers

59.     To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Richard Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **Reservation of Rights**

60.     Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors or any liens satisfied pursuant to this Motion, (b) an agreement or obligation to pay any claims, (c) a waiver of any claims or causes of action that may exist against any creditor or interest holder, (d) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (e) an approval, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **Notice**

61.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware (Attn: Linda Casey, Esq.); (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Scott Greenberg, Esq., Steven A. Domanowski, Esq., Matthew Williams, Esq., and Jason Goldstein, Esq.), as counsel to the DIP/First Lien Group; (f) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899 (Attn: Laura Davis Jones, Esq.), as co-counsel to the DIP Lenders and the DIP/First Lien Group (together with Gibson, Dunn & Crutcher LLP, the "**DIP/First Lien Group Advisors**"); (g) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Ira Dizengoff, Esq. and James Savin, Esq.), as counsel

to Apollo Global Management, Inc.; (h) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian Resnick, Esq. and Jonah A. Peppiatt, Esq.), as counsel to the First Lien Agent; and (h) any other party entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

62.    The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

41

WHEREFORE the Debtors respectfully request entry of the Interim and Final Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  September 27, 2022
        Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* pending)
Jeffrey D. Saferstein (*pro hac vice* pending)
Garrett A. Fail (*pro hac vice* pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                            :
In re                                       :      Chapter 11
                                            :
PHOENIX SERVICES TOPCO LLC, et al.,         :      Case No. 22– _____ (     )
                                            :
                    Debtors.¹               :      (Joint Administration Requested)
                                            :
------------------------------------------------------------ x
```

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this interim order (this "Interim Order"):

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable).  The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, PA 19087.

[2]  Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the DIP Credit Agreement (as defined herein).

(i) authorizing Phoenix Services International LLC, in its capacity as borrower (the "DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower, the "DIP Guarantors") on a joint and several basis, the DIP Borrower's obligations in connection with a superpriority senior secured multiple draw term loan credit facility (the "DIP Facility") in the aggregate principal amount of $200,000,000 (the "DIP Loans"), consisting of:

(a) New Money Loans. A superpriority senior secured multiple draw term loan credit facility in the principal amount of $50,000,000 (the "New Money Commitments" and the term loans made thereunder, the "New Money Loans"), which New Money Loans shall be fully funded upon entry of this Interim Order in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below), substantially in the form attached hereto as **Exhibit A** and all other terms and conditions of the DIP Documents;

(b) Roll-Up Loans. A superpriority term loan facility in the principal amount of $150,000,000 (the "Roll-Up Loans"), which Roll-Up Loans shall be deemed fully funded and an equal amount of First Lien Loans (as defined below) shall be deemed converted into and exchanged for, such Roll-Up Loans, in each case, upon entry of this Interim Order in accordance with the terms and conditions set forth in the DIP Credit Agreement and all other terms and conditions of the DIP Documents. On the date of this Interim Order, the Roll-Up Loans shall be deemed to be made by each Backstop Party (as defined in the DIP Credit Agreement) that is a Prepetition First Lien Lender (as defined below), an investment advisor or manager for the account of a Prepetition First Lien Lender, or a beneficial owner of First Lien Loans (or an affiliated fund or trade counterparty designated by such Backstop Party (as defined in the DIP Credit Agreement)) (such initial lender holding Roll-Up Loans, the "Closing Date Roll-Up Lenders") in an amount equal to the lesser of (x) the aggregate principal amount of the Prepetition Loans owing to the applicable Closing Date Roll-Up Lender on the Closing Date and (y) an amount equal to (I) $150,000,000 multiplied by (II) the quotient of the amount set forth next to each Backstop Party's name on Schedule 2.12(b) of the DIP Credit Agreement divided by the sum of all amounts set forth on Schedule 2.12(b) of the DIP Credit Agreement. On the terms set forth in the Syndication Procedures, (1) each Closing Date Roll-Up Lender shall be deemed to have assigned its Roll-Up Loans to each other Lender under the DIP Credit Agreement (such other Lenders, "Syndicate Lenders") on a pro rata basis, and each Syndicate Lender shall be deemed to have assumed an amount of Roll-Up Loans ratably from each Closing Date Roll-Up Lender and (2) each Syndicate Lender shall be deemed to have ratably assigned Remaining Prepetition Loans to each Closing Date Roll-Up Lender and be deemed to have ratably assumed Rolled-Up Prepetition Loans from each Closing Date Roll-Up Lender such that each Lender under the DIP Credit Agreement (including the Closing Date Roll-Up Lender) will hold the amount of Rolled-Up Prepetition Loans as set forth on Schedule 2.05 of the DIP Credit

Agreement and the Remaining Prepetition Loans will be reallocated and assigned accordingly;

(c)    Interim Facility. Upon entry of this Interim Order, the maximum amount of the New Money Commitments that will be disbursed to the Borrower shall be $25,000,000;

(ii)    authorizing the DIP Borrower and the DIP Guarantors to (a) enter into and perform under that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit Agreement dated as of September [___], 2022, among the DIP Borrower, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent, and collateral agent (in such capacities, the "DIP Agent," and, together with the DIP Lenders, the "DIP Secured Parties") (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement") and the other DIP Documents (as defined below) and (b) enter into and perform under that certain Escrow Agreement (the "Escrow Agreement"), dated as of September [___], 2022, among the DIP Borrower, the DIP Agent, and Bank of New York Mellon, as escrow agent (the "Escrow Agent"); and each of the foregoing, together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility and the Escrow Agreement), and other guarantee and security documentation, collectively, the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), (x) solely in accordance with the Approved DIP Budget (subject to any Permitted Variance set forth herein and in the DIP Credit Agreement), (y) to effectuate the exchange of First Lien Loans for Roll-Up Loans in accordance with the DIP Credit Agreement, this Interim Order, and the Final Order, and (z) to provide working capital for, and for other general corporate purposes of, the Debtors and certain of the Debtors' subsidiaries, including for payment of any Adequate Protection Payments (as defined below);

(iv)    granting adequate protection to the Prepetition First Lien Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below);

(v)    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x)

Carve Out (as defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition First Lien Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition Documents (the "Prior Senior Liens");

(vi)     granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(vii)     subject to entry of a Final Order (as defined below), waiving the Debtors' and the estates' right to surcharge against the Prepetition Collateral or DIP Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(viii)     subject to entry of a Final Order and to the extent set forth herein, for the "equities of the case" exception under Bankruptcy Code section 552(b) to not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(ix)     pursuant to Bankruptcy Rule 4001, holding an interim hearing (the "Interim Hearing") on the Motion before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Debtors to, on an interim basis, borrow from the DIP Lenders a principal amount of $175,000,000 in DIP Loans (inclusive of the Roll-Up Loans), (2) authorizing the DIP Guarantors to guaranty the DIP Obligations, (3) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (4) granting the adequate protection described in this Interim Order, and (5) authorizing the Debtors to execute and deliver the DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(x)     scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a final order (the "Final Order"), and approving the form of notice with respect to the Final Hearing; and

(xi)     granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Robert Richard in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. __] (the "First Day Declaration"), the *Declaration of John Singh in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative*

*Expense Claims, (III) Granting Adequate Protections, (IV) Modifying the Automatic Stay, (V)
Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. __] (the "<u>Singh
Declaration</u>"), and the other evidence submitted or adduced and the arguments of counsel made at
the Interim Hearing held on _____ __, 2022; and this Court having heard and resolved or
overruled any objections, reservations of rights, or other statements with respect to the relief
requested in the Motion; and the Court having noted the appearances of all parties in interest; and
it appearing that approval of the interim relief requested in the Motion is necessary to avoid
immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and
otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-
in-interest, and is essential for the continued operation of the Debtors' businesses and the
preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the
DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the
Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in
the Motion, and it appearing that no other or further notice of the interim relief granted herein need
be given under the circumstances; and after due deliberation and consideration, and for good and
sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE
COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW**:[3]

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings
of fact, pursuant to Bankruptcy Rule 7052.

A.    _Petition Date_.  On September 27, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware commencing these Cases.

B.    _Debtors in Possession_.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.    _Jurisdiction and Venue_.  The Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the _Amended Standing Order of Reference_ from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.    _Committee_.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "Committee").

E.    _Debtors' Stipulations_.  Subject only to the rights of parties in interest specifically set forth in paragraph 11 of this Interim Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Interim DIP Order), the Debtors stipulate and agree that (collectively, paragraphs E(i) through (ii) below are referred to herein as the "Debtors' Stipulations"):

(i)    First Lien Loans.

(a)    The Prepetition First Lien Lenders (as defined below) provided loans (the "First Lien Loans") in a total aggregate principal amount outstanding as of the Petition Date of

6

$504,487,499.98, and issued letters of credit in an aggregate face amount outstanding as of the Petition Date of $5,169,592.30 (the "Prepetition L/Cs") pursuant to a letter of credit sub-facility, in each case, under that certain First Lien Credit Agreement dated as of March 1, 2018, by and among Phoenix Services Holdings Corp., a Delaware corporation ("Holdings"), the DIP Borrower (as successor by merger to Phoenix Services Merger Sub, LLC), each of the lenders and issuing banks from time to time party thereto (collectively, the "Prepetition First Lien Lenders"), and Barclays Bank PLC as administrative agent and collateral agent (in such capacities, the "Prepetition First Lien Administrative Agent", and together with the Prepetition First Lien Lenders and the other Secured Parties (as defined in the Prepetition Credit Agreement), the "Prepetition First Lien Secured Parties") (such credit agreement, as amended, restated, or otherwise modified from time to time, the "Prepetition Credit Agreement", and together with the other "Loan Documents" (as defined in the Prepetition Credit Agreement), the "Prepetition First Lien Loan Documents").

(b)        As of the Petition Date, the Prepetition Loan Party Debtors (as defined below) were jointly and severally indebted to the Prepetition First Lien Secured Parties pursuant to the Prepetition First Lien Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $504,487,499.98 on account of First Lien Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as

defined in the Prepetition Credit Agreement), in each case, owing under or in connection with the Prepetition First Lien Loan Documents (collectively, the "Prepetition First Lien Obligations").

(ii)     *First Lien Loan Collateral*.   In connection with the Prepetition Credit Agreement, (x) certain Prepetition Loan Party Debtors entered into that certain Collateral Agreement (First Lien), dated as of March 1, 2018 (as amended, supplemented or otherwise modified from time to time, including by the Supplement No. 1 to the Collateral Agreement (First Lien), dated as of March 11, 2019, the "Subsidiary Collateral Agreement"), by and between the Borrower, the other Borrower subsidiaries party thereto, and the Prepetition First Lien Administrative Agent and (y) Holdings entered into that certain Holdings Guarantee and Pledge Agreement, dated as of March 1, 2018 (as amended, supplemented or otherwise modified from time to time, the "Holdings Guarantee and Pledge Agreement" and, together with the Subsidiary Collateral Agreement, the "Collateral Agreements"), by and between Holdings and the Prepetition First Lien Administrative Agent.   Pursuant to the Collateral Agreements and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "First Lien Loan Liens") on the "Collateral" (the "Prepetition Collateral"), as such term is defined in the Prepetition Credit Agreement, pursuant to the Prepetition Loan Documents.   The Prepetition Collateral consists of substantially all of the assets of the Debtors that were Loan Parties (as defined in the Prepetition Credit Agreement) under the Prepetition First Lien Loan Documents (the "Prepetition Loan Party Debtors"), except as set forth in the Prepetition Credit Agreement.

(iii)     *Cash Collateral*.   Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other

disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds of any of the foregoing is the Prepetition First Lien Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(iv)     *Bank Accounts*.    The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(v)     *Validity, Perfection, and Priority of First Lien Loan Liens and Prepetition First Lien Obligations*.    Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (A) the First Lien Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the First Lien Loan Liens are subject and subordinate only to Prior Senior Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Party Debtors; (D) the First Lien Loan Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (E) the First Lien Loan Liens were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the First Lien Loan Liens or Prepetition First Lien Obligations exist, and no portion of the First Lien Loan Liens or Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance,

disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Administrative Agent, the Prepetition First Lien Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations, or the First Lien Loan Liens.

(vi)     *Intercreditor Provisions*.  Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of, or entered into as permitted by and in accordance with, the Prepetition First Lien Loan Documents shall (i) remain in full force and effect, and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, in each case, unless expressly set forth herein or therein.

F.     *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)     The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement) to, among other things, (A) permit the orderly continuation of their businesses; (B) pay certain Adequate Protection Payments;

10

and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors and certain subsidiaries thereof.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Secured Parties the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iii)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon

11

the protections offered by section 364(e) of the Bankruptcy Code. The DIP Obligations, the DIP

Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code

section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or

modified on appeal or otherwise, and any liens or claims granted to, or payments made to, or

payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date

of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects

by the original provisions of this Interim Order, including entitlement to all rights, remedies,

privileges, and benefits granted herein.

(iv)    *Adequate Protection*. Each of the Prepetition First Lien Secured Parties are

entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate

protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for

any diminution in the value thereof.

(v)    *Sections 506(c) and 552(b)*. In light of the Prepetition First Lien Secured

Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and

the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition First

Lien Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy

Code and, subject to and upon entry of the Final Order, (i) a waiver of any "equities of the case"

claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section

506(c) of the Bankruptcy Code.

(vi)    *Consent by Required Lenders*. Holders constituting Required Lenders (as

defined in the Prepetition Credit Agreement) have consented to, conditioned on the entry of this

Interim Order, the Debtors' incurrence of the DIP Facility, and proposed use of Cash Collateral on

the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order.

G.    *Good Cause Shown; Best Interest*.   Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

H.    *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Interim Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

I.    *Arm's Length, Good Faith Negotiations*.  The terms of this Interim Order were negotiated in good faith and at arm's length between the Debtors and the Prepetition First Lien Secured Parties. The Prepetition First Lien Secured Parties have acted without negligence or violation of public policy or law in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facility and the Debtors' use of Cash Collateral, including in respect of all of the terms of this Interim DIP Order, all documents related thereto, and all transactions contemplated by the foregoing.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    <u>DIP Financing Approved</u>.  The Motion is granted on an interim basis as set forth herein, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.    <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.    <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)    The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents and to effectuate the exchange of First Lien Loans for Roll-Up Loans.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent (acting at the direction of the required lenders under and pursuant to the DIP Credit Agreement (the "<u>Required DIP Lenders</u>")) and the Required DIP Lenders.  Upon entry of this Interim Order and until execution and delivery of the DIP Credit Agreement and other DIP Documents required to be delivered thereunder, the Debtors and the DIP Secured Parties shall be bound by (x) the terms and conditions and other provisions set forth in the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility), with the same

force and effect as if duly executed and delivered to the DIP Agent by the Debtors, and (y) this Interim Order and the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility) shall govern and control the DIP Facility.  Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and other DIP Documents shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Facility Documents, subject to the terms and conditions set forth therein and this Interim Order.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Interim Order, the terms and conditions of this Interim Order shall govern and control.

(b)      Upon entry of this Interim Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $200,000,000 of DIP Loans (inclusive of the Roll-Up Loans), with $175,000,000 (inclusive of the Roll-Up Loans) being made available to the Borrower on an interim basis, subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party.

(c)      Upon the entry of this Interim Order, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have effectuated the exchange of First Lien Loans for Roll-Up Loans, subject to the occurrence of the Closing Date (as defined in the DIP Credit Agreement).

(d)      In accordance with the terms of this Interim Order and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP

Documents and this Interim Order, and in accordance with the Approved DIP Budget, subject to any Permitted Variance as set forth in this Interim Order and the DIP Documents.  Attached as **Exhibit B** hereto and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders in accordance with section 3.27 of the DIP Credit Agreement (the "Initial DIP Budget").

(e)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Documents, the Escrow Agent under the Escrow Agreement, and the Prepetition First Lien Administrative Agent under the Prepetition First Lien Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1)     the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

(2)     the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further approval

of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that are not material; provided, that, any such non-material amendment shall be provided to the U.S. Trustee and counsel for the Committee to the extent one has been appointed at such time;

(3)     the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), Evercore Group L.L.C. (as financial advisor), Pachulski Stang Ziehl & Jones LLP (as local bankruptcy counsel), and any other foreign counsel and other professionals necessary to represent the interests of the DIP Lenders and the ad hoc group of the Prepetition First Lien Lenders (the "DIP/First Lien Group") in connection with the Cases (collectively, the "DIP/First Lien Advisors"); (b) Gibson, Dunn & Crutcher LLP (as counsel), and Pachulski Stang Ziehl & Jones LLP (as local bankruptcy counsel) to the DIP Agent; and (c) Davis Polk & Wardwell LLP (as counsel) and Morris, Nichols, Arsht & Tunnell LLP (as local counsel) to the Prepetition First

Lien Administrative Agent; and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in each local jurisdiction, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 18 of this Interim Order; and

(4)     the performance of all other acts required under or in connection with the DIP Documents, including, without limitation, pursuant to the Escrow Agreement.

(f)     Upon entry of this Interim Order and subject to the Carve Out, such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to or on

18

behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of the Prepetition First Lien Secured Parties, in each case, pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (and, solely in the case of waivers of rights under sections 506(c) (as to the Prepetition First Lien Secured Parties) and the "equities of the case" exception of section 552(b), subject to the entry of the Final Order).  For the avoidance of doubt, and notwithstanding anything to the contrary in any Prepetition First Lien Loan Document, DIP Document, any additional document, instrument, certificate and/or agreement related to any of the foregoing, in no event shall any property, proceeds, cash, cash equivalents, or otherwise placed or held in the escrow account established pursuant to the Escrow Agreement at any time be, or be deemed to be, property of any of the Debtors or their affiliates or subsidiaries or any of the Debtors' estates and the parties to the Escrow Agreement have acknowledged and agreed to the foregoing.

(g)    The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

(h)    Notwithstanding anything to the foregoing in this DIP Order, the DIP Credit Agreement or any DIP Document, subject to entry of a Final Order, if any New Investor (as defined in the DIP Credit Agreement) makes a direct or indirect investment in Equity Interests (as defined in the DIP Credit Agreement) of the DIP Borrower (including through an investment in Equity Interests of any parent entity or any Affiliate or Subsidiary of the DIP Borrower) (the "New

Investment"), (i) each Lender must be provided written notice (the "Investor Notice") of the New Investment and (ii) the Borrower will offer the right to each Lender, to be exercised in its sole discretion, to convert all or a portion of its DIP Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor on the same terms as such New Investor including at the same equity value implied by such New Investment (taking into account all fees, discounts and other economics provided to the New Investor in connection with such New Investment), but including customary shareholder protections satisfactory to Lenders holding a majority of the Loans electing this option; provided, however, that, following receipt of any Investor Notice, any Lender who provides written notice to the DIP/First Lien Advisors and the Borrower that it does not wish to be offered the right to convert its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor as described in this paragraph shall not be offered such right. For the avoidance of doubt, this paragraph 3(h) shall survive termination of this Interim Order, the DIP Credit Agreement, any DIP Document, and/or any prepayment, repayment, payment, discharge, or other treatment of the DIP Loans and shall apply to the DIP Loans held by each Lender immediately prior to any such termination, prepayment, repayment, payment, discharge, other treatment, or otherwise.

4.   Budget and Variance Reporting.

(a)   On or before the fifth (5th) business day before the end of each Budget Period (as defined below) beginning with the fourth full week following the Petition Date (or more frequently if determined by the Debtors), the Debtors will deliver to the DIP Agent and the DIP/First Lien Advisors an updated Budget for the subsequent 13-week period (a "Subsequent DIP Budget"), which shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion (not to be unreasonably withheld). The Initial DIP Budget or any Subsequent

DIP Budget shall be deemed to constitute the "Approved DIP Budget" for purposes of this Interim Order with the most recently delivered Budget constituting the "Approved DIP Budget" solely upon approval by the Required DIP Lenders (which must be in writing (including from the DIP/First Lien Advisors), email being sufficient) in their sole discretion (not to be unreasonably withheld).  In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve (which approval shall not be unreasonably withheld) such Subsequent DIP Budget as an "Approved DIP Budget."  "Budget Period" means the initial four-week period set forth in the Approved DIP Budget in effect at such time.

(b)    Commencing on the Friday of the fourth full calendar week after the Petition Date, Budget Variances (as defined below) shall be tested on each Friday (each such date, a "Testing Date").  On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date, the Debtors shall deliver to the DIP Agent and the DIP/First Lien Advisors a budget variance report/reconciliation in form and substance reasonably satisfactory to the DIP/First Lien Group (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Debtors' actual disbursements (the "Actual Disbursements"), including, without limitation, maintenance capital expenditures, on an aggregate basis (and individually on a line by line basis for (x) Payroll & Benefits (as set forth in the Approved DIP Budget), (y) Capital Leases (as set forth in the Approved DIP Budget) and (z) such other line items as may be reasonably requested by the DIP/First Lien Advisors, to the extent the Debtors can report such line item individually without undue cost or burden) for the week period and the four-week period, in each case, ending on the applicable

Testing Date; (ii) the Debtors' actual ordinary course receipts that are accounted for as "revenue" under GAAP (as applied by the Debtors in the ordinary course of business consistent with past practice) (the "Actual Receipts"), excluding, for the avoidance of doubt, any intercompany transactions or asset sales outside the ordinary course of business, on an aggregate basis during the week period and the four-week period, in each case, ending on the applicable Testing Date; (iii) the (w) amounts set forth in the Approved DIP Budget under "Professional Fees", (x) the amounts set forth in the Approved DIP Budget under "Debt Service", (y) amounts of intercompany loans and  transfers and (z) the amounts set forth in the Approved DIP Budget under "Capital Expenditures – Growth", in each case, during the week period and the four-week period, in each case, ending on the applicable Testing Date; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Receipts and the Actual Disbursements for the week and four-week period ending on the Testing Date to the amount of Debtors' projected cash receipts and disbursements, in each case, on an aggregate basis, set forth in the Approved DIP Budget with respect to such week or four-week period ending on the applicable Testing Date; (v) as to each variance contained in the Approved DIP Budget Variance Report and required to be tested pursuant to clause (c) above, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance; (vi) a weekly roll forward of the Debtors' cash forecast (both domestic and international); and (vii) a cash balance for the Debtors by country.

(c)     The Debtors shall not permit: (i) for the rolling four-week period ending on any Testing Date, the Debtors' Actual Disbursements (in the aggregate) to be more than 115% of the projected disbursements (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period; and (ii) for the rolling four-week period ending on any Testing Date, the

Debtors' Actual Receipts (in the aggregate) to be less than 80% of the projected receipts (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period (the "Budget Variances"; all references in this Interim Order and the DIP Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Budget Variances). Commencing with the first full calendar week after the Petition Date, the Debtors shall maintain Domestic Liquidity (as defined in the DIP Credit Agreement) of not less than $5,000,000 as of the last business day of each calendar week. For the avoidance of doubt, for purposes of Budget Variances testing, (w) the amounts set forth in the Approved DIP Budget under "Professional Fees", (x) the amounts set forth in the Approved DIP Budget under "Debt Service", (y) adequate protection costs and (z) the amounts set forth in the Approved DIP Budget under "Capital Expenditures – Growth" shall be excluded.

5.      Access to Records.  The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.    <u>DIP Superpriority Claims</u>.  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any (the "<u>Avoidance Actions</u>").  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Cases.

7.    <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any

DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject only to (x) Prior Senior Liens, (y) the Excluded Property (as defined in the DIP Credit Agreement), and (z) the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Priority Lien On Any Unencumbered Property.  Subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), a 100% equity pledge of all first-tier foreign subsidiaries and all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all

contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and, subject to entry of the Final Order, all proceeds and property recovered in respect of Avoidance Actions (collectively, the "Previously Unencumbered Property"); provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)    Liens Priming the Prepetition Liens.   Subject only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)      <u>Liens Junior to Certain Other Liens</u>. Subject only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors immediately junior to the Prior Senior Liens.

8.      <u>Adequate Protection for the Prepetition First Lien Secured Parties</u>.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any diminution in value of such interests (each such diminution, a "<u>Diminution in Value</u>"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Administrative Agent, for the benefit of itself and the Prepetition First Lien Secured Parties, is hereby granted the following (collectively, the "<u>First Lien Adequate Protection Obligations</u>"):

(a)      <u>First Lien Adequate Protection Liens</u>.  As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "<u>First Lien Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, upon entry of the Final Order, all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) Prior Senior

27

Liens.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)     <u>Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "<u>Adequate Protection Superpriority Claims</u>"), but junior to the Carve Out and the DIP Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

(c)     <u>First Lien Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 18 of this Interim Order, all reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, of (i) Gibson, Dunn

& Crutcher LLP and Pachulski Stang Ziehl & Jones LLP, as counsel to the DIP Agent and Davis

Polk & Wardwell LLP, as counsel and Morris, Nichols, Arsht & Tunnell LLP, as local counsel, to

the Prepetition First Lien Administrative Agent and (ii) the DIP/First Lien Advisors (all payments

referenced in this sentence, collectively, the "Adequate Protection Payments").   None of the

Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee

Guidelines, and no recipient of any such payment shall be required to file any interim or final fee

application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)     Right to Seek Additional Adequate Protection.   This Interim Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the

Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection

at any time or the rights of the Debtors or any other party to contest such request.   Nothing herein

shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that

the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to

compensate for any Diminution in Value of their interests in the Prepetition Collateral during the

Cases.   Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment

by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein

does in fact adequately protect any of the Prepetition First Lien Secured Parties against any

Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash

Collateral).

(e)     *Other Covenants*. The Debtors shall maintain their cash management

arrangements in a manner consistent with the Cash Management Order approving the Debtors'

cash management motion.   The Debtors shall comply with the covenants contained in the DIP

Credit Agreement regarding conduct of business, including, without limitation, preservation of

rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(f)     *Reporting Requirements*.   As additional adequate protection to the Prepetition First Lien Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement.

(g)     *Miscellaneous*.  Except for (i) the Carve Out and (ii) as otherwise provided in paragraph 4, the First Lien Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties pursuant to paragraph 6 of this Interim Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

9.     Carve Out.

(a)     <u>Priority of Carve Out</u>.  Subject to the terms and conditions contained in this paragraph 9, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, First Lien Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out.  The Carve Out shall have such priority claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral.  For the avoidance of doubt, after the occurrence of the Termination Date or repayment of the DIP Obligations in full, the Carve Out shall remain in effect as to the Prepetition First Lien Obligations and the First Lien Adequate Protection Obligations, and the Debtors shall be permitted and

30

required to continue to fund amounts in relation to the Carve Out in accordance with the terms of this Interim Order.

(b)     Definition of Carve Out. As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (the amounts set forth in clauses (i) through (iii), the "Pre-Carve Out Trigger Notice Cap"); and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice

Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, the Prepetition First Lien Administrative Agent, and counsel to the Committee (to the extent one has been appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions of this Interim Order governing use of Cash Collateral that is not timely cured), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)     Starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors, the DIP Agent, and DIP/First Lien Advisors a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (the "Estimated Fees and Expenses"), along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (the "Cumulative Total Unpaid Fees and Expenses").  No later than one (1) business day after the delivery of a Carve Out Trigger Notice, each Professional Person shall deliver one (1) additional statement to the Debtors setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly

32

Statement has already been delivered and concluding on the date of the Carve Out Trigger Notice, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).  The Debtors shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the Cumulative Total Unpaid Fees and Expenses included in the most recent Weekly Statement timely received by the Debtors, which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Professional Persons for the prior week set forth in the Approved DIP Budget, and the DIP/First Lien Advisors, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition First Lien Secured Party (the "Professional Fees Escrow Account").  The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; provided that when all Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Escrow Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and this Interim Order; and provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.  Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Professional Persons, including with respect to obligations arising out of the Carve Out (with a reversionary interest to the Debtors of any amount remaining in the Professional Fees Escrow Account after all allowed Professional Fees are satisfied in full). Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Secured Parties herein or any First Lien Adequate Protection Liens or

Adequate Protection Superpriority Claims, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' estates; <u>provided</u> that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full.

(d)    <u>Carve Out Reserve</u>.  Notwithstanding the occurrence of an Event of Default, on the day on which a Carve Out Trigger Notice is given by the DIP Agent (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Professional Fees Escrow Account in an amount equal to the then unpaid amounts of the Professional Fees.  The Debtors shall deposit and hold such amounts in the Professional Fees Escrow Account to pay such then unpaid Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor after funding the Professional Fees Escrow Account in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in the Professional Fees Escrow Account to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Administrative Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any

assets) of the Debtors until the Carve Out Reserves have been fully funded to the Professional Fees Escrow Account.

(e)     Notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Professional Fee Escrow Account to satisfy in full the allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Approved DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fee Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of allowed Professional Fees due and payable by the Debtors.

(f)     <u>No Direct Obligation To Pay Professional Fees</u>.  The Prepetition First Lien Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved DIP Budget.  Except for permitting the funding of the Professional Fees Escrow Account or the Carve Out Reserves as provided herein, none of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

10.    <u>Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties</u>.  Subject only to the Carve Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition First Lien Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition First Lien Secured Parties under the DIP Documents, the Prepetition First Lien Loan Documents, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition First

36

Lien Secured Parties' rights and remedies.  For all adequate protection purposes throughout the Cases, each of the Prepetition First Lien Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date.  For the avoidance of doubt, such request will survive termination of this Interim Order.

11.    <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>.  Subject to the Challenge Period (as defined herein), the stipulations, admissions, waivers, and releases contained in this Interim Order, including the Debtors' Stipulations, shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Interim Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules seventy-five (75) calendar days after entry of the Interim Order (the "<u>Challenge Period</u>" and the date of expiration of the Challenge Period, the "<u>Challenge Period Termination Date</u>"); *provided, however*, that if, prior to the end of the Challenge Period, (x) the cases convert to chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended by the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence of either of the events discussed in the foregoing clauses (x) and (y); (i) seeking to avoid, object to, or otherwise

challenge the findings or Debtors' Stipulations regarding:  (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition First Lien Administrative Agent and the Prepetition First Lien Secured Parties;  or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Obligations (any such claim, a "Challenge"), and (ii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims,  not  subject  to  counterclaim,  setoff,  recoupment,  reduction,  subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the First Lien Loan Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including  the  Debtors'  Stipulations,  and  all  other  waivers,  releases,  affirmations,  and  other stipulations as to the priority, extent, and validity as to the Prepetition First Lien Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and

38

the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition First Lien Loan Documents, the First Lien Loan Liens, and the Prepetition First Lien Obligations, and a separate order of the Court conferring such standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest.

12. _Termination Date_.  On the Termination Date (as defined below), consistent with Article VII of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Carve Out Reserves shall be funded as set forth in this Interim Order; (b) all authority to use Cash Collateral shall cease; _provided_, _however_, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget, subject to any Permitted Variance provided for in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be

otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

13.      Events of Default.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, (b) the failure of the Debtors to comply with any of the Required Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

14.      Milestones.  The Debtors' failure to comply with those certain case milestones set forth in section 5.15 of the DIP Credit Agreement (collectively, the "Required Milestones") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement.

15.      Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP

Borrower and (b) subject to paragraph 12(b), the DIP Agent (at the direction of the Required DIP Lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "<u>Termination Date</u>").  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "<u>Remedies Notice Period</u>"):  (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out; (b) subject to the foregoing clause (a), the applicable Prepetition First Lien Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition First Lien Loan Documents and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing. Except as set forth in this paragraph 15 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties under this Interim Order.  Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties shall automatically be terminated at the end of the Remedies Notice Period

without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order; *provided*, that the Prepetition First Lien Secured Parties shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

16.     <u>Limitation on Charging Expenses Against Collateral</u>.  No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) subject to entry of the Final Order, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition First Lien Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties.

17.     <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition First Lien Secured Parties, but solely for the purposes set forth in this Interim Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Interim Order and the DIP Documents), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order,

from the date of this Interim Order through and including the date of termination of the DIP Credit Agreement.

18.     <u>Expenses and Indemnification</u>.

(a)      The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(d)(iii) and 8(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, and the DIP/First Lien Group, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, or the DIP/First Lien Group to first deliver a copy of its invoice as provided for herein.

(b)      The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraphs 3(d)(iii) and 8(c) of this Interim Order

(collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, any Committee, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors, any Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Committee that may be appointed in these Cases, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)     In addition, the Debtors will indemnify each of the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP Superpriority Claims.  In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

19.     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

20.     Section 507(b) Reservation.  Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to

compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

21.    <u>Insurance</u>.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

22.    <u>No Waiver for Failure to Seek Relief</u>.  The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

23.    <u>Perfection of the DIP Liens and Adequate Protection Liens</u>.

(a)    Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the First Lien Adequate Protection Liens granted pursuant to paragraph 8(a) hereof, the DIP Agent and the Prepetition First Lien Administrative Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition First Lien Administrative Agent shall (at the direction of the applicable required lenders) choose to file

such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

(b)     A certified copy of this Interim Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition First Lien Administrative Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions

of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the First Lien Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

24.    <u>Release</u>.    Subject to the rights and limitations set forth in paragraph 11 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, effective upon entry of this Interim Order, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "<u>Related Parties</u>"), and, effective upon entry of the Final Order, each of the Prepetition First Lien Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof  with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the

Prepetition First Lien Obligations, the First Lien Loan Liens or the Prepetition First Lien Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition First Lien Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.

25.    <u>Credit Bidding</u>.  The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Administrative Agent (at the direction of the Required Lenders) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

26.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Prepetition First Lien Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition First Lien Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or

similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 23 herein.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition First Lien Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition First Lien Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)    Unless and until all DIP Obligations, Prepetition First Lien Obligations, and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition First Lien Administrative Agent (acting at the direction of the Required Lenders), (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition First Lien Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with

priority equal or superior to the DIP Liens, the First Lien Adequate Protection Liens or the First Lien Loan Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(d)      Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or

discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders).

(f)     Other than as set forth in this Interim Order, subject to the Carve Out, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

27.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>.
Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility,
the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or
proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery
proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or
prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,
objection, defense, adversary proceeding, or other litigation of any type (i) against any of the
DIP Secured Parties or the Prepetition First Lien Secured Parties (each in their capacities as such),
and each of their respective affiliates, officers, directors, employees, agents, representatives,
attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any
transaction, occurrence, omission, action, or other matter (including formal discovery proceedings
in anticipation thereof), including, without limitation, any so-called "lender liability" claims and
causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured
Parties or the Prepetition First Lien Secured Parties (each in their capacities as such) under the DIP
Documents, the Prepetition First Lien Loan Documents, or this Interim Order, including, without
limitation, for the payment of any services rendered by the professionals retained by the Debtors
or any Committee appointed in these Cases in connection with the assertion of or joinder in any
claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense,
adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of
which would be to obtain, any order, judgment, determination, declaration, or similar relief that
would impair the ability of any of the DIP Secured Parties or the Prepetition First Lien Secured
Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief
against any of the DIP Secured Parties or the Prepetition Parties related to the DIP Obligations or

the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition First Lien Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition First Lien Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition First Lien Secured Parties, or the DIP Agent's, the DIP Lenders', the Prepetition First Lien Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition First Lien Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the First Lien Loan Liens) held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition First Lien Obligations, or the First Lien Loan Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the First Lien Loan Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations or the First Lien Loan Liens, *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition

Collateral, including the Cash Collateral, in the aggregate, may be used by any Committee appointed in these Cases, if any, solely to investigate, within the Challenge Period (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition First Lien Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the First Lien Loan Liens) held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations.

28.     <u>Conditions Precedent</u>.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

29.     <u>Repayment of DIP Superpriority Claims</u>.  Notwithstanding anything to the contrary herein or in the other DIP Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a plan of reorganization, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim (including, for the avoidance of doubt, pursuant to paragraph 3(h) of this Interim Order).  The requirements set forth in this paragraph 29 may not be amended without the prior written consent of each holder of a DIP Superiority Claim adversely affected thereby.

30.     <u>Intercreditor Provisions</u>. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition First Lien Loan Documents shall remain in full force and effect; provided that nothing in this Interim Order

shall be deemed to provide liens to any Prepetition First Lien Secured Party on any assets of the Debtors except as set forth herein.

31.     <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition First Lien Secured Parties, any Committee appointed in these Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition First Lien Secured Parties; *provided* that, except to the extent expressly set forth in this Interim Order, the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.     <u>Limitation of Liability</u>.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition

First Lien Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

33. <u>No Requirement to File Claim for DIP Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the

purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34. <u>No Requirement to File Claim for Prepetition First Lien Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition First Lien Administrative Agent nor any Prepetition First Lien Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition First Lien Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition First Lien Administrative Agent's or any Prepetition First Lien Lender's rights, remedies, powers, or privileges under any of the Prepetition First Lien Loan Documents, this Interim Order, or applicable law.   The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

35. <u>No Marshaling</u>.  The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order, the DIP Documents and the Prepetition First Lien Loan Documents, notwithstanding any other agreement or provision to the contrary, and subject to entry of the Final Order, the Prepetition

First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

36.    <u>Application of Proceeds of DIP Collateral</u>.  Subject to entry of a Final Order, the DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

37.    <u>Equities of the Case</u>.  The Prepetition First Lien Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

38.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on _____, 2022, at__:__ _.m., prevailing Eastern time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern time, on _____, 2022, and shall be served on:  (a) the Debtors; (b) proposed counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Ray C. Schrock, P.C., Jeffrey D. Saferstein, and Garrett A. Fail; (c) proposed co-counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi (defranceschi@rlf.com) and Zachary I. Shapiro (shapiro@rlf.com); (d) counsel to the DIP Lenders and the DIP/First Lien Group, Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn:  Scott J. Greenberg, Esq., Matthew J. Williams, Esq., and Jason Zachary Goldstein, Esq.; (e) co-counsel to the DIP Lenders and the DIP/First Lien Group, Pachulski Stang Ziehl &

Jones LLP; (f) counsel to the DIP Agent, Gibson, Dunn & Crutcher LLP, (g) co-counsel to the

DIP Agent, Pachulski Stang Ziehl & Jones LLP; (h) counsel to the Prepetition First Lien

Administrative Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New

York 10017, Attn: Brian M. Resnick, Esq. and Jonah A. Peppiatt, Esq.; (h) local counsel to the

Prepetition First Lien Administrative Agent, Morris, Nichols, Arsht & Tunnell LLP, 1201 North

Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899, Attn: Robert J. Dehney, Esq.

and Andrew R. Remming, Esq.; (i) the United States Trustee, 844 King Street, Suite 2207,

Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Casey, Esq.; and (i) counsel to any

statutory committee appointed in these chapter 11 cases.  In the event no objections to entry of the

Final Order on the Motion are timely received, this Court may enter such Final Order without need

for the Final Hearing.

      39.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable

immediately upon execution hereof.

      40.     <u>Retention of Jurisdiction</u>.  The Court retains exclusive jurisdiction with respect to

all matters arising from or related to the implementation of this Interim Order.

**<u>EXHIBIT A</u>**

**DIP Credit Agreement**

# EXHIBIT B

## Budget

105719022.10

**Exhibit B**

**DIP Credit Agreement**

**Draft 9/27/22**

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of [●], 2022

among

PHOENIX SERVICES TOPCO, LLC,
as TopCo,

PHOENIX SERVICES PARENT, LLC,
as Parent,

PHOENIX SERVICES HOLDINGS CORP.,
as Holdings,

PHOENIX SERVICES INTERNATIONAL LLC,
as Borrower,

THE LENDERS PARTY HERETO,

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent,

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................ 2

    Section 1.01    Defined Terms ................................................................................. 2
    Section 1.02    Terms Generally ............................................................................ 32
    Section 1.03    Effectuation of Transactions ......................................................... 32
    Section 1.04    Exchange Rates; Currency Equivalents .......................................... 32
    Section 1.05    [Reserved] ..................................................................................... 32
    Section 1.06    [Reserved] ..................................................................................... 32
    Section 1.07    Timing of Payment or Performance ............................................... 32
    Section 1.08    Times of Day ................................................................................. 33
    Section 1.09    [Reserved] ..................................................................................... 33
    Section 1.10    Election Date ................................................................................. 33
    Section 1.11    Rates .............................................................................................. 33
    Section 1.12    Divisions ....................................................................................... 33

ARTICLE II THE CREDITS .............................................................................................. 34

    Section 2.01    Commitments ................................................................................ 34
    Section 2.02    Loans and Borrowings ................................................................... 34
    Section 2.03    Requests for Borrowings ............................................................... 35
    Section 2.04    Roll-Up Loans ....................................................**Error! Bookmark not defined.**
    Section 2.05    [Reserved] ............................................................**Error! Bookmark not defined.**
    Section 2.06    Funding of Borrowings .................................................................. 36
    Section 2.07    Interest Elections ........................................................................... 36
    Section 2.08    Termination and Reduction of Commitments ................................. 37
    Section 2.09    Repayment of Loans; Evidence of Debt ......................................... 37
    Section 2.10    Repayment of Loans ..................................................................... 38
    Section 2.11    Prepayment of Loans ..................................................................... 39
    Section 2.12    Fees ............................................................................................... 39
    Section 2.13    Interest .......................................................................................... 40
    Section 2.14    Alternate Rate of Interest .............................................................. 41
    Section 2.15    Increased Costs .............................................................................. 41
    Section 2.16    Break Funding Payments ............................................................... 42
    Section 2.17    Taxes ............................................................................................. 43
    Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ................. 46
    Section 2.19    Mitigation Obligations; Replacement of Lenders ......................... 48
    Section 2.20    Illegality ..............................................................**Error! Bookmark not defined.**
    Section 2.21    Super Priority Nature of Obligations and Administrative Agent's Liens;
                    Payment of Obligations ................................................................. 49
    Section 2.22    Defaulting Lender ......................................................................... 49
    Section 2.23    Benchmark Replacement Setting ................................................... 50
    Section 2.24    Extension of Maturity Date ........................................................... 51

ARTICLE III REPRESENTATIONS AND WARRANTIES ................................................ 52

    Section 3.01    Organization; Powers .................................................................... 52
    Section 3.02    Authorization ................................................................................. 52
    Section 3.03    Enforceability ................................................................................ 52
    Section 3.04    Governmental Approvals ............................................................... 53
    Section 3.05    Financial Statements ...................................................................... 53
    Section 3.06    No Material Adverse Effect ........................................................... 53

i

TABLE OF CONTENTS
(Continued)

Page

Section 3.07    Title to Properties; Possession Under Leases ................................................ 53
Section 3.08    Subsidiaries ................................................................................................ 54
Section 3.09    Litigation; Compliance with Laws .............................................................. 54
Section 3.10    Federal Reserve Regulations ...................................................................... 54
Section 3.11    Investment Company Act ............................................................................ 54
Section 3.12    Use of Proceeds ......................................................................................... 54
Section 3.13    Tax Returns ................................................................................................ 54
Section 3.14    No Material Misstatements ......................................................................... 55
Section 3.15    Employee Benefit Plans .............................................................................. 55
Section 3.16    Environmental Matters ............................................................................... 56
Section 3.17    Security Interest ......................................................................................... 56
Section 3.18    [Reserved] .................................................................................................. 57
Section 3.19    [Reserved] .................................................................................................. 57
Section 3.20    Labor Matters ............................................................................................. 57
Section 3.21    Insurance .................................................................................................... 57
Section 3.22    No Default ................................................................................................... 57
Section 3.23    Intellectual Property; Licenses, Etc ........................................................... 57
Section 3.24    [Reserved] .................................................................................................. 57
Section 3.25    USA PATRIOT Act; OFAC ....................................................................... 57
Section 3.26    Foreign Corrupt Practices Act ................................................................... 58
Section 3.27    Bankruptcy Matters .................................................................................... 58

ARTICLE IV CONDITIONS OF LENDING ..................................................................... 59

Section 4.01    Conditions Precedent to Effectiveness of this Agreement and Funding the
                Loans .................................................................**Error! Bookmark not defined.**
Section 4.02    Conditions Precedent to each Withdrawal .................**Error! Bookmark not defined.**

ARTICLE V AFFIRMATIVE COVENANTS ...................................................................... 63

Section 5.01    Existence; Business and Properties ............................................................ 63
Section 5.02    Insurance .................................................................................................... 63
Section 5.03    Taxes .......................................................................................................... 64
Section 5.04    Financial Statements, Reports, etc ............................................................. 64
Section 5.05    Litigation and Other Notices ...................................................................... 66
Section 5.06    Compliance with Laws ............................................................................... 66
Section 5.07    Maintaining Records; Access to Properties and Inspections ...................... 67
Section 5.08    Use of Proceeds ......................................................................................... 67
Section 5.09    Compliance with Environmental Laws ....................................................... 67
Section 5.10    Additional Subsidiary; Further Assurances ................................................ 67
Section 5.11    Weekly Calls and Status Update Calls ....................................................... 67
Section 5.12    [Reserved] ..........................................................**Error! Bookmark not defined.**
Section 5.13    Cash Management ....................................................................................... 68
Section 5.14    Budget Covenant ........................................................................................ 68
Section 5.15    Milestones .................................................................................................. 69
Section 5.16    Debtor-in-Possession Obligations .............................................................. 70
Section 5.17    Additional Bankruptcy Matters .................................................................. 70
Section 5.18    [Post-Closing Obligations .......................................**Error! Bookmark not defined.**

ARTICLE VI NEGATIVE COVENANTS ........................................................................... 70

TABLE OF CONTENTS
(Continued)

Page

Section 6.01    Indebtedness ................................................................. 70
Section 6.02    Liens ............................................................................ 73
Section 6.03    Sale and Lease-Back Transactions ............................... 77
Section 6.04    Investments, Loans and Advances ............................... 77
Section 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions ..................... 80
Section 6.06    Dividends and Distributions ........................................ 81
Section 6.07    Transactions with Affiliates ........................................ 82
Section 6.08    Business of the Borrower and the Subsidiaries ........... 82
Section 6.09    Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc. .............. 84
Section 6.10    Fiscal Year .................................................................. 85
Section 6.11    Financial Covenants .................................................... 85
Section 6.12    Permitted Variance ...................................................... 86
Section 6.13    Customer Contracts ..................................................... 86
Section 6.14    Reclamation Claims ...................................**Error! Bookmark not defined.**
Section 6.15    Insolvency Proceeding Claims ................................... 86
Section 6.16    Bankruptcy Actions ..................................................... 86

ARTICLE VIA TOPCO AND HOLDINGS NEGATIVE COVENANTS ................................. 87

ARTICLE VII EVENTS OF DEFAULT ................................................................ 88

Section 7.01    Events of Default ......................................................... 88
Section 7.02    Treatment of Certain Payments .................................. 920

ARTICLE VIII THE AGENTS ........................................................................... 920

Section 8.01    Appointment ................................................................ 920
Section 8.02    Delegation of Duties ................................................... 931
Section 8.03    Exculpatory Provisions ............................................... 93
Section 8.04    Reliance by Agents ...................................................... 94
Section 8.05    Notice of Default ......................................................... 94
Section 8.06    Non-Reliance on Agents and Other Lenders ............... 94
Section 8.07    Indemnification ........................................................... 95
Section 8.08    Agent in Its Individual Capacity ................................ 95
Section 8.09    Successor Administrative Agent ................................ 95
Section 8.10    [Reserved] ................................................................... 96
Section 8.11    Collateral Matters ....................................................... 96
Section 8.12    Right to Realize on Collateral and Enforce Guarantees ............................ 96
Section 8.13    Withholding Tax .......................................................... 97
Section 8.14    Certain ERISA Matters ............................................... 97
Section 8.15    Erroneous Payments ....................................**Error! Bookmark not defined.**

ARTICLE IX MISCELLANEOUS ..................................................................... 100

Section 9.01    Notices; Communications ......................................... 100
Section 9.02    Survival of Agreement ............................................... 101
Section 9.03    Binding Effect ............................................................ 101
Section 9.04    Successors and Assigns .............................................. 102
Section 9.05    Expenses; Indemnity .................................................. 106
Section 9.06    Right of Set-off .......................................................... 107
Section 9.07    Applicable Law ........................................................... 108

TABLE OF CONTENTS
(Continued)

Section 9.08    Waivers; Amendment...................................................................... 108
Section 9.09    Interest Rate Limitation................................................................. 110
Section 9.10    Entire Agreement .......................................................................... 110
Section 9.11    WAIVER OF JURY TRIAL ........................................................... 110
Section 9.12    Severability..................................................................................... 110
Section 9.13    Counterparts; Electronic Execution of Assignments and Certain Other Documents...................................................................................... 111
Section 9.14    Headings.......................................................................................... 111
Section 9.15    Jurisdiction; Consent to Service of Process............................... 111
Section 9.16    Confidentiality............................................................................... 112
Section 9.17    Platform; Borrower Materials ...................................................... 112
Section 9.18    Release of Liens and Guarantees................................................. 113
Section 9.19    Judgment Currency ...................................................................... 114
Section 9.20    USA PATRIOT Act Notice............................................................ 114
Section 9.21    [Reserved] ................................................................**Error! Bookmark not defined.**
Section 9.22    Agency of the Borrower for the Loan Parties ........................... 115
Section 9.23    [Reserved] ...................................................................................... 115
Section 9.24    Acknowledgment and Consent to Bail-In of Affected Financial Institutions .......... 116
Section 9.25    Acknowledgement Regarding Any Supported QFCs.................. 116
Section 9.26    Incorporation of DIP Order ......................................................... 117
Section 9.27    Parties Including Trustees; Bankruptcy Court Proceedings..................... 117
Section 9.28    Lender Consent to Credit Bid...................................................... 117

WEIL:\98800863\14\67665.0003

**Exhibits and Schedules**

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Administrative Questionnaire |
| Exhibit C | Form of Withdrawal Notice |
| Exhibit D | Form of Borrowing Request |
| Exhibit E | Form of Interest Election Request |
| Exhibit F | [Reserved] |
| Exhibit G | [Reserved] |
| Exhibit H | [Reserved] |
| Exhibit I | Form of Non-Bank Tax Certificate |
| Exhibit J | Form of Intercompany Subordination Terms |

| | |
|---|---|
| Schedule 2.01 | Commitments |
| Schedule 2.05 | Syndication |
| Schedule 2.12(b) | Backstop Allocation Schedule |
| Schedule 3.01 | Organization and Good Standing |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.07(c) | Notices of Condemnation |
| Schedule 3.07(d) | Material Real Properties |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.08(b) | Subscriptions |
| Schedule 3.13 | Taxes |
| Schedule 3.21 | Insurance |
| Schedule 3.23 | Intellectual Property |
| Schedule 3.27 | Initial Budget |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02 | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.05 | Dispositions |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 9.01 | Notice Information |

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [●], 2022 (this "Agreement"), among PHOENIX SERVICES HOLDINGS CORP., a Delaware corporation ("Holdings"), PHOENIX SERVICES INTERNATIONAL LLC, a Delaware limited liability company (the "Borrower"), PHOENIX SERVICES PARENT, LLC a Delaware limited liability company ("Parent"), PHOENIX SERVICES TOPCO, LLC, a Delaware limited liability company ("TopCo"), the LENDERS party hereto from time to time, and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Administrative Agent (in such capacity, the "Administrative Agent") for the Lenders and Collateral Agent for the Secured Parties.

WHEREAS, on September [●], 2022 (the "Petition Date"), the Parent Entities (as defined below), Holdings, the Borrower and certain Domestic Subsidiaries of the Borrower (collectively, the "Debtors" and, each individually, a "Debtor") commenced cases (the "Chapter 11 Cases") under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Debtors have retained possession of their assets and are authorized under the U.S. Bankruptcy Code to continue the operations of their businesses as debtors-in-possession;

WHEREAS, prior to the Petition Date, the Lenders (together with the other Prepetition Lenders (as defined below)) provided financing to the Borrower pursuant to that certain First Lien Credit Agreement, dated as of March 1, 2018, among Holdings, the Borrower, as borrower, Barclays Bank PLC., as Administrative Agent (the "Prepetition Administrative Agent"), and the lenders party thereto from time to time (the "Prepetition Lenders") (as so amended, and as further amended, restated, supplemented or otherwise modified from time to time through the Petition Date, the "Prepetition Credit Agreement");

WHEREAS, on the Petition Date, the Prepetition Lenders under the Prepetition Credit Agreement were owed approximately $510,000,000 in outstanding principal balance of Loans (as defined in the Prepetition Credit Agreement) (the "Prepetition Loans") plus interest, fees, costs and expenses and all other Prepetition Obligations under the Prepetition Credit Agreement;

WHEREAS, the Obligations under and as defined in the Prepetition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrower and the Subsidiary Loan Parties (as defined in the Prepetition Credit Agreement) as more fully set forth in the Prepetition Loan Documents, and such security interest is perfected, and, as described in the Prepetition Loan Documents subject to certain limited exceptions set forth therein, has priority over other security interests;

WHEREAS, the Borrower has requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a senior secured superpriority debtor-in-possession term loan credit facility of up to $200,000,000 (the "DIP Facility"), consisting of two tranches: (i) a new money term loan in an aggregate principal amount not to exceed $50,000,000 and (ii) a term loan facility in an aggregate principal amount not to exceed $150,000,000 (the "Roll-Up Loans"), which Roll-Up Loans resulted from the roll-up and exchange of certain of the Prepetition Loans, in each case subject to the conditions set forth herein and in the DIP Order;

WHEREAS, the proceeds of the DIP Facility shall be used to fund the general corporate purposes and working capital requirements of the Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases pursuant to and in accordance with the Approved Budget;

WHEREAS, subject to the terms hereof and the DIP Order, the Borrower and the Guarantors have agreed to secure all of their Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal property;

WHEREAS, the Borrower and the Guarantors' business is a mutual and collective enterprise and the Borrower and the Guarantors believe that the loans and other financial accommodations to the Borrower under this Agreement will enhance the aggregate borrowing powers of the Borrower and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Borrower and the Guarantors.

WHEREAS, the Borrower and each Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement;

WHEREAS, the Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrower, and to administer the Borrower's and the Guarantors' collateral security therefor, on a combined basis as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrower and the Guarantors and at the Borrower's and the Guarantors' request and in furtherance of the Borrower's and the Guarantors' mutual and collective enterprise; and

WHEREAS, all capitalized terms used in this Agreement, including in these recitals, shall have the meanings ascribed to them in Section 1.01 below, and, for the purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Section 1.02 shall govern.  All Schedules, Exhibits, Annexes, and other attachments hereto, or expressly identified in this Agreement, are incorporated by reference, and taken together with this Agreement, shall constitute a single agreement.  These recitals shall be construed as part of this Agreement.

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

ARTICLE I

*Definitions*

Section 1.01    <u>Defined Terms</u>.  Each capitalized term used in this Agreement but not defined in this Agreement shall have the meaning assigned thereto in the DIP Order.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>ABR</u>" shall mean, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect for such day plus 0.50%, (b) the Prime Rate in effect on such day and (c) the Term SOFR for a one-month tenor in effect on such day plus 1.00%.  Any change in such rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR, as the case may be; provided, further, that if ABR determined as provided above shall ever be less than 3.00%, then ABR shall be deemed to be 3.00%.

"<u>ABR Borrowing</u>" shall mean a Borrowing comprised of ABR Loans.

"<u>ABR Loan</u>" shall mean any Loan bearing interest at a rate determined by reference to the ABR in accordance with the provisions of <u>Article II</u>.

"<u>Acceptable Plan</u>" shall mean a chapter 11 plan of reorganization in the Chapter 11 Cases of the Debtors and the Parent Entities that provides for a Discharge of DIP Obligations and otherwise

2

contains terms and conditions, including as to treatment of Prepetition Indebtedness and terms of agreements with Specified Customers, that are satisfactory to the Required Lenders.

"Adequate Protection Payments" shall have the meaning assigned to such term in the DIP Order.

"Adequate Protection Superpriority Claims" shall have the meaning assigned to such term in the DIP Order.

"Administrative Agent" shall have the meaning assigned to such term in the introductory paragraph of this Agreement, together with its successors and assigns.

"Administrative Agent Fee Letter" shall mean that certain Agent Fee Letter dated as of the date hereof, by and between the Borrower and the Administrative Agent.

"Administrative Agent Fees" shall have the meaning assigned to such term in Section 2.12(a).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit B or such other form supplied by the Administrative Agent.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"Agents" shall mean the Administrative Agent, the Collateral Agent and the Escrow Agent.

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement, as may be amended, restated, supplemented or otherwise modified from time to time.

"Agreement Currency" shall have the meaning assigned to such term in Section 9.19.

"Anti-Corruption Laws" shall have the meaning assigned to such term in Section 3.26.

"Applicable Margin" shall mean for any day with respect to any Loan, 12.00% per annum in the case of any SOFR Loan and 11.00% per annum in the case of any ABR Loan.

"Approved Budget" shall mean the Initial Budget for all purposes of this Agreement until superseded by an Updated Budget in accordance with, and to the extent permitted by, Section 5.14.

"Approved Fund" shall have the meaning assigned to such term in Section 9.04(b)(ii).

"Asset Sale" shall mean any loss, damage, destruction or condemnation of, or any Disposition (including any sale and leaseback of assets and any mortgage or lease of Real Property) to any person of, any asset or assets of the Borrower or any Subsidiary.

"Assignee" shall have the meaning assigned to such term in Section 9.04(b)(i).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent and the Borrower (if required by Section 9.04), in the form of Exhibit A or such other form (including electronic documentation generated by use of

3

an electronic platform) as shall be approved by the Administrative Agent and reasonably satisfactory to the Borrower.

"Availability Period" shall mean, with respect to the Loan proceeds deposited into the Loan Proceeds Account, the period from (and including) the date of the Final Order until the Maturity Date.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.23(d).

"Backstop Fee" shall have the meaning assigned to such term in Section 2.12(b).

"Backstop Parties" shall have the meaning assigned to such term in Section 2.12(b).

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation administration or other insolvency proceedings).

"Bankruptcy Court" shall have the meaning assigned to such term in the recitals of this Agreement.

"Benchmark" shall mean, initially, the Term SOFR Reference Rate; provided, that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.23(a).

"Benchmark Replacement" shall mean, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided, that, if such Benchmark Replacement as so determined would be less than 2.00%, such Benchmark Replacement will be deemed to be 2.00% for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method

4

for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

5

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" shall mean, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership of the Borrower as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. §1010.230.

"Benefit Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" shall mean, as to any person, the board of directors or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Borrower Materials" shall have the meaning assigned to such term in Section 9.17(a).

"Borrowing" shall mean a group of Loans of a single Type under the Facility, and made on a single date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Minimum" shall mean (a) in the case of SOFR Loans, $1,000,000 and (b) in the case of ABR Loans, $1,000,000.

6

"Borrowing Multiple" shall mean (a) in the case of SOFR Loans, $250,000 and (b) in the case of ABR Loans, $250,000.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit D or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent).

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Capitalized Lease Obligations" shall mean, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP; provided, that obligations of the Borrower or its Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries that would not have been required to be treated as capital lease obligations in accordance with GAAP as in effect, and as applied by the Borrower in its audited financial statements for the fiscal year ended on or about December 31, 2017 shall for all purposes not be treated as Capitalized Lease Obligations or Indebtedness hereunder.

"Carve-Out" shall have the meaning set forth for the defined term "Carve Out" in the DIP Order.

"Cash Management Order" shall mean the Final Order Pursuant to 11 U.S.C. §§ 105, 345, 363, 503 And 507 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Authorizing (A) Continuation of Intercompany Transactions and (B) Granting Superpriority Administrative Expense Status For Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(B), and (IV) Granting Related Relief.

"Cash Management Agreement" shall mean any agreement to provide to Holdings, the Borrower or any Subsidiary cash management services for collections, treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services), any demand deposit, payroll, trust or operating account relationships, commercial credit cards, merchant card, purchase or debit cards, non-card e-payables services, and other cash management services, including electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

A "Change in Control" shall be deemed to occur if:

(a)    any person, entity or "group" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such person, entity or "group" and its subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any holding company parent of the Borrower owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of voting power of the outstanding Voting Stock of the Borrower having more than

7

50.1% of the ordinary voting power for the election of directors of the Borrower, unless the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the members of the Board of Directors of the Borrower; or

(b)       a "Change of Control" or "Change in Control" (as defined in the Prepetition Credit Agreement) shall have occurred; or

(c)       Holdings shall fail to beneficially own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrower.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided, however, that notwithstanding anything herein to the contrary, (x) all requests, rules, guidelines or directives under or issued in connection with the Dodd-Frank Wall Street Reform and Consumer Protection Act, all interpretations and applications thereof and any compliance by a Lender with any request or directive relating thereto and (y) all requests, rules, guidelines or directives promulgated under or in connection with, all interpretations and applications of, or any compliance by a Lender with any request or directive relating to International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case under clauses (x) and (y) be deemed to be a "Change in Law" but only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy requirements similar to those described in clauses (a) and (b) of Section 2.15 generally on other borrowers of loans under United States of America cash flow credit facilities.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals of this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean [●], 2022, which is the date on which all conditions precedent set forth in Section 4.01 have been satisfied or waived in accordance with the terms of this Agreement and the funding of the Initial Term Loans shall have occurred.

"Closing Date Roll-Up Lenders" shall have the meaning assigned to such term in Section 2.01(b).

"Closing Fee" shall have the meaning assigned to such term in Section 2.12(b).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Co-Investors" shall mean (a) the Fund and Fund Affiliates (excluding any of their portfolio companies) and (b) the Management Group.

"Collateral" shall have the meaning assigned to the term "DIP Collateral" in the DIP Order.

8

"Collateral Agent" shall mean the Administrative Agent acting as collateral agent for the Secured Parties, together with its successors and permitted assigns in such capacity.

"Collateral and Guarantee Requirement" shall mean the requirement that (in each case subject to the DIP Order and Section 5.10):

(a)    the Obligations shall have been secured by a perfected security interest in the Collateral with the priority required by the DIP Order (subject in all respects to the Carve-Out) through the provisions of the DIP Order, to the extent such security interest may be perfected by virtue of the DIP Order or by filings of Uniform Commercial Code financing statements or any other method of perfection referred to in this definition;

(b)    on the Closing Date, the Collateral Agent shall have received from each of the Borrower, each Subsidiary Loan Party and Holdings, a counterpart of the Guarantee Agreement, in each case duly executed and delivered on behalf of such person; and

(c)    in the case of any person that becomes a Loan Party after the Closing Date, the Collateral Agent shall have received supplements to the Guarantee Agreement and any other documents reasonably requested by the Administrative Agent or the Required Lenders, in the form specified therefor or otherwise reasonably acceptable to the Administrative Agent, in each case, duly executed and delivered on behalf of such Loan Party, that will provide a perfected security interest in the Collateral with the priority required by the DIP Order (subject in all respects to the Carve-Out).

*provided, however*, that the foregoing definition shall not require, and the Loan Documents shall not contain any requirements as to, the creation or perfection of pledges of, security interests in, mortgages on, or the obtaining of title insurance, surveys, abstracts or appraisals or taking other actions with respect to, any Excluded Property.

"Commitments" shall mean with respect to any Lender, such Lender's Initial Term Loan Commitment.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Conduit Lender" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender; provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Sections 2.15, 2.16, 2.17 or 9.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender unless the designation of such Conduit Lender is made with the prior written consent of the Borrower (not to be unreasonably withheld or delayed), which consent shall specify that it is being made pursuant to the proviso in the definition of "Conduit Lender" and provided that the designating Lender provides such information as the Borrower reasonably requests in order for the Borrower to determine whether to provide its consent or (b) be deemed to have any Commitment.

"Conforming Changes" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Administrative Agent, in consultation with the Borrower, decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent, in consultation with the Borrower, decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Corresponding Loan Amount" shall have the meaning assigned to such term in Section 8.15(c).

"Covered Party" shall have the meaning assigned to such term in Section 9.25.

"Credit Event" shall have the meaning assigned to such term in Article IV.

"Debtor" shall have the meaning assigned to such term in the recitals of this Agreement.

"Debtor Relief Laws" shall mean the U.S. Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean, subject to Section 2.22, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend or expect to comply with its funding obligations hereunder or generally under other agreements in which it commits to extend credit, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance

10

Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.22) upon delivery of written notice of such determination to the Borrower and each Lender.

"DIP Facility" shall have the meaning assigned to such term in the recitals of this Agreement.

"DIP Order" shall mean the Interim Order, and upon its entry, the Final Order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order is in effect and not vacated or stayed, together with all extensions, modifications and amendments thereto which are satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guarantee) the Obligations, and grant Liens under this Agreement and the other Loan Documents, as the case may be, provides for the superpriority of the Administrative Agent's and the Lenders' claims and authorizes the use of Cash Collateral.

"Discharge of DIP Obligations" shall mean the occurrence of (a) all Commitments shall have been terminated and (b) the principal of and interest on each Loan, all Lender Payments and all other expenses or amounts payable under any Loan Document shall have been paid in full in cash (other than in respect of contingent indemnification and expense reimbursement claims not then due).

"Disclosure Statement" shall mean the related disclosure statement (and all exhibits thereto) with respect to the Acceptable Plan, which shall be reasonably satisfactory to the Required Lenders in all material respects.

"Disclosure Statement Order" shall mean the order of the Bankruptcy Court approving the adequacy of the Disclosure Statement and authorizing solicitation of votes on the Acceptable Plan, which shall be reasonably satisfactory to the Required Lenders in all material respects.

"Dispose" or "Disposed of" shall mean to convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose of any property, business or asset. The term "Disposition" shall have a correlative meaning to the foregoing.

"Disqualified Stock" shall mean, with respect to any person, any Equity Interests of such person that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payment of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would

11

constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the Maturity Date (provided, that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock). Notwithstanding the foregoing: (i) any Equity Interests issued to any employee or to any plan for the benefit of employees of the Borrower or the Subsidiaries or by any such plan to such employees shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability and (ii) any class of Equity Interests of such person that by its terms authorizes such person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar Equivalent" shall mean, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time on the basis of the Spot Rate for the purchase of Dollars with such currency.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Liquidity" shall mean, as of any date (i) prior to entry of the Final Order, the sum, without duplication of the aggregate Dollar equivalent of all unrestricted cash and Cash Equivalents held by the Borrower and its Domestic Subsidiaries who are Debtors under the Chapter 11 Cases at such time, and (ii) after entry of the Final Order, the sum, without duplication of the (a) aggregate Dollar equivalent of all unrestricted cash and Cash Equivalents held by the Borrower and its Domestic Subsidiaries who are Debtors under the Chapter 11 Cases at such time, and (b) proceeds of the Initial Term Loans deposited into the Loan Proceeds Account but not yet released to the Borrower. As used herein, the term "unrestricted" as it relates to such cash or Cash Equivalents excludes any such amounts representing deposits, escrows, sinking fund payments or other amounts that are otherwise encumbered (other than pursuant to the Loan Documents or the Prepetition Loan Documents), held in trust, or dedicated for a particular use and/or which would not be characterized as "unrestricted cash" on the financial statements of such entities in accordance with GAAP.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Election Date" shall have the meaning assigned to such term in Section 1.10.

"EMU Legislation" shall mean the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

12

"Environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, binding agreements, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the generation, use, transport, management, Release or threatened Release of, or exposure to, any Hazardous Material, or to public or employee health and safety matters (to the extent relating to the Environment or Hazardous Materials).

"Environmental Permits" shall have the meaning assigned to such term in Section 3.16.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Holdings, the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) with respect to any Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; (c) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the incurrence by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (f) the receipt by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (h) the receipt by Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Holdings, the Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; (j) the withdrawal of any of Holdings, the Borrower, a Subsidiary or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; or (k) any similar event with respect to any Foreign Pension Plan.

13

"Erroneous Payment" shall have the meaning assigned to such term in Section 8.15(a).

"Erroneous Payment Return Deficiency" shall have the meaning assigned to such term in Section 8.15(c).

"Escrow Agent" means the Escrow Agent under the Escrow Agreement, which shall initially be The Bank of New York Mellon, in its capacity as Escrow Agent.

"Escrow Agent Fee Letter" shall mean that certain Fee Schedule, dated as of September 21, 2022, by the Borrower in favor of the Escrow Agent.

"Escrow Agreement" means an Escrow Agreement, dated as of the Closing Date (as amended, restated, supplemented or otherwise modified from time to time), among the Borrower, the Escrow Agent and the Administrative Agent for and on behalf of the Lenders relating to the Loan Proceeds Account.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Property" means all licenses and any other property and assets (including any lease, license, permit or agreement) (i) to the extent that the Collateral Agent may not validly possess a security interest therein under, or such security interest is restricted by, (x) applicable laws (including, without limitation, rules and regulations of any Governmental Authority or agency) or (y) by contract, lease, license or other agreement with a counterparty that is not a Debtor or an affiliate thereof and that exists on the Closing Date or (ii) the pledge or creation of a security interest in which would require the consent, approval, license or authorization of (x) a Governmental Authority or (y) a third party that is not a Debtor or an affiliate thereof, which third party right to consent, approve or authorize such a pledge or creation of a security interest exists on the Closing Date and, in each case of clause (i) and (ii), other than to the extent such prohibition or limitation is rendered ineffective under the UCC, the U.S. Bankruptcy Code, other applicable insolvency laws or other applicable law notwithstanding such prohibition or limitation; provided, however, that Excluded Property shall not include any proceeds, substitutions or replacements of any Excluded Property unless such proceeds, substitutions or replacements constitute Excluded Property in accordance with clause (i) or (ii) above.

"Excluded Indebtedness" shall mean all Indebtedness not incurred in violation of Section 6.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (i) Taxes imposed on or measured by its overall net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), and franchise (and similar) Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable Lending Office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from this Agreement or any other Loan Documents or any transactions

14

contemplated thereunder), (ii) U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document that is required to be imposed on amounts payable to a Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 2.19(b) or Section 2.19(c)) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new Lending Office (or assignment), to receive additional amounts or indemnification payments from any Loan Party with respect to such withholding Tax pursuant to Section 2.17, (iii) any withholding Tax that is attributable to such recipient's failure to comply with Section 2.17(d), (e), (h) or (i) or (iv) any Tax imposed under FATCA.

"Exit Fee" shall has the meaning assigned to such term in Section 2.12(b).

"Extended Maturity Date" shall have the meaning assigned to such term in Section 2.24.

"Extension Effective Date" shall have the meaning assigned to such term in Section 2.24(a).

"Facility" shall mean the DIP Facility.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any Treasury Regulations promulgated thereunder or official administrative interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above) and any intergovernmental agreements (or related rules, legislation or official administrative guidance) implementing the foregoing.

"Fees" shall have the meaning assigned to such term in Section 2.12(b).

"Federal Funds Effective Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%) of the quotations for such day for such transactions received by the Administrative Agent and (c) if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero.

"Final Order" shall mean the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Related Relief, which shall be in form and substance satisfactory to the Required Lenders.

"Final Relief" shall have the meaning assigned to such term in Section 5.15(e).

"Financial Officer" of any person shall mean the Chief Financial Officer or an equivalent financial officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

WEIL:\98800863\14\67665.0003

"First Lien Adequate Protection Liens" shall have the meaning assigned to such term in the DIP Order.

"Fitch" shall mean Fitch Ratings, Inc. and its successors and assigns.

"Flow of Funds Statement" means a flow of funds statement relating to payments to be made and credited by all of the parties on the Closing Date (including wire instructions therefor) as prepared by the Borrower and its financial advisor in consultation with (and approved by) the Administrative Agent and the Lender Advisors.

"Foreign Lender" shall mean any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined in Section 7701(a)(30) of the Code.

"Foreign Pension Plan" shall mean any employee benefit plan sponsored, maintained or contributed to by Holdings, the Borrower or any Subsidiary that, under applicable law other than the laws of the United States or any political subdivision thereof, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle maintained exclusively by a Governmental Authority).

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any state thereof or the District of Columbia.

"FSHCO" shall mean any Subsidiary that owns no material assets other than the Equity Interests of one or more Foreign Subsidiaries that are CFCs and/or of one or more FSHCOs.

"Fund" shall mean, collectively, investment funds managed by Affiliates of Apollo Global Management, LLC.

"Fund Affiliate" shall mean (i) each Affiliate of the Fund that is neither a "portfolio company" (which means a company actively engaged in providing goods or services to unaffiliated customers), whether or not controlled, nor a company controlled by a "portfolio company" and (ii) any individual who is a partner or employee of Apollo Management, L.P., Apollo Natural Resources Partners II, L.P. or Apollo Commodities Management, L.P. with respect to Series IV.

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States of America, applied on a consistent basis, subject to the provisions of Section 1.02; provided, that any reference to the application of GAAP in Sections 3.13(b), 3.20, 5.03, 5.07 and 6.02(e) to a Foreign Subsidiary (and not as a consolidated Subsidiary of the Borrower) shall mean generally accepted accounting principles in effect from time to time in the jurisdiction of organization of such Foreign Subsidiary.

"Governmental Authority" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i)

16

to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness or other obligation (or any existing right, contingent or otherwise, of the holder of Indebtedness or other obligation to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"Guarantee Agreement" shall mean the Guarantee Agreement, dated as of the Closing Date, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, among Holdings, the Borrower, each Subsidiary Loan Party and the Collateral Agent.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Guarantors" shall mean the Loan Parties other than the Borrower.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including, without limitation, explosive and radioactive substances, petroleum by products and petroleum distillates, asbestos and asbestos-containing materials, polychlorinated biphenyls, radon gas and pesticides, fungicides, fertilizers and other agricultural chemicals, of any nature subject to regulation, or which can give rise to liability, under any Environmental Law.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction, or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value, or credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed price physical delivery contracts, or any similar transaction or any combination of these transactions, in each case of the foregoing, whether or not exchange traded; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of the Subsidiaries shall be a Hedging Agreement.

"Holdings" shall has the meaning as assigned to such term in the introductory paragraph of this Agreement.

"Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount or deferred financing fees, the payment of interest or dividends in the form of additional Indebtedness or in the form of Equity Interests, as applicable, the accretion of original issue

17

discount, deferred financing fees or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"Indebtedness" of any person shall mean, if and to the extent (other than with respect to clause (i)) the same would constitute indebtedness or a liability on a balance sheet prepared in accordance with GAAP, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than such obligations accrued in the ordinary course of business and consistent with past practice), to the extent that the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Capitalized Lease Obligations of such person, (f) all net payments that such person would have to make in the event of an early termination, on the date Indebtedness of such person is being determined, in respect of outstanding Hedging Agreements, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit, (h) the principal component of all obligations of such person in respect of bankers' acceptances, (i) all Guarantees by such person of Indebtedness described in clauses (a) to (h) above and (j) the amount of all obligations of such person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock); provided, that Indebtedness shall not include (A) trade and other ordinary-course payables, accrued expenses, and intercompany liabilities arising in the ordinary course of business and consistent with past practice, (B) prepaid or deferred revenue, (C) purchase price holdbacks arising in the ordinary course of business and consistent with past practice in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset, (D) [reserved], (E) earn-out obligations until such obligations become a liability on the balance sheet of such person in accordance with GAAP, (F) obligations in respect of Third Party Funds, (G) in the case of the Borrower and its Subsidiaries, (I) [reserved], (H) [reserved] or (I) liabilities in respect of membership deposits.  The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness limits the liability of such person in respect thereof.

"Indemnified Taxes" shall mean all Taxes imposed on or with respect to or measured by any payment by or on account of any obligation of any Loan Party hereunder or under any other Loan Document other than (a) Excluded Taxes and (b) Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Ineligible Institution" shall mean (a) bona fide business competitors of the Borrower (in the good faith determination of the Borrower), as identified in writing by the Borrower to the Administrative Agent on or prior to the Closing Date and (b) any Affiliates of any such competitor in clause (a) that are identified in writing by the Borrower to the Administrative Agent as such from time to time or are readily identifiable as such solely based on similarity of name.

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Initial Budget" shall have the meaning assigned to such term in Section 3.27(d).

"Initial Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Initial Term Loans hereunder.  The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is set forth on Schedule 2.01.  The aggregate amount of the Initial Term

18

Loan Commitments as of the Closing Date is $50,000,000 (which total, for the avoidance of doubt, does not include the Closing Fee and Backstop Fee, payable pursuant to the terms of this Agreement).

"Initial Term Loans" shall mean the initial term loans funded pursuant to Section 2.01(a) on the Closing Date.

"Intellectual Property" shall mean any and all intellectual property, whether protected, created or arising now or in the future under the laws of the United States, now or hereafter owned by a Loan Party, including: patents, copyrights, trademarks, brand names, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), writings, plans, specifications and schematics, all engineering drawings, customer lists, all recorded data of any kind or nature (regardless of the medium of recording), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof, any similar intellectual property rights with respect to any of the foregoing, and all rights to bring any causes of action for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07 and substantially in the form of Exhibit E or another form approved by the Administrative Agent.

"Interest Payment Date" shall mean, (a) with respect to any SOFR Loan, (i) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, (ii) [reserved] and (iii) in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter.

"Interest Period" shall mean, as to any SOFR Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1 month thereafter; provided, however, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Interim Order" shall mean the Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Cliams, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay (VI) Scheduling a Final Hearing and (II) Related Relief, in form and substance satisfactory to the Required Lenders.

"Interim Relief" shall have the meaning assigned to such term in Section 5.15(d).

"Investment" shall have the meaning assigned to such term in Section 6.04.

"IRS" shall mean the U.S. Internal Revenue Service.

"Judgment Currency" shall have the meaning assigned to such term in Section 9.19.

19

"Lender" shall mean each financial institution listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 9.04), as well as any person that becomes a "Lender" hereunder pursuant to Section 9.04.

"Lender Advisors" shall mean Gibson, Dunn & Crutcher LLP, legal counsel to Lenders, and Evercore Group L.L.C., financial advisor to the Lenders.

"Lender Payments" shall have the meaning assigned to such term in Section 2.12(b).

"Lending Office" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar monetary encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; provided, that in no event shall an operating lease or an agreement to sell be deemed to constitute a Lien.

"Loan Documents" shall mean (i) this Agreement, (ii) the Guarantee Agreement, (iii) the Escrow Agreement, (iv) the DIP Order, (v) any Note issued under Section 2.09(e) and (vi) solely for the purposes of Sections 4.01 and 7.01 hereof, the Administrative Agent Fee Letter and Escrow Agent Fee Letter.

"Loan Parties" shall mean the Parent Entities, Holdings, the Borrower and the Subsidiary Loan Parties.

"Loan Proceeds Account" means an escrow account with the Escrow Agent into which the proceeds of the Loans shall be deposited and retained subject to withdrawal thereof by the Borrower pursuant to a Withdrawal Notice in accordance with Section 4.02 and the Escrow Agreement.

"Loans" shall mean the Initial Term Loans and Roll-Up Loans.

"Local Time" shall mean New York City time (daylight or standard, as applicable).

"Management Group" shall mean the group consisting of the directors, executive officers and other management personnel of the Borrower, Holdings or any Parent Entity, as the case may be, that were in office or otherwise served in any such capacity at any time during the period commencing (and including) March 1, 2018 and ending on the Closing Date.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse effect on the (i) business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower and its Subsidiaries, taken as a whole (excluding (x) any matters disclosed in the declaration of Robert Richard in support of the petitions filed to commence the Chapter 11 Cases and the pleadings filed on or about the first day of the Chapter 11 Cases and (y) the filing of the Chapter 11 Cases, the events and conditions related and/or leading up thereto as disclosed in such declaration and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Orders), (ii) the validity or enforceability of any of the Loan Documents or the rights and remedies

of the Administrative Agent and the Lenders thereunder, or (iii) any material portion of the Collateral or the Collateral Agent's liens on any material portion of the Collateral.

"Material Indebtedness" shall mean Indebtedness for borrowed money (other than intercompany Indebtedness and Loans) of any one or more of the Borrower or any Subsidiary in an aggregate principal amount exceeding $2,500,000; provided, that in no event shall (x) any Capitalized Lease Obligation existing on the Closing Date or (y) any Indebtedness of any Specified Foreign Subsidiary described in clause (i) of the definition thereof be considered Material Indebtedness.

"Maturity Date" shall mean the earliest of (i) the date that is 6 months after the Closing Date, as such date may be extended pursuant to Section 2.24, (ii) the date on which all Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with this Agreement, by operation of law or otherwise, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor, (iv) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (v) the Plan Consummation Date.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Milestones" shall have the meaning assigned to such term in Section 5.15.

"Moody's" shall mean Moody's Investors Service, Inc. and its successors and assigns.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower, Holdings or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"Net Proceeds" shall mean:

(a)    100% of the cash proceeds actually received by the Borrower or any Subsidiary (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Asset Sale under Section 6.05(b), (g) or (k) net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset (to the extent such debt or obligations are permitted hereunder), other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) Taxes paid or payable (in the good faith determination of the Borrower) as a result thereof (including the amount of any distributions in respect thereof pursuant to Section 6.06(b)(iii) or Section 6.06(b)(v)) and (iii) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (ii) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be cash proceeds of such Asset Sale

occurring on the date of such reduction); provided, that, (1) in the case of any proceeds received by the Borrower or any Subsidiary constituting casualty insurance settlements or condemnation awards, such proceeds may be reinvested (in whole or in part) by the Borrower or any Subsidiary to replace or repair the assets subject to such casualty or condemnation event and (2) in the case of any proceeds received by a Subsidiary that is not a Debtor, such proceeds may be reinvested (in whole or in part) by the Borrower or any Subsidiary to acquire, maintain, develop, construct, improve, upgrade or repair assets used or useful in the business of the Borrower and the Subsidiaries or to make other Investments permitted hereunder (excluding Permitted Investments or intercompany Investments in Subsidiaries), in each case,  within 6 months of receipt of such proceeds, and to the extent the Borrower delivers a certificate of a Responsible Officer of the Borrower promptly following receipt of any such proceeds setting forth its intention to reinvest such proceeds in accordance with this proviso, such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 6 months of such receipt, so used or contractually committed to be so used (it being understood that if any portion of such proceeds are not so used within such 6 month period but within such 6 month period are contractually committed to be used, then such remaining portion if not so used within 3 months following the end of such 6 month period shall constitute Net Proceeds as of such date without giving effect to this proviso); and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any Subsidiary Loan Party of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

"New Investor" shall have the meaning assigned to such term in Section 9.21.

"New Investment" shall have the meaning assigned to such term in Section 9.21.

"Non-Bank Tax Certificate" shall have the meaning assigned to such term in Section 2.17(e)(i).

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.19(c).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" shall have the meaning assigned to such term in Section 2.09(e).

"Obligations" shall mean (a) the due and punctual payment by the Borrower of (i) the unpaid principal of and interest (whether cash pay or PIK Interest and including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans made to the Borrower under this Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) [reserved] and (iii) all other monetary obligations of the Borrower owed under or pursuant to this Agreement and each other Loan Document, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), and (b) the due and punctual payment of all obligations of each other Loan Party under or pursuant to each of the Loan Documents.

"OFAC" shall have the meaning provided in Section 3.25(b).

"<u>Other Taxes</u>" shall mean any and all present or future stamp or documentary Taxes or any other excise, transfer, sales, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, registration, delivery or enforcement of, consummation or administration of, from the receipt or perfection of security interest under, or otherwise with respect to, the Loan Documents (but excluding any Excluded Taxes).

"<u>Parent Entity</u>" shall mean each of (a) TopCo and (b) Parent.

"<u>Participant</u>" shall have the meaning assigned to such term in <u>Section 9.04(d)(i)</u>.

"<u>Participant Register</u>" shall have the meaning assigned to such term in <u>Section 9.04(d)(ii)</u>.

"<u>Participating Member State</u>" shall mean each state so described in any EMU Legislation.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"<u>Permitted Holder Group</u>" shall have the meaning assigned to such term in the definition of "Permitted Holders."

"<u>Permitted Holders</u>" shall mean (i) the Co-Investors (and each other person that owns Equity Interests of the Borrower, Holdings or any Parent Entity on March 1, 2018), and (ii) any person that has no material assets other than the Equity Interests of the Borrower, Holdings or any Parent Entity and that, directly or indirectly, holds or acquires beneficial ownership of 100% on a fully diluted basis of the voting Equity Interests of the Borrower, and of which no other person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), other than any of the other Permitted Holders, beneficially owns more than 50% on a fully diluted basis of the voting Equity Interests thereof.

"<u>Permitted Investments</u>" shall mean:

(a) direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case with maturities not exceeding two years from the date of acquisition thereof;

(b) time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c) repurchase obligations with a term of not more than 180 days for underlying securities of the types described in <u>clause (a)</u> above entered into with a bank meeting the qualifications described in <u>clause (b)</u> above;

(d) commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Borrower) organized and in existence under

23

the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P 1 (or higher) according to Moody's, F 1 (or higher) according to Fitch, or A 1 (or higher) according to S&P (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(e)        securities with maturities of two years or less from the date of acquisition, issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P, A by Moody's or A by Fitch (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(f)        shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (e) above;

(g)        money market funds that (i) comply with the criteria set forth in Rule 2a 7 under the Investment Company Act of 1940, (ii) are rated by any two of (1) AAA by S&P, (2) Aaa by Moody's or (3) AAA by Fitch and (iii) have portfolio assets of at least $5,000,000,000;

(h)        time deposit accounts, certificates of deposit, money market deposits, banker's acceptances and other bank deposits in an aggregate face amount not in excess of 0.5% of the total assets of the Borrower and the Subsidiaries, on a consolidated basis, as of the end of the Borrower's most recently completed fiscal year;

(i)        credit card receivables to the extent included in cash or cash equivalents on the consolidated balance sheet of such person; and

(j)        instruments equivalent to those referred to in clauses (a) through (i) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and commonly used by corporations for cash management purposes in any jurisdiction outside the United States of America to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction.

"Permitted Liens" shall have the meaning assigned to such term in Section 6.02.

"Permitted Variance" shall have the meaning assigned to such term in Section 6.12.

"person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Petition Date" shall have the meaning assigned to such term in the recitals of this Agreement.

"PIK Interest" means the interest that is paid in kind by adding such interest amount to the outstanding principal balance of the Loans in accordance with Section 2.13(e), which shall thereafter be deemed principal bearing interest in accordance with Section 2.13(a), subject to Section 2.13(d).

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) that is (i) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, (ii) sponsored or maintained (at the time of determination or at any time within the five years prior

thereto) by Holdings, the Borrower, any Subsidiary or any ERISA Affiliate, and (iii) in respect of which Holdings, the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the U.S. Bankruptcy Code) of a chapter 11 plan of reorganization, which, for purposes of this Agreement, shall be no later than the effective date of a chapter 11 plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"Platform" shall have the meaning assigned to such term in Section 9.17(a).

"Prepetition" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Prepetition Administrative Agent" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Agents" shall mean the Prepetition Administrative Agent and the Prepetition Collateral Agent.

"Prepetition Credit Agreement" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Collateral" shall have the meaning assigned to such term in the DIP Order.

"Prepetition Collateral Agent" shall mean Barclays Bank PLC, in its capacity as collateral agent under the Prepetition Credit Agreement.

"Prepetition Indebtedness" shall mean all Indebtedness of the Loan Parties outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, other than Indebtedness under the Prepetition Credit Agreement.

"Prepetition Lenders" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Loans" shall have the meaning assigned to such term in the recitals of this Agreement.

"Prepetition Loan Documents" shall mean the "Loan Documents" as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Credit Agreement.

"primary obligor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Prime Rate" shall mean the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted

therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent).

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" shall have the meaning assigned to such term in Section 9.17(b).

"QFC Credit Support" shall have the meaning assigned to such term in Section 9.25.

"Qualified Equity Interests" shall mean any Equity Interest other than Disqualified Stock.

"Qualified Purchaser" shall have the meaning assigned to such term in Section 9.28.

"Rate" shall have the meaning assigned to such term in the definition of the term "Type."

"Real Property" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, whether by lease, license, or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment incidental to the ownership, lease or operation thereof.

"Register" shall have the meaning assigned to such term in Section 9.04(b)(iv).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund that invests in bank or commercial loans and similar extensions of credit, any other fund that invests in bank or commercial loans and similar extensions of credit and is advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity (or an Affiliate of such entity) that administers, advises or manages such Lender.

"Related Parties" shall mean, with respect to any specified person, such person's Controlled or Controlling Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Controlled or Controlling Affiliates.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"Remaining Prepetition Loans" shall have the meaning assigned to such term in Section 2.01(b).

"Remedies Notice Period" shall have the meaning assigned to such term in Section 7.01.

26

"<u>Reportable Event</u>" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"<u>Required Lenders</u>" shall mean, at any time, Lenders having (a) Initial Term Loans outstanding and (b) unused Initial Term Loan Commitments that, taken together, represent more than 50% of the sum of (x) all Initial Term Loans outstanding and (y) all unused Initial Term Loan Commitments at such time; <u>provided</u>, that, at any time that no Initial Term Loans or Initial Term Loan Commitments are outstanding, Required Lenders shall mean, at any time, Lenders having Roll-Up Loans that, taken together, represent more than 50% of the sum of all Roll-Up Loans at such time.

"<u>Requirement of Law</u>" shall mean, as to any person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such person or any of its property or assets or to which such person or any of its property or assets is subject.

"<u>Resolution Authority</u>" shall mean EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, or any other duly authorized employee or signatory of such person.

"<u>Restricted Payments</u>" shall have the meaning assigned to such term in Section 6.06.  The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof (as determined by the Borrower in good faith).

"<u>Roll-Up Lender</u>" means any Lender with an outstanding Roll-Up Loan.

"<u>Roll-Up Loans</u>" has the meaning assigned to such term in the Recitals and shall include as principal thereof the PIK Interest thereon in accordance with Section 2.13(e).

"<u>Rolled-Up Prepetition Loans</u>" has the meaning assigned to such term in <u>Section 2.01(b)</u>.

"<u>RSA</u>" has the meaning assigned to such term in <u>Section 5.15(b)</u>.

 "<u>S&P</u>" shall mean S&P Global Ratings and its successors and assigns.

"<u>Same Day Funds</u>" means, with respect to disbursements and payments, immediately available funds.

"<u>Sanctions</u>" shall have the meaning assigned to such term in <u>Section 3.25(b)</u>.

"<u>Sanctions Laws</u>" shall have the meaning assigned to such term in <u>Section 3.25(c)</u>.

"<u>SEC</u>" shall mean the Securities and Exchange Commission or any successor thereto.

27

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Lender and each subagent appointed pursuant to Section 8.02 by the Administrative Agent with respect to matters relating to the Loan Documents or by the Collateral Agent with respect to matters relating to the Collateral.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"SOFR" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" shall mean, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" shall mean a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (c) of the definition of "ABR".

"Specified Customers" are those customers that have been identified to Lender Advisors as "Specified Customers" on or prior to the Petition Date.

"Specified Foreign Subsidiaries" shall mean (i) any Subsidiary that is organized or incorporated in Belgium or France and (ii) the business and operations of any other Subsidiary to the extent such business or operations are located in Belgium or France.

"Spot Rate" shall mean, with respect to any currency, the rate determined by the Administrative Agent to be the rate quoted by the person acting in such capacity as the spot rate for the purchase by such person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m., Local Time on the date three Business Days prior to the date as of which the foreign exchange computation is made or if such rate cannot be computed as of such date such other date as the Administrative Agent shall reasonably determine is appropriate under the circumstances; provided, that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Statutory Reserves" shall mean the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). SOFR Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subagent" shall have the meaning assigned to such term in Section 8.02.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more

28

than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of the Borrower.

"Subsidiary Loan Party" shall mean (a) each  Subsidiary of the Borrower that is a Debtor under the Chapter 11 Cases and (b) any other Subsidiary of the Borrower that may be designated by the Borrower (by way of delivering to the Collateral Agent a supplement to the Guarantee Agreement duly executed by such Subsidiary) in its sole discretion from time to time to be a guarantor in respect of the Obligations and the obligations in respect of the Loan Documents, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section 5.10 as if it were newly acquired.

"Supported QFC" shall have the meaning assigned to such term in Section 9.25.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Syndication" shall have the meaning assigned to such term in Section 2.05.

"Syndication Procedures" shall have the meaning assigned to such term in Section 2.05.

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority, whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Term SOFR" shall mean,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term

29

SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than 2.00%, then Term SOFR shall be deemed to be 2.00%.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Termination Declaration Date" shall have the meaning assigned to such term in Section 7.01.

"Third Party Funds" shall mean any accounts or funds, or any portion thereof, received by Borrower or any of its Subsidiaries as agent on behalf of third parties in accordance with a written agreement that imposes a duty upon Borrower or one or more of its Subsidiaries to collect and remit those funds to such third parties.

"TopCo" shall mean Phoenix Services TopCo, LLC, a Delaware limited liability company.

"Transactions" shall mean, collectively, the transactions to occur pursuant to the Loan Documents, including (a) the execution, delivery and performance of the Loan Documents, the creation of the Liens pursuant to the DIP Order, and the initial borrowings hereunder and the use of proceeds thereof and (b) the payment of all fees and expenses to be paid and owing in connection with the foregoing.

"Type" shall mean, when used in respect of any Loan or Borrowing, the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Term SOFR and the ABR.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" shall mean the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"U.S. Bankruptcy Code" shall mean Title 11 of the United States Code, as amended.

"U.S. Government Securities Business Day" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" shall mean any Lender other than a Foreign Lender.

"U.S. Special Resolution Regimes" shall have the meaning assigned to such term in Section 9.25.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107 56 (signed into law October 26, 2001)).

"Variance Report" shall have the meaning set forth in Section 5.14.

"Variance Test Period" shall have the meaning set forth in Section 5.14.

"Voting Stock" shall mean, with respect to any person, such person's Equity Interests having the right to vote for the election of directors of such person under ordinary circumstances.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.  Unless the context otherwise requires, "Wholly Owned Subsidiary" shall mean a Subsidiary of the Borrower that is a Wholly Owned Subsidiary of the Borrower.

"Withdrawal" means a withdrawal from the Loan Proceeds Account in a minimum amount of $1,000,000, made in accordance with Section 4.02.

"Withdrawal Date" means the date of the making of any Withdrawal.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withdrawal Notice" means a notice substantially in the form attached hereto as Exhibit C to be delivered by the Borrower to the Escrow Agent and the Administrative Agent from time to time to request a Withdrawal from the Loan Proceeds Account.

"Write-Down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any changes in GAAP after December 31, 2017, any lease of the Borrower or the Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries at the time of its incurrence of such lease, that would be characterized as an operating lease under GAAP as applied by the Borrower in its audited financial statements for the fiscal year ended on or about December 31, 2017 (whether such lease is entered into before or after such date) shall not constitute Indebtedness or a Capitalized Lease Obligation of the Borrower or any Subsidiary under this Agreement or any other Loan Document as a result of such changes in GAAP.

Section 1.03    Effectuation of Transactions.  Each of the representations and warranties of the Borrower contained in this Agreement (and all corresponding definitions) are made after giving effect to the Transactions as shall have taken place on or prior to the date of determination, unless the context otherwise requires.

Section 1.04    Exchange Rates; Currency Equivalents.  Except for purposes of financial statements delivered by Loan Parties hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as determined by the Administrative Agent in accordance with this Agreement.  If any limitation, threshold or basket is exceeded solely as a result of changes in currency exchange rates after the last time it was utilized, such limitation, threshold or basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates.  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VI or clause (f) or (j) of Section 7.01 being exceeded solely as a result of changes in currency exchange rates.  No Default or Event of Default shall arise as a result of the threshold set forth in Dollars in the definition of Material Indebtedness being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.05    [Reserved].

Section 1.06    [Reserved].

Section 1.07    Timing of Payment or Performance.  Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation

WEIL:\98800863\14\67665.0003

is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Times of Day.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.09    [Reserved].

Section 1.10    Election Date.  In connection with any commitment, definitive agreement or similar event relating to an Investment or Disposition, the Borrower or applicable Subsidiary may designate such Investment or Disposition as having occurred on the date of the commitment, definitive agreement or similar event relating thereto (such date, the "Election Date") if, after giving pro forma effect to such Investment or Disposition and all related transactions in connection therewith and any related pro forma adjustments, the Borrower or any of its Subsidiaries would have been permitted to make such Investment or Disposition on the relevant Election Date in compliance with this Agreement, and any related subsequent actual making of such Investment or Disposition will be deemed for all purposes under this Agreement to have been made on such Election Date, including, without limitation, for purposes of usage of any baskets hereunder and for purposes of determining whether there exists any Default or Event of Default (and all such calculations on and after such Election Date until the termination, expiration, passing, rescission, retraction or rescindment of such commitment, definitive agreement or similar event shall be made on a pro forma basis giving effect thereto and all related transactions in connection therewith).

Section 1.11    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.12    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

WEIL:\98800863\14\67665.0003

ARTICLE II

*The Credits*

Section 2.01    <u>Commitments and Loans</u>.  Subject to the terms and conditions set forth herein:

(a)    Each Lender agrees, severally and not jointly, to make Initial Term Loans in Dollars to the Borrower on the Closing Date in an aggregate principal amount not to exceed its Initial Term Loan Commitment.  Upon a Lender's funding of an Initial Term Loan on the Closing Date, such Lender's Initial Term Loan Commitment shall be permanently reduced to zero and shall terminate as of the Closing Date.

(b)    On the Closing Date, concurrently with the making of the Initial Term Loans pursuant to Section 2.01(a) above, $150,000,000 in aggregate principal amount of Prepetition Loans shall be deemed converted into and exchanged for Roll-Up Loans (the Prepetition Loans so rolled-up, the "<u>Rolled-Up Prepetition Loans</u>" and, the Prepetition Loans that are not Rolled-Up Prepetition Loans, the "<u>Remaining Prepetition Loans</u>"), and $150,000,000 of Roll-Up Loans shall be deemed funded on the Closing Date, without constituting a novation, and shall satisfy and discharge $150,000,000 in aggregate principal amount of Rolled-Up Prepetition Loans. On the Closing Date, the Roll-Up Loans shall be deemed to be made by each Backstop Party (or an investment advisor, manager, or beneficial owner for the account of a Backstop Party, or an affiliated fund or trade counterparty designated by such Backstop Party) (such initial lender holding Roll-Up Loans, the "<u>Closing Date Roll-Up Lenders</u>") in an amount equal to the lesser of (x) the aggregate principal amount of the Prepetition Loans owing to the applicable Closing Date Roll-Up Lenders on the Closing Date and (y) an amount equal to (I) $150,000,000 <u>multiplied by</u> (II) the quotient of the amount of Initial Term Loan Commitments set forth next to each Backstop Party's name on Schedule 2.12(b) <u>divided by</u> the aggregate amount of Initial Term Commitments provided by all Backstop Parties on the Closing Date.  On the terms set forth in the Syndication Procedures, (1) each Closing Date Roll-Up Lender shall be deemed to have assigned a portion of its Roll-Up Loans ratably to each other Lender hereunder on such date, and each Syndicate Lender shall be deemed to have ratably assumed an amount of Roll-Up Loans from each Closing Date Roll-Up Lender and (2) each Syndicate Lender hereunder on such date shall be deemed to have assigned a portion of their Remaining Prepetition Loans to each Closing Date Roll-Up Lender and be deemed to have assumed Rolled-Up Loans from each Closing Date Roll-Up Lender such that each Lender hereunder (including the Backstop Parties) will hold the amount of Roll-Up Loans as set forth on <u>Schedule 2.05</u> (as contemplated by <u>Section 2.05</u> hereof) and the Remaining Prepetition Loans will be reallocated and assigned accordingly.

(c)    Amounts repaid or prepaid in respect of the Initial Term Loans or Roll-Up Loans may not be reborrowed.

Section 2.02    <u>Loans and Borrowings</u>.  (a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; <u>provided</u>, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Subject to <u>Section 2.14</u>, each Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any ABR Loan or SOFR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; <u>provided</u>, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to

34

any amounts payable under Section 2.15 or 2.17 solely in respect of increased costs resulting from such exercise and existing at the time of such exercise.

(c)     Borrowings of more than one Type may be outstanding at the same time; provided, however, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than 10 SOFR Borrowings hereunder at any time.  Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(d)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03     Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by written request in the form of a Borrowing Request signed by the Borrower (a) in the case of a SOFR Borrowing, not later than 12:00 noon, Local Time, three U.S. Government Securities Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 10:00 a.m., Local Time, on the Business Day of the proposed Borrowing (or, in each case, such shorter period as the Administrative Agent may agree); provided, that to request a SOFR Borrowing or ABR Borrowing on the Closing Date, the Borrower shall notify the Administrative Agent by written request not later than 12:00 noon, Local Time, one day prior to the Closing Date (or such later time as the Administrative Agent may agree). Each such written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day; and

(iii)     whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04     Roll Up. On the Closing Date, concurrently with the funding of the Initial Term Loans, $150,000,000 in aggregate principal amount of Prepetition Loans shall be deemed to be converted into and exchanged for Roll-Up Loans, and $150,000,000 of Roll-Up Loans shall be deemed funded in accordance with Section 2.01(b). Interest shall begin to accrue on the Roll-Up Loans from (and including) the Closing Date.

Section 2.05     Syndication. Following the Closing Date, the Borrower shall use commercially reasonable efforts to assist the Backstop Parties in connection with a syndication process (the "Syndication") for the assignment of a proportionate share of Loans in accordance with syndication procedures (the "Syndication Procedures") acceptable to each of the Administrative Agent and the Backstop Parties (each in their sole discretion), in consultation with the Borrower.  Upon completion of the Syndication, a Schedule 2.05, which shall be prepared by the Lender Advisors and satisfactory to the Required Lenders, shall be delivered to the Administrative Agent and the Borrower, which shall set forth the aggregate principal amount of Initial Term Loans and Roll-Up Loans held by each Lender upon closing of the Syndication.

Section 2.06    Funding of Borrowings.  (a) The Administrative Agent, following receipt of a Borrowing Request, shall promptly notify each Lender of the applicable amount of Initial Term Loans to be funded. Whereupon, each Lender shall remit to the Administrative Agent its share of such Initial Term Loans, in Same Day Funds not later than 12:00 noon on the Business Day specified in the Borrowing Request to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders  most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds with respect to the Initial Term Loans, the Administrative Agent will promptly (i) in accordance with the Flow of Funds Statement, (I) remit to Lender Advisors all fees and expenses payable on the date of the funding of the Initial Term Loan, (II) deduct and apply all fees payable to the Administrative Agent on the date of the funding of the Initial Term Loan for its own account and for the account of the Escrow Agent and (III) remit the amount specified in the Flow of Funds Statement to the Loan Proceeds Account and (ii) in accordance with the Flow of Funds Statement and the Approved Budget, and subject to Section 4.01, remit to the Borrower any remaining amounts. For the avoidance of doubt, all parties agree that all Loans shall be funded and accrue interest starting on the Closing Date, including any Loans the proceeds of which have been deposited into the Loan Proceeds Account.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with clause (a) of this Section 2.06 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of (A) the Federal Funds Effective Rate and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to ABR Loans at such time.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

Section 2.07    Interest Elections.  (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.07.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section 2.07, the Borrower shall notify the Administrative Agent of such election by written request in the form of an Interest Election Request signed by the Borrower by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.

36

(c)    Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)    if the resulting Borrowing is a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. If less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall be in an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum and satisfy the limitations specified in Section 2.02(c) regarding the maximum number of Borrowings of the relevant Type.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender to which such Interest Election Request relates of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the written request (including a request through electronic means) of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.08    Termination and Reduction of Commitments. On the Closing Date (after giving effect to the funding of the Initial Term Loans to be made on such date), the Initial Term Loan Commitments of each Lender as of the Closing Date will terminate.

Section 2.09    Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.10.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

37

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Facility and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to clause (b) or (c) of this Section 2.09 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note (a "Note").  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent and reasonably acceptable to the Borrower.  Thereafter, unless otherwise agreed to by the applicable Lender, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if requested by such payee, to such payee and its registered assigns).

Section 2.10    Repayment of Loans.  (a) Subject to the other clauses of this Section 2.10, to the extent not previously paid, outstanding Loans shall be due and payable on the Maturity Date.

(b)    [Reserved].

(c)    Prepayment of the Loans from:

(i)    all Net Proceeds pursuant to Section 2.11(b) shall be allocated to the Loans in accordance with Section 2.10(d), provided, that any Lender, at its option, may elect to decline all (but not less than all) of its pro rata share of any such prepayment of any Loan held by it if it shall give written notice to the Administrative Agent thereof by 5:00 p.m. Local Time at least five Business Days prior to the date of such prepayment and on the date of any such prepayment, any amounts that would otherwise have been applied to prepay Loans owing to such declining Lender shall instead be retained by the Borrower for application for any purpose not prohibited by this Agreement, and

(ii)    any optional prepayments of the Loans pursuant to Section 2.11(a) shall be applied in accordance with Section 2.10(d).

(d)    Prior to any prepayment of any Loan hereunder, the Borrower shall notify the Administrative Agent of such prepayment by telephone (confirmed by electronic means) not later than 2:00 p.m., Local Time, (i) in the case of an ABR Borrowing, at least one (1) Business Day before the scheduled date of such prepayment and (ii) in the case of a SOFR Borrowing, at least three (3) U.S. Government Securities Business Days before the scheduled date of such prepayment (or, in each case such shorter period acceptable to the Administrative Agent); provided, that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, indentures or similar agreements or other transactions, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied (or waived by the Borrower in its sole discretion) and/or rescinded at any time by the Borrower if the Borrower determines in its sole discretion that any or all of such conditions will not be satisfied (or waived).  Each repayment of Loans

38

shall be applied, first, ratably to the Initial Term Loans included in the repaid Borrowing, until all Initial Term Loans are repaid in full, and, second, ratably to the Roll-Up Loans included in the repaid Borrowing, until all Roll-Up Loans are repaid in full. All repayments of Loans shall be accompanied by accrued interest on the amount repaid to the extent required by Section 2.13(d) and Exit Fees required to be paid pursuant to Section 2.12(c).

Section 2.11    Prepayment of Loans. (a) The Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, without premium or penalty (but subject to payment of the applicable Exit Fee and Section 2.16), in an aggregate principal amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or, if less, the amount outstanding, subject to prior notice in accordance with Section 2.10(d).

(b)    The Borrower shall apply all Net Proceeds promptly upon receipt thereof to prepay Loans in accordance with clauses (c) and (d) of Section 2.10, together with the applicable Exit Fee.

(c)    [Reserved].

(d)    Notwithstanding any other provisions of this Section 2.11 to the contrary, (i) to the extent that any Net Proceeds of any Asset Sale by a Foreign Subsidiary would otherwise be required to be applied pursuant to Section 2.11(b) but is prohibited, restricted or delayed by applicable local law from being repatriated to the United States of America, the portion of such Net Proceeds so affected will not be required to be applied to repay Loans at the times provided in Section 2.11(b) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States of America, and once such repatriation of any of such affected Net Proceeds is permitted under the applicable local law, such repatriation will be effected and such repatriated Net Proceeds will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to Section 2.11(b), to the extent provided therein and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of such Net Proceeds that would otherwise be required to be applied pursuant to Section 2.11(b) would have a material adverse tax consequence with respect to such Net Proceeds, the Net Proceeds so affected may be retained by the applicable Foreign Subsidiary for so long as, but only for so long as, as such material adverse tax consequences are reasonably expected to exist (the Borrower hereby agreeing to cause the applicable Subsidiary to promptly use commercially reasonable efforts to take all actions within the reasonable control of the Borrower that are reasonably required to eliminate such tax consequences).

Section 2.12    Fees. (a) The Borrower agrees to pay to the Administrative Agent, for the account of the Administrative Agent, the "Administration Fee" as set forth in the Administrative Agent Fee Letter, as may be amended, restated, supplemented or otherwise modified from time to time, at the times specified therein (the "Administrative Agent Fees"). The Borrower agrees to pay to the Fronting Lender, such fees set forth in the Fronting Lender Fee Letter. The Borrower agrees to pay to the Escrow Agent the fees set forth in the Escrow Agent Fee Letter.

(b)    The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, on the Closing Date a non-refundable fee equal to 5.0% of the aggregate principal amount of the Initial Term Loan Commitments actually provided on the Closing Date, with such fee payable in kind in additional amounts of Initial Term Loans (the "Closing Fee"). The Borrower agrees to pay to the Administrative Agent, for the account of the funds and/or accounts affiliated with, or managed and/or advised by, the entities set forth on Schedule 2.12(b), on file with the Administrative Agent (the "Backstop Allocation Schedule", and such entities, together with their respective successors and permitted assignees, or any fronting bank or other funding agent operating on their behalf, the "Backstop Parties") ratably in accordance with the amounts set forth opposite each such Backstop Party's name on the Backstop

Allocation Schedule, on the Closing Date a non-refundable fee equal to 5.0% of the Initial Term Loan Commitments actually provided on the Closing Date, with such fee payable in kind in additional amounts of Initial Term Loans (the "Backstop Fee"). The Borrower agrees to pay to the Administrative Agent, for the ratable account of each of the Lenders, on the Maturity Date or on any other date that the Initial Term Loans are repaid (whether through a mandatory prepayment, voluntarily prepayment, acceleration or otherwise, including, for the avoidance of doubt, through conversion of such Initial Term Loans pursuant to Section 2.10(b)) a non-refundable fee equal to 3.0% of the aggregate principal amount of the Initial Term Loans repaid on such applicable date (the "Exit Fee", together with the Closing Fee, and the Backstop Fee, the "Lender Payments", and the Lender Payments, together with the Administrative Agent Fees, the "Fees").

(c)     All Lender Payments shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Lender Payments shall be refundable under any circumstances.

Section 2.13     Interest.   (a) The Loans comprising each ABR Borrowing shall bear interest at the ABR plus the Applicable Margin.

(b)     The Loans comprising each SOFR Borrowing shall bear interest at the applicable Term SOFR for the Interest Period in effect for such Borrowing based on the applicable currency plus the Applicable Margin.

(c)     [Reserved].

(d)     Notwithstanding the foregoing, if any principal of or interest on any Loan or the Administrative Agent Fees or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding clauses of this Section 2.13 or (ii) in the case of any other overdue amount, 2.00% plus the rate applicable to ABR Loans as provided in clause (a) of this Section 2.13; provided, that this clause (c) shall not apply to any Event of Default that has been waived by the Lenders pursuant to Section 9.08.

(e)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date and on the Maturity Date. On each Interest Payment Date (I) with respect to any Term SOFR Borrowing of Initial Term Loans, interest (x) in an amount equal to Term SOFR for the applicable Interest Period plus 2.00% per annum of Applicable Margin shall be paid in cash and (y) the remainder of the Applicable Margin owing thereon shall be paid in kind in additional amounts of Initial Term Loans, (II) with respect to any ABR Borrowing of Initial Term Loans, (x) interest in an amount equal to ABR for the applicable Interest Period plus 1.00% per annum of Applicable Margin shall be paid in cash and (y) the remainder of the Applicable Margin owing thereon shall be paid in kind in additional amounts of Initial Term Loans and (III) with respect to any Borrowing of Roll-Up Loans, interest shall be paid in kind in additional amounts of Roll-Up Loans. On the Maturity Date, all accrued and unpaid interest shall be paid in cash. Notwithstanding the foregoing, (A) interest accrued pursuant to clause (d) of this Section 2.13 shall be payable in cash on demand, (B) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment in cash and (C) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion in cash. On each applicable Interest Payment Date, all accrued PIK Interest shall be added to the outstanding principal balance of the applicable Loans, and shall thereafter be treated as principal of such

40

Loans to which such PIK Interest was added for all purposes of this Agreement (regardless of whether evidenced by a Note).

(f)       All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable ABR or Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(g)       In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 2.14       <u>Alternate Rate of Interest</u>.  Subject to <u>Section 2.23</u> hereof, if prior to the commencement of any Interest Period for a SOFR Borrowing:

(a)       the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Term SOFR for such Interest Period; or

(b)       the Administrative Agent is advised by the Required Lenders that the Term SOFR for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by electronic means as promptly as practicable thereafter and any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to <u>clause (b)</u>, at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to this <u>Section 2.14</u>.  Subject to <u>Section 2.23</u>, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to <u>clause (c)</u> of the definition of "ABR" until the Administrative Agent revokes such determination.

Section 2.15       <u>Increased Costs</u>.  (a) If any Change in Law shall:

(i)       impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

41

(ii)    subject any Lender to any Tax with respect to any Loan Document (other than (A) Taxes indemnifiable under Section 2.17 or (B) Excluded Taxes); or

(iii)    impose on any Lender any other condition affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any SOFR Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; provided, however, that the Borrower shall not be liable for such compensation if the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto.

(b)    If any Lender determines that any Change in Law regarding capital requirements or liquidity has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in clause (a) or (b) of this Section 2.15 shall be delivered to the Borrower and shall be conclusive absent manifest error; provided, that any such certificate claiming amounts described in clause (x) or (y) of the definition of "Change in Law" shall, in addition, state the basis upon which such amount has been calculated and certify that such Lender's demand for payment of such costs hereunder, and such method of allocation is not inconsistent with its treatment of other borrowers which, as a credit matter, are similarly situated to the Borrower and which are subject to similar provisions. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.15, such Lender shall notify the Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16    Break Funding Payments. In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow (other than due to the default of the relevant Lender), convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event, including any loss,

cost or expense arising from the liquidation or redeployment of funds or from any fee payable. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.17    Taxes. (a) Any and all payments made by or on behalf of a Loan Party under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided, that if a Loan Party, the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirement of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with applicable Requirement of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Loan Party shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.17) any Lender (or where the Administrative Agent  receives the payment for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.  Whenever any Indemnified Taxes or Other Taxes are payable by a Loan Party, as promptly as possible thereafter, such Loan Party shall send to the Administrative Agent for its own account or for the account of a Lender, as the case may be, a certified copy of an official receipt (or other evidence acceptable to the Administrative Agent or such Lender, acting reasonably) received by the Loan Party showing payment thereof.  Without duplication, after any payment of Taxes by any Loan Party or the Administrative Agent to a Governmental Authority as provided in this Section 2.17, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Requirements of Law to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(b)    The Borrower shall timely pay any Other Taxes.

(c)    The Borrower shall indemnify and hold harmless the Administrative Agent and each Lender within 15 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent or such Lender, as applicable, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)    Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to withholding of Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, any such withholding of Taxes in respect of any payments to be made to such Lender by any Loan Party pursuant to any Loan Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction.  In addition, any Lender, if

43

requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements and to satisfy such requirements.

(e)    Without limiting the generality of Section 2.17(d), each Foreign Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i)    deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Foreign Lender is due hereunder, two copies of (A) in the case of a Foreign Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," IRS Form W-8BEN or W-8BEN-E, as applicable, (or any applicable successor form) (together with a certificate (substantially in the form of Exhibit I hereto, such certificate, the "Non-Bank Tax Certificate") certifying that such Foreign Lender is not a bank for purposes of Section 881(c) of the Code, is not a "10-percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower and is not a CFC related to the Borrower (within the meaning of Section 864(d)(4) of the Code), and that the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States of America), (B) IRS Form W-8BEN or W-8BEN-E, as applicable, or Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Foreign Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (A) and (B) above, provided, that if the Foreign Lender is a partnership, and one or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Foreign Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(ii)    deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

Any Foreign Lender that becomes legally ineligible to update any form or certification previously delivered shall promptly notify the Borrower and the Administrative Agent in writing of such Foreign Lender's inability to do so.

Each person that shall become a Participant pursuant to Section 9.04 or a Lender pursuant to Section 9.04 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 2.17(e); provided, that a Participant shall furnish all such required forms and statements solely to the person from which the related participation shall have been purchased.

Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.17(e).

44

In addition, the Administrative Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Administrative Agent becomes a successor Administrative Agent pursuant to <u>Section 8.09</u> on which payment by the Borrower is due hereunder, as applicable, two copies of a properly completed and executed IRS Form W-9 certifying its exemption from U.S. federal backup withholding or such other properly completed and executed documentation prescribed by applicable law certifying its entitlement to any available exemption from applicable U.S. federal withholding taxes in respect of any payments to be made to such Administrative Agent by any Loan Party pursuant to any Loan Document including, as applicable, an IRS Form W-8IMY certifying that the Administrative Agent is a U.S. branch and, with respect to payments received by the Administrative Agent on behalf of a Lender, intends to be treated as a U.S. person for purposes of withholding under Chapter 3 of the Code pursuant to Section 1.1441-1(b)(2)(iv) of the Treasury Regulations, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, two further copies of such documentation.   Notwithstanding anything to the contrary, the Administrative Agent is not required to provide any documentation that it is not legally eligible to provide as a result of any Change in Law occurring after the date hereof.

(f)     If any Lender or the Administrative Agent, as applicable, determines, in its sole discretion, that it has received a refund of an Indemnified Tax or Other Tax for which a payment has been made by a Loan Party pursuant to this Agreement or any other Loan Document, which refund in the good faith judgment of such Lender or the Administrative Agent, as the case may be, is attributable to such payment made by such Loan Party, then the Lender or the Administrative Agent, as the case may be, shall reimburse the Loan Party for such amount (net of all reasonable out-of-pocket expenses of such Lender or the Administrative Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender or Administrative Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the Indemnified Tax or Other Tax giving rise to such refund had not been imposed in the first instance; <u>provided</u>, that the Loan Party, upon the request of the Lender or the Administrative Agent agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority.   In such event, such Lender or the Administrative Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (<u>provided</u>, that such Lender or the Administrative Agent may delete any information therein that it deems confidential).   A Lender or the Administrative Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim. No Lender nor the Administrative Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party in connection with this <u>clause (f)</u> or any other provision of this <u>Section 2.17</u>.

(g)     If the Borrower determines that a reasonable basis exists for contesting an Indemnified Tax or Other Tax for which a Loan Party has paid additional amounts or indemnification payments, each affected Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.   The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such person in connection with any request made by the Borrower pursuant to this <u>Section 2.17(g)</u>.   Nothing in this <u>Section 2.17(g)</u> shall obligate any Lender or Agent to take any action that such person, in its sole

WEIL:\98800863\14\67665.0003

judgment, determines may result in a material detriment to such person.  Any resulting refund shall be governed by <u>Section 2.17(f)</u>.

(h)    Each U.S. Lender shall deliver to the Borrower and the Administrative Agent two IRS Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from U.S. federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(i)    If a payment made to any Lender or any Agent under this Agreement or any other Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this <u>Section 2.17(i)</u>, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(j)    The agreements in this <u>Section 2.17</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable under any Loan Document.

For purposes of this <u>Section 2.17</u>, the terms "applicable law" and "applicable Requirement of Law" include FATCA.

Section 2.18    <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.  (a) Unless otherwise specified herein, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under <u>Sections 2.15</u>, <u>2.16</u> or <u>2.17</u>, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds.  Each such payment shall be made without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.05</u> shall be made directly to the persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  Except as otherwise expressly provided herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments made under the Loan Documents shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     Subject to <u>Section 7.02</u>, if at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (ii) second, towards payment of principal then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on, any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender entitled to receive the same proportion of such payment, then the Lender receiving such greater proportion shall purchase participations in the Loans of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders entitled thereto ratably in accordance with the principal amount of each such Lender's respective Loans and accrued interest thereon; <u>provided</u>, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>clause (c)</u> shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 2.06</u> or <u>Section 2.18(d)</u>, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)     After the occurrence and during the continuation of an Event of Default, monies to be applied to the Obligations, whether arising from payments by the Loan Parties, realization on Collateral, set-off or otherwise, shall be allocated as follows (subject, in all respects, to the Carve-Out):

(i)     First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Agents in their capacity as such, until paid in full;

(ii)     Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause Second payable to them, until paid in full;

(iii)    Third, to pay interest and principal due in respect of Initial Term Loans, until paid in full;

(iv)    Fourth, to pay interest and principal due in respect of the Roll-Up Loans, until paid in full; and

(v)     Fifth, to pay all other Obligations that are due and payable, until paid in full.

Amounts shall be applied to each category of Obligations set forth above until paid in full and then to the next category.  If amounts are insufficient to satisfy a category, they shall be applied pro rata among the Obligations in the category.  The allocations set forth in this Section 2.18(f) are solely to determine the rights and priorities of the Agents and Lenders as among themselves and may be changed by agreement among the Agents and all of the Lenders without the consent of any Loan Party.  This Section 2.18(f) is not for the benefit of or enforceable by any Loan Party.

Section 2.19    Mitigation Obligations; Replacement of Lenders.  (a) If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event that gives rise to the operation of Section 2.20, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or Section 2.17 or mitigate the applicability of Section 2.20, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.20, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, or (iii) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require any such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, to the extent consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent, in each case, shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15, payments required to be made pursuant to Section 2.17 or a notice given under Section 2.20, such assignment will result in a reduction in such compensation or payments.  Nothing in this Section 2.19 shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender.  No action by or consent of the removed Lender shall be necessary in connection with such

48

assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment the Borrower, Administrative Agent, such removed Lender and the replacement Lender shall otherwise comply with <u>Section 9.04</u>, <u>provided</u>, that if such removed Lender does not comply with <u>Section 9.04</u> within one Business Day after the Borrower's request, compliance with <u>Section 9.04</u> shall not be required to effect such assignment.

(c)    If any Lender (such Lender, a "<u>Non-Consenting Lender</u>") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of <u>Section 9.08</u> requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) at its sole expense (including with respect to the processing and recordation fee referred to in <u>Section 9.04(b)(ii)(B)</u>) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to (and any such Non-Consenting Lender agrees that it shall, upon the Borrower's request) assign its Loans and its Commitments hereunder to one or more assignees reasonably acceptable to the Administrative Agent (unless such assignee is a Lender, an Affiliate of a Lender or an Approved Fund); <u>provided</u>, that: (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon and (c) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or termination.  No action by or consent of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with <u>Section 9.04</u>; <u>provided</u>, that if such Non-Consenting Lender does not comply with <u>Section 9.04</u> within one Business Day after the Borrower's request, compliance with <u>Section 9.04</u> shall not be required to effect such assignment.

Section 2.20    <u>Illegality</u>. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable Lending Office to make or maintain any SOFR Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue SOFR Loans or to convert ABR Borrowings to SOFR Borrowings shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), convert all SOFR Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so converted.

Section 2.21    <u>Super Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations</u>. The priority of the Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the DIP Orders (and, for the avoidance of doubt, are subject to the Carve-Out).  Subject to the terms of the DIP Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without application to or order of the Bankruptcy Court.

Section 2.22    <u>Defaulting Lender</u>. (a) *Defaulting Lender Adjustments*.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

49

(i)    *Waivers and Amendments*.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of "Required Lenders."

(ii)    *Defaulting Lender Waterfall*.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, following an Event of Default or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.22 shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    *General*.  No adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while a Lender was a Defaulting Lender.  Except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.23    Benchmark Replacement Setting.

(a)    *Benchmark Replacement*.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.23(a) will occur prior to the applicable Benchmark Transition Start Date.

(b)    *Benchmark Replacement Conforming Changes*.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right, in consultation with the Borrower, to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

50

(c)      *Notices; Standards for Decisions and Determinations*.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.23(d) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.23, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.23.

(d)      *Unavailability of Tenor of Benchmark*.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)      *Benchmark Unavailability Period*.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

Section 2.24      Extension of Maturity Date.  The Borrower may, with the consent of the Required Lenders and by notice to the Administrative Agent not later than the date that is 5 Business Days prior to the then-existing date set forth in clause (i) of the definition of Maturity Date, elect to extend such date to the date that is 1 month after such then-existing date (the "Extended Maturity Date").

(a)      Upon such election (the "Extension Effective Date"), subject to the satisfaction (or waiver by the Required Lenders) of each of the following conditions, the date set forth in clause (i) of the definition of Maturity Date shall be extended to the Extended Maturity Date:

(i)      The Borrower shall pay to the Administrative Agent, for the account of each Lender, a consent fee equal to 1.00% of the aggregate principal amount of the Loans held by such Lender on the date of such extension, with such fee payable in kind in additional amounts of Initial Term Loans; and

51

(ii)     On and as of the Extension Effective Date, no Default or Event of Default shall have occurred and be continuing.

(b)     Notwithstanding anything to the contrary in this <u>Section 2.24</u>, the Borrower may extend the date set forth in clause (i) of the definition of Maturity Date no more than four times pursuant to this <u>Section 2.24</u>.

ARTICLE III

*Representations and Warranties*

On the Closing Date and the date of each other Credit Event, the Borrower represents and warrants to each of the Lenders that:

Section 3.01     <u>Organization; Powers</u>.  Except as set forth on <u>Schedule 3.01</u>, each of Holdings, the Borrower and each of the Subsidiaries (a) is a partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States of America) under the laws of the jurisdiction of its organization, (b) subject to any restriction arising on account of Holdings', the Borrower's or any Subsidiary's status as a "debtor" under the U.S. Bankruptcy Code, has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required and (d) subject to the entry of the DIP Order and the terms thereof, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow and otherwise obtain credit hereunder; except in each case of <u>clauses (a)</u> (other than with respect to the Borrower), <u>(b)</u> (other than with respect to the Borrower) and <u>(c)</u>, to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 3.02     <u>Authorization</u>.  Subject to the entry of the DIP Order and the terms thereof, the execution, delivery and performance by the Borrower and each of the Subsidiary Loan Parties and, in the case of <u>Section 3.02(a)</u> and <u>3.02(b)(i)(A)</u> and <u>(B)</u>, Holdings, of each of the Loan Documents to which it is a party and the borrowings hereunder (a) have been duly authorized by all corporate, stockholder, partnership or limited liability company action required to be obtained by Holdings, the Borrower and such Subsidiary Loan Parties and (b) will not violate (A) any provision of law, statute, rule or regulation applicable to Holdings, the Borrower or any such Subsidiary Loan Party, (B) the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreements) or by-laws of Holdings, the Borrower, or any such Subsidiary Loan Party or (C) any applicable order of any court or any rule, regulation or order of any Governmental Authority applicable to the Borrower or any such Subsidiary Loan Party where any such conflict, violation or breach referred to in this <u>Section 3.02(b)</u> would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to (x) any property or assets now owned or hereafter acquired by the Borrower or any such Subsidiary Loan Party, other than the Liens created by the Loan Documents and Permitted Liens, or (y) any Equity Interests of the Borrower now owned or hereafter acquired by Holdings, other than Liens created by the Loan Documents or Liens permitted by <u>Article VIA</u>.

Section 3.03     <u>Enforceability</u>.  Subject to the entry of the DIP Order and the terms thereof, this Agreement has been duly executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by the Borrower, Holdings and each Subsidiary Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party

52

enforceable against the Borrower, such Subsidiary Loan Party and Holdings, as applicable, in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), (iii) implied covenants of good faith and fair dealing and (iv) any foreign laws, rules and regulations as they relate to pledges of Equity Interests of Foreign Subsidiaries that are not Loan Parties.

Section 3.04    <u>Governmental Approvals</u>.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required for the execution, delivery or performance of each Loan Document to which the Borrower or any Subsidiary Loan Party is a party, except for (a) such as have been made or obtained and are in full force and effect, (b) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect, (c) filings or other actions listed on <u>Schedule 3.04</u> and (d) the entry of the DIP Order.

Section 3.05    Financial Statements.  The audited consolidated balance sheets and the statements of operations and comprehensive income, stockholders' equity and cash flows for the fiscal years ended December 31, 2019, December 31, 2020 and December 31, 2021 for the Borrower and its consolidated subsidiaries, including the notes thereto, if applicable, present fairly in all material respects the consolidated financial position of the Borrower and its consolidated subsidiaries as of the dates and for the periods referred to therein and the results of operations and, if applicable, cash flows for the periods then ended, and, except as set forth on Schedule 3.05 or as otherwise noted therein, were prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby.

Section 3.06    <u>No Material Adverse Effect</u>.  Since the Petition Date, there has been no event or circumstance that, individually or in the aggregate with other events or circumstances, has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Title to Properties; Possession Under Leases</u>.  (a) Each of the Borrower and the Subsidiaries has good and marketable title in fee simple or equivalent to, or easements or valid leasehold interests in, or other limited property interests in, all its Real Properties and has valid title to its personal property and assets, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Permitted Liens or Liens arising by operation of law.  The Equity Interests of the Borrower owned by Holdings are free and clear of Liens, other than Liens permitted by <u>Article VIA</u>.

(b)    Except for a default arising from the Chapter 11 Cases or a rejection of Specified Customer contract permitted hereunder, the Borrower and each of the Subsidiaries has complied with all material obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.

(c)    As of the Closing Date, none of the Borrower and the Subsidiaries has received any written notice of any pending or contemplated condemnation proceeding affecting any material portion of any material Real Property or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date, except as set forth on <u>Schedule 3.07(c)</u>.

53

(d)      As of the Closing Date, none of the Borrower and its Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any material Real Property or any interest therein, except as permitted under Section 6.02 or Section 6.05 or as would not reasonably be expected to have a Material Adverse Effect.

(e)      Schedule 3.07(d) lists each piece of material Real Property owned by any Loan Party as of the Closing Date that has a book value (as determined by the Borrower) in excess of $500,000.

Section 3.08      Subsidiaries.  (a) Schedule 3.08(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each Subsidiary of the Borrower and, as to each such Subsidiary, the percentage of each class of Equity Interests owned by the Borrower or by any such Subsidiary.

(b)      As of the Closing Date, after giving effect to the Transactions, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors (or entities controlled by directors) and shares held by directors (or entities controlled by directors)) relating to any Equity Interests of the Borrower or any of the Subsidiaries, except as set forth on Schedule 3.08(b).

Section 3.09      Litigation; Compliance with Laws.  Except for the Chapter 11 Cases,

(a)      there are no actions, suits or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against the Borrower or any of the Subsidiaries or any business, property or rights of any such person (including those that involve any Loan Document) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and

(b)      None of the Borrower, the Subsidiaries and their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are the subject of Section 3.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10      Federal Reserve Regulations.  Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board.

Section 3.11      Investment Company Act.  None of Holdings, the Borrower and the Subsidiaries is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 3.12      Use of Proceeds.  The Loan Parties shall use the proceeds of the Loans to (i) pay fees, interest and other amounts payable under this Agreement, (ii) provide working capital for, and for other general corporate purposes of, the Borrower and its Subsidiaries, including for funding the Carve-Out and payment of any Adequate Protection Obligations, in each case of clauses (i) and (ii), in accordance with, and subject to, the DIP Order and the Approved Budget (subject to any Permitted Variance), and (iii) in the case of the Roll-Up Loans in exchange for (and to satisfy and discharge) Prepetition Loans.

Section 3.13      Tax Returns.  Except as set forth on Schedule 3.13:

(a)      Except (i) pursuant to an order of the Bankruptcy Court or pursuant to the U.S. Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and each of the Subsidiaries has filed or caused to be filed all federal, state, local and non-U.S. Tax returns required to have been filed by it (including in its capacity as withholding agent) and each such Tax return is true and correct;

(b)      Except (i) pursuant to an order of the Bankruptcy Court or pursuant to the U.S. Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and each of the Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due), except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which Holdings, the Borrower or any of the Subsidiaries (as the case may be) has set aside on its books adequate reserves in accordance with GAAP; and

(c)      Other than as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect, as of the Closing Date, with respect to the Borrower and each of the Subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

Section 3.14      No Material Misstatements. (a) All written factual information (other than projections, forward looking information and information of a general economic nature or general industry nature) (the "Information") concerning Holdings, the Borrower, the Subsidiaries, the Transactions and any other transactions contemplated hereby or otherwise prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates provided thereto).

(b)      All projections and other forward looking information and information of a general economic nature prepared by or on behalf of Holdings or the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby (including each Updated Budget, Variance Report and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that such projections are as to future events and are not to be viewed as facts, such projections are subject to significant uncertainties and contingencies and that actual results during the period or periods covered by any such projections may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized), as of the date such projections and information were furnished to the Lenders.

Section 3.15      Employee Benefit Plans. Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) no Reportable Event has occurred during the past five years as to which the Borrower, any of its Subsidiaries or any ERISA Affiliate was required to file a report with the PBGC; (ii) no ERISA Event has occurred or is reasonably expected to occur; and (iii) none of the Borrower, the Subsidiaries or any of their ERISA Affiliates has received any written notification that any Multiemployer Plan has been terminated within the meaning of Title IV of ERISA.

55

Section 3.16    Environmental Matters.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, request for information, order, complaint or penalty has been received by the Borrower or any of its Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Borrower's knowledge, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Borrower or any of its Subsidiaries, (ii) each of the Borrower and its Subsidiaries has all environmental permits, licenses and other approvals necessary for its operations to comply with all Environmental Laws ("Environmental Permits") and is in compliance with the terms of such Environmental Permits and with all other Environmental Laws, (iii) no Hazardous Material is located at, on or under any property currently or, to the Borrower's knowledge, formerly owned, operated or leased by the Borrower or any of its Subsidiaries that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws or Environmental Permits, and no Hazardous Material has been generated, used, treated, stored, handled, disposed of or controlled, transported or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower or any of its Subsidiaries under any Environmental Laws or Environmental Permits, (iv) there are no agreements in which the Borrower or any of its Subsidiaries has expressly assumed or undertaken responsibility for any known or reasonably likely liability or obligation of any other person arising under or relating to Environmental Laws, which in any such case has not been made available to the Administrative Agent prior to the Closing Date, and (v) there has been no material written environmental assessment or audit conducted (other than customary assessments not revealing anything that would reasonably be expected to result in a Material Adverse Effect), by or on behalf of the Borrower or any of the Subsidiaries of any property currently or, to the Borrower's knowledge, formerly owned or leased by the Borrower or any of the Subsidiaries that has not been made available to the Administrative Agent prior to the Closing Date.

Section 3.17    Security Interest.  (a) Subject to the entry thereof, the DIP Order creates in favor of the Collateral Agent (for the benefit of the Secured Parties), in each case, a legal, valid and enforceable security interest and Liens on the Collateral described therein and proceeds thereof, which security interest and Lien shall be valid and perfected as of the Closing Date by entry of the DIP Order with respect to each Loan Party and which shall constitute a continuing security interest and Lien on the Collateral having priority over all other security interests and Liens on the Collateral and securing all the Obligations, other than as set forth in the DIP Order.  The Collateral Agent and Lenders shall not be required to file or record any financing statements, mortgages, notices of Lien or similar instruments, in any jurisdiction or filing office or to take any other action in order to validate, perfect or establish the priority of the security interest and Lien granted pursuant to the DIP Order.

(b)    Pursuant to Section 364(c)(1) of the U.S. Bankruptcy Code, the Obligations of the Loan Parties shall at all times constitute allowed senior administrative expenses against each of the Loan Parties in the Chapter 11 Cases (without the need to file any proof of claim or request for payment of administrative expense), with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the U.S. Bankruptcy Code, and over any and all other administrative expense claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the U.S. Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, which allowed claims shall for purposes of Section 1129(a)(9)(A) of the U.S. Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the U.S. Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and their estates and all proceeds thereof other than as set forth in the DIP Order.

56

(c)       [Reserved].

(d)       Notwithstanding anything herein (including this Section 3.17) or in any other Loan Document to the contrary, no Borrower or any other Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign law.

Section 3.18       [Reserved].

Section 3.19       [Reserved].

Section 3.20       Labor Matters.  Except as would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from the Borrower or any of the Subsidiaries or for which any claim may be made against the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Borrower or any of the Subsidiaries (or any predecessor) is a party or by which the Borrower or any of the Subsidiaries (or any predecessor) is bound.

Section 3.21       Insurance.   Schedule  3.21 sets forth a true, complete and correct description, in all material respects, of all material insurance (excluding any title insurance) maintained by or on behalf of the Borrower or the Subsidiaries as of the Closing Date.  As of such date, such insurance is in full force and effect.

Section 3.22       No Default.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 3.23       Intellectual Property; Licenses, Etc.  Except as would not reasonably be expected to have a Material Adverse Effect or as set forth in Schedule 3.23, (a) the Borrower and each of its Subsidiaries owns, or possesses the right to use, all Intellectual Property used or held for use in or otherwise reasonably necessary for the present conduct of their respective businesses, (b) to the knowledge of the Borrower, the Borrower and its Subsidiaries are not interfering with, infringing upon, misappropriating or otherwise violating Intellectual Property of any person, and (c) (i) no claim or litigation regarding any of the Intellectual Property owned by the Borrower and its Subsidiaries is pending or, to the knowledge of the Borrower, threatened in writing and (ii) to the knowledge of the Borrower, no claim or litigation regarding any other Intellectual Property described in the foregoing clauses (a) and (b) is pending or threatened.

Section 3.24       [Reserved].

Section 3.25       USA PATRIOT Act; OFAC.

(a)     The Borrower and each Subsidiary Loan Party is in compliance in all material respects with the material provisions of the USA PATRIOT Act and the Borrower has provided to the Administrative Agent all information related to the Loan Parties (including names, addresses and tax identification numbers (if applicable)) reasonably requested in writing by the Administrative Agent at least three Business Days prior to the Closing Date and mutually agreed to be required under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by the Administrative Agent or any Lender.

(b)     None of Holdings, the Borrower or any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of the Borrower or any of the Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC") or the U.S. Treasury Department, the European Union or relevant member states of the European Union, the United Nations Security Council or His Majesty's Treasury ("Sanctions").

(c)     The Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any person, for the purpose of financing the activities of any person that is currently the target of any Sanctions or for the purpose of funding, financing or facilitating any activities, business or transaction with or in any country or territory that is the target of the Sanctions, to the extent such activities, businesses or transaction would be prohibited by sanctions laws and regulations administered by the United States, including OFAC and the U.S. State Department, the United Nations Security Council, His Majesty's Treasury, the European Union or relevant member states of the European Union (collectively, the "Sanctions Laws"), or in any manner that would result in the violation of any Sanctions Laws applicable to any party hereto.

Section 3.26     Foreign Corrupt Practices Act.

(a)     Holdings, the Borrower and its Subsidiaries, and, to the knowledge of the Borrower or any of its Subsidiaries, their directors, officers, agents or employees, are in compliance with the U.S. Foreign Corrupt Practices Act of 1977 or similar law of a jurisdiction in which the Borrower or any of its Subsidiaries conduct their business and to which they are lawfully subject ("Anti-Corruption Laws"), in each case, in all material respects.

(b)     No part of the proceeds of the Loans made hereunder will be used to make any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

Section 3.27     Bankruptcy Matters.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable law and proper notice thereof was given.  Proper notice was also provided for (x) the motion seeking approval of the Loan Documents pursuant to the DIP Order and (y) the hearing for the approval of the DIP Order.

(b)     After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Liens permitted by Section 6.02 and (ii) prior and superior to any other Person or Lien pursuant to Section 364(d)(1) of the Bankruptcy Code, in each case, other than the Carve-Out and the Prior Senior Liens (as defined in the DIP Orders) and subject to the priorities set forth in the Interim Order or the Final Order, as applicable (with respect to specified property of the estate, with respect to which the Obligation shall have a junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code).

(c)      The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the Administrative Agent and Required Lenders' consent (which consent of the Required Lenders may be communicated via an email from the Lender Advisors).

(d)      A true and complete copy of the initial budget, as agreed to with the Required Lenders as of the Closing Date, is attached as <u>Schedule 3.27</u> hereto (the "<u>Initial Budget</u>").

ARTICLE IV

*Conditions of Lending*

Section 4.01      <u>Conditions Precedent to Effectiveness of this Agreement and Funding the Loans</u>.  The effectiveness of this Agreement and the obligations of each Lender to make Initial Term Loans (or to be deemed to have made Roll-Up Loans) on the Closing Date is subject to the satisfaction or waiver by the Required Lenders in their respective sole discretion and, with respect to any condition affecting the rights and duties of the Administrative Agent, the Administrative Agent, any which waiver by the Required Lenders and the satisfaction of the Required Lenders, with any document described in clauses (a)-(l) below, as applicable, which may be communicated via an email from each of the Lender Advisors, of the following conditions:

(a)      The Administrative Agent (or its counsel) shall have received from each Loan Party party thereto (i) a counterpart signed by such Loan Party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include delivery of a signed signature page of the applicable agreement by electronic transmission (e.g., "pdf")) that such Loan Party has signed a counterpart of (i) this Agreement and (ii) the Guarantee Agreement and (iii) the Escrow Agreement.

(b)      The Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(c)      The Administrative Agent shall have received a certificate of the Secretary or Assistant Secretary or similar officer of each Loan Party dated the Closing Date and certifying:

(i)      a copy of the certificate or articles of incorporation, certificate of limited partnership, certificate of formation or other equivalent constituent and governing documents, including all amendments thereto, of such Loan Party, (1) in the case of a corporation, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, or (2) otherwise certified by the Secretary or Assistant Secretary of such Loan Party or other person duly authorized by the constituent documents of such Loan Party,

(ii)      a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of such Loan Party as of a recent date from such Secretary of State (or other similar official),

(iii)      that attached thereto is a true and complete copy of the by-laws (or partnership agreement, limited liability company agreement or other equivalent constituent and governing documents) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in <u>clause (iv)</u> below,

59

(iv)    that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member) authorizing the execution, delivery and performance of the Loan Documents dated as of the Closing Date to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(v)    as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party, and

(vi)    as to the absence of any pending proceeding for the dissolution or liquidation of such Loan Party or, to the knowledge of such person, threatening the existence of such Loan Party.

(d)    The Borrower shall have paid all fees and out-of-pocket costs and expenses of (i) the Administrative Agent (including the reasonable and documented fees and expenses of [●], counsel to the Administrative Agent) and (ii) the Lenders (including the reasonable and documented fees and expenses of the Lender Advisors), in each case, that have been invoiced at least one (1) Business Day prior to the Closing Date.

(e)    The Administrative Agent shall have received (i) at least two Business Day prior to the Closing Date, all information related to the Loan Parties (including names, addresses and tax identification numbers (if applicable)) reasonably requested in writing by the Administrative Agent not less than three Business Days prior to the Closing Date and mutually agreed to be required under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by the Administrative Agent or any Lender and (ii) at least three Business Days prior to the Closing Date, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, and any Lender or Agent that has made a request therefor, in a written notice to the Borrower not less than five Business Days prior to the Closing Date, a Beneficial Ownership Certification.

(f)    The Lenders and the Administrative Agent shall have received the Initial Budget.

(g)    [reserved].

(h)    (i) The Bankruptcy Court shall have entered the Interim Order, no later than five (5) Business Days after the Petition Date, and such order shall be in form and substance satisfactory to the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (which consent may be communicated via an email from each of the Lender Advisors, as applicable) (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent); (ii) the Administrative Agent and the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors), not later than a reasonable time in advance of the Petition Date for the Administrative Agent's and Lenders' counsel to review and analyze the same; (iii) all motions, orders (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (which satisfaction may be communicated via an email from the Lender Advisors); and (iv) all "first day" orders shall have been

approved and entered by the Bankruptcy Court except as otherwise reasonably agreed by the Required Lenders (which agreement may be communicated via an email from each of the Lender Advisors).

(i)      The Prepetition Agent and the Prepetition Lenders shall have each consented to the use of collateral or received adequate protection (if applicable) in respect of the liens securing their respective obligations pursuant to the Interim Order.

(j)      The representations and warranties set forth in the Loan Documents shall be true and correct in all material respects as of the Closing Date, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(k)      As of the Closing Date, no Event of Default or Default shall have occurred and be continuing.

(l)      After due inquiry, each Loan Party is unaware of any fraudulent activities in connection with its business.

Section 4.02      Conditions Precedent to each Withdrawal.  Any Withdrawal after the Closing Date is subject to the satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)      The Bankruptcy Court shall have entered the Final Order, it shall be in full force and effect and it shall not have been vacated, stayed, reversed, modified or amended, in whole or in any part, without the Required Lenders' written consent (which consent may be communicated via an email from the Lender Advisors).  All other "second day" orders shall be entered in form and substance acceptable to the Required Lenders.

(b)      The Administrative Agent (for distribution to the Lenders and the Lender Advisors) shall have received an executed Withdrawal Notice, executed by the Borrower requesting the proposed Withdrawal thereunder by no later than 2:00 p.m. five Business Days prior to the proposed Withdrawal Date.

(c)      The representations and warranties set forth in the Loan Documents shall be true and correct in all material respects as of the Withdrawal Date, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(d)      no Event of Default or Default shall have occurred and be continuing on the Withdrawal Date.

(e)      No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is  adverse to the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent or Escrow Agent.

(f)      After due inquiry, each Loan Party is unaware of any fraudulent activities in connection with its business.

61

(g)        [Reserved].

(h)        If implemented prior to such Withdrawal Date, the RSA shall be in full force and effect and no material default by any of the Loan Parties shall have occurred and be continuing (with all applicable grace periods having expired) under the RSA, except as otherwise waived in accordance with the terms thereof.

(i)        The Loan Parties shall be in compliance with the Approved Budget in all respects and the proceeds of the Loans shall be used as set forth in the Approved Budget (in each case, subject to the Permitted Variance).

(j)        The Borrower shall be in compliance in all respects with the Milestones.

(k)        Interim Relief (as defined in Section 5.15(d)) shall have been obtained.

(l)        The Required Lenders and Lender Advisors shall have been provided with any updates with respect to contract negotiations with the Specified Customers and the Required Lenders shall be satisfied in all respects with the status and progress of such negotiations, which may be communicated via an email from each of the Lender Advisors.

Upon receipt of the Withdrawal Notice and satisfaction of the conditions set forth in Article 4, the Administrative Agent shall promptly direct the Escrow Agent to disburse funds by 2:00 p.m. on the applicable Withdrawal Date; provided that, if the Required Lenders determine (which determination may be communicated via an email from each of the Lender Advisors) that the Borrower has failed to satisfy the conditions precedent set forth in this Section 4.02 for a Withdrawal Notice and so advise the Administrative Agent in writing (directly or through the Lender Advisors) prior to the Escrow Agent disbursing the Withdrawal, the Administrative Agent shall decline to authorize such Withdrawal and shall communicate the same to the Escrow Agent.

On any date on which the Loans shall have been accelerated, any amounts remaining in the Loan Proceeds Account, as the case may be, may be applied by the Administrative Agent to reduce the Loans then outstanding, in accordance with Section 2.18 (other than with respect to amounts to fund the Carve-Out). None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the Loan Proceeds Account upon the occurrence and during the continuance of any Default or Event of Default (except to fund the Carve-Out). It is understood and agreed that the Administrative Agent may not deliver a "Termination Notice" (as defined and under the Escrow Agreement) unless and until an Event of Default has occurred and is continuing or otherwise.

The acceptance by the Borrower of the Loans or proceeds of a Withdrawal shall conclusively be deemed to constitute a representation by the Borrower that each of the conditions precedent set forth in Section 4.01 and Section 4.02 shall have been satisfied in accordance with its respective terms or shall have been irrevocably waived by the applicable relevant Person; provided, however, that the making of any such Loan or Withdrawal (regardless of whether the lack of satisfaction was known or unknown at the time), shall not be deemed a modification or waiver by the Agents, any Lender or other Secured Party of the provisions of this Article 4 on such occasion or on any future occasion or operate as a waiver of (i) the right of the Administrative Agent and the Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance, (ii) any Default or Event of Default due to such failure of conditions or otherwise or (iii) any rights of any Agent or any Lender as a result of any such failure of the Loan Parties to comply.

ARTICLE V

*Affirmative Covenants*

Each of Holdings and the Borrower covenants and agrees with each Lender that, until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

Section 5.01    <u>Existence; Business and Properties</u>.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of the Borrower, where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and except as otherwise permitted under <u>Section 6.05</u>, and except for the liquidation or dissolution of Subsidiaries if the assets of such Subsidiaries to the extent they exceed estimated liabilities are acquired by the Borrower or a Wholly Owned Subsidiary of the Borrower in such liquidation or dissolution; <u>provided</u>, that Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Loan Parties and Domestic Subsidiaries may not be liquidated into Foreign Subsidiaries.

(b)    Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, Intellectual Property, licenses and rights with respect thereto necessary to the normal conduct of its business, and (ii) at all times maintain, protect and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted), from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as permitted by this Agreement); <u>provided</u> that, in no event shall this <u>Section 5.01(b)</u> prohibit the Borrower or any Subsidiary from rejecting or abandoning or seeking rent abatement or other modifications under any lease or any other contract in accordance with the U.S. Bankruptcy Code and any order of the Bankruptcy Court, in each case, in accordance with the terms of this Agreement.

Section 5.02    <u>Insurance</u>.  (a) Maintain, with financially sound and reputable insurance companies, insurance (subject to customary deductibles and retentions) in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations.  Notwithstanding the foregoing, the Borrower and the Subsidiaries may self-insure with respect to such risks with respect to which companies of established reputation engaged in the same general line of business in the same general area usually self-insure.

(b)    In connection with the covenants set forth in this <u>Section 5.02</u>, it is understood and agreed that:

(i)    the Administrative Agent, the Collateral Agent, the Lenders and their respective agents or employees shall not be liable for any loss or damage insured by the insurance policies required to be maintained under this <u>Section 5.02</u>, it being understood that (A) the Loan Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Administrative Agent, the Collateral Agent, the Lenders or their agents or employees.  If, however, the insurance policies, as a matter of the internal policy of such insurer, do not provide waiver of subrogation rights against such parties, as required above, then each of Holdings and the Borrower, on behalf of itself and behalf of each of its Subsidiaries, hereby agrees, to the extent permitted by law, to waive, and further agrees to cause each of their

63

Subsidiaries to waive, its right of recovery, if any, against the Administrative Agent, the Collateral Agent, the Lenders and their agents and employees;

(ii)     the designation of any form, type or amount of insurance coverage by the Collateral Agent (including acting in the capacity as the Collateral Agent) under this Section 5.02 shall in no event be deemed a representation, warranty or advice by the Collateral Agent or the Lenders that such insurance is adequate for the purposes of the business of Holdings, the Borrower and the Subsidiaries or the protection of their properties; and

(iii)     the amount and type of insurance that the Borrower and its Subsidiaries has in effect as of the Closing Date satisfies for all purposes the requirements of this Section 5.02.

Section 5.03     Taxes.  Subject to the U.S. Bankruptcy Code, the terms of the DIP Order and any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that would result in a violation of any applicable law, including the U.S. Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payment), pay its obligations in respect of all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.04     Financial Statements, Reports, etc.  Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a)     within 105 days after the end of each fiscal year (commencing with the fiscal year ending December 31, 2022), a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal year and the consolidated results of their operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year, which consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be accompanied by customary management's discussion and analysis and audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants to the effect that such consolidated financial statements fairly present, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that the delivery by the Borrower of annual reports on Form 10-K (or any successor or comparable form) of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(a) to the extent such annual reports include the information specified herein);

(b)     within 60 days after the end of each of the first three fiscal quarters of each fiscal year (commencing with the fiscal quarter ending on or about March 31, 2023), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrower and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail, which consolidated balance sheet and related statements of operations and cash flows shall be accompanied by customary management's discussion and analysis and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Borrower and its Subsidiaries on a consolidated basis and, except as set forth in any notes or schedules attached thereto, in accordance with GAAP (subject to normal year-end audit

adjustments and the absence of footnotes) (it being understood that the delivery by the Borrower of quarterly reports on Form 10-Q (or any successor or comparable form) of the Borrower and its consolidated Subsidiaries shall satisfy the requirements of this Section 5.04(b) to the extent such quarterly reports include the information specified herein);

(c)    as soon as available, but in any event not later than the fifteenth (15th) day after the end of month, an unaudited financial summary of the financial performance, and unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year;

(d)    (x) concurrently with any delivery of financial statements under clause (a), (b) or (c) above, a certificate of a Financial Officer of the Borrower certifying that no Event of Default or Default has occurred since the date of the last certificate delivered pursuant to this Section 5.04(c) or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (y) concurrently with any delivery of financial statements under clause (a) above, if the accounting firm is not restricted from providing such a certificate by its policies office, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations);

(e)    promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials filed by Holdings, the Borrower or any of the Subsidiaries with the SEC, or after an initial public offering, distributed to its stockholders generally, as applicable; provided, however, that such reports, proxy statements, filings and other materials required to this clause (d) shall be deemed delivered for purposes of this Agreement when posted to the website of the Borrower (or Holdings) or the website of the SEC and written notice of such posting has been delivered to the Administrative Agent;

(f)    prior to delivery to any Specified Customer, the initial written proposal, if any, from to the Company to such Specified Customer in connection with respect to any proposed contract renegotiation with such Specified Customer;

(g)    promptly after received, copies of any written proposals received by the Borrower or any subsidiaries with respect to customer agreements (which shall also be delivered directly to the Lender Advisors within 24 hours), and shall use commercially reasonable efforts to update the Lender Advisors on any verbal proposals within 24 hours;

(h)    at the request of the Lender Advisors, a report containing a summary of accounts payable and aging, including demands or claims related to or asserting any lien on any property of the Borrower or any of the Subsidiaries;

(i)    promptly, from time to time, such other customary information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender);

(j)        in the event that Holdings reports on a consolidated basis, such consolidated reporting at Holdings' level in a manner consistent with that described in clauses (a) and (b) of this Section 5.04 for the Borrower will satisfy the requirements of such paragraphs; and

(k)        deliver to the Administrative Agent and the Lender Advisors copies of all monthly reports, projections, or other written information with respect to each of the Loan Parties' business or financial condition or prospects (as well as all pleadings, motions, applications and judicial information) filed by or on behalf of the Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Case) or the Committee, as applicable; provided, however, that such reports, projections, or other written information required to be delivered pursuant to this clause (i) shall be deemed delivered to the Administrative Agent and the Lender Advisors for purposes of this Agreement when such reports, projections or other written information is filed with the Bankruptcy Court.

The Borrower hereby acknowledges and agrees that all financial statements and reports furnished pursuant to clauses (a), (b) and (d) above and/or Section 5.14 are hereby deemed to be Borrower Materials suitable for distribution, and to be made available, to Public Lenders as contemplated by Section 9.17 and may be treated by the Administrative Agent and the Lenders as if the same had been marked "PUBLIC" in accordance with such paragraph (unless the Borrower otherwise notifies the Administrative Agent in writing on or prior to delivery thereof).

Section 5.05     Litigation and Other Notices. Furnish to the Administrative Agent (which will promptly thereafter furnish to the Lenders) written notice of the following promptly after any Responsible Officer of Holdings or the Borrower obtains actual knowledge thereof:

(a)        any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)        the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, the Borrower or any of the Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(c)        any other development specific to Holdings, the Borrower or any of the Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)        the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to have a Material Adverse Effect.

Section 5.06     Compliance with Laws. Subject to the DIP Order, comply with all laws, rules, regulations and orders of any Governmental Authority (including any order of the Bankruptcy Court) applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided, that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.09, or to laws related to Taxes, which are the subject of Section 5.03. The Borrower will maintain in effect and enforce policies and procedures reasonably designed to ensure compliance in all material respects by the Borrower, its Subsidiaries and

66

their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions Laws in connection with the Borrower's or its Subsidiaries' business operations.

Section 5.07    Maintaining Records; Access to Properties and Inspections.  Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties of Holdings, the Borrower or any of the Subsidiaries at reasonable times, upon reasonable prior notice to Holdings or the Borrower, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to Holdings or the Borrower to discuss the affairs, finances and condition of Holdings, the Borrower or any of the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Borrower has the opportunity to participate in any such discussions with such accountants), in each case, subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract.

Section 5.08    Use of Proceeds.  All proceeds of the Loans shall be used by the Loan Parties at any time for any of the permitted purposes described under Section 3.12, or for any other purpose permitted under the DIP Order or as set forth in the Approved Budget.

Section 5.09    Compliance with Environmental Laws.  Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.09, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10    Additional Subsidiary; Further Assurances.  If any additional direct or indirect Subsidiary of the Borrower is formed or acquired after the Closing Date and if such Subsidiary becomes a Debtor under the Chapter 11 Cases, within 5 Business Days after the date such Subsidiary becomes a Debtor under the Chapter 11 Cases (or such longer period as the Administrative Agent may agree in its reasonable discretion), notify the Collateral Agent thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary.  The Borrower shall and shall cause the Guarantors to take any and all actions reasonably requested by the Administrative Agent or Required Lenders that they deem necessary or advisable to obtain or maintain a valid and perfected Lien with respect to the Collateral, all at the expense of the Loan Parties. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, no Subsidiary of any Debtor that is not a Debtor shall be required to become a Guarantor or Loan Party under the Loan Documents.

Section 5.11    Weekly Calls; Status Update Calls; Advisor Materials.

(a)    At the request of the Lender Advisors, cause Alix Partners and PJT to participate in weekly calls between the Lender Advisors, PJT and Alix Partners, which call shall, among other things, provide (x) an update as to critical vendors and associated disbursements and (y) a consultation regarding payments to vendors that arose prior to the Petition Date (in the case of this clause (y), such call shall only be required to be between the Lender Advisors and Alix Partners);

(b)    At the request of the Lender Advisors, weekly from and after the Petition Date through the Maturity Date, the Borrower shall hold a meeting (at a mutually agreeable location and time or telephonically) with management of the Borrower and the Lender Advisors, which meeting, at the

discretion of the Lender Advisors, may include Lenders; provided, that the Lender Advisors shall (i) communicate the participants to the Borrower in advance of such call or meeting and (ii) provide an agenda in advance of such call or meeting (which exercise of discretion may be communicated via an email from either of the Lender Advisors) regarding the financial results, operations, compliance of the Loan Parties and developments in the Chapter 11 Cases, including the negotiation of customer agreements; provided, that any such meeting may be combined with such telephone conference outlined in Section 5.11(a) hereof; and

(c)     At the request of the Lender Advisors, provide the Lender Advisors with any backup models, analysis or other materials reasonably requested by the Lender Advisors to analyze proposals received from customers, draft proposals to be made to customers, and to monitor the financial and operating performance of the business.

Section 5.12     Consultation Rights.  The Borrower shall notify the Lender Advisors promptly upon becoming aware of any material development, change or deviation in the status of any contract renegotiations with any new or existing customers since the time of the last update provided to the Lenders and/or the Lender Advisors (including pursuant to this Section 5.12 or Section 5.11), and shall consult with the Lender Advisors with respect to such material development, change or deviation.

Section 5.13     Cash Management.  Maintain the cash management of the Loan Parties in accordance in all material respects with the Cash Management Order.

Section 5.14     Budget Covenant.

(a)     On or before the fifth (5th) business day before the end of each Budget Period (as defined below) beginning with the fourth full week following the Petition Date (or more frequently if determined by the Debtors), the Debtors will deliver to the Administrative Agent and the Lender Advisors an updated budget for the subsequent 13-week period (a "Subsequent DIP Budget"), which shall be in form and substance satisfactory to the Required Lenders in their sole discretion (not to be unreasonably withheld) (which satisfaction may be communicated via an email from each of the Lender Advisors).  The Initial Budget or any Subsequent DIP Budget shall be deemed to constitute the "Approved Budget" for purposes of this Agreement with the most recently delivered budget constituting the "Approved Budget" solely upon approval by the Required Lenders (which must be in writing (including from the Lender Advisors), email being sufficient) in their sole discretion (not to be unreasonably withheld).  In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved Budget" are not met as set forth herein, the prior Approved Budget shall remain in full force and effect and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve (which approval shall not be unreasonably withheld) such Subsequent DIP Budget as an "Approved Budget."  "Budget Period" means the initial four-week period set forth in the Approved Budget in effect at such time.

(b)     Commencing on the Friday of the fourth full calendar week after the Petition Date, budget variances (as defined below) shall be tested on each Friday (each such date, a "Testing Date").  On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date, the Debtors shall deliver to the Administrative Agent and the Advisors a variance report/reconciliation in form and substance reasonably satisfactory to the Required Lenders (the "Approved Budget Variance Report"), setting forth in detail (i) the Debtors' actual disbursements (the "Actual Disbursements"), including, without limitation, maintenance capital expenditures, on an aggregate basis and individually on a line by line basis for (x) Payroll & Benefits (as set forth in the Approved Budget), (y) Capital Leases (as set forth in the Approved Budget) and (z) such other line items as may be reasonably requested by the Lender Advisors, to the extent the Debtors can report such line item individually without undue cost or burden) for the week period and

68

the four-week period, in each case, ending on the applicable Testing Date; (ii) the Debtors' actual ordinary course receipts that are accounted for as "revenue" under GAAP (as applied by the Debtors in the ordinary course of business consistent with past practice)  (the "Actual Receipts"), excluding, for the avoidance of doubt, any intercompany transactions or asset sales outside the ordinary course of business, on an aggregate basis during the week period and the four-week period, in each case, ending on the applicable Testing Date; (iii) the (w) amounts set forth in the Approved Budget under "Professional Fees", (x) amounts set forth in the Approved Budget under "Debt Service", (y) amounts of intercompany loans and  transfers and (z) amounts set forth in the Approved Budget under "Capital Expenditures – Growth", in each case, during the week period and the four-week period, in each case, ending on the applicable Testing Date; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Receipts and the Actual Disbursements for the week and four-week period ending on the Testing Date to the amount of Debtors' projected cash receipts and disbursements, in each case, on an aggregate basis, set forth in the Approved Budgets with respect to such week or four-week period ending on the applicable Testing Date; and (v) as to each variance contained in the Approved Budget Variance Report and required to be tested pursuant to Section 6.12 below, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance; (vi) a weekly roll forward of the Debtors' cash forecast (both domestic and international); and (vii) a cash balance for the Debtors by country.

Section 5.15    Milestones. By the times and dates set forth below (as any such time and date may be extended with the consent of the Administrative Agent (at the direction of the Required Lenders) cause the following to occur (each, a "Milestone"):

(a)    by the date that is no later than 5 days after the Petition Date, the Debtors shall obtain entry of the Interim Order;

(b)    by the date that is no later than 30 days after the Petition Date, the Debtors shall have entered into a restructuring support agreement with the Prepetition Lenders that is in form and substance  satisfactory to the Required Lenders (the "RSA");

(c)    by the date that is no later than 30 days after the Petition Date, the Debtors shall obtain entry of the Final Order;

(d)    by the date that is no later than 30 days after the Petition Date, the Debtors shall have agreed in principal to revised pricing terms providing for cost-plus payment schemes that is in form and substance acceptable to the Required Lenders and shall have obtained interim Bankruptcy Court approval therefor (the "Interim Relief") with each Specified Customer and if such Interim Relief has not been obtained, the Borrower shall have moved to reject the applicable contract between the Borrower and the Specified Customer in accordance with the Bankruptcy Code no later than 30 days after the Petition Date;

(e)    by the date that is no later than 75 days after the Petition Date, the Debtors shall have entered into binding agreements with each Specified Customer that was the subject of Interim Relief and that is in form and substance  acceptable to the Required Lenders and shall have obtained final Bankruptcy Court approval therefor (the "Final Relief") and if such Final Relief is not obtained, the Borrower shall have moved to reject the applicable contract between the Borrower and the Specified Customer in accordance with the Bankruptcy Code no later than 75 days after the Petition Date;

(f)    by the date that is no later than 90 days after the Petition Date, the Debtors shall deliver to the Required Lenders a five-year business plan detailing emergence from the Chapter 11 Cases that is in a form and substance satisfactory to the Required Lenders and that incorporates the terms of the Final Relief;

69

(g)        by the date that is no later than 95 days after the Petition Date, the Debtors shall have filed a Disclosure Statement and an Acceptable Plan;

(h)        by the date that is no later than 125 days after the Petition Date, the Debtors shall have obtained entry of an order approving the Disclosure Statement, and such order to be in form and substance satisfactory to the Required Lenders;

(i)        by the date that is no later than 155 days after the Petition Date, the Debtors shall obtain entry of an order confirming an Acceptable Plan, and such order to be in form and substance satisfactory to the Required Lenders;

(j)        by the date that is no later than 165 days after the Petition Date, the effective date of the Acceptable Plan shall have occurred.

Section 5.16        Debtor-in-Possession Obligations. Comply in all material respects in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the DIP Order, and any other order of the Bankruptcy Court.  Give, on a timely basis as specified in the applicable DIP Order, all notices required to be given to all parties specified in such DIP Order.

Section 5.17        Additional Bankruptcy Matters. Promptly provide the Administrative Agent, the Lenders and the Lender Advisors with updates of any material developments in connection with the Loan Parties' reorganization efforts under the Chapter 11 Cases, whether in connection with the sale of all or substantially all of the Borrower's and its Subsidiaries' consolidated assets, the marketing of any Loan Parties' assets, the formulation of bidding procedures, an auction plan, and documents related thereto, or otherwise.

Section 5.18        Ratings.  The Borrower will use commercially reasonable efforts to obtain from Moody's and S&P (i) ratings for the Initial Term Loans and (ii) corporate credit ratings and corporate family ratings in respect of the Borrower (it being understood that, in each case, the Borrower shall not be required to obtain a specific rating) on or prior to the date that is 60 days after the Petition Date, and shall begin the process of requesting such ratings no later than 5 Business Days after the Petition Date.


ARTICLE VI

*Negative Covenants*

Each of the Parent Entities, Holdings and the Borrower covenants and agrees with each Lender that, until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, each of the Parent Entities, Holdings and the Borrower shall not, and shall not permit any of the Subsidiaries to:

Section 6.01        Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)        Indebtedness existing or committed on the Closing Date (provided, that any such Indebtedness that is (x) not intercompany Indebtedness and (y) in excess of $1,000,000 shall be set forth on Schedule 6.01);

70

(b)        Indebtedness created hereunder and under the other Loan Documents;

(c)        Indebtedness of any Subsidiary pursuant to Hedging Agreements entered into for non-speculative purposes and in ordinary course of business;

(d)        Indebtedness in respect of self-insurance and Indebtedness and other obligations owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to the Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person, in each case in the ordinary course of business and consistent with past practice;

(e)        Indebtedness of the Borrower to Holdings or any Subsidiary and of any Subsidiary to Holdings, the Borrower or any other Subsidiary; provided, that (i) Indebtedness of any Subsidiary that is not a Subsidiary Loan Party owing to the Loan Parties incurred pursuant to this Section 6.01(e) shall be subject to Section 6.04 and (ii) Indebtedness owed by any Loan Party to any Subsidiary that is not a Loan Party incurred pursuant to this Section 6.01(e) shall be subordinated to the Obligations under this Agreement on subordination terms described in the intercompany note substantially in the form of Exhibit J hereto or on substantially identical subordination terms or other subordination terms reasonably satisfactory to the Administrative Agent and the Borrower;

(f)        Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees and similar obligations, in each case provided in the ordinary course of business and consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and consistent with past practice;

(g)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in each case incurred in the ordinary course of business or other cash management services incurred in the ordinary course of business and consistent with past practice;

(h)        Adequate Protection Claims;

(i)        Capitalized Lease Obligations, mortgage financings and other Indebtedness incurred by the Borrower or any Subsidiary prior to or within 270 days after the acquisition, lease, construction, installation, repair, replacement or improvement of the respective property (real or personal), equipment or other asset (whether through the direct purchase of property or the Equity Interest of any person owning such property) permitted under this Agreement in order to finance such acquisition, lease, construction, installation, repair, replacement or improvement, in each case, in accordance with the Approved Budget (subject to any Permitted Variance);

(j)        [reserved];

(k)        Indebtedness of the Borrower or any Subsidiary, in an aggregate principal amount outstanding that, immediately after giving effect to the incurrence of such Indebtedness and the use of proceeds thereof, together with the aggregate principal amount of any other Indebtedness outstanding pursuant to this Section 6.01(k), would not exceed $1,000,000;

(l)        [reserved];

71

(m)      Guarantees (i) by the Borrower or any Subsidiary Loan Party of any Indebtedness of the Borrower or any Subsidiary Loan Party permitted to be incurred under this Agreement, (ii) by the Borrower or any Subsidiary Loan Party of Indebtedness otherwise permitted hereunder of any Subsidiary that is not a Subsidiary Loan Party to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)), (iii) by any Subsidiary that is not a Subsidiary Loan Party of Indebtedness of another Subsidiary that is not a Subsidiary Loan Party, and (iv) by the Borrower of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties incurred for working capital purposes in the ordinary course of business and consistent with past practice on ordinary business terms so long as such Indebtedness is permitted to be incurred under Section 6.01 to the extent such Guarantees are permitted by Section 6.04 (other than Section 6.04(v)); provided, that Guarantees by the Borrower or any Subsidiary Loan Party under this Section 6.01(m) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to the Obligations to at least the same extent as such underlying Indebtedness is subordinated;

(n)      [reserved];

(o)      Indebtedness in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations and trade letters of credit (other than obligations in respect of other Indebtedness) in the ordinary course of business and consistent with past practice;

(p)      Guarantees by the Borrower or any Subsidiary of Indebtedness under customer financing lines of credit entered into in the ordinary course of business and consistent with past practice ;

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      [reserved];

(u)      Indebtedness incurred in the ordinary course of business and consistent with past practice  in respect of obligations of the Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; provided, that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and consistent with past practice and not in connection with the borrowing of money or any Hedging Agreements;

(v)      Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) or any Subsidiary incurred in the ordinary course of business and consistent with past practice;

(w)      [reserved];

(x)      obligations in respect of Cash Management Agreements;

(y)      [reserved];

(z)      [reserved];

WEIL:\98800863\14\67665.0003

(aa)     [reserved];

(bb)     [reserved];

(cc)     [reserved];

(dd)     [reserved];

(ee)     [reserved];

(ff)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take- or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and consistent with past practice;

(gg)     Indebtedness outstanding on the Petition Date in respect of the Prepetition Credit Agreement in an aggregate principal amount equal to $[510,000,000]; and

(hh)     all premium (if any, including tender premiums) expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (gg) above or refinancings thereof.

For purposes of determining compliance with this Section 6.01 or Section 6.02, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), accrued interest, defeasance costs and other costs and expenses incurred in connection with such refinancing.

Further, for purposes of determining compliance with this Section 6.01, Indebtedness need not be permitted solely by reference to one category of permitted Indebtedness (or any portion thereof) described in Sections 6.01(a) through (hh) but may be permitted in part under any combination thereof; provided, that the Indebtedness described in Section 6.01(gg) shall only be permitted pursuant to such Section 6.01(gg) and no other clause of this Section 6.01.

Section 6.02     Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person) of the Borrower or any Subsidiary at the time owned by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, "Permitted Liens"):

(a)     Liens on property or assets of the Borrower and the Subsidiaries existing on the Closing Date (or created following the Closing Date pursuant to agreements in existence on the Closing

73

Date (or refinancings thereof) requiring the creation of such Liens) and, to the extent securing Indebtedness in an aggregate principal amount in excess of $1,000,000, set forth on Schedule 6.02 and any modifications, replacements, renewals or extensions thereof; provided, that such Liens shall secure only those obligations that they secure on the Closing Date and shall not subsequently apply to any other property or assets of the Borrower or any Subsidiary other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien, and (B) proceeds and products thereof;

(b)    any Lien securing the DIP Obligations pursuant to the DIP Order;

(c)    Adequate Protection Liens;

(d)    Liens for Taxes, assessments or other governmental charges or levies not yet delinquent by more than 30 days or that are being contested in compliance with Section 5.03;

(e)    Liens imposed by law, such as landlord's (including for this purpose landlord's Liens created pursuant to the applicable lease), carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier's, construction or other like Liens, securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower or any Subsidiary shall have set aside on its books reserves in accordance with GAAP;

(f)    (i) pledges and deposits and other Liens made in the ordinary course of business and consistent with past practice in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance, employers' health tax and other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(g)    deposits and other Liens to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capitalized Lease Obligations), statutory obligations, surety, indemnity, warranty, release, appeal or similar bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business and consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and consistent with past practice;

(h)    zoning restrictions, easements, survey exceptions, trackage rights, leases (other than Capitalized Lease Obligations), licenses, special assessments, rights-of-way, covenants, conditions, servitudes, declarations, homeowners' associations and similar agreements and other restrictions (including minor defects and irregularities in title and similar encumbrances) on or with respect to the use of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and consistent with past practice and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary;

(i)    Liens securing Indebtedness permitted by Section 6.01(i); provided, that such Liens do not apply to any property or assets of the Borrower or any Subsidiary other than the property or assets acquired, leased, constructed, replaced, repaired or improved with such Indebtedness, and accessions and additions thereto, proceeds and products thereof, customary security deposits and related property;

74

provided, further, that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender (and its Affiliates);

(j)      [reserved];

(k)      Liens securing judgments that do not constitute an Event of Default;

(l)      Liens disclosed by the title insurance policies delivered on or subsequent to the Closing Date and any replacement, extension or renewal of any such Lien; provided, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal and any accessions and additions thereto or proceeds and products thereof and related property; provided, further, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

(m)      any interest or title of a lessor or sublessor under any leases or subleases entered into by the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice;

(n)      Liens that are contractual rights of set-off (and related pledges) (i) relating to the establishment of depository relations with banks and other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposits, sweep accounts, reserve accounts or similar accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and consistent with past practice of the Borrower or any Subsidiary, including with respect to credit card charge-backs and similar obligations, or (iii) relating to purchase orders and other agreements entered into with customers, suppliers or service providers of the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice;

(o)      Liens (i) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and consistent with past practice, (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and consistent with past practice and not for speculative purposes, (iv) in respect of Third Party Funds or (v) in favor of credit card companies pursuant to agreements therewith;

(p)      Liens securing obligations in respect of trade-related letters of credit, bankers' acceptances or similar obligations and completion guarantees permitted under Section 6.01(f), (k) or (o) and covering the property (or the documents of title in respect of such property) financed by such letters of credit, bankers' acceptances or similar obligations and completion guarantees and the proceeds and products thereof;

(q)      leases or subleases, licenses or sublicenses (including with respect to Intellectual Property) granted to others in the ordinary course of business and consistent with past practice not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole;

(r)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(s)      [reserved];

(t)      (i) Liens with respect to property or assets of any Subsidiary that is not a Loan Party securing obligations of a Subsidiary that is not a Loan Party permitted under Section 6.01 and (ii)

75

Liens with respect to property or assets of the applicable joint venture or the Equity Interests of such joint venture securing Indebtedness permitted under Section 6.01(bb);

(u)        any Lien created under the Loan Documents (as defined under the Prepetition Credit Agreement), including Liens created under the Security Documents (as defined under the Prepetition Credit Agreement) securing obligations in respect of Secured Hedge Agreements and Secured Cash Management Agreements (each as defined under the Prepetition Credit Agreement), existing as of the Closing Date;

(v)        the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business and consistent with past practice;

(w)        agreements to subordinate any interest of the Borrower or any Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any of its Subsidiaries pursuant to an agreement entered into in the ordinary course of business and consistent with past practice;

(x)        Liens arising from precautionary Uniform Commercial Code financing statements regarding operating leases or other obligations not constituting Indebtedness or purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or equivalent filings;

(y)        Liens on Equity Interests of, or loans to, joint ventures (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement or arrangement;

(z)        Liens on securities that are the subject of repurchase agreements constituting Permitted Investments under clause (c) of the definition thereof;

(aa)       [reserved];

(bb)       Liens securing insurance premiums financing arrangements; provided, that such Liens are limited to the applicable unearned insurance premiums;

(cc)       in the case of Real Property that constitutes a leasehold interest, any Lien to which the fee simple interest (or any superior leasehold interest) is subject;

(dd)       Liens securing Indebtedness or other obligation (i) of the Borrower or a Subsidiary in favor of the Borrower or any Subsidiary Loan Party and (ii) of any Subsidiary that is not Loan Party in favor of any Subsidiary that is not a Loan Party;

(ee)       [reserved];

(ff)       Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit, bank guarantee or bankers' acceptance issued or created for the account of the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice; provided, that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit, bank guarantee or banker's acceptance to the extent permitted under Section 6.01;

(gg)       [reserved];

(hh)       [reserved];

76

(ii)  [reserved];

(jj)  Liens arising out of conditional sale, title retention or similar arrangements for the sale or purchase of goods by the Borrower or any of the Subsidiaries in the ordinary course of business and consistent with past practice;

(kk)  [reserved];

(ll)  Liens with respect to property or assets of the Borrower or any Subsidiary securing obligations in an aggregate outstanding principal amount outstanding that, immediately after giving effect to the incurrence of such Liens, would not exceed $1,000,000;

(mm)  [reserved];

(nn)  Liens (i) on inventory held by and granted to a local distribution company in the ordinary course of business and consistent with past practice and (ii) in accounts purchased and collected by and granted to a local distribution company that has agreed to make payments to the Borrower or any of its Subsidiaries for such amounts in the ordinary course of business and consistent with past practice; and

(oo)  Liens on equipment of the Borrower or any Subsidiary granted in the ordinary course of business and consistent with past practice.

For purposes of determining compliance with this Section 6.02, Liens need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 6.02(a) through (oo) but may be permitted in part under any combination thereof; provided, that the Liens described in Section 6.02(u) shall only be permitted pursuant to Section 6.02(u) and no other clause of this Section 6.02. In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

Section 6.03    Sale and Lease-Back Transactions. Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.04    Investments, Loans and Advances. (i) Purchase or acquire (including pursuant to any merger with a person that is not a Wholly Owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of Indebtedness or other securities of any other person, (ii) make any loans or advances to or Guarantees of the Indebtedness of any other person or (iii) purchase or otherwise acquire, in one transaction or a series of related transactions, (x) all or substantially all of the property and assets or business of another person or (y) assets constituting a business unit, line of business or division of such person (each of the foregoing, an "Investment"), except:

(a)  [reserved];

(b)  (i) Investments by the Borrower or any Subsidiary in the Equity Interests of the Borrower or any Subsidiary (or any entity that will become a Subsidiary as a result of such Investment); (ii) intercompany loans from the Borrower or any Subsidiary to the Borrower or any Subsidiary; and (iii) Guarantees by the Borrower or any Subsidiary of Indebtedness otherwise permitted hereunder of the Borrower or any Subsidiary; provided, that as at any date of determination, the aggregate outstanding

77

amount (valued at the time of the making thereof, and without giving effect to any subsequent change in value) of (A) Investments made after the Closing Date by the Loan Parties pursuant to subclause (i) in Subsidiaries that are not Subsidiary Loan Parties, plus (B) outstanding intercompany loans made after the Closing Date by the Loan Parties to Subsidiaries that are not Subsidiary Loan Parties pursuant to subclause (ii), plus (C) outstanding Guarantees by the Loan Parties of Indebtedness after the Closing Date of Subsidiaries that are not Subsidiary Loan Parties pursuant to subclause (iii) shall not exceed $250,000 for any individual Investment or $500,000 for all Investments in the aggregate during the term of this Agreement (for the avoidance of doubt, these amounts will not be increased or replenished as a result of any payments or other transfers of assets from subsidiaries that are not Subsidiary Loan Parties to the Borrower or any Subsidiary Loan Party);

(c)    Permitted Investments and Investments that were Permitted Investments when made;

(d)    [reserved];

(e)    loans and advances to, or Guarantees of Indebtedness of, officers, directors, employees or consultants of the Borrower or any Subsidiary (i) in respect of payroll payments and expenses in the ordinary course of business and consistent with past practice and (ii) for business-related travel expenses, moving expenses and other similar expenses, in each case, incurred in the ordinary course of business and consistent with past practice;

(f)    accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and consistent with past practice and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business and consistent with past practice;

(g)    Hedging Agreements entered into for non-speculative purposes and in the ordinary course of business and consistent with past practice;

(h)    Investments existing on the Closing Date as set forth on Schedule 6.04;

(i)    Investments resulting from pledges and deposits under Sections 6.02(f), (g), (o), (r), (s), (ee) and (ll);

(j)    Investments by the Borrower or any Subsidiary, other than in Subsidiaries that are not Subsidiary Loan Parties, in an aggregate outstanding amount (valued at the time of the making thereof, and without giving effect to any subsequent change in value) not to exceed $1,000,000;

(k)    [reserved];

(l)    intercompany loans between Subsidiaries that are not Loan Parties and Guarantees by Subsidiaries that are not Loan Parties permitted by Section 6.01(m);

(m)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business and consistent with past practice or Investments acquired by the Borrower or a Subsidiary as a result of a foreclosure by the Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(n)     [reserved];

(o)     [reserved];

(p)     Guarantees by the Borrower or any Subsidiary of operating leases (other than Capitalized Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into by the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice;

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     Investments in the ordinary course of business and consistent with past practice consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers;

(u)     [reserved];

(v)     Guarantees permitted under Section 6.01 (except to the extent such Guarantee is expressly subject to this Section 6.04);

(w)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrower or such Subsidiary;

(x)     [reserved];

(y)     [reserved];

(z)     [reserved];

(aa)     to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property in each case in the ordinary course of business and consistent with past practice;

(bb)     [reserved];

(cc)     [reserved];

(dd)     [reserved];

(ee)     [reserved];

(ff)     [reserved];

(gg)     [reserved]; and

(hh)     Investments made in satisfaction of obligations under joint venture agreements existing on the Closing Date.

WEIL:\98800863\14\67665.0003

Any Investment in any person other than the Borrower or a Subsidiary Loan Party that is otherwise permitted by this Section 6.04 may be made through intermediate Investments in Subsidiaries that are not Loan Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above.

The amount of any Investment made other than in the form of cash or cash equivalents shall be the fair market value thereof, which shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such Investment or as of the date of the definitive agreement with respect to such Investment, and without giving effect to any subsequent change in value.

For purposes of determining compliance with this covenant, an Investment need not be permitted solely by reference to one category of permitted Investments (or any portion thereof) described in the above clauses but may be permitted in part under any combination thereof.

Notwithstanding anything herein to the contrary, the Loan Parties shall not, and shall not permit any of its Subsidiaries that are not Specified Foreign Subsidiaries to, (i) make any Investments (directly or indirectly) in any Specified Foreign Subsidiary, (ii) make any Investments in any Subsidiary for the purpose of benefitting (directly or indirectly) any Subsidiary's operations in France or Belgium, (iii) guarantee the obligations of any such Specified Foreign Subsidiary or (iv) sell, dispose of, assign or otherwise transfer any assets to a Specified Foreign Subsidiary.

Section 6.05    Mergers, Consolidations, Sales of Assets and Acquisitions.  Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or Dispose of (in one transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of related transactions) all of the assets of any other person or division or line of business of a person, except that this Section 6.05 shall not prohibit:

(a)    (i) the purchase and Disposition of inventory or the conversion of accounts receivable to notes receivable, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by the Borrower or any Subsidiary or, with respect to operating leases, otherwise for fair market value on market terms (as determined in good faith by the Borrower), (iii) the Disposition of surplus, obsolete, damaged or worn out equipment or other property by the Borrower or any Subsidiary in the ordinary course of business and consistent with past practice or determined in good faith by the Borrower to be no longer used or useful or necessary in the operation of the business of the Borrower or any Subsidiary, (iv) [reserved] or (v) the Disposition of Permitted Investments in the ordinary course of business and consistent with past practice;

(b)    the Disposition of assets as set forth on Schedule 6.05;

(c)    Dispositions to the Borrower or a Subsidiary (upon voluntary liquidation or otherwise); provided, that any Dispositions by a Loan Party to a Subsidiary that is not a Subsidiary Loan Party in reliance on this clause (c) shall be made in compliance with Section 6.04(b);

(d)    [reserved];

(e)    Investments permitted by Section 6.04, Permitted Liens and Restricted Payments permitted by Section 6.06;

80

(f)    Dispositions of defaulted receivables in the ordinary course of business and consistent with past practice and not as part of an accounts receivables financing transaction;

(g)    other Dispositions of assets for an aggregate consideration of less than $1,000,000; provided, that (x) the Net Proceeds thereof, if any, are applied in accordance with Section 2.11(b) to the extent required thereby and (y) such Dispositions shall be made for fair market value and at least 75% of the proceeds of such Disposition shall be cash or Permitted Investments;

(h)    Dispositions constituting the rejection or abandonment of any lease or contract in accordance with the U.S. Bankruptcy Code and any order of the Bankruptcy Court;

(i)    leases, assignments, licenses or subleases or sublicenses of any real or personal property in the ordinary course of business and consistent with past practice;

(j)    Dispositions of inventory or Dispositions or abandonment of Intellectual Property of the Borrower and its Subsidiaries determined in good faith by the management of the Borrower to be no longer useful or necessary in the operation of the business of the Borrower or any of the Subsidiaries;

(k)    Dispositions of the Equity Interests of, or all or any portion of the assets of, any Subsidiary of the Borrower located on the United Arab Emirates;

(l)    [reserved]; and

(m)    to the extent constituting a Disposition, any termination, settlement, extinguishment or unwinding of obligations in respect of any Hedging Agreement;

For purposes of this Agreement, the fair market value of any assets acquired, leased, exchanged, Disposed of, sold, conveyed or transferred by the Borrower or any Subsidiary shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such acquisition, lease, exchange, Disposition, sale, conveyance or transfer, as applicable, or as of the date of the definitive agreement with respect to such acquisition, lease, exchange, Disposition, sale, conveyance or transfer, as applicable. For the avoidance of doubt, no transactions shall be permitted under this Section 6.05 to the extent prohibited by the last paragraph of Section 6.04.

Section 6.06    Dividends and Distributions. Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of the Borrower's or Holdings' Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the person redeeming, purchasing, retiring or acquiring such shares) (all of the foregoing, "Restricted Payments"); provided, however, that:

(a)    Restricted Payments may be made to the Borrower or any Wholly Owned Subsidiary of the Borrower; and

(b)    Restricted Payments may be made in respect of (i) general corporate operating and overhead, legal, accounting and other professional fees and expenses of Holdings or any Parent Entity, (ii) [reserved], (iii) franchise and similar taxes and other fees and expenses in connection with the maintenance of Holdings' (or any Parent Entity's) existence and Holdings' (or any Parent Entity's) ownership of the

81

Borrower, (iv) payments permitted by <u>Section 6.07(b)</u> (other than <u>Section 6.07(b)(vii)</u>), (v) any taxable period for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar tax group for U.S. federal and/or applicable state, local or foreign tax purposes of which a direct or indirect parent of the Borrower is the common parent, or for which the Borrower is a disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state, local or foreign tax purposes, Restricted Payments may be made to Holdings (or the applicable Parent Entity) in an amount not to exceed the amount of any U.S. federal, state, local and/or foreign income taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid during such taxable year (including any U.S. federal income tax imposed on a direct or indirect parent of Borrower under Section 965 of the Code with respect to the Borrower and/or its Subsidiaries) had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate taxpayer or a stand-alone corporate group (without duplication, for the avoidance of doubt, of any amount of such taxes actually directly paid by the Borrower and/or any of its Subsidiaries to the relevant taxing authority, if any) and (vi) customary salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, officers, directors, employees and consultants of Holdings, in each case in order to permit Holdings to make such payments; <u>provided</u>, that (x) in the case of <u>subclauses (i)</u> and <u>(iii)</u>, the amount of such Restricted Payments shall not exceed the portion of any amounts referred to in such <u>subclauses (i)</u> and <u>(iii)</u> that are allocable to the Borrower and its Subsidiaries (y) no Restricted Payment shall be made pursuant to this clause (b) to, related to, or for the benefit of, directly or indirectly, the Fund, any Fund Affiliate and/or any of their counsel, advisors, employees, agents or Related Parties.

The amount of any Restricted Payment made other than in the form of cash or cash equivalents shall be the fair market value thereof, which shall be determined in good faith by the Borrower and may be determined either, at the option of the Borrower, at the time of such Restricted Payment or as of the date of the definitive agreement with respect to such Restricted Payment.

For purposes of determining compliance with this covenant, a Restricted Payment need not be permitted solely by reference to one category of permitted Restricted Payments (or any portion thereof) described in the above clauses but may be permitted in part under any combination thereof.

For the avoidance of doubt, no transactions shall be permitted under this Section 6.06 to the extent prohibited by the last paragraph of Section 6.04.

Section 6.07    <u>Transactions with Affiliates</u>.  (a) Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates (other than the Borrower, Holdings, and the Subsidiaries or any person that becomes a Subsidiary as a result of such transaction) in a transaction (or series of related transactions) involving aggregate consideration in excess of $250,000, unless such transaction is (i) otherwise permitted (or required) under this Agreement or (ii) upon terms that are substantially no less favorable, when taken as a whole, to the Borrower or such Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate, as determined by the Board of Directors (or equivalent governing body) of the Borrower or such Subsidiary in good faith.

(b)    The foregoing <u>clause (a)</u> shall not prohibit, to the extent otherwise permitted under this Agreement,

(i)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, equity purchase agreements, stock options and stock ownership plans approved by the Board of Directors of Holdings (or any Parent Entity) or of the Borrower,

82

(ii)     [reserved],

(iii)     transactions among the Borrower or any Subsidiary of the Borrower, in each case, in the ordinary course of business and consistent with past practice,

(iv)     the payment of fees, reasonable out-of-pocket costs and indemnities and employment and severance arrangements provided to, or on behalf of or for the benefit of, directors, officers, consultants and employees of Holdings, the Borrower and the Subsidiaries in the ordinary course of business and consistent with past practice,

(v)     [reserved]

(vi)     (A) any employment agreements entered into by the Borrower or any of the Subsidiaries in the ordinary course of business and consistent with past practice, (B) any subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors, and (C) any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto,

(vii)     Restricted Payments permitted under Section 6.06, including payments to Holdings, and Investments permitted under Section 6.04,

(viii)     [reserved],

(ix)     [reserved],

(x)     transactions for the purchase or sale of goods, equipment, products, parts and services (including property management and similar services) entered into in the ordinary course of business and consistent with past practice,

(xi)     [reserved],

(xii)     [reserved],

(xiii)     transactions with joint ventures for the purchase or sale of goods, equipment, products, parts and services entered into in the ordinary course of business and consistent with past practice,

(xiv)     [reserved],

(xv)     the issuance, sale or transfer of Equity Interests of the Borrower or any Subsidiary to Holdings and capital contributions by Holdings to the Borrower or any Subsidiary,

(xvi)     [reserved],

(xvii)     [reserved],

(xviii)     [reserved],

(xix)     [reserved], and

WEIL:\98800863\14\67665.0003

(xx)     transactions with customers, clients or suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and consistent with past practice otherwise in compliance with the terms of this Agreement that are fair to the Borrower or the Subsidiaries (in the good faith determination of the Borrower).

For the avoidance of doubt, no transactions shall be permitted under this Section 6.07 to the extent prohibited by the last paragraph of Section 6.04.

Section 6.08    <u>Business of the Borrower and the Subsidiaries</u>.  Notwithstanding any other provisions hereof, engage at any time to any material respect in any business or business activity substantially different from any business or business activity conducted by any of them on the Closing Date.

Section 6.09    <u>Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc</u>.

(a)     Amend or modify in any manner materially adverse to the Lenders (without the consent of the Required Lenders), or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders (without the consent of the Required Lenders)), the articles or certificate of incorporation, by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of the Borrower or any of the Subsidiary Loan Parties.

(b)     Make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, principal of or interest on any Indebtedness (other than the Loans), including, for the avoidance of doubt, the Indebtedness described in <u>Section 6.01(gg)</u> and other Prepetition Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any such Indebtedness, except for payments made in compliance with the DIP Order or the Approved Budget (including any Permitted Variance), including Adequate Protection Payments permitted by <u>Section 6.13</u> and payments in respect of leases made in compliance with the Approved Budget (including any Permitted Variance).

(c)     Amend or modify, or permit the amendment or modification of, any provision of any Material Indebtedness, or any agreement, document or instrument evidencing or relating thereto, other than amendments or modifications that are not materially adverse to the Lenders (without the consent of the Required Lenders) and that do not affect the subordination or payment provisions thereof (if any) in a manner adverse to the Lenders when taken as a whole (as determined in good faith by the Borrower.

(d)     Permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to the Borrower or any Subsidiary that is a direct or indirect parent of such Subsidiary or (ii) the granting of Liens by the Borrower or such Subsidiary that is a Loan Party pursuant to the DIP Order, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(A)     restrictions imposed by applicable law;

(B)     contractual encumbrances or restrictions in effect on the Closing Date as set forth on <u>Schedule 6.01</u> and <u>Schedule 6.02</u>;

(C)     [reserved];

84

(D)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures entered into in the ordinary course of business and consistent with past practice;

(E)    [reserved]

(F)    [reserved]

(G)    customary provisions contained in leases or licenses of Intellectual Property and other similar agreements entered into in the ordinary course of business and consistent with past practice;

(H)    customary provisions restricting subletting or assignment (including any change of control deemed an assignment) of any lease governing a leasehold interest;

(I)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business and consistent with past practice;

(J)    customary restrictions and conditions contained in any agreement relating to the sale, transfer, lease or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer, lease or other disposition;

(K)    customary restrictions and conditions contained in the document relating to any Lien, so long as (1) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien, and (2) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(L)    customary net worth provisions imposed by suppliers, customers or landlords of Real Property under contracts entered into in the ordinary course of business and consistent with past practice or customary restrictions on cash or other deposits or net worth arising in connection with any Liens permitted under Section 6.02 so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations under the Loan Documents;

(M)    [reserved];

(N)    restrictions in agreements representing Indebtedness permitted under Section 6.01 of a Subsidiary of the Borrower that is not a Subsidiary Loan Party and

(O)    restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business and consistent with past practice.

Section 6.10    Fiscal Year.  In the case of the Borrower, permit any change to its fiscal year without prior notice to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.11    Financial Covenants.

85

(a)    Commencing with the first full calendar week after the Petition Date, the Debtors shall maintain Domestic Liquidity of not less than $5,000,000 as of the last business day of each calendar week.

Section 6.12    Permitted Variance.  The Debtors shall not permit: (i) for the rolling four-week period ending on any Testing Date, the Debtors' Actual Disbursements (in the aggregate) to be more than 115% of the projected disbursements (in the aggregate) as set forth in the Approved Budgets with respect to such period; and (ii) for the rolling four-week period ending on any Testing Date, the Debtors' Actual Receipts (in the aggregate) to be less than 80% of the projected receipts (in the aggregate) as set forth in the Approved Budgets with respect to such period (the "Permitted Variances"; all references in the Loan Documents to "Approved Budget" shall mean the Approved Budget as it is subject to the Permitted Variances). For the avoidance of doubt, for purposes of  budget variance testing in accordance with this Section 6.12, (w) the amounts set forth in the Approved Budget under "Professional Fees", (x) the amounts set forth in the Approved Budget under "Debt Services", (y) adequate protection costs and (z) the amounts set forth in the Approved Budget under "Capital Expenditures – Growth" shall be excluded.

Section 6.13    Contracts.

(a)    [reserved].

(b)    Pay any individual payment in excess of $100,000 individually or that exceeds $200,000 in the aggregate for any vendor that arose prior to the Petition Date without the consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement).

(c)    Enter into any new material contract or amendments to any material contract with any customer or other vendor without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement).

(d)    Make any disbursements or enter into any new leases or purchase agreements or amend any leases or purchase agreements for growth capital expenditures without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement).

(e)    File with the Bankruptcy Court any motion to assume or reject an executory contract under section 365 of the U.S. Bankruptcy Code without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement).

Section 6.14    Insolvency Proceeding Claims. Incur, create, assume, suffer to exist or permit, or permit any Subsidiary to incur, create, assume, suffer to exist or permit, any other super priority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the DIP Order.

Section 6.15    Bankruptcy Actions.  Seek, consent to, or permit to exist, or permit any Subsidiary to seek, consent to or permit to exist, without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement), any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Order or the other Loan Documents or refrain from

taking any action that is required to be taken by the terms of the DIP Order or any of the other Loan Documents.

Notwithstanding anything to the contrary in this Agreement (including this Article VI), to the extent that any Specified Foreign Subsidiary is required (or the Borrower, in good faith on the advice of counsel, deems it necessary or advisable for such Specified Foreign Subsidiary) to take any action (or omit to take any action) in order to comply with any applicable law, ordinance, regulation, rule, order, judgment, decree or permit binding on such Specified Foreign Subsidiary or any of its assets in connection with any proceedings under any applicable Debtor Relief Law to which such Specified Foreign Subsidiary or any of its assets are subject, then such Specified Foreign Subsidiary shall be permitted to take (or omit to take) any such action and the taking (or omitting to take) any such action shall be permitted in all respects under this Agreement and shall not result in a Default or an Event of Default.

## ARTICLE VIA

### *TopCo and Holdings Negative Covenants*

Each of TopCo and Holdings hereby covenants and agrees with each Lender that, from and after the Closing Date and until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, it will not engage in any business or operating activities other than its ownership of all of the Equity Interests of, and the management of, the Borrower and, indirectly, the Subsidiaries of the Borrower and activities incidental thereto; provided, that, subject to the DIP Order, each of TopCo and Holdings may engage in those activities that are incidental to (a) the maintenance of its existence in compliance with applicable law, (b) legal, tax and accounting matters in connection with any of the foregoing or the following activities, (c) the entering into, and performing its obligations under this Agreement and the other Loan Documents to which it is a party, (d) the holding of any cash or property in the ordinary course of business consistent with past practice, (e) the compliance with applicable reporting and other obligations, under federal, state or other securities law, (f) the retention of (and the entry into, and exercise of rights and performance of obligations in respect of, contracts and agreements with) counsel, accountants and other advisors and consultants, (g) the performance of obligations under and compliance with its certificate of formation (or equivalent) and operating agreement (or equivalent governing document), or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit as a result of or in connection with the activities of the Borrower and its Subsidiaries, (h) the incurrence and payment of its operating and business expenses and any taxes for which it may be liable (including reimbursement to Affiliates for such expenses paid on its behalf), (i) the consummation of the Transactions, (j) solely in the case of TopCo, compliance with and performance of its obligations under any Indebtedness (including guarantees) of TopCo existing on the Petition Date, and (k) any other activities expressly contemplated by this Agreement, the DIP Order or any other order of the Bankruptcy Court to be engaged in by Holdings.

TopCo hereby covenants and agrees with each Lender that, from and after the Closing Date and until the Discharge of DIP Obligations has occurred, unless the Required Lenders shall otherwise consent in writing, upon request of the Borrower, it will make any cash or cash equivalents held at TopCo available to the Borrower for working capital and general corporate purposes of the Borrower and its Subsidiaries. TopCo shall not use any cash or cash equivalents, unless the Required Lenders shall otherwise consent in writing; provided that, TopCo may use cash and cash equivalents (i) in accordance with the previous sentence, (ii) to pay expenses necessary to maintain its existence and good standing in its jurisdiction of organization or (iii) as permitted in the immediately preceding paragraph.

Notwithstanding anything to the contrary herein and subject to the DIP Order, each of TopCo and Holdings will not (i) create, incur, assume or suffer to exist any Lien on the Equity Interest of the Borrower (other than Liens securing Indebtedness under the Loan Documents or arising solely by

87

operation of law), (ii) incur any Indebtedness or other liabilities (other than in respect of (x) its Guarantee of the Obligations pursuant to the Guarantee Agreement, and (y) the Indebtedness permitted by clauses (j) and (k) above) or (iii) own or acquire any assets, including, without limitation, Equity Interests of any person (other than (x) the Equity Interest of the Borrower or (y) cash or other property permitted by clause (d) above).

ARTICLE VII

*Events of Default*

Section 7.01    Events of Default.  In the case of the happening of any of the following events (each, an "Event of Default"):

(a)    any representation or warranty made or deemed made by the Borrower or any Subsidiary Loan Party herein or in any other Loan Document or any certificate or document (including any Variance Report) delivered pursuant hereto or thereto shall prove to have been false or misleading in any material respect when so made or deemed made;

(b)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan or in the payment of any Fees or any other amount (other than an amount referred to in clause (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)    default shall be made in the due observance or performance by the Borrower of any covenant, condition or agreement contained in, Section 5.01(a), 5.05(a), 5.08, 5.11, 5.12, 5.14, 5.15, 5.16, 5.17 or 5.18 or in Article VI;

(e)    default shall be made in the due observance or performance by Holdings of Article VIA or by the Borrower or any of the Subsidiary Loan Parties of any covenant, condition or agreement contained in any Loan Document, including the DIP Order (other than those specified in any other clauses of this Section 7.01) and such default shall continue unremedied for a period of five (5) days after notice thereof from the Administrative Agent to the Borrower;

(f)    (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; or (ii) the Borrower or any of the Subsidiaries shall fail to pay the principal of any Material Indebtedness at the stated final maturity thereof; provided, that this clause (f) shall not apply to any Prepetition Indebtedness to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Chapter 11 Cases;

(g)    there shall have occurred a Change in Control;

(h)    [reserved];

88

(i)      the failure by the Debtors to object to any administrative claim filed in the Chapter 11 Cases over $10,000,000, or the settlement by the Debtors of any claim in any amount over $500,000, without the prior written consent of the Required Lenders (which approval may be communicated via an email from each of the Lender Advisors) (which consent shall constitute authorization under this Agreement);

(j)      the failure by the Borrower or any Loan Party to pay one or more final post-petition judgments aggregating in excess of $2,500,000 (to the extent not covered by insurance), which post-petition judgments are not discharged or effectively waived or stayed for a period of 45 consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or any Subsidiary to enforce any such judgment;

(k)      (i) an ERISA Event shall have occurred, (ii) the PBGC shall institute proceedings (including giving notice of intent thereof) to terminate any Plan or Plans, or (iii) the Borrower or any Subsidiary or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is being terminated, within the meaning of Title IV of ERISA; and in each case in clauses (i) through (iii) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to have a Material Adverse Effect; or

(l)      (i) any Loan Document shall for any reason be asserted in writing by Holdings, the Borrower or any Subsidiary Loan Party not to be a legal, valid and binding obligation of any party thereto (other than in accordance with its terms), (ii) any security interest or Lien purported to be created by the DIP Order in a material portion of the Collateral shall cease to be, or shall be asserted in writing by the Borrower or any other Loan Party not to be (other than, in each case, in accordance with its terms), a valid and perfected security interest (perfected as or having the priority required by this Agreement or the DIP Order and subject to such limitations and restrictions as are set forth herein and therein) in the securities, assets or properties covered thereby, except to the extent that any such loss of perfection or priority results from the limitations of foreign laws, rules and regulations as they apply to pledges of Equity Interests of Foreign Subsidiaries or the application thereof and except to the extent that such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer, or (iii) a material portion of the Guarantees pursuant to the Guarantee Agreement by Holdings or the Subsidiary Loan Parties guaranteeing the Obligations shall cease to be in full force and effect (other than in accordance with the terms thereof), or shall be asserted in writing by Holdings or any Subsidiary Loan Party not to be in effect or not to be legal, valid and binding obligations (other than in accordance with the terms thereof);

(m)      the entry of an order by the Bankruptcy Court appointing, the filing of an application by any Debtor or any Debtor consenting to or supporting an application by any other Person, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under Section 1104 of the U.S. Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in Sections 1106(a)(3) and 1106(a)(4) of the U.S. Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(n)      other than circumstances whereby the Lenders are paid the Obligations in full, the consummation of a sale of all or substantially all of the Debtors' assets pursuant to a sale under Section 363 of the U.S. Bankruptcy Code, a confirmed plan of reorganization in the Chapter 11 Cases or otherwise or any Loan Party shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking any of the foregoing, in each case, without the prior written consent of the Required Lenders;

WEIL:\98800863\14\67665.0003

(o)     the creation or incurrence by the Debtors of any claim that is senior to or *pari passu* with the Adequate Protection Claims without the prior written consent of the Required Lenders;

(p)     the Debtors filing or supporting any motion, pleading, applications or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition Liens or the Prepetition Secured Claims or asserting or supporting any other cause of action against and/or with respect to any of the Prepetition Liens, the Prepetition Secured Claims or any of the Prepetition Secured Parties;

(q)     the conversion of any Chapter 11 Case of a Debtor from one under chapter 11 to one under chapter 7 of the U.S. Bankruptcy Code or any Debtor shall file a motion or other pleading or shall consent to or support a motion or other pleading filed by any other Person seeking the conversion of any Chapter 11 Case of a Debtor under Section 1112 of the U.S. Bankruptcy Code or otherwise;

(r)     the payment of or granting adequate protection (except for Adequate Protection Payments) that rank senior to or *pari passu* with the Adequate Protection Payments with respect to any Prepetition Indebtedness (other than as set forth in the DIP Order or any Approved Budget);

(s)     (i) the entry by the Bankruptcy Court of any order terminating the Debtors' exclusive periods to file a plan of reorganization or liquidation and solicit acceptances thereon under Section 1121 of the U.S. Bankruptcy Code or (ii) the expiration of any Loan Party's exclusive right to file a plan of reorganization or plan of liquidation;

(t)     the dismissal of any Chapter 11 Case which does not contain a provision for Discharge of DIP Obligations, or if any Debtor shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case which does not contain a provision for the Discharge of DIP Obligations;

(u)     the entry by the Bankruptcy Court of an order granting relief from or modifying the automatic stay of Section 362 of the U.S. Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral which has a value in excess of $250,000, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority which has a value in excess of $250,000;

(v)     the bringing of a motion or taking of any action in any Chapter 11 Case , or the entry by the Bankruptcy Court of any order in any Chapter 11 Case: (i) to obtain additional financing under Section 364(c) or (d) of the U.S. Bankruptcy Code not otherwise permitted pursuant to this Agreement or the DIP Order, as the case may be, except (x) as may be permitted by the Required Lenders and (y) to the extent that such new financing shall pay in full in cash the Obligations substantially concurrently with the incurrence thereof or (ii) except as provided in the DIP Order, to use cash collateral of the Agents or Lenders under Section 363(c) of the U.S. Bankruptcy Code without the prior written consent of the Required Lenders;

(w)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of any order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, granting any Lien that is *pari passu* or senior to the Liens on the Collateral securing the Obligations, other than Liens expressly permitted under this Agreement or the DIP Order;

(x)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking an order, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, amending, supplementing, staying, vacating or otherwise modifying any Loan Document, the DIP Order or

90

the Cash Management Order, in each case, in a manner that is adverse to the Lenders, in their capacities as such, without the prior written consent of the Required Lenders;

(y)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry by the Bankruptcy Court of an order in any Chapter 11 Case, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, avoiding or requiring repayment by any Lender of any portion of the payments made by any Debtor on account of the Obligations owing under this Agreement or the other Loan Documents;

(z)     the filing of a motion by any Debtor requesting, or the entry of any order by the Bankruptcy Court granting, any superpriority claim which is senior or *pari passu* with the Lenders' claims or with the claims of the Prepetition Lenders under the Prepetition Loan Documents;

(aa)     the filing of a motion or the taking of any action in any Chapter 11 Case by any Debtor seeking the entry of an order by the Bankruptcy Court, or the entry by the Bankruptcy Court of an order in any Chapter 11 Case, precluding the Administrative Agent or the Prepetition Administrative Agent to have the right to or be permitted to "credit bid";

(bb)     any attempt by any Loan Party to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Indebtedness;

(cc)     the filing by any Loan Party of any chapter 11 plan of reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure, that is not an Acceptable Plan without the prior written consent of the Required Lenders;

(dd)     (i) the filing by any of the Debtors of any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Obligations or the Obligations, and/or the liens securing the Prepetition Obligations or the Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Obligations, the Obligations, the liens securing the Prepetition Obligations, the lien securing the Obligations, the Prepetition Agents or the Administrative Agent (or if any Debtor files a pleading supporting any such motion, application or adversary proceeding commenced by any third party) or (ii) the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any Consenting Lender, the Prepetition Agents or the Administrative Agent with respect to any of the foregoing claims, causes of action or proceedings, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding;

(ee)     an order in the Chapter 11 Cases shall be entered (i) charging any of the Collateral under Section 506(c) of the U.S. Bankruptcy Code against the Administrative Agent and the Secured Parties or (ii) limiting the extension under Section 552(b) of the U.S. Bankruptcy Code of the Liens of the Prepetition Administrative Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date (or granting any other relief under section 552(b) of the U.S. Bankruptcy Code) or the commencement of other actions that is adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(ff)     any Material Adverse Effect shall have occurred; or

(gg)     to the extent the RSA has been executed, a material default thereunder by any of the Loan Parties shall have occurred and be continuing (with all applicable grace periods having expired);

then, and in every such event, and at any time thereafter during the continuance of such event, but subject to the terms and conditions of the DIP Order, the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times and upon written notice thereof by the Administrative Agent (which such notice shall be made to the Debtors, the Committee and the United States Trustee for Region 3 and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "Termination Declaration Date"): (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Lender Payments and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding and (iii) declare a restriction or termination of the Loan Parties' ability to use Cash Collateral.

In addition, five (5) Business Days following the Termination Declaration Date (such five (5) Business Day period, the "Remedies Notice Period"), absent the Debtors curing all such existing Events of Default during such Remedies Notice Period, the Agents, subject to other applicable conditions set forth in the DIP Order, may foreclose on all or any portion of the Collateral, collect accounts receivable and, subject to the Carve-Out, apply the proceeds thereof to the Obligations in accordance with Section 7.02, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law and the DIP Order.  During the Remedies Notice Period, the Debtors and any statutory committee shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred.

Section 7.02    Treatment of Certain Payments.  Subject to the Carve-Out, any amount received by the Administrative Agent or the Collateral Agent from any Loan Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement, in each case that is continuing, shall be applied as set forth in Section 2.18(f).

ARTICLE VIII

*The Agents*

Section 8.01    Appointment.  (a) Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, including as the Collateral Agent for such Lender and the other Secured Parties, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

(b)    In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together

92

with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent (and any Subagents appointed by the Collateral Agent pursuant to <u>Section 8.02</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof), or for exercising any rights or remedies thereunder at the direction of the Collateral Agent) shall be entitled to the benefits of this <u>Article VIII</u> (including, without limitation, <u>Section 8.07</u>) as though the Collateral Agent (and any such Subagents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

Section 8.02    <u>Delegation of Duties</u>. The Administrative Agent and the Collateral Agent may execute any of their respective duties under this Agreement and the other Loan Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof)) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care. Each Agent may also from time to time, when it deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "<u>Subagent</u>") with respect to all or any part of the Collateral; <u>provided</u>, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent or the Collateral Agent. Should any instrument in writing from the Borrower or any other Loan Party be required by any Subagent so appointed by an Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by such Agent. If any Subagent, or successor thereto, shall become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Subagent. No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Subagent that it selects with reasonable care.

Section 8.03    <u>Exculpatory Provisions</u>. None of the Agents, or their respective Affiliates or any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by any Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party. No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (b) no Agent shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by such Agent or any of its Affiliates in any capacity. The Agents shall be deemed not to have knowledge of any Default or Event of Default unless and until written notice describing such Default or Event of Default is given to the Administrative Agent by the Borrower or a Lender. No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this

93

Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the DIP Order, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 8.04    <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) or conversation believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to any Credit Event, that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received notice to the contrary from such Lender prior to such Credit Event.  Each Agent may consult with legal counsel (including counsel to Holdings or the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

Section 8.05    <u>Notice of Default</u>.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all or other Lenders); <u>provided</u>, that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06    <u>Non-Reliance on Agents and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based

94

on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, operations, property, financial and other condition and creditworthiness of, the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

Section 8.07    <u>Indemnification</u>.  The Lenders agree to indemnify each Agent (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), in the amount of its pro rata share (based on its aggregate outstanding Loans and unused Commitments hereunder), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u>, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The failure of any Lender to reimburse any Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent for such other Lender's ratable share of such amount.  The agreements in this <u>Section 8.07</u> shall survive the payment of the Loans and all other amounts payable hereunder.

Section 8.08    <u>Agent in Its Individual Capacity</u>.  Each Agent and its affiliates may make loans to, accept deposits from, and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

Section 8.09    <u>Successor Administrative Agent</u>.  The Administrative Agent may resign as Administrative Agent and Collateral Agent upon 10 days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent and Collateral Agent under this Agreement and the other Loan Documents, then the Borrower shall have the right, subject to the reasonable consent of the Required Lenders (so long as no Event of Default under <u>Section 7.01(b)</u> or <u>(c)</u> shall have occurred and be continuing, in which case the Required Lenders shall have the right), to appoint a successor which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent and Collateral Agent, and the term "Administrative Agent" shall mean such successor agent effective

upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective (except in the case of the Collateral Agent holding collateral security on behalf of such Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed), and the Lenders shall assume and perform all of the duties of the Administrative Agent and Collateral Agent hereunder until such time, if any, as the Borrower (or the Required Lenders) appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 8.09 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

Section 8.10    [Reserved].

Section 8.11    Collateral Matters. The Lenders and the other Secured Parties authorize the Collateral Agent to release any Collateral or Guarantors in accordance with Section 9.18 or if approved, authorized or ratified in accordance with Section 9.08.

Section 8.12    Right to Realize on Collateral and Enforce Guarantees. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, (i) the Administrative Agent (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent and any Subagents allowed in such judicial proceeding, and (B) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies with respect to the Collateral may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as

96

agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other Disposition.

Section 8.13    <u>Withholding Tax</u>.  To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Loan Party and without limiting the obligation of any applicable Loan Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, fines, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>Section 8.13</u>.

Section 8.14    <u>Certain ERISA Matters</u>.

(a)    Each Lender (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants, from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of subsections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE

97

84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless subclause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in subclause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants, from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent, the Arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.321) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(A)-(E),

(iii)    the person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies,

(iv)    the person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent, the Arrangers or any their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)    Each of the Administrative Agent and the Arrangers hereby informs the Lenders that each such person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such person has a financial interest in the transactions contemplated hereby in that such person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees,

98

letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 8.15    Erroneous Payments.

(a)    If the Administrative Agent notifies a Lender or other Secured Party, or any Person who has received funds on behalf of a Lender or other Secured Party (any such Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof) (provided, that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within 30 Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender or other Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error. If a Payment Recipient receives any payment, prepayment or repayment of principal, interest, fees, distribution or otherwise and does not receive a corresponding payment notice or payment advice, such payment, prepayment or repayment shall be presumed to be in error absent written confirmation from the Administrative Agent to the contrary.

(b)    Each Lender or other Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or other Secured Party under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender or other Secured Party from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(c)    For so long as an Erroneous Payment (or portion thereof) has not been returned by any Payment Recipient who received such Erroneous Payment (or portion thereof) (such unrecovered amount, an "Erroneous Payment Return Deficiency") to the Administrative Agent after demand therefor in accordance with immediately preceding clause (a), (i) the Administrative Agent may elect, in its sole discretion on written notice to such Lender or other Secured Party, that all rights and claims of such Lender or other Secured Party with respect to the Loans or other Obligations owed to such Person up to the amount of the corresponding Erroneous Payment Return Deficiency in respect of such Erroneous Payment (the "Corresponding Loan Amount") shall immediately vest in the Administrative Agent upon such election; after such election, the Administrative Agent (x) may reflect its ownership interest in Loans in a principal amount equal to the Corresponding Loan Amount in the Register, and (y) upon five (5) Business Days' written notice to such Lender or other Secured Party, may sell such Loan (or portion thereof) in respect of

99

the Corresponding Loan Amount, and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by such Lender or other Secured Party shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender or other Secured Party (and/or against any Payment Recipient that receives funds on its behalf), and (ii) each party hereto agrees that, except to the extent that the Administrative Agent has sold such Loan, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of such Lender or other Secured Party with respect to the Erroneous Payment Return Deficiency. For the avoidance of doubt, no vesting or sale pursuant to the foregoing clause (i) will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(d)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(e)     No Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(f)     Each party's obligations, agreements and waivers under this Section 8.15 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

(g)     Notwithstanding anything to the contrary herein or in any other Credit Document, no Loan Party nor any of their respective Affiliates shall have any obligations or liabilities directly or indirectly arising out of this Section 8.15 in respect of any Erroneous Payment (other than with respect to acknowledging and consenting to any assignment and/or subrogation rights referenced in Section 8.15(c), subject to any consent rights set forth in this Agreement and other than the Borrower's agreement to Section 8.15(d)) (it being understood that this clause (g) shall not limit any rights the Administrative Agent may have against any Loan Party under any provision of this Agreement or any other Credit Document other than this Section 8.15).

ARTICLE IX

*Miscellaneous*

Section 9.01     Notices; Communications.     (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.01(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by  electronic means as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to any Loan Party or the Administrative Agent, to the address, electronic mail address or telephone number specified for such person on Schedule 9.01; and

(ii)    if to any other Lender, to the address, electronic mail address or telephone number specified in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by them, underlined, that approval of such procedures may be limited to particular notices or communications.

(c)    Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices delivered through electronic communications to the extent provided in Section 9.01(b) above shall be effective as provided in such Section 9.01(b).

(d)    Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

(e)    Documents required to be delivered pursuant to Section 5.04 and/or Section 5.14 may be delivered electronically (including as set forth in Section 9.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 9.01, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender entitled to access thereto and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided, that the Borrower shall notify the Administrative Agent (by electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  Except for such certificates required by Section 5.04(c), the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

(f)    Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Administrative Agent, the Collateral Agent and the Lenders in the manner prescribed by the U.S. Bankruptcy Code any pleading or notice required to be given to the Administrative Agent, the Collateral Agent and the Lenders pursuant to the U.S. Bankruptcy Code.

Section 9.02    Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until the Discharge of DIP Obligations has occurred.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.15, 2.16, 2.17 and 9.05) shall survive the Discharge of DIP Obligations.

Section 9.03    Binding Effect.  This Agreement shall become effective when it shall have been executed by Holdings, the Borrower and the Administrative Agent and when the Administrative Agent

101

shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Borrower, the Administrative Agent and each Lender and their respective permitted successors and assigns.

Section 9.04    Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in clause (c) of this Section 9.04), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.  Any assignment that violates or does not comply with this Section 9.04 shall be *void ab initio*.

(b)    (i)    Subject to the conditions set forth in subclause (ii) below, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    the Borrower, which consent, with respect to the assignment of a Loan, will be deemed to have been given if the Borrower has not responded within three (3) Business Days after the delivery of any request for such consent; provided, that no consent of the Borrower shall be required (i) for an assignment of a Loan to a Lender, an Affiliate of a Lender, an Approved Fund, (ii) if an Event of Default has occurred and is continuing, any other person or in connection with the syndication of the DIP Facility contemplated by the DIP Orders; and

(B)    the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 or an integral multiple of $1,000,000 in excess thereof, unless each of the Borrower and the Administrative Agent otherwise consent; provided, that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds (with simultaneous assignments to or by two or more Related Funds shall be treated as one assignment), if any;

(B)    the parties to each assignment shall (1) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (2) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, in each case together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the reasonable discretion of the Administrative Agent);

102

(C)     the Assignee, if it shall not be a Lender, shall (x) deliver to the Administrative Agent an Administrative Questionnaire and any tax forms required to be delivered pursuant to Section 2.17 and (y) deliver to the Borrower a duly executed certificate, certifying that, as to itself and on and as of the date it becomes a Lender hereunder, the representations and warranties set forth in Section 9.21 are true and correct in all respects; and

(D)     the Assignee shall not be the Borrower or any of the Borrower's Affiliates or Subsidiaries.

For the purposes of this Section 9.04, "Approved Fund" shall mean any person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender. Notwithstanding the foregoing or anything to the contrary herein, no Lender shall be permitted to assign or transfer any portion of its rights and obligations under this Agreement to (A) any Ineligible Institution, (B) any Defaulting Lender or any of its Subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this clause (B), or (C) a natural person. Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any assignment made to an Ineligible Institution. Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default under Section 7.01(b) or (c) has occurred and is continuing.

(iii)     Subject to acceptance and recording thereof pursuant to subclause (v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.05 (subject to the limitations and requirements of those Sections)); provided, that an Assignee shall not be entitled to receive any greater payment pursuant to Section 2.17 than the applicable Assignor would have been entitled to receive had no such assignment occurred. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section 9.04 (except to the extent such participation is not permitted by such clause (d) of this Section 9.04, in which case such assignment or transfer shall be null and void).

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable

103

time and from time to time upon reasonable prior notice; provided, that no Lender shall, in such capacity, have access to, or be otherwise permitted to review any information in the Register other than information with respect to such Lender.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 9.04, if applicable, and any written consent to such assignment required by clause (b) of this Section 9.04 and any applicable Tax forms, the Administrative Agent shall accept such Assignment and Acceptance and promptly record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this subclause (v).

(c)     [Reserved].

(d)     (i)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations in Loans and Commitments to one or more banks or other entities other than (I) any Ineligible Institution (to the extent that the list of Ineligible Institutions has been made available to all Lenders; provided, that regardless of whether the list of Ineligible Institutions has been made available to all Lenders, no Lender may sell participations in Loans or Commitments to an Ineligible Institution without the consent of the Borrower if the list of Ineligible Institutions has been made available to such Lender), (II) the Borrower or any of the Borrower's Affiliates or Subsidiaries or (III) any Defaulting Lender or any of its Subsidiaries, or any person who, upon becoming a Lender hereunder, would constitute any of the foregoing persons described in this clause (III) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided, that (x) such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that both (1) requires the consent of each Lender directly affected thereby pursuant to clauses (i), (ii), (iii) or (vi) of the first proviso to Section 9.08(b) and (2) directly adversely affects such Participant (but, for the avoidance of doubt, not any waiver of any Default or Event of Default) and (y) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant.  Subject to clause (d)(iii) of this Section 9.04, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the limitations and requirements of those Sections and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 9.04.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender; provided, that such Participant shall be subject to Section 2.18(c) as though it were a Lender.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Participant or potential Participant is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any participation made to an Ineligible Institution.

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and

104

address of each Participant and the principal amounts and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and each party hereto shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. Without limitation of the requirements of this Section 9.04(d), no Lender shall have any obligation to disclose all or any portion of a Participant Register to any person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other Obligations under any Loan Document), except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other Obligation is in registered form for U.S. federal income tax purposes or is otherwise required by applicable law.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent, which consent shall state that it is being given pursuant to this Section 9.04(d)(iii); provided, that each potential Participant shall provide such information as is reasonably requested by the Borrower in order for the Borrower to determine whether to provide its consent.

(e)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank and in the case of any Lender that is an Approved Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender, including to any trustee for, or any other representative of, such holders, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(f)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in clause (e) above.

(g)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent.  Each of Holdings, the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto and each Loan Party for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(h)    Notwithstanding anything herein to the foregoing, in no event shall any assignments or participations be permitted to the Borrower or any of its Subsidiaries or Affiliates.

(i)    [reserved].

(j)    [reserved].

105

(k)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any other Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans; provided, that notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Section 9.05    Expenses; Indemnity.  (a) Subject to the DIP Order, the Borrower agrees to pay, whether accrued or incurred prior to, on, or after the Petition Date (i) all reasonable and documented out-of-pocket expenses (including Other Taxes) incurred by the Administrative Agent or the Collateral Agent in connection with the preparation of this Agreement and the other Loan Documents, or by the Administrative Agent, the Collateral Agent and the Lenders in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof, including the reasonable fees, charges and disbursements of the Lender Advisors and [●], counsel for the Administrative Agent and the Collateral Agent, and, if necessary, the reasonable fees, charges and disbursements of one local counsel per jurisdiction, and (ii) all reasonable and documented out-of-pocket expenses (including Other Taxes) incurred by the Agents or any Lender in connection with the enforcement of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made hereunder, including the fees, charges and disbursements of the Lender Advisors and, if necessary, a single local counsel in each appropriate jurisdiction for all such persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where such person affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel with the Borrower's prior written consent (not to be unreasonably withheld), of another firm of counsel for such affected person).

(b)    Subject to the DIP Order, the Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, each Lender and each of their respective Affiliates, successors and assignors, and each of their respective directors, officers, employees, agents, trustees, advisors and members (each such person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees, charges and disbursements (excluding the allocated costs of in house counsel and limited to not more than one counsel for all such Indemnitees, taken as a whole, and, if necessary, a single local counsel in each appropriate jurisdiction for all such Indemnitees, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel with the Borrower's prior written consent (not to be unreasonably withheld), of another firm of counsel for such affected Indemnitee)), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans, (iii) any violation of or liability under Environmental Laws by the Borrower or any Subsidiary, (iv) any actual or alleged presence, Release or threatened Release of or exposure to Hazardous Materials at, under, on, from or to any property owned, leased or operated by the Borrower or any Subsidiary or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether

106

or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrower or any of their subsidiaries or Affiliates; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties, (y) arose from a material breach of such Indemnitee's or any of its Related Parties' obligations under any Loan Document (as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (z) arose from any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of its Affiliates and is brought by an Indemnitee against another Indemnitee (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against any Agent in its capacity as such).  None of the Indemnitees (or any of their respective affiliates) shall be responsible or liable to the Fund, Holdings, the Borrower or any of their respective subsidiaries, Affiliates or stockholders or any other person or entity for any special, indirect, consequential or punitive damages, which may be alleged as a result of the Facility or the Transactions. The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  Subject to the DIP Order, all amounts due under this Section 9.05 shall be payable within 15 days after written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)      Except as expressly provided in Section 9.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.17, this Section 9.05 shall not apply to any Taxes (other than Taxes that represent losses, claims, damages, liabilities and related expenses resulting from a non-Tax claim), which shall be governed exclusively by Section 2.17 and, to the extent set forth therein, Section 2.15.

(d)      To the fullest extent permitted by applicable law, Holdings and the Borrower shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)      The agreements in this Section 9.05 shall survive the resignation of the Administrative Agent or the Collateral Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.

Section 9.06      Right of Set-off.  If an Event of Default shall have occurred and be continuing, subject to the DIP Order, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of Holdings, the Borrower or any Loan Party against any and all of the obligations of Holdings or the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured;

107

provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

Section 9.07    Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW AND, TO THE EXTENT APPLICABLE, THE U.S. BANKRUPTCY CODE.

Section 9.08    Waivers; Amendment.  (a) No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on Holdings, the Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders , and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each Loan Party party thereto and the Administrative Agent and consented to by the Required Lenders; provided, however, that no such agreement shall:

(i)    decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, any Loan without the prior written consent of each Lender directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification); provided, that any extension of the Maturity Date pursuant to Section 2.24 shall not constitute an extension of the final maturity of any Loan under this clause (i),

(ii)    increase or extend the Commitment of any Lender, or decrease any Lender Payments owed to any Lender without the prior written consent of such Lender (which, notwithstanding the foregoing, such consent of such Lender shall be the only consent required hereunder to make such modification); provided, that (x) waivers or modifications of conditions precedent, covenants, Defaults or Events of Default, mandatory prepayments or of a mandatory

108

reduction in the aggregate Commitments shall not constitute an increase or extension of the Commitments of any Lender for purposes of this clause (ii) and (y) any extension of the Maturity Date pursuant to Section 2.24 shall not constitute an extension of any Commitment of any Lender under this clause (ii),

(iii)    extend any date on which payment of interest on any Loan or any Lender Payment is due, without the prior written consent of each Lender directly adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification); provided that, any extension of the Maturity Date pursuant to Section 2.24 shall not constitute an extension of any date on which any payment is due for the purposes of this clause (iii),

(iv)    amend the provisions of Section 7.02 with respect to the pro rata application of payments required thereby in a manner that by its terms modifies the application of such payments required thereby to be on a less than pro rata basis, without the prior written consent of each Lender adversely affected thereby (which, notwithstanding the foregoing, such consent of such Lender directly adversely affected thereby shall be the only consent required hereunder to make such modification),

(v)    amend or modify the provisions of this Section 9.08 or the definition of the terms "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby, in each case except, for the avoidance of doubt, as otherwise provided in Section 9.08(e) (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Loans and Commitments are included on the Closing Date), and

(vi)    release all or substantially all of the Collateral or all or substantially all of the applicable Loan Parties from their respective Guarantees under the Guarantee Agreement, without the prior written consent of each Lender other than a Defaulting Lender,

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement, as applicable.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08 and any consent by any Lender pursuant to this Section 9.08 shall bind any Assignee of such Lender.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have the right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be affected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c)    [Reserved].

(d)    [Reserved].

109

(e)     Notwithstanding the foregoing, (A) technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent (but without the consent of any Lender) to the extent necessary to cure any ambiguity, omission, defect or inconsistency and (B) this Agreement may be amended to implement any Benchmark Replacement or any Conforming Changes or otherwise effectuate the terms of <u>Section 2.23</u>.

(f)     [Reserved].

(g)     [Reserved].

(h)     [Reserved].

(i)     [Reserved].

Section 9.09     <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "<u>Charges</u>"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate; <u>provided</u>, that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

Section 9.10     <u>Entire Agreement</u>.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11     <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.11</u>.

Section 9.12     <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13    Counterparts; Electronic Execution of Assignments and Certain Other Documents.

(a)    This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03.  Delivery of an executed counterpart to this Agreement by electronic transmission pursuant to procedures approved by the Administrative Agent shall be as effective as delivery of a manually signed original.

(b)    The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments, Borrowing Requests, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.14    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15    Jurisdiction; Consent to Service of Process.  (a) The Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, the Collateral Agent, any Lender, or any Affiliate of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court, and, if the Bankruptcy Court does not have, or abstains from jurisdiction, the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court and, if applicable, any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

111

(c)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party to this Agreement or any other Loan Document to serve process in any other manner permitted by law.

Section 9.16     Confidentiality.  Each of the Lenders, and each of the Agents agrees that it shall maintain in confidence any information relating to Holdings, any Parent Entity, the Borrower and any Subsidiary furnished to it by or on behalf of Holdings, any Parent Entity, the Borrower or any Subsidiary (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender or such Agent without violating this Section 9.16 or (c) was available to such Lender or such Agent from a third party having, to such person's knowledge, no obligations of confidentiality to Holdings, any Parent Entity, the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know and any numbering, administration or settlement service providers or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), except: (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (B) as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the Financial Industry Regulatory Authority, Inc., (C) to its parent companies, Affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.16), (D) in order to enforce its rights under any Loan Document in a legal proceeding, (E) to any pledgee under Section 9.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16) and (F) to the Bankruptcy Court in connection with the approval of the Transactions contemplated hereby; provided, that, in the case of clause (E), no information may be provided to any Ineligible Institution or person who is known to be acting for an Ineligible Institution, in each case, to the extent that the list of Ineligible Institutions has been made available to the disclosing Lender.

Section 9.17     Platform; Borrower Materials.  The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information (or, if Holdings is not at the time a public reporting company, material information of a type that would not reasonably be expected to be publicly available if Holdings was a public reporting company) with respect to Holdings, the Borrower or its Subsidiaries or any of their respective securities) (each, a "Public Lender"). The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as solely containing information that is either (A) publicly available information or (B) not material (although it may be sensitive and proprietary) with respect to Holdings, the Borrower or its Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (provided, however, that such Borrower Materials shall be treated as set forth in Section 9.16, to the extent such Borrower Materials constitute information subject to the terms thereof), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (iv) the Administrative Agent shall be entitled to treat any Borrower

112

Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

        Section 9.18      <u>Release of Liens and Guarantees</u>.

        (a)      The Lenders and the other Secured Parties hereby irrevocably agree that the Liens granted to the Collateral Agent by the Loan Parties on any Collateral shall be automatically released: (i) in full upon the occurrence of the Discharge of DIP Obligations as set forth in <u>Section 9.18(d)</u> below; (ii) upon the Disposition of such Collateral by any Loan Party to a person that is not (and is not required to become) a Loan Party in a transaction not prohibited by this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iii) to the extent that such Collateral comprises property leased to a Loan Party, upon termination or expiration of such lease (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry), (iv) if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such other percentage of the Lenders whose consent may be required in accordance with <u>Section 9.08</u>), (v) to the extent that the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with the Guarantee Agreement or <u>clause (b)</u> below (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry),  and (vi) subject to the DIP Order, as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent hereunder and under the DIP Order.  Any such release (other than pursuant to <u>clause (i)</u> above) shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Loan Documents.

        (b)      In addition, the Lenders and the other Secured Parties hereby irrevocably agree that (i) upon the Disposition of all of the Equity Interests of a Guarantor to another person pursuant to a Disposition not prohibited hereunder, which person is not an Affiliate of the Borrower, such Guarantor shall be automatically released from its Guarantees upon consummation of such Disposition and (ii) upon consummation of any other transaction not prohibited hereunder resulting in any Guarantor ceasing to exist or constitute a Subsidiary , the Administrative Agent shall release such Guarantor from its Guarantees concurrently with such transaction (and, in each case, the Administrative Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry).

        (c)      The Lenders and the other Secured Parties hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this <u>Section 9.18</u> and to return to Holdings or the Borrower all possessory collateral (including share certificates (if any)) held by it in respect of any Collateral so released, all without the further consent or joinder of any Lender or any other Secured Party.  Any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Guarantor shall no longer be deemed to be made.  In connection with any release hereunder, the Administrative Agent and the Collateral Agent shall promptly (and the Secured Parties hereby authorize the Administrative Agent and the Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Loan Document in respect of such Subsidiary, property or asset; <u>provided</u>, that the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower containing

113

such certifications as the Administrative Agent shall reasonably request and any such release shall be without recourse to or warranty by the Administrative Agent or Collateral Agent.

(d)    Notwithstanding anything to the contrary contained herein or any other Loan Document, upon the occurrence of the Discharge of DIP Obligations, all Liens granted to the Collateral Agent by the Loan Parties on any Collateral and all obligations of the Borrower and the other Loan Parties under any Loan Documents (other than such obligations that expressly survive the Discharge of DIP Obligations pursuant to the terms hereof) shall, in each case, be automatically released and, upon request of the Borrower, the Administrative Agent and/or the Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to evidence the release its security interest in all Collateral (including returning to Holdings or the Borrower all possessory collateral (including all share certificates (if any)) held by it in respect of any Collateral), and to evidence the release of all obligations under any Loan Document (other than such obligations that expressly survive the Discharge of DIP Obligations pursuant to the terms hereof), whether or not on the date of such release there may be any contingent indemnification obligations or expense reimburse claims not then due; provided, that the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower containing such certifications as the Administrative Agent shall reasonably request.  Any such release of obligations shall be deemed subject to the provision that such obligations shall be reinstated if after such release any portion of any payment in respect of the obligations guaranteed thereby shall be rescinded, avoided, or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.  The Borrower agrees to pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or the Collateral Agent (and their respective representatives) in connection with taking such actions to release security interest in all Collateral and all obligations under the Loan Documents as contemplated by this Section 9.18(d).

Section 9.19    Judgment Currency.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other person who may be entitled thereto under applicable law).

Section 9.20    USA PATRIOT Act Notice.  Each Lender that is subject to the USA PATRIOT Act and the Beneficial Ownership Regulation and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record

114

information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 9.21    Equitization and Lender Representations.

(a)    Notwithstanding anything to the foregoing in this Agreement or any Loan Document, subject to entry of a Final Order, if any New Investor (as defined below) makes a direct or indirect investment in Equity Interests of the Borrower (including through an investment in Equity Interests of any parent entity or any Affiliate or Subsidiary of the Borrower) (the "New Investment", and such investor, the "New Investor"), (i) each Lender must be provided written notice (the "Investor Notice") of the New Investment and (ii) the Borrower will offer the right to each Lender, to be exercised in its sole discretion, to convert all or a portion of its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor on the same terms as such New Investor, including at the same equity value implied by such New Investment (taking into account all fees, discounts and other economics provided to the New Investor in connection with such New Investment) (the "Equitization"), but including customary shareholder protections satisfactory to Lenders holding a majority of the Loans electing this option; provided, however, that, following receipt of any Investor Notice, any Lender who provides written notice to the Lender Advisors and the Borrower that it does not wish to be offered the right to convert its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor as described in this paragraph shall not be offered such right.

(b)    Each Lender represents and warrants as of the date hereof (or if later, as of the date such Lender becomes party to this Agreement) and as of consummation of the Equitization, as applicable, that (A) it is a sophisticated investor with respect to the transactions described in this Section 9.21 with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities (including as contemplated by this Section 9.21), and has made its own analysis and decision to enter into this Agreement and (B) (1) it is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act that is also an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act and (2) with respect to any securities that may be subscribed for by it pursuant to this Agreement, is not acquiring such securities with a view to a distribution in violation of applicable securities laws. Each Lender further represents and warrants that that it understands and is able to bear any economic risks associated with such securities that may be subscribed for pursuant to this Agreement (including the necessity of holding such securities for an indefinite period of time) and is able to afford a loss of its investment. Such Lender understands that any such securities may only be sold pursuant to a registration statement filed under the Securities Act of 1933, as amended (the "Securities Act") and any applicable state securities or "blue sky" laws, unless an exemption from such registration is available, and further understands that it is not currently contemplated that any such securities will be registered at the time of issuance. For the purposes of Rule 144 promulgated under the Securities Act as in effect as of the date hereof, the Borrower acknowledges that the holding period of any such securities may be tacked on to the holding period of the Equitization right and the Borrower agrees not to take a position contrary thereto.

Section 9.22    Agency of the Borrower for the Loan Parties.  Each of the other Loan Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Loan Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

Section 9.23    [Reserved].

115

Section 9.24    <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions</u>.  Solely to the extent any Lender that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.25    <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with

116

respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 9.25, the following terms have the following meanings:

"BHC Act Affiliate" of a party shall mean an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" shall mean any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 9.26    Incorporation of DIP Order.  Each of the Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders agrees that any reference contained herein to the DIP Order shall include all terms, conditions and provisions of such DIP Order and that the DIP Order is incorporated herein for all purposes.  To the extent there is any inconsistency between the terms of this Agreement (or any other Loan Document) and the terms of the DIP Order, the terms of the DIP Order shall govern.

Section 9.27    Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the U.S. Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Secured Parties and their respective permitted assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Loan Parties, the Agents and Secured Parties with respect to the transactions contemplated hereby and no Person (other than the Indemnitees) shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 9.28    Lender Consent to Credit Bid.  Each Lender hereby irrevocably (x) authorizes and directs the Collateral Agent to, in a manner determined by the Required Lenders and subject to the Collateral Agent's rights and protections (including requesting direction and indemnity), credit bid

117

all or any portion of the Obligations in connection with any "credit bid" and (y) in connection with any credit bid, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Required Lenders determine in order to consummate such credit bid (and each such Lender shall execute and deliver such documents as the Collateral Agent reasonably requests to evidence such assignment and delegation).  As used herein, "Qualified Purchaser" shall mean a Person (i) designated by the Required Lenders as a "Qualified Purchaser" in connection with any such credit bid, (ii) whose stock is owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such credit bid) and (iii) whose actions are controlled by the Required Lenders.

*[Signature Pages Follow]*

118

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

PHOENIX SERVICES TOPCO, LLC

By: _____
      Name:
      Title:

PHOENIX SERVICES PARENT, LLC

By: _____
      Name:
Title:

PHOENIX SERVICES HOLDINGS CORP.

By: _____
      Name:
      Title:

PHOENIX SERVICES INTERNATIONAL LLC

By: _____
      Name:
      Title:

[Signature Page to Credit Agreement]

WILMINGTON SAVINGS FUND SOCIETY, FSB

as Administrative Agent and Collateral Agent

By: _____
      Name:
      Title:

[Signature Page to Credit Agreement]

CREDIT SUISSE LOAN FUNDING LLC, as Lender

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

105727297.17

[Signature Page to Credit Agreement]