## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                              :
In re                                         :        Chapter 11
                                              :
PHOENIX SERVICES TOPCO LLC, et al.,           :        Case No. 22– 10906 (      )
                                              :
            Debtors.¹                         :        (Joint Administration Requested)
                                              :
-------------------------------------------------------- x
```

## DECLARATION OF JOHN SINGH
## IN SUPPORT OF MOTION OF DEBTORS FOR
## (I) AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING,
## (B) USE CASH COLLATERAL, (C) GRANT LIENS AND PROVIDE
## SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANT
## ADEQUATE PROTECTION, (E) MODIFY THE AUTOMATIC STAY, AND
## (F) SCHEDULE A FINAL HEARING AND (II) RELATED RELIEF

I, John Singh, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am above 18 years of age, and I am competent to testify.  I am a Partner in the Restructuring and Special Situations Group at PJT Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

2.      Having been retained in July 2022 to provide general restructuring and strategic advice, PJT is the proposed investment banker for Phoenix Services Topco LLC ("**Phoenix Topco**") and its affiliated debtors in the above-captioned chapter 11 cases

---

1       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable).  The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, PA 19087.

(the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the "**Debtors,**" and together with their non-Debtor foreign subsidiaries, "**Phoenix**," or the "**Company**").

3.      I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Liens and Provide Superpriority Administrative Expense Status, (D) Grant Adequate Protection, (E) Modify the Automatic Stay and (F) to Schedule a Final Hearing and (II) Related Relief* (the "**Motion**").[2]

4.      Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents, (iii) information provided to me by PJT employees working under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and/or (v) my opinion based upon my experience as a restructuring professional.  If called to testify, I could and would testify to each of the facts set forth herein on that basis.

## Qualifications and Professional Background

5.      As stated above, I am a Partner at PJT, where I specialize in advising distressed companies in recapitalization and restructuring situations.

6.      PJT was spun off from The Blackstone Group L.P. ("**Blackstone**") effective October 1, 2015.  Upon the consummation of the spin-off, Blackstone's Restructuring and Reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT.  PJT and its senior professionals have extensive

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Interim DIP Order attached as **Exhibit A** thereto.

experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.  PJT has approximately 850 employees located in New York, Houston, San Francisco, Los Angeles, Boston, Chicago, London, Hong Kong, Frankfurt, and Madrid.  PJT is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Securities Investor Protection Corporation and is regulated by the Financial Industry Regulatory Authority.

7.      I received a Bachelor of Science in Finance and Economics from New York University and a MBA from the Wharton School of the University of Pennsylvania.  I have approximately thirteen (13) years of investment banking and restructuring experience and three (3) years of experience as a fixed income analyst before that.  Prior to joining PJT, I was a Vice President in Blackstone's Restructuring & Reorganization Group.  Since joining Blackstone in 2009, and continuing at PJT, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees, governmental entities, and acquirers of distressed assets.  Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions.  In particular, I have been involved in numerous restructurings, including, among others: Automotores Gildemeister S.A.; Cecon ASA (re: Davie Shipyard); Bristow Group; Borden Dairy Company; CHC Helicopter; Desarrolladora Homex, S.A.B.  de C.V.; Financial Guaranty Insurance Company; Fusion Connect, Inc.; High Ridge Brands Co.; Homer City Generation; Houston Astros; Inversiones Alsacia S.A.; Kerzner International; MBIA, Inc.  (re: Bank of America); M&G Chemicals S.A.; Mortgage Guaranty Insurance Corporation; Nortel Networks Corporation; Pacific Exploration & Production Corporation; Pension Benefit Guaranty Corporation (re: Smurfit Stone); PES Holdings, LLC;

Pierre Foods, Inc.; PHI, Inc.; Ruby Pipeline, L.L.C.; Simmons Bedding Company; Syncreon; Twin River; and Westinghouse Electric Company LLC.

**PJT's Retention**

8.     In early 2022, PJT was initially retained by Phoenix Services International LLC in connection with a potential capital raise and/or amendment of the Debtors' revolving credit facility.  Thereafter, on or around July 1, 2022, PJT was retained by Weil, Gotshal & Manges LLP ("**Weil**"), on behalf of the Debtors, to assist Weil in advising the Debtors in connection with the evaluation of alternatives with respect to their capital structure and a potential bankruptcy.  Since that time, members of my team and I have worked closely with the Debtors' management and other professionals to be retained by the Debtors in the Chapter 11 Cases in the analysis of the Debtors' business affairs, assets, financial position, contractual arrangements, and various proposed strategic transactions.  Pursuant to this work, my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

9.     In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives, restructuring options, and financings.  I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions, including comparing iterations of debtor-in-possession financing proposals.  Additionally, I have participated in numerous meetings with the Company's board of managers (the "**Board**") and its special committee (the "**Special Committee**") in order to, among other things, address the Debtors' need for, and access to, the proposed debtor-in-possession superpriority financing facility (the "**DIP Financing**," and such facility, the "**DIP Facility**," and the lenders thereunder, the "**DIP Lenders**").

10.     I am not being compensated specifically for this testimony other than through payments received by PJT as a professional proposed to be retained by the Debtors.[3]

### Debtors' Capital Structure and Immediate
### Need for DIP Financing and Use of Cash Collateral

11.     The Debtors' prepetition capital structure is detailed in the *Declaration of Robert Richard in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**Richard Declaration**").  The following table provides a summary of the Debtors' prepetition funded debt, which consists of a first-lien revolving credit facility (the "**First Lien Revolving Facility**"), a first-lien term loan facility (the "**First Lien Term Loan**" and, the claims arising therefrom and from the First Lien Revolving Facility, the "**First Lien Claims**"), and capital leases.

|  | Outstanding Principal Amount |
|---|---|
| First Lien Revolving Credit Facility | $65.00 million |
| First Lien Term Loan | $445.24 million |
| **Total First Lien Debt** | **$510.24 million** |
| Capital Leases | $76.80 million |
| **Total Funded Debt** | **$587.04 million** |

12.     As stated in the Richard Declaration, recent headwinds have rendered the Debtors' current customer contract portfolio unsustainable.  Among other things, inflationary pressures and rising fuel costs, coupled with suboptimal contract terms, have resulted in unprofitable contracts. The Debtors have also faced a variety of discrete operational challenges at customer sites, such as equipment failures and management turnover.  The contracts and operational challenges, in turn, have placed a significant strain on the Debtors' liquidity, which

---

[3]     Pursuant to PJT's engagement letter entered into with the Debtors, and subject to approval of this Court, PJT will be entitled to receive a capital raising fee in respect of the DIP Facility equal to 0.75% x $50 million or $375,000.

has been further weakened by capital lease payments, rising interest rates, and increased capital expenditures.

13.     The Debtors' current balance sheet is not sustainable over the long term. The Debtors have approximately $587 million in aggregate funded debt, a portion of which will mature as early as next year.  The costs of such debt service has impacted the Debtors' ability to access capital to invest in growth initiatives, improve performance, and continue to fund operations due to unprofitable contracts.

14.     In the months leading up to the Petition Date, guided by a new management team, the Company and the Advisors worked diligently to address both its operational and liquidity challenges.  As provided in the Richard Declaration, on the operational front, the Company has been working to address issues at customer sites and has implemented new systems to improve equipment maintenance practices and improved quality control to prevent pursuing contracts with poor economics.

15.     The Company has likewise undertaken various measures to enhance liquidity.  In the months leading up to the chapter 11 filing, the Company (i) liquidated certain in-the-money positions (*e.g.*, unwinding certain FX Swap positions); (ii) adjusted the debt service requirement pursuant to the First Lien Credit Agreement Obligations by electing quarterly, instead of monthly, interest payments; (iii) fully drew down the First Lien Revolving Facility; and (iv) stretched working capital.

16.     In the months leading up to the Petition Date, the Company and its advisors also explored various financing alternatives, including:  (i) capital lease financings in South Africa and Finland to support capex spending; (ii) a sale-leaseback transaction with one of the Company's existing equipment lessors; and (iii) an accounts receivable securitization facility process, which

included outreach to fifteen (15) potential financing parties, one of which entered into an exclusivity arrangement with the Company.  None of these alternatives were successful, in part due to the Company's current credit profile.

17.     Concurrently with such efforts, the Debtors and their advisors, including PJT, began to analyze the Debtors' financing alternatives in order to ensure that the Debtors would have sufficient liquidity to operate their business during the pendency of these Chapter 11 Cases. PJT worked with the Debtors' management team and AlixPartners LLP ("**AlixPartners**"), the Debtors' proposed financial advisor, to analyze the Debtors' cash flows and to determine whether financing might be reasonably required and, if so, the amount and type of financing that would be appropriate to operate their businesses during a chapter 11 process.  I understand, based on analysis performed by the Debtors and AlixPartners, that the Debtors concluded that they would require debtor-in-possession financing to finance their operations, re-negotiate burdensome and uneconomical customer contracts, and maintain a sufficient liquidity cushion during the pendency of these Chapter 11 Cases.

18.     Accordingly, to fund these Chapter 11 Cases and, by extension, to continue the Debtors' restructuring efforts, PJT has undertaken a process to assist the Debtors in obtaining debtor-in-possession financing on the best terms available to the Debtors under the circumstances.

### Debtors' Efforts to Obtain Postpetition Financing

19.     PJT, AlixPartners, and the Debtors undertook an analysis of how much postpetition financing would be required to operate the Debtors' business, pay administrative costs during the chapter 11 process, and capitalize the restructured Company.  Based on this analysis, the Debtors ultimately determined that they would require incremental liquidity of approximately $50 million to operate smoothly postpetition, satisfy all administrative costs and expenses, and

remain adequately capitalized upon emergence. PJT relied on these projections in its conversations with potential financing providers.

20.    As described in the Richard Declaration, the Debtors entered into restructuring negotiations with the ad hoc committee of lenders' (collectively, the "**Ad Hoc Committee**"). Following significant engagement with the Ad Hoc Committee, the Ad Hoc Committee indicated that it would be willing to provide the Debtors with access to a postpetition term loan financing facility on a priming senior secured basis.

21.    In consultation with the Debtors and their advisors, PJT developed a list of parties that potentially would be interested in providing the DIP Financing to create a competitive environment and potentially alternative source for raising the necessary capital on the best terms available in the market. Since substantially all of the Debtors' assets are encumbered and subject to validly perfected first priority liens, according to PJT's understanding, PJT's strategy to obtain the best source of financing from the market was reflective of the practical realities of the Debtors' existing capital structure. In other words, PJT evaluated: (a) engaging in a priming dispute with the Prepetition First Lien Secured Parties whose liens would be primed and (b) locating a thirdparty postpetition lender willing to provide debtor-in-possession financing on a non-consensual junior basis.

22.    Given the facts and circumstances of the Debtors' situation, my team and I contacted parties PJT believed, in our experience and judgment, were most likely to fund a postpetition financing facility. I, and others on my team under my supervision, solicited interest from 18 financial institutions to determine the extent to which third parties would be willing to provide postpetition financing to the Debtors. In its solicitation, PJT provided potential lenders an overview of the situation and described the financing opportunity.

23.     I believe that there are no alternative sources of financing currently available to the Debtors on both better and executable terms than those being provided by the DIP Facility.  No party that PJT communicated with as part of the marketing process and no other party that PJT is aware of was interested in providing and willing to provide postpetition financing to the Debtors.

24.     I understand that the proposed DIP Facility is necessary for the Debtors to meet critical going concern funding requirements, including, but not limited to, funding the Debtors' next payroll cycle on September 28, 2022.  I also understand that the DIP Facility serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with a clear source of financing during the pendency of the Chapter 11 Cases.

25.     Accordingly, I believe that the DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best—and in fact only—currently available option.

**DIP Negotiations and Terms**

26.     The Debtors engaged in negotiations with the DIP Lenders and, in many cases, received concessions from the DIP Lenders.  Over the course of several weeks, the Debtors, the DIP Lenders, and their respective legal and financial advisors negotiated the terms and provisions of the DIP Facility, exchanging several term sheets and mark-ups and participating in numerous calls and virtual negotiations.  Throughout the negotiation process, the Debtors' restructuring professionals held numerous calls and briefings with the Debtors' management team, the board of Phoenix Topco (the "**Board**"), and the Special Committee of the Board, each of which provided feedback and direction with respect to the terms of the DIP Financing.

27.     In my professional judgment, given the lack of alternatives and the arm's-length negotiations that took place between the Debtors and the DIP Lenders, the DIP Financing represents the best terms currently available to the Debtors given the facts and circumstances.  I believe that the proposed DIP Financing, taken as a whole, is reasonable, and in the best interests of the Debtors' estates, providing the Debtors with the financing required for these Chapter 11 Cases on the best terms available to the Debtors given the facts and circumstances.

28.     The proposed DIP Facility contemplates an interim draw of $25 million of new money upon approval of the DIP Financing on an interim basis and subsequent draws of up to $25 million of new money in aggregate upon satisfaction of certain milestones and conditions precedent on a final basis, reflecting DIP Financing in an aggregate principal amount of up to $50 million of new money.

29.     The DIP Facility also contemplates a roll-up (effective upon entry of the Interim Order) of up to $150 million of obligations outstanding under the First Lien Credit Agreement held by DIP Lenders and a proposed tag right (effective upon entry of the Final Order), whereby each DIP Lender can elect to convert its DIP loans to equity if a third party invests in the Debtors through equity or equity–linked securities on economically-similar terms.

30.     The DIP Financing bears interest at a rate of SOFR plus 12%, (x) with respect to the new money, of which SOFR + 2% is payable in cash and the remainder is payable in kind and (y) with respect to the roll-up loans, all of which is payable in kind.  Various fees and premiums are payable, including (i) on the new money provided, (I) 5% upfront fee (payable in kind), (II) 5% backstop fee (payable in kind) to backstop lenders, and (III) 3% exit fee, (ii) on all then outstanding loans, 1% extension fee on each one-month maturity extension (payable in kind, with four extensions available), and (iii) certain agency and other administrative fees.

31.     The proposed DIP Facility contains severable favorable terms and conditions to the Debtors.  Specifically, the proposed DIP Facility:

    a.   is being funded by a group of the Debtors' prepetition secured lenders who have a vested interest in the success of the Chapter 11 Cases;

    b.   is structured almost entirely as PIK interest designed to alleviate the Debtors' debt service obligations;

    c.   is structured to be available to all Prepetition First Lien Secured Parties on a *pro rata* basis (*i.e.*, contains no holdback provisions);

    d.   provides sufficient liquidity to the Debtors and avoids any funding requirements from non-Debtor foreign affiliates during the Chapter 11 Cases, allowing the non-Debtors to focus on sustaining their own operations;

    e.   provides access of up to $50 million of incremental liquidity if the Debtors are able to meet certain milestones;

    f.   provides milestones that support the Debtors' customer contract re-negotiation strategy; and

    g.   provides four (4) one-month maturity extensions beyond the original six-month maturity by a vote of the Required Lenders, thereby providing the Debtors with more time on a postpetition basis to maximize the value of their estates.

32.     In my professional opinion, this fee structure, the applicable interest rates, and other key terms of the proposed DIP Facility taken as a whole are on the higher end but within

RLF1 27987008V.1

the range of comparable DIP financing transactions and are reasonable given the facts and circumstances of the Chapter 11 Cases.

## **<u>Need for DIP Financing</u>**

33.    The Debtors require immediate access to the proceeds of the DIP Financing to ensure, among other things, (a) sufficient working capital to operate their business and to administer their estates, (b) the ability to timely pay administrative expenses incurred during these Chapter 11 Cases, and (c) operate as a going concern to avoid immediate and irreparable harm to the Debtors' estates.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 27th day of September, 2022

Respectfully submitted,

By:    */s/  John Singh*
         John Singh
         Partner
         PJT Partners LP