**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                    :

In re                           :         **Chapter 11**

                    :

**PHOENIX SERVICES TOPCO LLC,** *et al.,*  :        **Case No. 22–10906 (MFW)**

                    :

        **Debtors.**[1]        :         **(Jointly Administered)**

                    :

---------------------------------------------------------------- x    **Re: Docket Nos. 14 & 73**

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") in the above captioned chapter 11 cases (collectively, the "<u>Cases</u>"),

pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code (as

amended, the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1(b), 4001-2, 9006-1, and

9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "<u>Local Rules</u>"), seeking entry of this final order (this "<u>Final</u>

<u>Order</u>"):

        (i)     authorizing Phoenix Services International LLC, in its capacity as
borrower (the "<u>DIP Borrower</u>"), to obtain postpetition financing, and for each of the other

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Phoenix Services Topco, LLC (4517); Phoenix Services Parent, LLC (8023); Phoenix Services Holdings Corp. (1330); Phoenix Services International LLC (4693); Metal Services LLC (8793); Terracentric Materials LLC (0673); Cool Springs LLC (8687); Metal Services Investment LLC (2924); and Phoenix Receivables, LLC (not applicable).  The Debtors' mailing address is 4 Radnor Corporate Center, Suite 520, 100 Matsonford Road, Radnor, PA 19087.

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the DIP Credit Agreement (as defined herein).

Debtors to guarantee unconditionally (the Debtors, other than the DIP Borrower,  the "DIP Guarantors") on a joint and several basis, the DIP Borrower's obligations in connection with a superpriority senior secured multiple draw term loan credit facility (the "DIP Facility") in the aggregate principal amount of $200,000,000 (the "DIP Loans"), consisting of:

(a)    New Money Loans. A superpriority senior secured multiple draw term loan credit facility in the principal amount of $50,000,000 (the "New Money Commitments" and the term loans made thereunder, the "New Money Loans"), which New Money Loans were fully funded in accordance with the terms and conditions set forth in the DIP Credit Agreement (as defined below) and all other terms and conditions of the DIP Documents;

(b)    Roll-Up Loans.  A superpriority term loan facility in the principal amount of up to $150,000,000 (the "Roll-Up Loans"), of which (x) $75,000,000 was deemed funded in accordance with clause (i) below on the date of the Interim Order and (y) up to an additional $75,000,000 will be deemed funded in accordance with clause (ii) below, and an equal amount of First Lien Loans (as defined below) was, or will be, deemed converted into and exchanged for, such Roll-Up Loans, in each case, at the times, and in accordance with the terms and conditions, set forth in the DIP Credit Agreement and the other DIP Documents and as set forth below.

(i)    On the date of the Interim Order, concurrently with the making of the New Money Loans as described in clause (a) above, $75,000,000 in aggregate principal amount of First Lien Loans were deemed converted into and exchanged for Roll-Up Loans (the First Lien Loans rolled-up pursuant to this clause (b), the "Rolled-Up First Lien Loans" and, the First Lien Loans that are not Rolled-Up First Lien Loans, the "Remaining First Lien Loans"), and $75,000,000 of Roll-Up Loans were deemed funded on the date of the Interim Order, without constituting a novation, which deemed funding satisfied and discharged $75,000,000 in aggregate principal amount of Rolled-Up First Lien Loans.  The Roll-Up Loans deemed funded on the date of the Interim Order were deemed to be made by each Backstop Party (as defined in the DIP Credit Agreement) (or an investment advisor, manager, or beneficial owner for the account of a Backstop Party, or an affiliated fund or trade counterparty designated by such Backstop Party) (such initial lender holding such Roll-Up Loans, the "Closing Date Roll-Up Lenders") in an amount equal to the lesser of (x) the aggregate principal amount of the First Lien Loans owing to the applicable Closing Date Roll-Up Lenders on the date of the Interim Order and (y) an amount equal to (I) $75,000,000 multiplied by (II) the quotient of the amount set forth next to each Backstop Party's name on Schedule 2.12(b) of the DIP

2

Credit Agreement <u>divided by</u> the sum of all amounts set forth on Schedule 2.12(b) of the DIP Credit Agreement.

(ii)    On each Withdrawal Date (as defined in the DIP Credit Agreement), concurrently with and automatically upon the withdrawal from the Loan Proceeds Account (as defined in the DIP Credit Agreement) and disbursement of New Money Loans to the DIP Borrower on such Withdrawal Date (the aggregate amount of New Money Loans funded by any DIP Lender  and so withdrawn and disbursed on any such Withdrawal Date, such DIP Lender's "<u>Withdrawn Amount</u>"), each DIP Lender (or an investment advisor, manager, or beneficial owner for the account of such DIP Lender, or an affiliated fund or trade counterparty designated by such DIP Lender) (collectively, the "<u>Additional Roll-Up Lenders</u>") shall be deemed to have (x) converted and exchanged an aggregate principal amount of Remaining First Lien Loans equal to the lesser of (I) such Additional Roll-Up Lender's Remaining First Lien Loans on such date and (II) three times its Withdrawn Amount on such Withdrawal Date (such lesser amount, such DIP Lender's "<u>Roll-Up Amount</u>") for Roll-Up Loans and (y) funded an amount of Roll-Up Loans equal to its Roll-Up Amount on such Withdrawal Date, without constituting a novation, and satisfied and discharged an aggregate principal amount of its Rolled-Up First Lien Loans equal to its Roll-Up Amount.

(iii)    On the terms set forth in the Syndication Procedures, upon completion of the Syndication (as defined in the DIP Credit Agreement) (1) each DIP Lender holding Roll-Up Loans on such date ("<u>Existing Roll-Up Lender</u>") shall be deemed to have assigned a portion of its Roll-Up Loans ratably to each other DIP Lender on such date (each such DIP Lender, a "<u>Syndicate Lender</u>"), and each Syndicate Lender shall be deemed to have ratably assumed an amount of Roll-Up Loans from each Existing Roll-Up Lender and (2) each Syndicate Lender on such date shall be deemed to have assigned a portion of its Remaining First Lien Loans to each Existing Roll-Up Lender and each Existing Roll-Up Lender shall be deemed to have assumed a portion of such Remaining First Lien Loans from each Syndicate Lender such that each DIP Lender (including both Existing Roll-Up Lenders and Syndicate Lenders) will hold the amount of Roll-Up Loans as set forth set forth on Schedule 2.05 of the DIP Credit Agreement and the Remaining First Lien Loans will be reallocated and assigned accordingly.

(ii)    authorizing the DIP Borrower and the DIP Guarantors to (a) enter into and perform under that certain Senior Secured Super-Priority Term Loan Debtor-In-Possession Credit Agreement dated as of September 29, 2022, among the DIP

3

Borrower, the lenders party thereto (collectively in such capacities, the "DIP Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent, and collateral agent (in such capacities, the "DIP Agent," and, together with the DIP Lenders, the "DIP Secured Parties") (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "DIP Credit Agreement") and the other DIP Documents (as defined below) and (b) enter into and perform under that certain Escrow Agreement (the "Escrow Agreement"), dated as of September 29, 2022, among the DIP Borrower, the DIP Agent, and Bank of New York Mellon, as escrow agent (the "Escrow Agent"); and each of the foregoing, together with the Interim Order, this Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the DIP Borrower in connection with the DIP Facility and the Escrow Agreement), and other guarantee and security documentation, collectively, the "DIP Documents"), and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    authorizing the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), (x) solely in accordance with the Approved DIP Budget (subject to any Permitted Variance set forth herein and in the DIP Credit Agreement), (y) to effectuate the exchange of First Lien Loans for Roll-Up Loans in accordance with the DIP Credit Agreement and this Final Order, and (z) to provide working capital for, and for other general corporate purposes of, the Debtors and certain of the Debtors' subsidiaries, including for payment of any Adequate Protection Payments (as defined below);

(iv)    granting adequate protection to the Prepetition First Lien Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below);

(v)    granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and each Debtors' estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below) and (y) other valid, perfected and unavoidable liens, if any, existing as of the Petition Date that are senior to the liens or security interests of the Prepetition First Lien Secured Parties as of the Petition Date by operation of law, prepetition subordination or waiver agreements, or permitted by the Prepetition First Lien Loan Documents and liens that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "Prior Senior Liens");

(vi)    granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or

4

RLF1 28191414V.1

nature subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(vii)    waiving the Debtors' and the estates' right to surcharge against the Prepetition Collateral or DIP Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(viii)    providing that the "equities of the case" exception under Bankruptcy Code section 552(b) does not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable;

(ix)    pursuant to Bankruptcy Rule 4001, holding a final hearing (the "Final Hearing") on the Motion before this Court to consider entry of this Final Order, among other things, (1) authorizing the Debtors to, on a final basis, borrow from the DIP Lenders a principal amount of $200,000,000 in DIP Loans of which (I) $25,000,000 of New Money Loans were made available to the DIP Borrower upon entry of the Interim Order, (II) $25,000,000 of New Money Loans were funded into an escrow account on the date of the Interim Order and are available to be drawn by the DIP Borrower in accordance with the DIP Documents, (III) $75,000,000 of Roll-Up Loans were deemed funded and converted from and exchanged for First Lien Loans upon the entry of the Interim Order, and (IV) up to an additional $75,000,000 of Roll-Up Loans shall be deemed funded and converted from and exchanged for First Lien Loans upon the entry of, and in accordance with, this Final Order, (2) authorizing the DIP Guarantors to guaranty the DIP Obligations, (3) authorizing the Debtors' use of Prepetition Collateral (including Cash Collateral), (4) granting the adequate protection described in this Final Order, and (5) authorizing the Debtors to execute and deliver the DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(x)    granting related relief.

The interim hearing on the Motion having been held by this Court on September 28, 2022 (the "Interim Hearing"); and upon the record made by the Debtors at the Interim Hearing, including the Motion (Docket No. 14), the *Declaration of Robert Richard in Support of Debtors' Chapter 11 Petitions and First Day Relief* (Docket No. 13) (the "First Day Declaration"), the *Declaration of John Singh in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protections, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI)*

RLF1 28191414V.1

*Granting Related Relief* (Docket No. 15), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held on September 28, 2022; and this Court having entered, after the Interim Hearing, that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 73); and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the final relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion and the relief requested therein as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

RLF1 28191414V.1

A.      *Petition Date*.  On September 27, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware commencing these Cases.

B.      *Debtors in Possession*.   The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Court may enter a final order consistent with Article III of the United States Constitution.

D.      *Committee*.  On October 11, 2022, and as modified on October 18, 2022, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (the "Committee").

E.      *Debtors' Stipulations*.  Subject only to the rights of parties in interest specifically set forth in paragraph 11 of this Final Order (and subject to the limitations thereon contained in such paragraph or otherwise in this Final Order), the Debtors stipulate and agree that (collectively, paragraphs E(i) through (ii) below are referred to herein as the "Debtors' Stipulations"):

(i)      First Lien Loans.

(a)      The Prepetition First Lien Lenders (as defined below) provided loans (the "First Lien Loans") in a total aggregate principal amount outstanding as of the Petition Date of

7

$504,487,499.98, and issued letters of credit in an aggregate face amount outstanding as of the Petition Date of $5,429,307.75 (the "Prepetition L/Cs") pursuant to a letter of credit sub-facility, in each case, under that certain First Lien Credit Agreement dated as of March 1, 2018, by and among Phoenix Services Holdings Corp., a Delaware corporation ("Holdings"), the DIP Borrower (as successor by merger to Phoenix Services Merger Sub, LLC), each of the lenders and issuing banks from time to time party thereto (collectively, the "Prepetition First Lien Lenders"), and Barclays Bank PLC as administrative agent and collateral agent (in such capacities, the "Prepetition First Lien Administrative Agent", and together with the Prepetition First Lien Lenders and the other Secured Parties (as defined in the Prepetition Credit Agreement), the "Prepetition First Lien Secured Parties") (such credit agreement, as amended, restated, or otherwise modified from time to time, the "Prepetition Credit Agreement", and together with the other "Loan Documents" (as defined in the Prepetition Credit Agreement), the "Prepetition First Lien Loan Documents").

(b)    As of the Petition Date, the Prepetition Loan Party Debtors (as defined below) were jointly and severally indebted to the Prepetition First Lien Secured Parties pursuant to the Prepetition First Lien Loan Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $504,487,499.98 on account of First Lien Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accounts', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as

8

defined in the Prepetition Credit Agreement), in each case, owing under or in connection with the Prepetition First Lien Loan Documents (collectively, the "Prepetition First Lien Obligations").[4]

(ii)    *First Lien Loan Collateral*.   In connection with the Prepetition Credit Agreement, (x) certain Prepetition Loan Party Debtors entered into that certain Collateral Agreement (First Lien), dated as of March 1, 2018 (as amended, supplemented or otherwise modified from time to time, including by the Supplement No. 1 to the Collateral Agreement (First Lien), dated as of March 11, 2019, the "Subsidiary Collateral Agreement"), by and between the Borrower, the other Borrower subsidiaries party thereto, and the Prepetition First Lien Administrative Agent and (y) Holdings entered into that certain Holdings Guarantee and Pledge Agreement, dated as of March 1, 2018 (as amended, supplemented or otherwise modified from time to time, the "Holdings Guarantee and Pledge Agreement" and, together with the Subsidiary Collateral Agreement, the "Collateral Agreements"), by and between Holdings and the Prepetition First Lien Administrative Agent.  Pursuant to the Collateral Agreements and the other Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable first-priority security interests in and liens (the "First Lien Loan Liens") on the "Collateral" (the "Prepetition Collateral"), as such term is defined in the Prepetition Credit

---

[4]    For the avoidance of doubt, the term "Prepetition First Lien Obligations" also includes obligations arising under (a) that certain ISDA Master Agreement between Barclays Bank PLC ("Barclays") and Phoenix Services International LLC, dated as of April 4, 2018 (as amended, supplemented or modified, and together with all schedules, annexes and exhibits thereto, and all Confirmations exchanged pursuant to transactions entered into in connection therewith, the "Barclays Swap Agreement") and (b) that certain ISDA Master Agreement between Royal Bank of Canada ("RBC") and Phoenix Services International LLC, dated as of April 6, 2018 (as amended, supplemented or modified, and together with all schedules, annexes and exhibits thereto, and all Confirmations exchanged pursuant to transactions entered into in connection therewith, the "RBC Swap Agreement"), and RBC and Barclays are each Prepetition First Lien Lenders with respect to any obligations or transactions arising under the Barclays Swap Agreement or the RBC Swap Agreement, as applicable.  Subject to paragraph 11 of this Final Order, Barclays and RBC shall each hereby have an allowed secured claim against the applicable Debtors for all purposes on account of obligations arising under the Barclays Swap Agreement or the RBC Swap Agreement, as applicable, including, in each case to the extent payable under the Barclays Swap Agreement or the RBC Swap Agreement, legal fees, indemnities and disbursements and any other amounts or obligations due or owing in respect thereof.

9

Agreement, pursuant to the Prepetition Loan Documents. The Prepetition Collateral consists of substantially all of the assets of the Debtors that were Loan Parties (as defined in the Prepetition Credit Agreement) under the Prepetition First Lien Loan Documents (the "Prepetition Loan Party Debtors"), except as set forth in the Prepetition Credit Agreement.

(iii)    *Cash Collateral*.    Any and all of the Debtors' (other than as to Holdings, Phoenix Services Topco, LLC and Phoenix Services Parent, LLC) (the "Subsidiary Debtors") cash, including the Subsidiary Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Subsidiary Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or deposited into the Subsidiary Debtors' banking, checking, or other deposit accounts after the Petition Date (including by, from, or on account of Holdings), and the proceeds of any of the foregoing is the Prepetition First Lien Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(iv)    *Bank Accounts*.    The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(v)    *Validity, Perfection, and Priority of First Lien Loan Liens and Prepetition First Lien Obligations*.    Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (A) the First Lien Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (B) the First Lien Loan Liens are subject and subordinate only to Prior Senior Liens; (C) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan

10

Party Debtors; (D) the First Lien Loan Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (E) the First Lien Loan Liens were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (F) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the First Lien Loan Liens or Prepetition First Lien Obligations exist, and no portion of the First Lien Loan Liens or Prepetition First Lien Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (G) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Administrative Agent, the Prepetition First Lien Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition First Lien Loan Documents, the Prepetition First Lien Obligations, or the First Lien Loan Liens.

RLF1 28191414V.1

(vi)    *Intercreditor Provisions*.  Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of, or entered into as permitted by and in accordance with, the Prepetition First Lien Loan Documents shall (i) remain in full force and effect, and (ii) not be deemed to be amended, altered or modified by the terms of this Final Order or the DIP Documents, in each case, unless expressly set forth herein or therein.

F.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)    The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget, subject to any Permitted Variance set forth herein and in the DIP Credit Agreement) to, among other things, (A) permit the orderly continuation of their businesses; (B) pay certain Adequate Protection Payments; and (C) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors and certain subsidiaries thereof.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtors' going concern value and successful reorganization.  The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Cases without access to the DIP Facility and authorized use of Cash Collateral.

(ii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the

Debtors granting to the DIP Secured Parties the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Final Order and the DIP Documents.

(iii)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, or payments made to, the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)     *Adequate Protection*. Each of the Prepetition First Lien Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

13

RLF1 28191414V.1

(v)     *Sections 506(c) and 552(b)*.  In light of the Prepetition First Lien Secured Parties' agreement to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, the Prepetition First Lien Secured Parties are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(vi)    *Consent by Required Lenders*.  Holders constituting Required Lenders (as defined in the Prepetition Credit Agreement) have consented to, conditioned on the entry of this Final Order, the Debtors' incurrence of the DIP Facility, and proposed use of Cash Collateral on the terms and conditions set forth in this Final Order, including, without limitation, the terms of the adequate protection provided for in this Final Order.

G.      *Good Cause Shown; Best Interest*.  Good cause has been shown for entry of this Final Order, and entry of this Final Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization. Absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.

H.      *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b) and (c), and 9014, and the Local Rules, notice of the Final Hearing has been provided by the Debtors.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested herein, and of the Final Hearing complies with Bankruptcy Rules 2002, 4001(b) and (c), and 9014 and applicable Local Rules.

14

I.    *Arm's Length, Good Faith Negotiations*. The terms of this Final Order were negotiated in good faith and at arm's length between the Debtors and the Prepetition First Lien Secured Parties. The Prepetition First Lien Secured Parties have acted in good faith in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the DIP Facility and the Debtors' use of Cash Collateral, including in respect of all of the terms of this Final Order, all documents related thereto, and all transactions contemplated by the foregoing.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    DIP Financing Approved.  The Motion is granted on a final basis as set forth herein, and the use of Cash Collateral on a final basis is authorized, subject to the terms of this Final Order.

2.    Objections Overruled.  Any objections, reservations of rights, or other statements with respect to entry of this Final Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Final Order shall become effective immediately upon its entry.

3.    Authorization of the DIP Facility and the DIP Documents.

(a)    The DIP Borrower and the DIP Guarantors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Final Order and the DIP Documents and to effectuate the exchange of First Lien Loans for Roll-Up Loans.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith,

15

RLF1 28191414V.1

and in all respects such DIP Documents shall be, subject to the terms of this Final Order, consistent with the terms of the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent (acting at the direction of the required lenders under and pursuant to the DIP Credit Agreement (the "Required DIP Lenders")) and the Required DIP Lenders.  Upon entry of this Final Order, this Final Order and the other executed DIP Documents (including the fee letters executed in connection with the DIP Facility) shall govern and control the DIP Facility.  The DIP Agent is hereby authorized to execute and enter into its respective obligations under the DIP Facility Documents, subject to the terms and conditions set forth therein and this Final Order.  Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms.  To the extent there exists any conflict among the terms and conditions of the DIP Documents and this Final Order, the terms and conditions of this Final Order shall govern and control.

(b)      Upon entry of this Final Order, the DIP Borrower is hereby authorized to borrow, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $200,000,000 in DIP Loans (inclusive of the Roll-Up Loans) of which (I) $25,000,000 of New Money Loans were made available to the DIP Borrower upon entry of the Interim Order, (II) $25,000,000 of New Money Loans were funded into an escrow account on the date of the Interim Order and are available to be drawn by the DIP Borrower in accordance with the DIP Documents, (III) $75,000,00 of Roll-Up Loans were deemed funded and converted from and exchanged for First Lien Loans upon the entry of the Interim Order, and (IV) up to an additional $75,000,000 of Roll-Up Loans shall be deemed funded and converted from and exchanged for First Lien Loans upon the entry of, and in accordance with, this Final Order.

RLF1 28191414V.1

(c)    In accordance with the terms of this Final Order and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and this Final Order, and in accordance with the Approved DIP Budget, subject to any Permitted Variance as set forth in this Final Order and the DIP Documents.  Attached as Exhibit B to the Interim Order and incorporated herein by reference is a budget prepared by the Debtors and approved by the Required DIP Lenders in accordance with section 3.27 of the DIP Credit Agreement (the "Initial DIP Budget").

(d)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted solely to the extent necessary to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Documents, the Escrow Agent under the Escrow Agreement, and the Prepetition First Lien Administrative Agent under the Prepetition First Lien Loan Documents) that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility, including, without limitation:

(1)    the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent required thereby;

(2)    the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents

17

and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders may reasonably agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that are not material; provided, that, any such non-material amendment shall be provided to the U.S. Trustee and counsel for the Committee, and the Debtors shall consult with the Committee in connection with such non-material amendment prior to execution;

(3)     the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents, including (x) all fees and other amounts owed to the DIP Agent and the DIP Lenders and (y) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Final Order (whether incurred before or after the Petition Date, including, for the avoidance of doubt, (a) Gibson, Dunn & Crutcher LLP (as counsel), Evercore Group L.L.C. (as financial advisor), Pachulski Stang Ziehl & Jones LLP (as local bankruptcy counsel), and any other foreign counsel and other professionals necessary to represent the interests of the DIP Lenders and the ad hoc group of the Prepetition First Lien Lenders (the "DIP/First Lien Group") in connection with the Cases (collectively, the "DIP/First Lien Advisors"); (b) Gibson, Dunn & Crutcher LLP (as counsel), and

18

Pachulski Stang Ziehl & Jones LLP (as local bankruptcy counsel) to the DIP Agent; and (c) Davis Polk & Wardwell LLP (as counsel) and Morris, Nichols, Arsht & Tunnell LLP (as local counsel) to the Prepetition First Lien Administrative Agent; and, to the extent necessary to exercise its rights and fulfill its obligations under the DIP Documents, one counsel to the DIP Agent in each local jurisdiction, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 18 of this Final Order; and

(4)    the performance of all other acts required under or in connection with the DIP Documents, including, without limitation, pursuant to the Escrow Agreement.

(e)    Such DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor in accordance with their respective terms and the terms of this Final Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent

19

Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.  All payments or proceeds remitted (a) to or on behalf of the DIP Agent on behalf of any DIP Secured Parties or (b) to or on behalf of the Prepetition First Lien Secured Parties, in each case, pursuant to the DIP Documents, the provisions of this Final Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code.  For the avoidance of doubt, and notwithstanding anything to the contrary in any Prepetition First Lien Loan Document, DIP Document, any additional document, instrument, certificate and/or agreement related to any of the foregoing, in no event shall any property, proceeds, cash, cash equivalents, or otherwise placed or held in the escrow account established pursuant to the Escrow Agreement at any time be, or be deemed to be, property of any of the Debtors or their affiliates or subsidiaries or any of the Debtors' estates and the parties to the Escrow Agreement have acknowledged and agreed to the foregoing.

(f)        The DIP Guarantors are hereby authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Final Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrower.

(g)        Notwithstanding anything to the foregoing in this DIP Order, the DIP Credit Agreement or any DIP Document, if any New Investor (as defined in the DIP Credit Agreement) makes a direct or indirect investment in Equity Interests (as defined in the DIP Credit Agreement) of the DIP Borrower (including through an investment in Equity Interests of any parent entity or any Affiliate or Subsidiary of the DIP Borrower) (the "New Investment"), (i) each Lender must be provided written notice (the "Investor Notice") of the New Investment and (ii) the Borrower will

20

offer the right to each Lender, to be exercised in its sole discretion, to convert all or a portion of its DIP Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor on the same terms as such New Investor including at the same equity value implied by such New Investment (taking into account all fees, discounts and other economics provided to the New Investor in connection with such New Investment), but including customary shareholder protections satisfactory to Lenders holding a majority of the Loans electing this option; provided, however, that, following receipt of any Investor Notice, any Lender who provides written notice to the DIP/First Lien Advisors and the Borrower that it does not wish to be offered the right to convert its Loans (including Roll-Up Loans) into the Equity Interests issued to such New Investor as described in this paragraph shall not be offered such right.   For the avoidance of doubt, this paragraph 3(g) shall survive termination of this Final Order, the DIP Credit Agreement, any DIP Document, and/or any prepayment, repayment, payment, discharge, or other treatment of the DIP Loans and shall apply to the DIP Loans held by each Lender immediately prior to any such termination, prepayment, repayment, payment, discharge, other treatment, or otherwise.

(h)    Pursuant to sections 105 and 363 of the Bankruptcy Code, reasonably promptly following the entry of this Final Order, each Hedge Bank shall transfer the proceeds from its respective terminated hedge(s) (such hedges, the "Terminated Hedges" and the date on which such Terminated Hedges were terminated, the "Hedge Termination Date") owed to the Debtors under its respective Hedging Agreement (each as defined in the Prepetition Credit Agreement) (such proceeds, "Hedge Proceeds") to the Prepetition First Lien Administrative Agent. Upon receipt of such Hedge Proceeds, the Prepetition First Lien Administrative Agent shall apply such amounts to the remaining balance of the outstanding Prepetition First Lien Obligations as if the Borrower made, and the Borrower shall be deemed to have made, a ratable prepayment of the

21

Revolving Facility Loans (as defined in the Prepetition Credit Agreement) and the Term Loans (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement, in accordance with Section 2.11 of the Prepetition Credit Agreement, on and as of the Hedge Termination Date. The payment and application of the Hedge Proceeds pursuant hereto shall be final for all purposes and shall constitute indefeasible payment as of the Hedge Termination Date, not subject to avoidance, recapture, clawback, re-calculation, further objection or any further contest by any person on any basis. From (and including) and following the Hedge Termination Date, no interest shall, or shall have, accrued on any amounts of the Revolving Loans and Term Loans deemed to be prepaid pursuant to this paragraph 3(h) on the Hedge Termination Date. The Debtors, the Prepetition First Lien Administrative Agent, the Prepetition First Lien Lenders and the Hedge Banks are authorized and directed to take all actions necessary to ensure the reasonably timely application of the Hedge Proceeds as set forth in this paragraph 3(h) and to otherwise effectuate the relief granted pursuant to this paragraph 3(h). For the avoidance of doubt, the indemnification obligations set forth in the Prepetition Credit Agreement and in paragraph 18(c) of this Final Order apply to all actions or omissions of the Prepetition First Lien Administrative Agent taken in connection with the application of Hedge Proceeds pursuant to this paragraph 3(h).

4.      Budget and Variance Reporting.

(a)      On or before the first Wednesday following the end of any Budget Period (as defined below) (or such later date as may be consented to by the Required DIP Lenders in their sole discretion and which consent may be communicated via an email from either one of the DIP/First Lien Advisors) or more frequently if determined by the Debtors and consented to by the Required DIP Lenders in their sole discretion (which consent may be communicated via an email from either one of the DIP/First Lien Advisors), commencing with the first Wednesday following

22

the Budget Period ending on or about November 18, 2022 (any such date a Subsequent DIP Budget is so delivered, a "Subsequent Budget Delivery Date"), the Debtors will deliver to the DIP Agent (who shall promptly deliver such Subsequent DIP Budget to the DIP Lenders), the DIP/First Lien Advisors and the Prepetition First Lien Administrative Agent (who shall promptly deliver such Subsequent DIP Budget to the Prepetition First Lien Lenders) an updated Budget (a "Subsequent DIP Budget") covering the 13-week period commencing on the Saturday immediately preceding such Subsequent Budget Delivery Date (or, if such Subsequent Budget Delivery Date is a Saturday, such Subsequent Budget Delivery Date) which Subsequent DIP Budget shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion (not to be unreasonably withheld and which satisfaction may be communicated via an email from either one of the DIP/First Lien Advisors).  The Initial DIP Budget and the budget delivered by the Debtors on or about October 28, 2022 are the "Approved DIP Budgets" as in effect as of the date of this Final Order and any Subsequent DIP Budget delivered thereafter shall be deemed to constitute an "Approved DIP Budget" for purposes of this Final Order solely upon approval by the Required DIP Lenders (which must be in writing (including from either one of the DIP/First Lien Advisors), email being sufficient) in their sole discretion (not to be unreasonably withheld).  In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved DIP Budget" are not met as set forth herein, the prior Approved DIP Budget shall remain in full force and effect as the most recently delivered "Approved Budget" and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve (which approval shall not be unreasonably withheld and may be communicated via an email from either one of the Lender Advisors) such Subsequent DIP Budget as an "Approved DIP Budget."  "Budget Period" means the initial four-week period set

23

forth in the most recently delivered Approved DIP Budget in effect at such time; provided, however, that notwithstanding anything herein or in the DIP Credit Agreement, section 5.14(a) of the DIP Credit Agreement shall be amended and restated in its entirety as follows:

On or before the first Wednesday following the end of any Budget Period (as defined below) (or such later date as may be consented to by the Required Lenders (in their sole discretion and which consent may be communicated via an email from either one of the Lender Advisors) or more frequently if determined by the Debtors and consented to by the Required Lenders in their sole discretion (which consent may be communicated via an email from either one of the Lender Advisors), commencing with the first Wednesday following the Budget Period ending on or about November 18, 2022 (any such date a Subsequent DIP Budget is so delivered, a "Subsequent Budget Delivery Date"), the Debtors will deliver to the Administrative Agent (who shall promptly deliver such Subsequent DIP Budget to the Lenders),  the Lender Advisors and the Prepetition Administrative Agent (who shall promptly deliver such Subsequent DIP Budget to the Prepetition Lenders) an updated budget for the 13-week period (a "Subsequent DIP Budget") commencing on the Saturday immediately preceding such Subsequent Budget Delivery Date (or, if such Subsequent Budget Delivery Date is a Saturday, such Subsequent Budget Delivery Date), which Subsequent DIP Budget shall be in form and substance satisfactory to the Required Lenders in their sole discretion (not to be unreasonably withheld) (which satisfaction may be communicated via an email from either one of the Lender Advisors). The Initial DIP Budget and the budget delivered by the Debtors on or about October 28, 2022 are the "Approved DIP Budgets" as in effect as of the date of the Final Order and any Subsequent DIP Budget delivered thereafter shall be deemed to constitute an "Approved Budget" for purposes of this Agreement solely upon approval by the Required Lenders (which must be in writing (including from either one of the Lender Advisors), email being sufficient) in their sole discretion (not to be unreasonably withheld). In the event the conditions for the most recently delivered Subsequent DIP Budget to constitute an "Approved Budget" are not met as set forth herein, the prior Approved Budget shall remain in full force and effect as the most recently delivered "Approved Budget" and the Debtors shall be required to work in good faith with the Required DIP Lenders to modify such Subsequent DIP Budget until the Required DIP Lenders approve (which approval shall not be unreasonably withheld and may be communicated via an email from either one of the Lender Advisors) such Subsequent DIP Budget as an "Approved Budget." "Budget Period" means the initial four-week period set forth in the most recently delivered Approved Budget in effect at such time.

(b)    On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date (as defined below), the Debtors shall deliver to the DIP Agent (who shall promptly deliver such Approved DIP Budget Variance Report to the DIP Lenders),  the DIP/First Lien Advisors and the

24

Prepetition First Lien Administrative Agent (who shall promptly deliver such Approved DIP Budget Variance Report to the Prepetition First Lien Lenders) a budget variance report/reconciliation in form and substance reasonably satisfactory to the DIP/First Lien Group (the "Approved DIP Budget Variance Report"), setting forth in detail (i) the Debtors' actual disbursements (the "Actual Disbursements"), including, without limitation, maintenance capital expenditures, on an aggregate basis (and individually on a line by line basis for (x) Payroll & Benefits (as set forth in the applicable Approved DIP Budgets), (y) Capital Leases (as set forth in the applicable Approved DIP Budget) and (z) such other line items as may be reasonably requested by the DIP/First Lien Advisors, to the extent the Debtors can report such line item individually without undue cost or burden) for the week period and the four-week period, in each case, ending on the Friday of the week immediately preceding the week in which such Testing Date falls (such Friday, the "Test As-of Date"); (ii) the Debtors' actual ordinary course receipts that are accounted for as "revenue" under GAAP (as applied by the Debtors in the ordinary course of business consistent with past practice) (the "Actual Receipts"), excluding, for the avoidance of doubt, any intercompany transactions or asset sales outside the ordinary course of business, on an aggregate basis during the week period and the four-week period, in each case, ending on the applicable Test As-of Date; (iii) the (w) the amounts set forth in the applicable Approved DIP Budgets under "Professional Fees", (x) the amounts set forth in the Approved DIP Budget under "Debt Service", (y) amounts of intercompany loans and transfers and (z) the amounts set forth in the Approved DIP Budget under "Capital Expenditures – Growth", in each case, during the week period and the four-week period, in each case, ending on the applicable Test As-of Date; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Receipts and the Actual Disbursements for the week and four-week period ending on the Test As-of Date to the

25

amount of Debtors' projected cash receipts and disbursements, in each case, on an aggregate basis, set forth in the applicable Approved DIP Budgets with respect to such week or four-week period ending on the applicable Test As-of Date; (v) as to each variance contained in the Approved DIP Budget Variance Report and required to be tested pursuant to clause (c) above, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance; (vi) a weekly roll forward of the Debtors' cash forecast (both domestic and international); and (vii) a cash balance for the Debtors by country; provided, however, that notwithstanding anything herein or in the DIP Credit Agreement, section 5.14(b) of the DIP Credit Agreement shall be amended and restated in its entirety as follows:

On or before 5:00 p.m. (prevailing Eastern time) on each Testing Date, the Debtors shall deliver to the Administrative Agent (who shall promptly deliver such Approved Budget Variance Report to the Lenders), the Advisors and the Prepetition Administrative Agent (who shall promptly deliver such Approved Budget Variance Report to the Prepetition Lenders)  a variance report/reconciliation in form and substance reasonably satisfactory to the Required Lenders (the "Approved Budget Variance Report"), setting forth in detail (i) the Debtors' actual disbursements (the "Actual Disbursements"), including, without limitation, maintenance capital expenditures, on an aggregate basis (and individually on a line by line basis for (x) Payroll & Benefits (as set forth in the applicable Approved Budgets), (y) Capital Leases (as set forth in the applicable Approved Budgets) and (z) such other line items as may be reasonably requested by the Lender Advisors, to the extent the Debtors can report such line item individually without undue cost or burden) for the week period and the four-week period, in each case, ending on the Friday of the week immediately preceding the week in which such Testing Date falls (such Friday, the "Test As-of Date"); (ii) the Debtors' actual ordinary course receipts that are accounted for as "revenue" under GAAP (as applied by the Debtors in the ordinary course of business consistent with past practice) (the "Actual Receipts"), excluding, for the avoidance of doubt, any intercompany transactions or asset sales outside the ordinary course of business, on an aggregate basis during the week period and the four-week period, in each case, ending on the applicable Test As-of Date; (iii) the (w) amounts set forth in the applicable Approved Budgets under "Professional Fees", (x) amounts set forth in the Approved Budget under "Debt Service", (y) amounts of intercompany loans and transfers and (z) amounts set forth in the Approved Budget under "Capital Expenditures – Growth", in each case, during the week period and the four-week period, in each case, ending on the applicable Test As-of Date; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) of the Actual Receipts and the Actual

26

Disbursements for the week and four-week period ending on the Test As-of Date to the amount of Debtors' projected cash receipts and disbursements, in each case, on an aggregate basis, set forth in the applicable Approved Budgets with respect to such week or four-week period ending on the applicable Test As-of Date; and (v) as to each variance contained in the Approved Budget Variance Report and required to be tested pursuant to Section 6.12 below, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance; (vi) a weekly roll forward of the Debtors' cash forecast (both domestic and international); and (vii) a cash balance for the Debtors by country.

(c)     Budget Variances (as defined below) shall be tested on each Friday commencing on October 28, 2022 (each such date, a "Testing Date"). The Debtors shall not permit on any Testing Date: (i) for the rolling four-week period ending on the applicable Test As-of Date, the Debtors' Actual Disbursements (in the aggregate) to be more than 115% of the projected disbursements (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period; and (ii) for the rolling four-week period ending on the applicable Test As-of Date, the Debtors' Actual Receipts (in the aggregate) to be less than 80% of the projected receipts (in the aggregate) as set forth in the Approved DIP Budgets with respect to such period (the "Budget Variances"; all references in this Final Order and the DIP Documents to "Approved DIP Budget" shall mean the Approved DIP Budget as it is subject to the Budget Variances). Notwithstanding anything herein or in the DIP Credit Agreement, section 6.12 of the DIP Credit Agreement shall be amended and restated in its entirety as follows:

Permitted Variance. Budget variances shall be tested on each Friday commencing on October 28, 2022 (each such date, a "Testing Date"). The Debtors shall not permit on any Testing Date: (i) for the rolling four-week period ending on the applicable Test As-of Date, the Debtors' Actual Disbursements (in the aggregate) to be more than 115% of the projected disbursements (in the aggregate) as set forth in the Approved Budgets with respect to such period; and (ii) for the rolling four-week period ending on the applicable Test As-of Date, the Debtors' Actual Receipts (in the aggregate) to be less than 80% of the projected receipts (in the aggregate) as set forth in the Approved Budgets with respect to such period (the "Permitted Variances"; all references in the Loan Documents to "Approved Budget" shall mean the Approved Budget as it is subject to the Permitted

27

Variances). For the avoidance of doubt, for purposes of budget variance testing in accordance with this Section 6.12, (w) the amounts set forth in the Approved Budget under "Professional Fees", (x) the amounts set forth in the Approved Budget under "Debt Services", (y) adequate protection costs and (z) the amounts set forth in the Approved Budget under "Capital Expenditures – Growth" shall be excluded.

(d)   Commencing with the first full calendar week after the Petition Date, the Debtors shall maintain Domestic Liquidity (as defined in the DIP Credit Agreement) of not less than $5,000,000 as of the last business day of each calendar week.  For the avoidance of doubt, for purposes of Budget Variances testing, (w) the amounts set forth in the Approved DIP Budget under "Professional Fees", (x) the amounts set forth in the Approved DIP Budget under "Debt Service", (y) adequate protection costs and (z) the amounts set forth in the Approved DIP Budget under "Capital Expenditures – Growth" shall be excluded.

(e)   The Debtors shall provide to the advisors for the official committee of unsecured creditors in these chapter 11 cases (the "Creditors' Committee Advisors"), subject to their confidentiality agreement with the Debtors, a copy of each Subsequent DIP Budget and Approved DIP Budget Variance Report actually delivered to the DIP/First Lien Advisors and Prepetition First Lien Administrative Agent pursuant to subparagraphs (a) and (b) above.

5.   Access to Records.  The Debtors shall provide the DIP/First Lien Advisors with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  As soon as reasonably practicable after delivery to the DIP Agent, DIP Lenders, or their respective advisors, the Debtors shall provide to the Creditors' Committee Advisors, subject to their confidentiality agreement with the Debtors, all documents or reports required under Sections 5.04(a-h), (j) and (k) of the DIP Credit Agreement.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to counsel to the Debtors (email being sufficient), the Debtors shall permit representatives,

28

agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

6.     DIP Superpriority Claims.  Subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) to the extent set forth in the Bankruptcy Code, with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of

the Bankruptcy Code, if any (the "Avoidance Actions"); provided, however, that the DIP Superpriority Claims shall not be paid from the Debtors' or the Debtors' estates claims or causes of action, including but not limited to Avoidance Actions, in each case against Apollo Global Management, LLC or its affiliates, the Fund, or the Fund Affiliates, or proceeds thereof (the "Fund Claims"). Except as set forth in this Final Order, no other superpriority claims shall be granted or allowed in these Cases.

7. DIP Liens. As security for the DIP Obligations, effective and perfected upon the date of this Final Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified in clause (a) and (b) below being collectively referred to as the "DIP Collateral"), subject only to (x) Prior Senior Liens, (y) the Excluded Property (as defined in the DIP Credit Agreement), and (z) the Carve Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Final Order and the DIP Documents, the "DIP Liens"):

(a) First Priority Lien On Any Unencumbered Property. Subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected first priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b)

30

of the Bankruptcy Code) including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens), a 100% equity pledge of all first-tier foreign subsidiaries and all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all commercial tort claims of the Debtors; and all claims and causes of action (including causes of action arising under section 549 of the Bankruptcy Code, claims arising on account of transfers of value from a Debtor to (x) another Debtor and (y) a non-Debtor affiliate incurred on or following the Petition Date), and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing and all proceeds and property recovered in respect of Avoidance Actions (collectively, the "Previously Unencumbered Property"); *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Final Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the

31

foregoing; *provided, further*, that (i) the aggregate amount of the secured claim with respect to the DIP Loans that is secured by DIP Liens on Previously Unencumbered Property shall not exceed an amount equal to the sum of (i) $150,000,000, plus (ii) fees on the Initial Term Loans that are paid in kind pursuant to the DIP Credit Agreement, plus (iii) PIK Interest in accordance with Section 2.13 of the DIP Credit Agreement on (a) the Initial Term Loans, plus any PIK Interest or paid in kind fees on such Initial Term Loans, and (b) $100 million of the Roll-Up Loans.  For the avoidance of doubt, the immediately preceding sentence does not alter or reduce the amount of the DIP Loans or the DIP Superpriority Claims pursuant to this Final DIP Order or the DIP Credit Agreement.

(b)      Liens Priming the Prepetition Liens.  Subject only to the Carve Out and Prior Senior Liens, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all property of the Debtors that was subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; provided, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Final Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(c)      Liens Junior to Certain Other Liens. Subject only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all prepetition and post-petition property of the Debtors immediately junior to the Prior Senior Liens.

(d)   Liens on Fund Claims.  Notwithstanding anything herein to the contrary, the DIP Collateral shall not include the Fund Claims, and the DIP Obligations shall not be secured by any lien or security interest in the Fund Claims.

8.   Adequate Protection for the Prepetition First Lien Secured Parties.  Subject only to the Carve Out and the terms of this Final Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any diminution in value of such interests (each such diminution, a "Diminution in Value") determined by agreement among the Debtors, the Creditors' Committee and DIP Lenders or by order of the Court, resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Administrative Agent, for the benefit of itself and the Prepetition First Lien Secured Parties, is hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)   First Lien Adequate Protection Liens.  As security for any Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Final Order (together, the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and all proceeds or property recovered from Avoidance Actions.  Subject to the terms of this Final Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) Prior Senior Liens.  The First Lien Adequate Protection Liens shall

33

otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)     Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP Superpriority Claims.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, and to the extent set forth in the Bankruptcy Code, the Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

(c)     First Lien Adequate Protection Payments.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 18 of this Final Order, all reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(d)(3) hereof, including all reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Final Order, including, for the avoidance of doubt, of (i) Gibson, Dunn

34

& Crutcher LLP and Pachulski Stang Ziehl & Jones LLP, as counsel to the DIP Agent, and Davis Polk & Wardwell LLP, as counsel and Morris, Nichols, Arsht & Tunnell LLP, as local counsel, to the Prepetition First Lien Administrative Agent and (ii) the DIP/First Lien Advisors (all payments referenced in this sentence, collectively, the "Adequate Protection Payments").  None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments; provided, however, that all parties reserve the right under section 506(b) of the Bankruptcy Code to seek to recharacterize any Adequate Protection Fees as principal owed under the applicable Prepetition First Lien Loan Documents, unless payment of the fees or expenses included in such Adequate Protection Fees are owed in connection with the DIP Facility.

(d)     Right to Seek Additional Adequate Protection.  This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

35

(e) *Other Covenants*. The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order approving the Debtors' cash management motion.  The Debtors shall comply with the covenants contained in the DIP Credit Agreement regarding conduct of business, including, without limitation, preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights material to the conduct of their business and the maintenance of properties and insurance.

(f) *Reporting Requirements*.  As additional adequate protection to the Prepetition First Lien Secured Parties, the Debtors shall comply with all reporting requirements set forth in the DIP Credit Agreement.

(g) *Miscellaneous*.  Except for (i) the Carve Out and (ii) as otherwise provided in paragraph 7, the First Lien Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties pursuant to this paragraph 8 of this Final Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

(h) *Fund Claims*.  Notwithstanding anything herein to the contrary, the Adequate Protection Superpriority Claims shall not be paid from the Fund Claims, and the First Lien Adequate Protection Liens shall not include any lien or security interest in the Fund Claims.

36

9.     Carve Out.

(a)     Priority of Carve Out. Subject to the terms and conditions contained in this paragraph 9, each of the DIP Liens, DIP Superpriority Claims, Prepetition Liens, First Lien Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve Out. The Carve Out shall have such priority claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral. For the avoidance of doubt, after the occurrence of the Termination Date or repayment of the DIP Obligations in full, the Carve Out shall remain in effect as to the Prepetition First Lien Obligations and the First Lien Adequate Protection Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve Out in accordance with the terms of this Final Order.

(b)     Definition of Carve Out. As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all accrued and unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger Notice (as defined

37

below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, (iv) any allowed administrative claims in an aggregate amount not to exceed $1,000,000 arising out of the Debtors' obligations to reimburse employees for health care premiums and reimbursements incurred between the Petition Date and the first business day following delivery by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) of a Carve Out Trigger, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice  (the amounts set forth in clauses (i) through (iv), the "Pre-Carve Out Trigger Notice Cap"); and (v) Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise, less the amount of any prepetition retainers received by any such Professional Persons and not previously returned or applied to fees and expenses (the amounts set forth in this clause (v) being the "Post-Carve Out Trigger Notice Cap" and, together with the Pre-Carve Out Trigger Notice Cap, the "Carve Out Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, the Prepetition First Lien Administrative Agent, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility (or the Debtors' breach of the provisions of this Final Order governing use

38

of Cash Collateral that is not timely cured), stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)     Starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors, the DIP Agent, and DIP/First Lien Advisors a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (the "Estimated Fees and Expenses"), along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (the "Cumulative Total Unpaid Fees and Expenses").  No later than one (1) business day after the delivery of a Carve Out Trigger Notice, each Professional Person shall deliver one (1) additional statement to the Debtors setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the date of the Carve Out Trigger Notice, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account (as defined herein).  The Debtors shall on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the Cumulative Total Unpaid Fees and Expenses included in the most recent Weekly Statement timely received by the Debtors, which shall be reported to the DIP Agent, or if an estimate is not provided, the total budgeted weekly fees of Professional Persons for the prior week set forth in the Approved DIP Budget, and the DIP/First Lien Advisors, into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any Prepetition First Lien Secured Party (the "Professional Fees Escrow Account").  The Debtors shall use funds

39

held in the Professional Fees Escrow Account exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any interim or final orders of the Court; provided that when all Professional Fees have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Professional Fees Escrow Account shall revert to the Debtors for use in a manner consistent with the DIP Credit Agreement and this Final Order; and provided further that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.  Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Professional Persons, including with respect to obligations arising out of the Carve Out (with a reversionary interest to the Debtors of any amount remaining in the Professional Fees Escrow Account after all allowed Professional Fees are satisfied in full).  Funds transferred to the Professional Fees Escrow Account shall not be subject to any liens or claims granted to the DIP Secured Parties herein or any First Lien Adequate Protection Liens or Adequate Protection Superpriority Claims, shall not constitute DIP Collateral, and shall not constitute Cash Collateral or assets of the Debtors' estates; provided that the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Professional Fees Escrow Account, if any, after all allowed Professional Fees are satisfied in full.

(d)     Carve Out Reserve.  Notwithstanding the occurrence of an Event of Default, on the day on which a Carve Out Trigger Notice is given by the DIP Agent (or by the Prepetition First Lien Secured Parties after repayment of the DIP Obligations in full) to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any

40

RLF1 28191414V.1

Debtor to fund the Professional Fees Escrow Account in an amount equal to the then unpaid amounts of the Professional Fees. The Debtors shall deposit and hold such amounts in the Professional Fees Escrow Account to pay such then unpaid Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor after funding the Professional Fees Escrow Account in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in the Professional Fees Escrow Account to pay such Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Administrative Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded to the Professional Fees Escrow Account.

(e)     Notwithstanding anything to the contrary in this Final Order, (i) the failure of the Professional Fee Escrow Account to satisfy in full the allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Approved DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Professional Fee Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of allowed Professional Fees due and payable by the Debtors.

41

RLF1 28191414V.1

42

(f)    No Direct Obligation To Pay Professional Fees.  The Prepetition First Lien Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved DIP Budget.  Except for permitting the funding of the Professional Fees Escrow Account or the Carve Out Reserves as provided herein, none of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person or any fees or expenses of the U.S. Trustee or Clerk of the Court incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)    Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

10.    Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties.  Subject only to the Carve Out, notwithstanding any other provision in this Final Order or the DIP Documents to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition First Lien Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall at all times

42

be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Final Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition First Lien Secured Parties under the DIP Documents, the Prepetition First Lien Loan Documents, any intercreditor agreement, or the Bankruptcy Code or under non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties.  The delay in or failure of the DIP Secured Parties and/or the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition First Lien Secured Parties' rights and remedies.  For all adequate protection purposes throughout the Cases, each of the Prepetition First Lien Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Diminution in Value from and after the Petition Date.  For the avoidance of doubt, such request will survive termination of this Final Order.

11.     Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims.  Subject to the Challenge Period (as defined herein) and the challenge rights of the Committee and other parties in interest expressly set forth herein, the stipulations, admissions, waivers, and releases contained in this Final Order, including the Debtors' Stipulations, shall be

43

binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The stipulations, admissions, and waivers contained in this Final Order, including, the Debtors' Stipulations, shall be binding upon all other parties in interest, including any committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that the Committee or any other party in interest, in each case with proper standing granted by order of the Court (or other court of competent jurisdiction), has timely filed an adversary proceeding or contested matter under this Final Order and the Bankruptcy Rules no later than January 17, 2023 (the "Challenge Period") (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding, among other things: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition First Lien Administrative Agent and the Prepetition First Lien Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition First Lien Obligations; or (ii) otherwise asserting or prosecuting any action against the Prepetition First Lien Administrative Agent or the Prepetition First Lien Secured Parties for the avoidance of preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (any such claim, a "Challenge"), and (iii) in which the Court enters a final order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  If, prior to the end of the Challenge Period, (x) any of the Cases convert to a case under chapter 7, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended to the later of (A) the time remaining under the Challenge Period plus ten (10) days or (B) such other time as ordered by the Court solely with respect to any such trustee, commencing on the occurrence

44

RLF1 28191414V.1

of either of the events discussed in the foregoing clauses (x) and (y); *provided*, *further*, that the timely filing of a motion seeking standing to file a Challenge consistent with applicable law and rules of procedure before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft complaint, until entry of an order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court, provided, further that if standing is denied by the Court pursuant to a final order, the Challenge Period shall be deemed to have immediately expired with respect to such Challenge(s).  In the event of the expiration of the Challenge Period without the filing of a Challenge (or if any such Challenge is filed and overruled):  (a) any and all such Challenges by any party (including any committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Prepetition First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the First Lien Loan Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in this Final Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition First Lien Secured Parties' claims, liens, and interests contained in this Final Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates,

45

and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. If any adversary proceeding or contested matter asserting a Challenge is timely filed under this Final Order and the Bankruptcy Rules and is pending on the date, if any, on which any of the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates, without any further authorization or order of the Court. Furthermore, if any such adversary proceeding or contested matter is timely filed under this Final Order and the Bankruptcy Rules, the stipulations and admissions contained in this Final Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on the Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the expiration of the Challenge Period. Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition First Lien Loan Documents, the First Lien Loan Liens, and the Prepetition First Lien Obligations, and a separate order of the Court conferring such standing on the Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party-in-interest. The Prepetition First Lien Secured Parties stipulate and agree that each of the Prepetition First Lien Secured Parties will not raise as a defense in connection with any Challenge the ability of the Committee or creditors to file derivative suits on behalf of limited liability companies under the Delaware Limited Liability Company Act. In the event of a successful Challenge, notwithstanding anything contained in this Final Order to the contrary, the Court shall retain authority and the ability to award any appropriate remedies.

RLF1 28191414V.1

12.     Termination Date.  On the Termination Date (as defined below), consistent with Article VII of the DIP Credit Agreement, (a) all DIP Obligations shall be immediately due and payable, all Commitments will terminate, and the Carve Out Reserves shall be funded as set forth in this Final Order; (b) all authority to use Cash Collateral shall cease; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget, subject to any Permitted Variance provided for in the DIP Credit Agreement; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Final Order.

13.     Events of Default.  The occurrence of any of the following events, unless waived by the Required DIP Lenders in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"):  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Final Order, (b) the failure of the Debtors to comply with any of the Required Milestones (as defined below) or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

14.     Milestones.  The Debtors' failure to comply with those certain case milestones set forth in section 5.15 of the DIP Credit Agreement (collectively, the "Required Milestones") shall constitute an "Event of Default" in accordance with the terms of the DIP Credit Agreement; *provided*, *however*, the Debtors shall consult with the Committee prior to any extension of the Required Milestones; *provided*, *further*, that notwithstanding anything herein or in the DIP Credit Agreement, section 5.15(b) of the DIP Credit Agreement shall be amended and restated in its entirety as follows:

47

by the date that is no later than 30 days after entry of the Final Order, the Debtors shall have entered into a restructuring support agreement with the Prepetition Lenders that is in form and substance satisfactory to the Required Lenders (the "RSA");

15.     Rights and Remedies Upon Event of Default.   Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Final Order, subject to the Remedies Notice Period (defined below), (a) the DIP Agent (at the direction of the Required DIP Lenders) may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice to the DIP Borrower and (b) subject to paragraph 12(b), the DIP Agent (at the direction of the Required DIP Lenders) may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the date on which a Termination Declaration is delivered, the "Termination Date").  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties is hereby modified so that five (5) business days after the Termination Date (the "Remedies Notice Period"):  (a) the DIP Agent (at the direction of the Required DIP Lenders) shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this Final Order to satisfy the DIP Obligations, DIP Superpriority Claims,

and DIP Liens, subject to the Carve Out; (b) subject to the foregoing clause (a), the applicable Prepetition First Lien Secured Parties shall be entitled to exercise their respective rights and remedies to the extent available in accordance with the applicable Prepetition First Lien Loan Documents and this Final Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors and the Committee shall each be entitled to seek an emergency hearing within the Remedies Notice Period with the Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing.  Except as set forth in this paragraph 15 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties under this Final Order.  Unless the Court orders otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Prepetition First Lien Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Final Order; *provided*, that the Prepetition First Lien Secured Parties shall be permitted to exercise remedies to the extent available solely with respect to the Debtors' use of Cash Collateral.

16.    <u>Limitation on Charging Expenses Against Collateral</u>.    No expenses of administration of the Cases or any future proceeding that may result therefrom, including

49

liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, or the DIP Lenders or (b) the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition First Lien Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties.

17.   Use of Cash Collateral.   The Debtors are hereby authorized to use all Cash Collateral of the Prepetition First Lien Secured Parties, but solely for the purposes set forth in this Final Order and in accordance with the Approved DIP Budget (subject to permitted variances as set forth in this Final Order and the DIP Documents), including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Final Order, from the date of this Final Order through and including the date of termination of the DIP Credit Agreement.

18.   Expenses and Indemnification.

(a)   The Debtors are hereby authorized and directed to pay, in accordance with this Final Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, backstop, fronting, closing, arrangement or commitment payments (including all payments and other amounts owed to the DIP Lenders), administrative agent's fees, collateral agent's fees, and escrow agent's fees (including all fees and other amounts owed to the DIP Agent), the reasonable and documented fees and disbursements of counsel and

50

other professionals to the extent set forth in paragraphs 3(d)(iii) and 8(c) of this Final Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Final Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses, including the fees and expenses of counsel to the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, and the DIP/First Lien Group, incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, or the DIP/First Lien Group to first deliver a copy of its invoice as provided for herein.

(b)    The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraphs 3(d)(iii) and 8(c) of this Final Order (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, the Committee, or the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition Date.  Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed (which shall provide sufficient information to determine if such fees and expenses are reasonable), and which may be redacted or modified to the extent necessary to delete any information subject to the

51

attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law.  The Debtors, the Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, the Committee, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than the Disputed Invoiced Fees.

(c)  In addition, the Debtors will indemnify each of the DIP Lenders, the DIP Agent, the Prepetition First Lien Administrative Agent, and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility as and to the extent provided in the DIP Credit Agreement.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions

52

contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence, fraud, or willful misconduct or breach of their obligations under the DIP Facility, which indemnity shall have equal priority and lien status to the DIP Superpriority Claims. In no event shall any Indemnified Person or any Debtor be liable on any theory of liability for any special, indirect, consequential, or punitive damages; provided, that this shall not affect the Debtor's indemnification obligations pursuant to the immediately preceding sentence.

19.     No Third Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

20.     Section 507(b) Reservation.  Subject only to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

21.     Insurance.  Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date and shall name the DIP Agent as loss payee or additional insured, as applicable, thereunder.

RLF1 28191414V.1

22.     No Waiver for Failure to Seek Relief.  The failure or delay of the DIP Agent or the Required DIP Lenders to exercise rights and remedies under this Final Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

23.     Perfection of the DIP Liens and Adequate Protection Liens.

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the First Lien Adequate Protection Liens granted pursuant to paragraph 8(a) hereof, the DIP Agent and the Prepetition First Lien Administrative Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition First Lien Administrative Agent shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to the Challenge Period, subject to challenge, dispute, or subordination as of the date of entry of this Final Order.  If the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments (which, in each case, shall be at the sole cost and expense of the Debtors), the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent or the Prepetition First Lien Administrative Agent (at the direction of the applicable required lenders),

54

and the automatic stay shall be modified solely to allow such filings as provided for in this Final Order.

(b)    A certified copy of this Final Order may, at the direction of the applicable Required DIP Lenders, be filed with or recorded in filing or recording offices by the DIP Agent or the Prepetition First Lien Administrative Agent in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Final Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, lessors, or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the First Lien Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Final Order, subject to applicable law.

24.    Release.  Subject to the rights and limitations set forth in paragraph 11 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish,

55

irrevocably waive, and discharge, each of the DIP Secured Parties and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "Related Parties"), and each of the Prepetition First Lien Secured Parties and each of their respective Related Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition First Lien Obligations, the First Lien Loan Liens or the Prepetition First Lien Loan Documents, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition First Lien Secured Parties; *provided* that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Documents.

25.    Credit Bidding.  Subject to section 363(k) of the Bankruptcy Code, the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Administrative Agent (at the direction of the Required Lenders) (as to the Prepetition First Lien Administrative Agent,

RLF1 28191414V.1

subject to paragraph 11) shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying lenders' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

26.     <u>Preservation of Rights Granted Under this Final Order</u>.

(a)     Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Prepetition First Lien Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition First Lien Loan Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in paragraph 23 herein.

(b)     In the event this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition First Lien Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition First Lien Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)      Unless and until all DIP Obligations, Prepetition First Lien Obligations, and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all Commitments are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent, the Required DIP Lenders, and the Prepetition First Lien Administrative Agent (acting at the direction of the Required Lenders), (x) any modification, stay, vacatur, or amendment of this Final Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition First Lien Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the First Lien Adequate Protection Liens or the First Lien Loan Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Final Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases; provided, however, that none of the foregoing shall require the Debtors to violate their fiduciary duties.

(d)     Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Final Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue

59

in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition First Lien Secured Parties granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required DIP Lenders and the DIP Agent (acting at the direction of the Required DIP Lenders).

(f)    Other than as set forth in this Final Order, subject to the Carve Out, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

27.    <u>Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral</u>. Notwithstanding anything to the contrary set forth in this Final Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition First Lien Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives,

60

attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition First Lien Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition First Lien Loan Documents, or this Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or the Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Parties related to the DIP Obligations or the Prepetition First Lien Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition First Lien Obligations, or the DIP Agent's, the DIP Lenders', and the Prepetition First Lien Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition First Lien Secured Parties, or the DIP Agent's, the DIP Lenders', the Prepetition First Lien Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on

the DIP Obligations or the Prepetition First Lien Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the First Lien Loan Liens) held by or on behalf of each of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition First Lien Obligations, or the First Lien Loan Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the First Lien Loan Liens or any other rights or interests of any of the Prepetition First Lien Secured Parties related to the Prepetition First Lien Obligations or the First Lien Loan Liens, *provided* that no more than $300,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Committee appointed in these Cases solely to investigate (including by way of examination or discovery proceedings),  or in connection with seeking standing, with respect to any potential Challenge within the Challenge Period (as defined below).

28.     Conditions Precedent.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

62

29.     Repayment of DIP Superpriority Claims.  Notwithstanding anything to the contrary herein or in the other DIP Documents, the Debtors shall indefeasibly pay to each holder of a DIP Superpriority Claim cash equal to the full amount of such DIP Superpriority Claim on the effective date of a plan of reorganization, unless such holder of a DIP Superpriority Claim consents to a different treatment with respect to such DIP Superpriority Claim (including, for the avoidance of doubt, pursuant to paragraph 3(g) of this Final Order).  The requirements set forth in this paragraph 29 may not be amended without the prior written consent of each holder of a DIP Superiority Claim adversely affected thereby.

30.     Intercreditor Provisions. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition First Lien Loan Documents shall remain in full force and effect; provided that nothing in this Final Order shall be deemed to provide liens to any Prepetition First Lien Secured Party on any assets of the Debtors except as set forth herein.

31.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition First Lien Secured Parties, any committee appointed in these Cases, and the Debtors and their respective successors and permitted assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition First Lien Secured Parties; provided that, except to the extent expressly set forth in this Final Order, the Prepetition First Lien

RLF1 28191414V.1

Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

32.     Limitation of Liability.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Final Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or any Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

33.     No Requirement to File Claim for DIP Obligations.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of

administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agent nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agent's or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Final Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

34. <u>No Requirement to File Claim for Prepetition First Lien Obligations</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the Prepetition First Lien Administrative Agent nor any other Prepetition First Lien Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition First Lien Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition First Lien Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition First Lien Administrative Agent's or any other Prepetition First

65

Lien Secured Party's rights, remedies, powers, or privileges under any of the Prepetition First Lien Loan Documents, this Final Order, or applicable law. The Prepetition First Lien Administrative Agent is authorized, but not directed or required, to file in the Debtors' lead chapter 11 case *In re Phoenix Services Topco LLC*, Case No. 22-10906 (MFW), a master proof of claim on behalf of any of the Prepetition First Lien Secured Parties on account of any and all of their respective claims arising pursuant to the applicable Prepetition First Lien Loan Obligations and hereunder (each, a "Master Proof of Claim") against each of the Debtors. Upon the filing of a Master Proof of Claim by the Prepetition First Lien Administrative Agent, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition First Lien Loan Obligations, and the claim of each applicable Prepetition First Lien Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Cases. The Master Proofs of Claim shall not be required to identify whether any Prepetition First Lien Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims. The provisions of this paragraph 34 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition First Lien Secured Party (or its successors in interest) to vote separately on any plan proposed in these Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition First Lien Secured Parties, which instruments, agreements or other documents will be provided to counsel to

66

the Debtors (subject to appropriate confidentiality terms acceptable to the Prepetition First Lien Administrative Agent) upon reasonable written request to counsel to the Prepetition First Lien Administrative Agent.

35.     No Marshaling.  The DIP Agent and the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Final Order, the DIP Documents and the Prepetition First Lien Loan Documents, notwithstanding any other agreement or provision to the contrary, and the Prepetition First Lien Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral; *provided*, *however*, that in the event of any action or proceeding by the DIP Agent to seek recovery from the DIP Collateral in satisfaction of the DIP Superpriority Claims, any proceeds of the DIP Collateral, excluding the proceeds of any Avoidance Actions, that are received by the DIP Agent shall be first applied to the outstanding DIP Superpriority Claims prior to applying any proceeds of Avoidance Actions to satisfaction of such claims.

36.     Application of Proceeds of DIP Collateral.  The DIP Obligations, at the option of the Required DIP Lenders, to be exercised in their sole and absolute discretion, shall be repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral.

37.     U.S. Specialty Insurance Company.  Nothing in the Motion, the Interim Order, this Final Order, or the DIP Credit Agreement shall prime any (i) valid and properly perfected lien of U.S. Specialty Insurance Company (the "Surety") over collateral in the amount of $50,000 cash provided to the Surety in connection with that certain General Indemnity Agreement and the Collateral Security Agreement entered into by Debtor Phoenix Services LLC with the Surety on

67

January 30, 2017 (such collateral, the "Bond Collateral') and (ii) setoff and/or recoupment rights and/or lien rights of the Surety or of any party to whom the Surety has or may become subrogated. In addition, notwithstanding anything in the Motion, the Interim Order, this Final Order, or the DIP Credit Agreement to the contrary, the rights and defenses of the Debtors and the Surety, as applicable, are fully preserved with respect to the Bond Collateral and any of the Surety's setoff, recoupment, subrogation and common law rights.

38.     Equities of the Case.  The Prepetition First Lien Secured Parties shall each be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any of the Collateral (including the Prepetition Collateral).

39.     Amendment to Extension Fee.  Notwithstanding anything herein or in the DIP Credit Agreement to the contrary, section 2.24 of the DIP Credit Agreement shall be amended and restated in its entirety as follows:

(a)     Extension of Maturity Date.  The Borrower may, with the consent of the Required Lenders and by notice to the Administrative Agent not later than the date that is 5 Business Days prior to the then-existing date set forth in clause (i) of the definition of Maturity Date, elect to extend such date to the date that is 2 months after such then-existing date (the "Extended Maturity Date").(a)     Upon such election (the "Extension Effective Date"), subject to the satisfaction (or waiver by the Required Lenders) of each of the following conditions, the date set forth in clause (i) of the definition of Maturity Date shall be extended to the Extended Maturity Date:

(i)     The Borrower shall pay to the Administrative Agent, for the account of each Lender, a consent fee equal to 1.00% of the aggregate principal amount of the Initial Term Loans held by such Lender on the date of such extension, with such fee payable in kind in additional amounts of Initial Term Loans; and

(ii)     On and as of the Extension Effective Date, no Default or Event of Default shall have occurred and be continuing.

RLF1 28191414V.1

(b)    Notwithstanding anything to the contrary in this Section 2.24, the Borrower may extend the date set forth in clause (i) of the definition of Maturity Date no more than two times pursuant to this Section 2.24.

40.    Certain Capital Lease and Financing Agreements.    Notwithstanding anything herein to the contrary, this paragraph 40 applies to the rights and interests only of (i) 36th Street Capital Partners, LLC, (ii) Encina Equipment Finance SPV, LLC, (iii) Fifth Third Bank, N.A., (iv) Liberty Commercial Finance LLC, (v) Pathward, N.A. f/k/a Crestmark Equipment Finance, a division of MetaBank, National Association, (vi) De Lage Landen Financial Services, Inc. (vii) Caterpillar Financial Services Corporation and (viii) First-Citizens Bank & Trust Company (as successor-in-interest to CIT Bank, N.A.) (the "Capital Lease/Financing Agreement Parties").  Any Prior Senior Liens held by the Capital Lease/Financing Agreement Parties shall include any valid, perfected, and unavoidable Liens in equipment and other collateral (including, without limitation, the proceeds thereof), as well as any cross-collateralized security interests in such equipment and other collateral (including, without limitation, the proceeds thereof) pursuant to any lease agreement (to the extent that such lease agreement is not a Capital Lease,[5] as defined herein), Capital Lease, or equipment financing agreement, including, without limitation, valid, perfected, and unavoidable Liens on equipment or other collateral securing any advances under progress payment agreements and interim funding schedules utilized to finance the construction or manufacture of such equipment or other collateral that will be subject to lease agreements, Capital Leases, or equipment financing agreements.  Neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties may exercise any rights or remedies on account of any junior Liens in

---

[5]    For purposes of this paragraph 41, a "Capital Lease" means, with respect to any person, each lease (or other arrangement conveying the right to use) of personal property, which obligations are required to be classified, and accounted for, as a financing lease (and not, for the avoidance of doubt, as an operating lease) on a balance sheet of such person prepared in accordance with GAAP.

69

any equipment or other collateral (including, without limitation, the proceeds thereof) subject to Prior Senior Liens of any Capital Lease/Financing Agreement Parties until the earlier of (a) the Court, after notice to the Capital Lease/Financing Agreement Parties and an opportunity for such parties to object, granting the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable, authority to exercise such rights or remedies, or (b) such time as all obligations secured by such Prior Senior Liens are satisfied in full.

41.    Limited Objection of Certain SERP Participants [Docket No. 194] (the "SERP Objection").[6]  The Trust Fund (as defined in the Trust Agreement) shall continue to be held by the Trust subject to the terms of the Trust Agreement, unless and until any party in interest obtains entry of an order (the "Trust Termination Order"), upon the filing of a motion and after proper notice, directing the Trustee (as defined in the Trust Agreement) to transfer the Trust Fund to the Debtors.  The rights of the Movant[7] to object to entry of the Trust Termination Order on any grounds are reserved. Nothing herein shall be deemed to be a determination as to whether the Trust Fund is or is not property of the Debtors' estates.  Based on the foregoing, the SERP Objection is withdrawn without prejudice.

42.    Register. The Prepetition Agent may conclusively rely on the provisions of the Interim Order, this Final Order and the adjustments to the register to the DIP Credit Agreement (the "DIP Register") and register to the Prepetition Credit Agreement (the "Prepetition Register") provided (through counsel or otherwise) by the DIP Agent in adjusting the Prepetition Register to reflect the DIP Register, the Roll-Up and the Syndication.

---

[6]    Capitalized terms used in this paragraph 41 that are not otherwise defined shall have the meanings given to them in the SERP Objection.

[7]    The Movant is defined collectively to include the following individuals: Arthur J. Blencowe Jr., Joseph Borzillo, Robert Carlisle, Anthony Cunningham, Paul Diaz, Michael W. Glowa, Carol Hamilton, John J. Hilbert, Keith A. Pyles, Bruce E. Roth, Jerry V. Schwab, and Terry Wagaman.

70

RLF1 28191414V.1

43.     Interim Relief. The Debtors are authorized to enter into and operate under each of the agreements with Specified Customers governing Interim Relief.

44.     Effect of this Final Order.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

45.     Retention of Jurisdiction.  The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

Dated: November 2nd, 2022
Wilmington, Delaware

MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

RLF1 28191414V.1